IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ROBERT C. BEVIS, and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation;<br><br>  Plaintiffs,<br><br>v.<br><br>CITY OF NAPERVILLE, ILLINOIS,<br><br>  Defendant. | Case No. 22-cv-04775 |

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

Plaintiffs submit the following Motion for Temporary Restraining Order and Preliminary Injunction against the City of Naperville, Illinois (the "City").

**Certificate**: Plaintiffs have conferred with counsel for Defendant. Defendant opposes this motion.

## INTRODUCTION

This action challenges the constitutionality of Chapter 19 of Title 3 of the Naperville Municipal Code (the "Ordinance"). The Ordinance bans the commercial sale of certain semi-automatic firearms of a type that are held by millions of law-abiding American citizens for lawful purposes. The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes. *D.C. v. Heller*, 554 U.S. 570, 627 (2008). "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use . . ." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). Thus, this provision of the Ordinance is unconstitutional. Accordingly, Plaintiffs hereby move

1

the Court to enter a temporary restraining order and a preliminary injunction enjoining the City from enforcing this unconstitutional provision of the Ordinance.

## NOTE REGARDING TIMING OF MOTION

The Ordinance goes into effect on January 1, 2023. Because the Ordinance was not currently in effect and thereby depriving them of their constitutional rights, Plaintiffs have not sought a TRO earlier. Since, however, the Ordinance will be effective in a few weeks, Plaintiffs are seeking a TRO at this time to prevent the Ordinance from going into effect.

## FACTS

1. Section 3-19-1 of the Ordinance defines the term "assault rifle." The term "assault rifle" as used in the Code is not a technical term used in the firearms industry or community for firearms commonly available to civilians. Brown Dec. ¶ 5. Instead, the term is a rhetorically charged political term[1] meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes. *Id*. Plaintiffs refuse to adopt the City's politically charged rhetoric in this Motion. Therefore, for purposes of this Motion, the term "Banned Firearm" shall have the same meaning as the term "assault rifle" in Section 3-19-1 of the Code.

2. Section 3-19-2 of the Ordinance states: "The Commercial Sale of Assault Rifles within the City is unlawful and is hereby prohibited." Section 3-19-3 of the Ordinance provides for substantial penalties for any violation of its provisions.

3. Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit membership and donor-supported organization qualified as tax-exempt under 26 U.S.C. § 501(c)(4).

---

[1] *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

Brown Dec. ¶2. NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms. NAGR has members who reside within the City. *Id*. NAGR represents the interests of its members who reside in the City. *Id*.

4. Plaintiff Robert C. Bevis is a business owner in the City and a law-abiding citizen of the United States. Bevis Dec. ¶¶ 1, 2.

5. Plaintiff Law Weapons, Inc. d/b/a Law Weapons & Supply ("LWI")is a duly registered Illinois corporation which operates in the City engaged in the commercial sale of firearms. Bevis Dec. ¶ 2. A substantial part of LWI's business consists of the commercial sale of firearms that will be Banned Weapons when the Ordinance goes into effect. Bevis Dec. ¶3.

6. Plaintiffs and/or their members and/or customers desire to exercise their Second Amendment right to acquire the Banned Firearms within the City for lawful purposes, including, but not limited to, the defense of their homes. Bevis Dec. ¶ 4; Brown Dec. ¶ 6. When the Ordinance becomes effective on January 1, 2023, Plaintiffs and/or their members and/or customers will be prohibited from exercising their Second Amendment rights in this fashion. Bevis Dec. ¶ 5; Brown Dec. ¶ 7.

7. The ban applies to licensed gun sellers, but not private sales by unlicensed parties. Bevis Dec. ¶ 6.

7. At least 20 million semi-automatic firearms such as those defined as "assault rifles" are owned by millions of American citizens who use those firearms for lawful purposes. Declaration of James Curcuruto ¶6. Mr. Curcuruto's declaration was originally submitted in *Rocky Mountain Gun Owners, et al. v. Town of Superior*, 22-CV-1685-RM. It is used with permission in this action.

**STANDARD FOR GRANTING TRO AND PRELIMINARY INJUNCTION**

The standard for issuing a temporary restraining order is identical to that governing the issuance of a preliminary injunction. *Mays v. Dart*, 453 F. Supp. 3d 1074, 1087 (N.D. Ill. 2020). To be entitled to preliminary relief, Plaintiffs must establish as a threshold matter: (1) they are likely to suffer irreparable harm in the absence of preliminary relief; (2) inadequate remedies at law exist; and (3) they have a reasonable likelihood of success on the merits. (3) the balance of the equities tips in their favor. *Whitaker v. Kenosha Unified School District,* 858 F. 3d 1034, 1044 (7th Cir. 2017). If the movant successfully makes this showing, the court must engage in a balancing analysis, to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests. *Id., Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017), *citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In a case involving an alleged violation of a constitutional right, the likelihood of success on the merits will often be the determinative factor. *Id.*, *citing Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012).[2] That is because even short deprivations of constitutional rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional. *Id*. So "the analysis begins and ends with the likelihood of success on the merits" of the constitutional claim. *Id.*, *citing Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013).

---

[2] *Higher Soc'y of Indiana* was a First Amendment case, but that difference does not matter, because in *Bruen*, *infra*, the Supreme Court held that Second Amendment rights should be protected in the same way First Amendment rights are protected. *Id*., 142 S. Ct. at 2130.

4

In *Ezell v. City of Chicago*, 651 F.3d 684, 997 (7th Cir. 2011), the Court equated the standard for obtaining a preliminary injunction in the Second Amendment context with the standard for obtaining that relief in a First Amendment case. Also in *Ezell*, the Court granted preliminary relief against a Chicago ordinance which *inter alia* prohibited commercial activity found to be protected by the Second Amendment. Namely, the ordinance prohibited all shooting galleries, firearm ranges, or any other places where firearms are discharged.

### THE GOVERNMENT BEARS THE BURDEN OF DEMONSTRATION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court unambiguously placed on the government a substantial burden of demonstrating that any law seeking to regulate firearms is consistent with this Nation's historical tradition of firearm regulation.[3] Specifically, the Court stated:

> "To support that [its claim that its regulation is permitted by the Second Amendment], the burden falls on [the government] to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct."

*Bruen*, 142 S. Ct. at 2135.

In this case, the Second Amendment's plain text covers Plaintiffs' conduct in seeking to acquire and/or sell bearable arms. *Bruen*, 142 S. Ct. at 2132 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms"). *Ezell* also makes clear commercial activity related to the right to keep and bear arms is as much protected by the Second Amendment as is the right to possess and carry firearms. Accordingly, Plaintiffs' conduct is **presumptively**

---

[3] "Significantly, the plaintiff need not demonstrate the absence of regulation in order to prevail; the burden rests squarely on the government to establish that the activity has been subject to some measure of regulation." *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 415 (7th Cir. 2015) (Manion, J., dissenting).

5

protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2126 ("when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"). The government may attempt to rebut that presumption by demonstrating that its law is consistent with this Nation's historical tradition of firearm regulation. If the government attempts to meet that burden in its response, Plaintiffs will have an opportunity to submit rebuttal evidence in their reply.

## ARGUMENT

**I.  The Supreme Court has Reaffirmed the *Heller* Standard**

**A.  A Regulation Burdening the Right to Keep and Bear Arms is Unconstitutional Unless it is Consistent with the Text of the Second Amendment and the Nation's History and Traditions**

In *Bruen*, the Court rejected the two-part balancing test for Second Amendment challenges that several courts of appeal adopted in the wake of *Heller* and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010). Instead, it reiterated the *Heller* standard, which it summarized as follows:

> "Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."

*Bruen*, 142 S. Ct. at 2126 (internal quotation marks omitted).

The *Bruen* court spent significant time describing how lower courts are to proceed in Second Amendment cases. As particularly relevant here, *Bruen* described the proper analysis of the term "arms." That word, *Bruen* affirmed, has a "historically fixed meaning" but one that

"applies to new circumstances." *Id.* at 2132. It thus "covers modern instruments that facilitate armed self-defense." *Id.*, *citing Caetano v. Massachusetts*, 577 U.S. 411, 411—412 (2016) *(per curiam)* (stun guns). Accordingly, the text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*.

The Court then explained that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Id*. In considering history, courts are to engage in "reasoning by analogy." *Id*. This analogical reasoning requires the government to identify a well-established and representative historical analogue to the challenged regulation. *Id*. at 2133. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the Court today. *Id*. at 2132. Two metrics are particularly salient in determining if a historical regulation is relevantly similar: [1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense. *Id*. at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a modern-day regulation is analogous enough to historical precursors that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id*.

As noted above, the Court held that the judicial balancing of means and ends pursuant to intermediate scrutiny review plays no part in Second Amendment analysis. "*Heller* does not support applying means-end scrutiny." *Id*., 142 S. Ct. at 2127; *see also Id*., 142 S. Ct. at 2129 (inquiry into the statute's alleged "salutary effects" upon "important governmental interests" is not part of the test).

7

**B.     Only the Sale of "Dangerous and Unusual Arms" Can be Banned Consistent with Our History and Tradition**

This case involves a blanket prohibition on the commercial sale of a class of arms. Both *Bruen* and *Heller* identified only one aspect of the nation's history and tradition that is sufficiently analogous to – and therefore capable of justifying – such a ban: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons" that are not "in common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of arm is in common use, there is, by definition, no historical tradition of banning its sale. Thus, for the type of restriction at issue in this case, the Court has already analyzed the relevant historical tradition and established its scope: the sale of "dangerous and unusual" weapons may be subject to a blanket ban, but the sale of arms "in common use at the time" may not be. *Id*.

The *Heller* test is based on historical practice and "the historical understanding of the scope of the right," but with reference to modern realities of firearm ownership. *Heller*, 554 U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. "). In summary, in the context of blanket bans on the sale of bearable arms, the Supreme Court has already done the historical spadework, and the only restrictions of this kind that it has deemed consistent with the historical understanding of the right to keep and bear arms are restrictions limited to dangerous and unusual arms that are not in common use.

This Court's task is therefore a simple one: it merely must determine whether the arms the sale of which is banned are "dangerous and unusual." Importantly, this is a "conjunctive test: A weapon may not be banned unless it is both dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., *concurring*). An arm that is in common use for lawful purposes is, by definition, not

8

unusual. Such an arm therefore cannot be both dangerous and unusual and therefore cannot be subjected to a blanket ban. *Bruen*, 142 S. Ct. at 2143*; Heller*, 554 U.S. at 629.

To determine whether an arm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people nationwide, not just, say, in this State. *See id*. at 2131 ("It is this balance – struck by the traditions of the American people – that demands our unqualified deference."); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420 (Alito, J., *concurring*) ("stun guns are widely owned and accepted as a legitimate means of self-defense across the country"). Therefore, the Second Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms from outlier legislation (like the City's ban here) just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions.

Furthermore, courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several reasons that a citizen may prefer a handgun for home defense, the Court held that "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id*., 554 U.S. at 629. The Court reaffirmed that the traditions of the American people, which includes their choice of preferred firearms, demand the courts' "unqualified deference." *Id*., 142 S. Ct. at 2131.

As set forth below, the Banned Firearms are "typically possessed by law-abiding citizens for lawful purposes." Under *Heller* and *Bruen*, that is the end of the analysis. The Second

Amendment does not countenance a complete prohibition on the commercial sale of one of the most popular weapons chosen by Americans for self-defense in the home. *Id*., 142 S. Ct. at 2128.

Finally, the Second Amendment inquiry focuses on the choices commonly made by contemporary law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *Id*. at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that arms protected by the Second Amendment need not have been in existence at the time of the Founding. 577 U.S. 411-12, *quoting Heller*, 554 U.S. at 582. The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id*. And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

**II.      The City's Prohibition on the Sale of Banned Firearms is Unconstitutional**

    **A.      Introduction**

Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen*, 142 S. Ct. at 2126. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. Here, the Second Amendment's plain text covers the Banned Firearms, so it falls to the City to attempt to justify its law as consistent with historical tradition rooted in the Founding. It cannot possibly do so, because the Banned Firearms

are commonly possessed by law abiding citizens, and *Bruen* has already established that, by definition, there cannot be a tradition of banning the sale of an arm if it is commonly possessed.

## B. The Banned Firearms are in Common Use

This case thus reduces to the following, straightforward inquiry: are the arms the commercial sale of which is banned by the City in "common use," according to the lawful choices by contemporary Americans? They unquestionably are. There is no class of firearms known as "assault rifle." "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." *Stenberg v. Carhart*, 530 U.S. 914, 1001 (2000) at n. 16 (Thomas, J., dissenting). But while "assault rifle" is not a recognized category of firearms, "semiautomatic rifle" is. And it is semiautomatic rifles that the City's "assault rifle" ban targets. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic rifle, a semiautomatic rifle will not fire continuously on one pull of its trigger; rather, a semiautomatic rifle requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 (1994) at n. 1.

There is therefore a significant practical difference between a truly automatic and a merely semiautomatic rifle. According to the United States Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. Dept. of the Army, RIFLE MARKSMANSHIP: ML6-/M4-SERIES WEAPONS, 2-1 tbl. 2-1 (2008), available at https://bit.ly/3pvS3SW.

There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles. The Supreme Court has held as much. In *Staples,* it concluded that semiautomatics, unlike

11

machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTMP. L. 381, 413 (1994).

In contrast to this long history of legal ownership of semi-automatic rifles, the first "assault weapon" ban was not enacted until California did so in 1989, a full 200 years after the Constitution became effective. Obviously, that is far too late to demonstrate anything about the original meaning of the Second or Fourteenth Amendment, no matter which is the relevant historical reference point. *Bruen*, 142 S.Ct. at 2126 (cautioning against giving post enactment history more weight than it can rightly bear). Even today, the vast majority of states (42 out of 50)[4], do not ban semiautomatic weapons that would be deemed "assault rifles" under the law at issue in this action.[5]

Thus, there is no historical tradition of banning semi-automatic firearms. This is borne out by the fact that millions of law-abiding citizens choose to possess firearms in that category. *Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133, 1147 (9th Cir. 2020) ("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows that "millions" are owned); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255

---

[4] The federal government banned semi-automatic rifles from 1994 to 2004 when Congress allowed that law after the Justice Department concluded that it produced "no discernible reduction" in gun violence. Christopher S. Koper, Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms, 19 Crim'y & Pub. Pol'y 96 (2020).

[5] The bans and the year each was enacted are: CAL. PENAL CODE §§ 30600, 30605 (**1989**); N.J. STAT. §§ 2C:39-5(f), 2C:39-9(g) (**1990**); HAW. REV. STAT. § 134-8(a) (**1992**); CONN. GEN. STAT. § 53-202c (**1993**); MD. CODE ANN., CRIM. LAW §§ 4-301, 4-303 (**1994**); MASS. GEN. LAWS ch. 140, § 131M (**1994**); N.Y. PENAL LAW §§ 265.02(7), 265.10(1)-(3) (**2000**); 11 DEL. CODE § 1466 (**2022**).

(2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'").

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009); *see also Duncan v. Becerra* ("*Duncan III*"), 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019).

This issue was addressed in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen*, *supra*. In his dissent (which, after *Bruen*, likely represents the correct interpretation of the law), Judge Traxler stated:

> "It is beyond any reasonable dispute from the record before us that a statistically significant number of American citizens possess semiautomatic rifles (and magazines holding more than 10 rounds) for lawful purposes. Between 1990 and 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were manufactured in or imported into the United States. In 2012, semiautomatic sporting rifles accounted for twenty percent of all retail firearms sales. In fact, in 2012, the number of AR- and AK- style weapons manufactured and imported into the United States was more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150. In terms of absolute numbers, these statistics lead to the unavoidable conclusion that popular semiautomatic rifles such as the AR-15 are commonly possessed by American citizens for lawful purposes within the meaning of *Heller*."

*Id*., 849 F.3d at 153, Traxler, J. dissenting (internal citations and quotation marks omitted).

Today, the number of AR-rifles and other modern sporting rifles in circulation in the United States exceeds twenty-four million. The Firearms Industry Trade Ass'n, *Commonly*

13

*Owned: NSSF Announces Over 24 Million MSRS in Circulation*, (July 20, 2022), available at https://bit.ly/3pUj8So.[6]

According to industry sources, as of 2018, roughly thirty-five percent of all newly manufactured guns sold in America are modern semiautomatic rifles, Bloomberg, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, FORTUNE (June 20, 2018), available at https://bit.ly/3R2kZ3s, and an estimated 5.4 million Americans purchased firearms for the first time in 2021. The Firearms Industry Trade Ass'n, *NSSF Retailer Surveys Indicate 5.4 million First-Time Gun Buyers in 2021,* (Jan. 25, 2022), available at https://bit.ly/3dV6RKI. In fact, a recent survey of gun owners estimated that 24.6 million Americans have owned AR-15 or similar rifles. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), available at https://bit.ly/3yPfoHw .

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes. In a 2021 survey of 16,708 gun owners, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English, *supra*, at 33-34. This is consistent with the findings of an earlier 2013 survey of 21,942 confirmed owners of such firearms, in which home-defense again followed (closely) only recreational target shooting as the most important reason for owning these firearms. *See also Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014), *aff'd* 784 F.3d 406 (7th Cir. 2015). "An additional survey estimated that approximately 11,977,000 people participated in target shooting with a modern sporting rifle." *Id*. Indeed the "AR-15 type rifle . . . is the leading type of firearm used in national matches and in other matches sponsored by the congressionally established

---

[6] *See also* Declaration of James Curcuruto ¶ 6 ("At least 20 million semi-automatic firearms such as those defined as "assault rifles" are owned by millions of American citizens who use those firearms for lawful purposes."

Civilian Marksmanship program." *Shew v. Malloy*, 994 F. Supp. 2d 234, 245 n.40 (D. Conn. 2014).

The fact that "assault" rifles are used extremely rarely in crime underscores that AR-15s and other Banned Firearms are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'" Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997). This conclusion is borne out by FBI statistics. In the five years from 2015 to 2019 (inclusive), there were an average of 14,556 murders per year in the United States. On average, rifles of all types (of which so-called "assault rifles" are a subset) were identified as the murder weapon in 315 murders per year. U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V. By way of comparison, on average 669 people are murdered by "personal weapons" such as hands, fists and feet. *Id*. According to the FBI, a murder victim is more than twice as likely to have been killed by hands and feet than by a rifle of any type.

Even in the counterfactual event that a modern semiautomatic rifle had been involved in each rifle-related murder from 2015 to 2019, an infinitesimal percentage of the approximately 24 million modern sporting rifles in circulation in the United States during that time period –around .001 percent – would have been used for that unlawful purpose. More broadly, as of 2016, only 0.8 percent of state and federal prisoners reported using any kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates*, 2016, U.S. DEPT OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), available at https://bit.ly/31VjRa9

Finally, the Supreme Court's decision in *Caetano* further confirms that the arms the sale of which is banned by the City are in common use. That case concerned Massachusetts's ban on the possession of stun guns, which that state's highest court had upheld on the ground that such weapons are not protected by the Second Amendment. *Id*., 577 U.S. at 411. In a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id*. at 411-12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, Justice Alito filed a concurring opinion expressly concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id*. at 420 (Alito, J., concurring) (cleaned up) (citation omitted). If hundreds of thousands" of arms constitute wide ownership, *a fortiori* so does the tens of millions of semiautomatic rifles sold to private citizens nationwide.

The Massachusetts court got the message. In a subsequent case, that court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the State to rebut the prima facie presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019). This reasoning is sound, and it necessarily entails the invalidity of the City's blanket ban, which restricts arms that are many times more common than stun guns.

### III. *Illinois Ass'n of Firearms Retailers* Controls

In *Bruen*, the Court held that when the Second Amendment covers an individual's conduct, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation in order for it to be valid. *Bruen*, 142 S. Ct. at 2126. In this regard, this Court has already held that flat prohibitions on the sale of firearms are not supported by this nation' history and traditions. In *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014), this Court invalidated an ordinance banning the commercial sale of firearms. It stated:

> Although the City argues that 'state bans of the sale of even popular and common arms stretch back nearly 200 years,' [] the only historical support that it musters are three statutes from Georgia, Tennessee, and South Carolina banning the sale, manufacture, and transfer of firearms within their borders. *See* [] Georgia Act of Dec. 25, 1837, ch. 367, § I; [] Tennessee Act of Mar. 17, 1879, ch. 96, § 1 [], South Carolina Act of Feb. 20, 1901, ch. 435, § 1. But these isolated statutes were enacted 50 to 110 years after 1791, which is 'the critical year for determining the amendment's historical meaning.' *Moore*, 702 F.3d at 935. These statutes are thus not very compelling historical evidence for how the Second Amendment was historically understood. And citation to a few isolated statutes – even to those from the appropriate time period – 'fall[ ] far short' of establishing that gun sales and transfers were historically unprotected by the Second Amendment. *Ezell*, 651 F.3d at 706. **The City's proffered historical evidence fails to establish that governments banned gun sales and transfers at the time of the Second Amendment's enactment**, so the Court must move on to the second step of the inquiry.

*Id.*, 961 F. Supp. 2d at 937 (emphasis added). Accordingly, the Court entered an injunction against enforcement of the prohibition on commercial sales.

It does no good for the City to argue that its residents could acquire the Banned Firearms in other cities. This Court rejected this argument in *Illinois Ass'n of Firearms Retailers*. It stated:

> The City argues in response that these ordinances do not ban acquisition, but merely regulate where acquisition may occur. [] It is true that some living on the outskirts of the City might very well currently live closer to gun stores now than they would absent these ordinances. But *Ezell* makes clear that this type of argument 'assumes that the harm to a constitutional right is measured by the extent to which it can be

17

> exercised in another jurisdiction. That's a profoundly mistaken assumption.' 651 F.3d at 697. It was no answer there that plenty of gun ranges were located in the neighboring suburbs, or even right on the border of Chicago and the suburbs. Instead, the Seventh Circuit drew on First Amendment jurisprudence to reason that Second Amendment rights must be guaranteed within a specified geographic unit – be it a city or a State. *See id*. ('In the First Amendment context, the Supreme Court long ago made it clear that 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'' (*quoting Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76–77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981)).

*Id*., 961 F. Supp. 2d 928, 938–39.

This Court's holding in *Illinois Ass'n of Firearms Retailers* is consistent with the Supreme Court's analysis in *Bruen*. In *Bruen* the Court cited with approval the case of *Drummond v. Robinson*, 9 F.4th 217, 226 (3rd Cir. 2021). *Id*. 142 S. Ct. at 2133. In *Drummond*, the Third Circuit held that a city's ordinance prohibiting the operation of a commercial gun club was an "outlier" and thus not supported by the nation's history or tradition of firearms regulation. 9 F.4th at 232.

In summary, millions of law-abiding citizens own and use for lawful purposes semi-automatic firearms such as the Banned Firearms the sale of which will be banned by the Ordiannce. The Ordinance's prohibition on the sale of the Banned Firearms is an historical outlier. Therefore, by definition, the Ordinance is not consistent with the nation's history and tradition of firearm regulation. Accordingly, the Ordinance violates the Second Amendment. As such, Plaintiffs are likely to succeed on the merits of their claims. "A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, he must only show that his chances to succeed on his claims are "better than negligible." *Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir. 1999). This is a low threshold." *Whitaker,* at 1046.

Banning the sale of the Banned Firearms will cause irreparable harm to LWI and the citizens of Naperville who will be unable to purchase Banned Firearms in Naperville. Harm is considered irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Girl Scouts of Manitou Council, Inc.,* 549 F.3d at 1089, *quoting Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th Cir. 1984. And it is no remedy to say businesses selling Banned Firearms can simply relocate outside of Naperville. See *Ezell*, *supra* at 697.

Moreover, since the harm is prospective in nature, Plaintiffs and others similarly situated have no adequate remedy at law, as any such award "would be 'seriously deficient as compared to the harm suffered.'" *Whitaker*, at 1046 (citations omitted).

Accordingly, the balance of harms favors Plaintiffs. "Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1100 (7th Cir. 2008); *see also Turnell v. CentiMark Corp.,* 796 F.3d 656, 662 (7th Cir. 2015). This is done on a "sliding scale" measuring the balance of harms against the moving party's likelihood of success. *Turnell,* 796 F.3d at 662. The more likely he is to succeed on the merits, the less the scale must tip in his favor. *Id.*" *Whitaker*, at 1054. As established above, Plaintiffs are eminently likely to succeed on the merits, especially in light of *Bruen*. As such the balance of harms favors granting injunctive relief to Plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to enter a preliminary injunction enjoining the City from enforcing the Ordinance.

Respectfully submitted this 18th day of November 2022.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com
*Admitted Pro Hac Vice*

Jason R. Craddock
Attorney at Law
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(773) 777-4440
cradlaw1970@gmail.com or craddocklaw@icloud.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 18, 2022, he filed the foregoing via the Court's CM/ECF system which caused service to be effected on the following counsel of record:

Christopher Wilson
Perkins Coie LLP
110 North Wacker, Suite 3400
Chicago, IL 60606-1511
CWilson@perkinscoie.com


*/s/ Barry K. Arrington*

_____

Barry K. Arrington*