```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                              EASTERN DIVISION

3   ROBERT C. BEVIS, et al.,          )   Docket No. 22 C 04775
                                      )
4                   Plaintiffs,       )   Chicago, Illinois
                                      )   November 21, 2022
5            v.                       )   12:30 p.m.
                                      )
6   CITY OF NAPERVILLE, ILLINOIS, a   )
    municipal corporation,            )
7                                     )
                    Defendant.        )
8

9            TRANSCRIPT OF PROCEEDINGS - Motion Hearing
              BEFORE THE HONORABLE VIRGINIA M. KENDALL
10

    APPEARANCES:   (Via Videoconference)
11
    For the Plaintiffs:      ARRINGTON LAW FIRM by
12                           MR. BARRY KEVIN ARRINGTON
                             3801 East Florida Avenue, Suite 830
13                           Denver, CO  80210

14                           LAW OFFICE OF JASON R. CRADDOCK by
                             MR. JASON R. CRADDOCK SR.
15                           2021 Midwest Road, Suite 200
                             Oak Brook, IL  60523
16

17  For the Defendants:      PERKINS COIE LLC by
                             MR. CHRISTOPHER B. WILSON
18                           MR. GABRIEL TONG
                             MS. MICAELA SNASHALL
19                           MR. OLIVER G. SERAFINI
                             MR. DANIEL T. BURLEY
20                           110 North Wacker Drive, Suite 3400
                             Chicago, IL  60606
21

22  Also Present:            Mr. Philip Bangle, Brady Center

23  Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Room 2504
                             Chicago, IL 60604
25                           312.435.6047
                             gayle_mcguigan@ilnd.uscourts.gov
```

1          (Proceedings heard via videoconference.)

2               THE CLERK:  Good afternoon.  Court resumes session.

3               Case number 22 C 4775, Bevis versus City of

4    Naperville.

5               Please introduce yourself, starting with plaintiffs'

6    counsel.

7               THE COURT:  You're on mute, sir.

8               MR. ARRINGTON:  Barry Arrington appearing on behalf of

9    plaintiffs.

10              Joining me today is Jason Craddock.

11              MR. CRADDOCK:  Jason Craddock for plaintiffs.

12              THE COURT:  Good morning.

13              MR. WILSON:  Good morning, Judge Kendall.  This is

14   Chris Wilson for the City of Naperville.

15              I also have several members of my firm on.

16              And also Phil Bangle from the *Brady* Center is on as

17   well.

18              THE COURT:  Why don't you introduce anybody who might

19   be working on the case with you from your firm.

20              MR. WILSON:  Sure, be glad to.  Thank you, your Honor.

21              Daniel Burley is on, Micaela Snashall, Oliver

22   Serafini, and Gabriel Tong also on, from Perkins Coie.

23              THE COURT:  Thank you.  Good morning.

24              All right, folks.  I got your TRO.  Of course, I've

25   read it.  And now is the time for you to argue it.

1    So will it be you, Mr. Arrington, or Mr. Craddock?

2    MR. ARRINGTON:  That will be me, your Honor.  Thank

3    you.

4    THE COURT:  Okay.  You may start.

5    MR. ARRINGTON:  Thank you.

6    This action challenges the constitutionality of

7    Chapter 19, Title 3, of the Naperville Municipal Code, which is

8    a complete ban on the sale of certain modern sporting rifles,

9    which they (indiscernible) call assault weapons, which is not

10    an actual category of weapons, as we make clear in our

11    pleadings. (indiscernible) most popular rifle --

12    THE COURT:  Hold on.

13    So the court reporter, she just stopped, so she must

14    not have heard one thing.

15    So go ahead, Gayle, and tell him what it was.

16    COURT REPORTER:  The last I heard was "which is not an

17    actual category of weapons, as we make clear in our pleadings."

18    MR. ARRINGTON:  I'm sorry.  Am I speaking too fast?

19    THE COURT:  It might be.  I think if you slow down, if

20    there's ever any technical glitches, we tend to be able to pick

21    up the sound better, so just take it nice and slow.

22    MR. ARRINGTON:  I will endeavor to do so.

23    So the assault -- what they call assault weapons is

24    not an actual category of weapons recognized in the firearms

25    industry or community.  They are, in fact, banning modern

1    sporting rifles, including some of the most popular rifles in

2    the market today.  Literally tens of millions are held by

3    law-abiding citizens in the United States.

4            So they are not banning the possession of modern

5    sporting rifles.  They are banning the commercial sale of

6    modern sporting rifles.

7            Now, that's also a Second Amendment burden, as *Ezell*

8    makes clear, where it says "The right to possess firearms

9    implies a corresponding right to acquire firearms."  That's

10   *Ezell*, 651 F.3d at 684.

11           So we had a burden on a Second Amendment right.

12   That's the initial starting point in this case.

13           We had very recent Supreme Court guidance with the

14   courts on how to analyze such burdens.  And the Supreme Court's

15   guidance really couldn't be more plain or, in fact, more

16   simple.  It sets out the process where there is a burden on a

17   Second Amendment right, that burden is presumptively

18   unconstitutional unless the government can prove that the

19   burden is in accordance with the nation's tradition of firearm

20   regulation going back to the founding.

21           So it's a two-step process.  The burden is on the

22   government to show that its regulation is consonant with the

23   historical tradition of firearm regulation.

24           So if we did nothing more, your Honor, than come in

25   today and say there's a burden on the Second Amendment right,

1    and the government didn't carry or attempt to carry its burden

2    of showing that that burden on the Second Amendment right is

3    consonant with the nation's history of firearm regulation, we

4    win.  It's not on us to show the negative, that it's not

5    consonant with the tradition.  It's on them to show the

6    positive that it is.

7              So, here, we had a slapped ban on the sale of the most

8    popular rifle in America.  It's presumptively unconstitutional.

9    And one of the ways that *Heller* and *Bruen* said that such a ban

10   might be justified is to show that the historical tradition

11   that weapons, an analogous weapon, had been banned as dangerous

12   and unusual.

13             Now, all firearms are dangerous.  And the other

14   thing -- so it's not just dangerous.  It's dangerous and

15   unusual.  It's a conjunctive test, as the Court has made clear.

16   You have to show both of those things.

17             Well, when you have a weapon that is out there in

18   the -- in literally the tens of millions, as our expert

19   declaration has shown, the City is not going to be able to show

20   that it's unusual.  As a matter of fact, it is usual.  And they

21   haven't even attempted to show that.  Obviously, they can't.

22             And so I would -- since this is a relatively simple

23   case, my affirmative case is going to be somewhat truncated.

24             But what I would do, your Honor, at this time is point

25   the Court to a case that we cite, *Illinois Association of*

1    *Firearms Retailers*.  That's 961 F. Supp. 2d 928.  And I'm going

2    to quote something from that.  It's on page 934.  And it

3    begins, "The first step is to conduct a historical inquiry into

4    the scope of the Second Amendment right as it was understood in

5    1791, when the Bill of Rights was ratified, for federal law or

6    in 1868, when the Fourteenth Amendment was ratified, for state

7    and local law.  Your Honor, that's the *Bruen* test.  Step one in

8    *Illinois Association* is the *Bruen* test.

9              THE COURT:  Hold on.  May I ask a question?

10             But *Friedman* was decided after that, right?  So what

11   do you do with the *Friedman* analysis then?

12             MR. ARRINGTON:  So if I can finish up with *Illinois

13   Association*, I will then turn to *Friedman*, because -- in a

14   couple minutes.  Is that okay, your Honor?

15             THE COURT:  That's fine.

16             MR. ARRINGTON:  Okay.  So, now, *Illinois Association*,

17   you are to apply the second part of the two-step analysis.  But

18   in *Bruen*, the Court said that the second two-step analysis is

19   one step too many.  You stop at the first step.

20             And if the government can't show that the burden is

21   consonant with the firearm tradition going back to the

22   founding, then that's done.

23             And *Illinois Association*, applying this first step,

24   which is the test now, the Court said, on page 937, that City

25   of Chicago just utterly failed to present any analogous

1    regulation -- historical analysis regulations to support its

2    analysis under the first step.

3          So, basically, *Illinois Association of Firearms*, which

4    is the reason that we cited it, applied the *Bruen* test, got it

5    right, and said there is no historical analogue for banning the

6    sale -- commercial sale of these weapons.

7          Now, of course, the defendant has raised *Friedman*.

8    *Friedman* is obviously abrogated by *Bruen*.  I mean, I -- that's

9    just so completely obvious.  *Friedman* establishes a three-part

10   test.  All three of those parts are in direct conflict with the

11   *Bruen* test.

12         So what are the three-part tests that *Friedman*

13   establishes?

14         It says, one, were the banned weapons in common use at

15   the time of ratification.

16         In *Heller*, the Court said it borders on the frivolous

17   to suggest that the Second Amendment applies only to weapons

18   that were in common use at the time of the ratification.

19         THE COURT:  Can I -- can I stop you again and ask a

20   question?

21         Did you say because -- the court reporter pulled up --

22   I don't know if she heard the word.  Did you say that *Friedman*

23   was obviously abrogated by *Heller*?

24         MR. ARRINGTON:  I'm sorry, obviously abrogated by

25   *Bruen*.  I'm sorry.

1      THE COURT:  What case are you saying?

2      MR. ARRINGTON:  *Bruen*.  Supreme Court case in June.

3      THE COURT:  Got it, okay.  I thought you said *Heller*.

4  Never mind.

5      MR. ARRINGTON:  If I did, I misspoke.

6      THE COURT:  Okay.  Very well.

7      MR. ARRINGTON:  They're not abrogated by *Heller*

8  because it was post *Heller*.

9      THE COURT:  That's right.  That's what my next

10  question was going to be, but -- okay.  By *Bruen*.

11      MR. ARRINGTON:  Yes.

12      So the first step under *Friedman* is does the ban apply

13  to weapons that were in common use at the time of the

14  ratification.

15      And the Court has said -- and here I'm quoting

16  *Heller* -- that it's bordering on the frivolous, the argument

17  that only those arms in existence in the 18th Century are

18  protected.  That's 577 U.S. 582.

19      The second step in the *Friedman* analysis is those that

20  have some reasonable relationship to a well-regulated militia.

21      That's completely absent from the *Bruen* analysis.

22      The *Bruen* analysis is very simple and very

23  straightforward.  If there's a Second Amendment burden, the

24  government has to show that that burden is consonant with the

25  nation's history of firearm regulation.  Has absolutely nothing

1    to do with -- (indiscernible) -- set forth in *Bruen*, and

2    absolutely nothing to do with whether the weapon in question

3    was part of -- was used by any militia at any time.

4            And, finally, the third step is whether law-abiding

5    citizens retain adequate means of self-defense.  Again, utterly

6    irrelevant under *Bruen*.

7            Also -- and, again, that very issue was addressed in

8    *Heller* where the Court said -- (indiscernible) basically said

9    to the Court, well, we ban handguns, but they can use other

10   sorts of weapons.  The Court said not good enough.  The fact

11   that they have other weapons doesn't ratify the banning of a

12   particular weapon.

13           And so all three legs of the *Friedman* test run smack

14   into *Heller* and *Bruen* and in no sense does it continue to be

15   good law.

16           THE COURT:  Let me ask you -- first of all, do I have

17   jurisdiction right now to be working on this since the statute

18   has not been enacted yet?

19           MR. ARRINGTON:  So the statute has been enacted, and

20   it is -- it has a delayed effective date of January 1.  And so

21   what -- defendants actually bring this issue up, whether we

22   have to wait until we're actually losing sales before the Court

23   can give us relief.  Our position is that there's actual

24   controversy in front of the Court, and even the specter of

25   being put out of business is an injury, in fact, that the Court

1    can address with a preliminary injunction and a TRO.

2            THE COURT:  And do you -- have you provided me with

3    the information that shows that it is your number one sale or

4    the number one used gun in the United States for hunting?

5            MR. ARRINGTON:  That is in the briefs, your Honor.

6            THE COURT:  Well, it's argued, but have you given me

7    support for that?

8            MR. ARRINGTON:  Yes.

9            THE COURT:  Can you cite to it?  I've got -- I'm

10   looking at the ordinance.

11           Let me take a look at the exhibits, see if maybe I

12   don't have them all.  Let's see.

13           MR. ARRINGTON:  The AR-15, which is one of the weapons

14   that is banned, is the most popular semi-automatic rifle in

15   America.

16           And that's from *Heller II*.  "In recent years, it has

17   been the best-selling type of" -- I'm quoting from page 13 of

18   my brief.

19           THE COURT:  Okay.  So --

20           MR. ARRINGTON:  My --

21           THE COURT:  The most popular one comes from the *Heller*

22   case?  Is that what you're saying?

23           MR. ARRINGTON:  That's from the -- that's the

24   *Heller II* case.

25           And the -- I also cite (indiscernible) restrictions --

1          COURT REPORTER:  Excuse me, Mr. Arrington.  This is

2     the court reporter.

3          I did not understand what you said.  "The Heller II

4     case, and I also cite."

5          MR. ARRINGTON:  To a *Hastings Law Review* article,

6     *Hastings Law Journal* 1285, talking about how the AR-15 is

7     (indiscernible) --

8          THE COURT:  Is what?

9          MR. ARRINGTON:  Is very -- is a very popular weapon.

10         Finally, I cite *Kolbe versus Hogan*, the dissent, which

11    held -- which basically said that the AR-15 is held by millions

12    of people in the United States.  That's, again, on page 13.

13         And then, finally, I had provided the Court with a

14    declaration from an expert stating that there are over 20

15    million AR-15s in circulation in the country, which, by any

16    definition, would meet common use.

17         THE COURT:  Okay.  Anything else that you want to add?

18     I mean, I'll give you another shot, but -- oh, that was a bad

19    pun.

20         MR. ARRINGTON:  Another shot?

21         THE COURT:  Do you have anything else --

22         MR. WILSON:  Be careful, your Honor.

23       (Laughter.)

24         MR. ARRINGTON:  Well, the Court -- the defendant did

25    indicate that *Friedman* conducted the historical analysis

1    required by *Bruen*.  That's just not true.

2            *Friedman* did have a historical analysis, but it was a

3    historical analysis precluded by *Bruen*.  I'm talking about

4    whether the guns were banned -- were in popular use at the time

5    of the founding.

6            But that is all I have at the moment, your Honor.

7            THE COURT:  Okay.  Very well.

8            All right.  Let me turn to defense, please.

9            MR. WILSON:  Thanks so much, your Honor.

10           For the record, this is Chris Wilson on behalf of the

11    City of Naperville.

12           I wanted to respond by going back to each of the four

13    factors needed for injunctive relief:  Likelihood of success on

14    the merits; demonstration of irreparable harm; inadequate

15    remedy at law; and the balance of the hardships tipped in

16    favor, allegedly, of the plaintiffs.  And we submit that none

17    of those are met here.

18           I'd like to start with the first one, your Honor, the

19    likelihood of success on the merits.

20           I think, in many ways, this is a very easy case for

21    your Honor to rule against a temporary restraining order here

22    or further injunctive relief because the *Friedman* case is

23    absolutely the law and absolutely controlling here.

24           In *Friedman versus Highland Park*, the Seventh Circuit,

25    Judge Easterbrook writing for the majority made clear that the

1    Second Amendment does not extend to assault weapons.

2          And I know that Mr. Arrington objects to the use of

3    that term, but "assault weapons" have been defined by the

4    United States Congress in the Federal Weapon -- Assault Weapons

5    Ban of 1994.  They've been defined by states and municipalities

6    and counties covering, you know, nearly a hundred million

7    people.  The semi-automatic assault weapons of the type at

8    issue here have been banned all over the country, in the Ninth

9    Circuit, the Second Circuit, the DC Circuit, the First Circuit,

10   the Seventh Circuit.  This is something the courts have been

11   dealing with for more than a decade.

12          And in *Friedman*, Judge Easterbrook went through

13   exactly the type of historical analysis that said that these

14   are not the type of weapons that should enjoy or do enjoy

15   protection under the Second Amendment.

16          So Mr. Arrington and plaintiffs are really arguing

17   that somehow the *Bruen* case reversed that and that the *Friedman*

18   case is no longer good law or the *Shew versus Malloy* case or

19   the *Kolbe* case or the *Heller II* case or any of the cases are no

20   longer -- somehow no longer good law.  And I'd just like to

21   take you to the concurrence by Justice Alito that makes it

22   clear that no such thing happened.

23          Justice Alito, at page 2157 of the *Bruen* opinion,

24   noted that all that they were doing in *Bruen* was reviewing the

25   licensing framework of the State of New York and saying that to

1    the extent that *Heller -- Heller versus -- DC versus Heller*

2    opinion covered whether or not people had the right to a

3    handgun for self-defense in the home.  And *Bruen* now extended

4    that to the right to have a handgun for self-defense in public.

5            And this is the language I wanted to take you to at

6    2157, your Honor.  "That is all we decide.  Our holding decides

7    nothing about who may lawfully possess a firearm or the

8    requirements that must be met to buy a gun, nor does it decide

9    anything about the kinds of weapons that people may possess,

10   nor have we disturbed anything that we said in *Heller* or

11   *McDonald*."

12           For the record, I want to read that again.  "Nor does

13   it decide anything about the kinds of weapons that people may

14   possess."

15           So the idea that somehow the *Bruen* court overturned,

16   you know, a half a dozen Courts of Appeals' opinions banning

17   assault -- upholding bans on assault weapons just simply isn't

18   the case, nor could it be the case.

19           So I don't see -- particularly the *Friedman* case,

20   which didn't apply the means/ends test that was challenged in

21   *Bruen*.  If anything, it applied precisely the kind of

22   historical analysis that now is required under *Bruen*.

23           So there's a lot of heavy lifting to overturn

24   *Friedman*.  And I don't think that, with respect to the district

25   court, can just do that on her own.  That's got to be something

1    that the Seventh Circuit or really the Supreme Court overturns.

2    Currently, an assault weapons ban in the Seventh Circuit is --

3    is controlling law.

4            Beyond that, what was at issue with *Friedman* was a

5    complete ban on the possession, ownership, or sale of assault

6    weapons.  Here, we're talking about a much more narrow

7    restriction, a ban on commercial sale of these weapons.

8            So I don't know how they could leap from -- over

9    *Friedman* to say that, while *Friedman* had a ban on possession or

10   ownership of these weapons, that a more limited ban on

11   commercial sale of the weapon within the city limits would

12   violate the Second Amendment.

13           THE COURT:  So someone can buy an AR-15 and possess it

14   within the municipality, but they -- if they bought it outside

15   of the municipality?  Is that what you're saying?

16           MR. WILSON:  Right.  Or if they bought it at another

17   state or another county or if they bought it somewhere else.

18           The reason for that, your Honor, is because of the law

19   in Illinois.  There was a narrow window in 2013, a 10-day

20   window, in which any municipality could adopt a ban on assault

21   weapons.  Highland Park adopted the ban within that 10-day

22   window.  Evanston, Morton Grove, Cook County, the City of

23   Chicago, they all had pre-existing bans that were grandfathered

24   in.  And then the Village of Deerfield and others had adopted

25   regulation that later could be converted to a ban.  And that

1    was upheld by the Illinois courts.

2         But because the City of Naperville didn't act within

3    that 10-day window, either to impose regulations or to adopt a

4    ban, they were precluded by Illinois law from adopting a ban,

5    but they could restrict commercial sales consistent with that

6    law.

7         So that's why this is a more limited ordinance than

8    you would see in many other municipalities in Illinois because,

9    in light of the shooting on the 4th of July in Highland Park,

10   citizens of Naperville asked to do something, and this was --

11   this was the extent of what they could do, given the State of

12   Illinois law.

13        THE COURT:  And according to you, the AR-15 fits into

14   your definition of assault rifle at Section 2?  Is that

15   correct?  The one that says "semi-automatic rifle that has

16   fixed magazine with a capacity to accept more than ten rounds,"

17   that one?

18        MR. WILSON:  Correct, correct.  And the pistol grip

19   and some other elements of it.

20        THE COURT:  Okay.

21        MR. WILSON:  These -- to Mr. Craddock -- to

22   Mr. Arrington's point, this definition of "assault weapon" was

23   first -- it may have been in another state earlier, but it was

24   certainly recognized in the 1994 federal ban, and that

25   definition of "assault weapons" and "semi-automatic weapons"

1    with certain features and certain capabilities has been on the

2    books federally and in multiple states for, you know, almost 30

3    years now.  So the idea that Illinois -- it's too vague a

4    description or -- this is exactly -- the City of Naperville

5    worked from the ordinance the City of Highland Park had had

6    affirmed by the Seventh Circuit.  They worked from the

7    ordinance that the Village of Deerfield had confirmed by the

8    Illinois Supreme Court.  So this -- they're writing on a slate

9    that has been heavily written on before.

10           THE COURT:  So why do you say that *Bruen* didn't impact

11   that slate at all?

12           MR. WILSON:  Well, in part because they made clear

13   that this was a limited holding, that they're not attempting to

14   overturn existing laws other than those that apply the

15   means/ends test or applied some level of scrutiny that was

16   inconsistent with the holding of *Bruen*.

17           But where the Court has applied a historical analysis,

18   as they did in *Friedman*, and where it involves weapons beyond

19   handguns, there's nothing in *Bruen* that would address assault

20   weapons.  It is quite a reading of Bruen to say this

21   permitted -- this now constitutionally protects assault

22   weapons, which -- which no court has ever done.

23           What *Bruen* addresses is the use of handguns, like in

24   *Heller*, in public, to take them outside the home for

25   self-defense.

1          But to say that *Bruen* can be read to require -- not

2     just permit, but to require -- municipalities, states, to

3     permit assault weapons or large capacity magazines when

4     multiple jurisdictions have approved the ban on both of those,

5     there's just no way to read *Bruen* to get from A to B.

6          THE COURT:  *Bruen* was decided on summary judgment; is

7     that right?

8          MR. WILSON:  *Bruen* was a full record --

9          MR. ARRINGTON:  That's not true.  *Bruen* was -- on the

10    pleadings --

11         MR. WILSON:  That's correct, Mr. Arrington.  *Bruen*

12    was.

13         We would submit that in *Bruen*, it was a licensing

14    requirement at issue and whether or not the licensing -- the

15    requirement that they go to an extra step of showing a specific

16    need before receiving a firearms license in New York, that was

17    the restriction under review.  And there really wasn't a large

18    dispute about how it worked, as I recall.  Mr. Arrington may

19    know the facts of -- the underlying facts of *Bruen* better than

20    I do.

21         But we would submit here, in order to overturn

22    *Friedman*, we think you would need a full record, including

23    summary judgment, which is what was built in *Friedman*.

24         The plaintiffs there sought a preliminary injunction,

25    which Judge Darrah denied, but then he allowed the parties to

1    have expert discovery and develop a full record before deciding

2    on summary judgment.

3         So we think those facts are much, much more relevant

4    here where you say I'll allow -- in fact, our plan, your Honor,

5    was to answer the complaint rather than move to dismiss under

6    *Friedman* because, clearly, this is a test case.  This is a

7    case, a -- an attempt to use the holding in *Bruen* to permit

8    assault weapons, but we think that that deserves the

9    development of a full record and that it shouldn't be decided

10   here at the injunctive stage.

11        That said, at the injunctive stage that we're at,

12   there is no basis for the entry of a preliminary injunction.

13        Unless you had questions about the likelihood of

14   success on the merits -- and you may, as we go forward -- none

15   of the other three factors can be reached either.

16        The irreparable harm -- the limitation of commercial

17   sales has never been found to be irreparable harm.

18        And I agree, to the extent your Honor had questions

19   about it, it's just a conclusory statement in the -- Mr. -- one

20   of the plaintiffs' affidavits that this would put them out of

21   business, that there's no showing of the number of lost sales

22   or the profit from those lost sales or why the loss of those

23   profits would result in the end of its business.  Other

24   firearms certainly may continue to be sold.  Non-semi-automatic

25   rifles would continue to be sold.  So, there, the other parts

1    of the business would continue on.  It's just these things

2    covered by the ordinance and covered by a typical assault

3    weapons ban.

4          And I would submit that courts look at lost sales and

5    calculate the lost profits from lost sales all the time.  In

6    the event that there is found to be that the ordinance was, for

7    some reason, impermissible, it's the kind of things that courts

8    calculate every day in cases, contract cases, antitrust cases,

9    and all other kinds of cases.

10          Beyond that, I guess and along with that, there are

11   adequate remedies at law if they truly believe they were harmed

12   by the inability to sell these weapons.

13          In terms of the fourth factor, the balance of the

14   hardships -- I know the Court is well aware of the events over

15   the weekend and what happened in Colorado Springs.  But,

16   frankly, that happens all too often every week.  This was the

17   605th, I believe, mass-shooting incident this year, in Colorado

18   Springs.  And all too often these types of assault weapons are

19   used, and they're used to kill huge numbers of people in an

20   amazingly small amount of time.  And it's -- whether it's

21   Las Vegas or Sutherland Springs or the Pulse Nightclub or

22   Uvalde, the types of weapons that are banned by this ordinance

23   are all too often used in those mass-shooting events.  And

24   that's precisely the concern of the City of Naperville and why

25   citizens encouraged the City of Naperville to take action and

1    why they did.

2           So this one, the balance of the hardships, the balance

3    of the equities, it just overwhelmingly tips in favor of the

4    concerns of the citizens.

5           As *Friedman* held, Judge Easterbrook wrote, the right

6    to feel safer as a result of an ordinance is the reason why

7    people enact ordinances, why people have laws, is to feel safer

8    and to feel safety from these types of weapons.

9           So the hardships just tip enormously in favor of the

10   City of Naperville and the people of Naperville.

11          Unless you have further questions, I think that those

12   are the areas I wanted to hit.

13          I guess I would turn to the first one, because this is

14   a constitutional question, and *Friedman* has decided that

15   question for this Court.  Assault weapons, like those

16   identified in the ordinance, are not protected by the Second

17   Amendment.  It's Seventh Circuit law.

18          *Bruen* makes clear that it is not intended to overturn

19   any of the weapons like -- weapons laws like that.  In fact,

20   Justice Alito said in his concurrence that this does not

21   address what types of weapons are covered by the Second

22   Amendment.

23          So there's no basis in *Bruen* to claim that *Friedman* is

24   overturned and no longer good law.

25          So we would say that not only is there no likelihood

1    of success on the merits, but the law of the Seventh Circuit

2    makes clear that your Honor has to deny this motion for a

3    temporary restraining order.

4          I guess one final point.  This is -- we are just at

5    the TRO section here.  And there is no exigent circumstance

6    that requires the granting of injunctive relief.  This law goes

7    into effect January 1st.  It was passed many months ago.

8    Plaintiffs filed their case, their complaint, in September, so

9    they've had many weeks.  And to just declare a crisis on

10   November 18th is really inconsistent with how this law is about

11   to be implemented, the impact that the law would have, and the

12   traditional grounds for TROs, let alone preliminary injunction.

13         THE COURT:  So it was removed over to me, right?  Is

14   that correct?

15         MR. WILSON:  No.  This was filed in federal court.

16         THE COURT:  Oh, okay.

17         MR. WILSON:  It was not filed in state court

18   initially.  You are the lucky owner of this from day one --

19         THE COURT:  Okay, got it.

20         MR. WILSON:  -- Judge Kendall.

21         THE COURT:  All right.  Now, let me just ask a few

22   questions of Mr. Arrington.  And then, of course, sir, I'll

23   give you a reply.

24         You said originally that they don't even refer to

25   assault weapons or that the term "assault weapons" isn't

1    something that should be applied, and yet it does appear here

2    that we have a definition of the ordinance -- the ordinance has

3    the "assault rifle" definition.

4         Are you taking issue with the way that it is defined,

5    first and foremost?

6         MR. ARRINGTON:  No.  Your Honor, we don't dispute that

7    the ordinance actually applies to the weapons, for example, the

8    AR-15, the most popular rifle in America.  We just object to

9    the term "assault weapon" as a made-up political term rather

10   than a real firearm term.

11        THE COURT:  Oh, I get it.  Thank you for that

12   clarification.

13        What support have you provided me that would show, as

14   you mentioned, that if you were not allowed to sell these

15   AR-15s that you would be at risk of going out of business?

16        MR. ARRINGTON:  So --

17        THE COURT:  Is it the number of sales for your

18   business?  That's -- that's what I was asking for before when I

19   was looking for the exhibit supporting that, and then you

20   mentioned that the most popular weapon is the AR-15 from the

21   *Heller* case as a quote.  But what documentation have you given

22   me?

23        MR. ARRINGTON:  So we feel like we're being whipsawed

24   here, your Honor.  It's been suggested that we're filing this

25   too soon because the ordinance isn't in effect yet.  Then it

1    was suggested that we filed it too late because, you know, we

2    haven't -- we didn't file it immediately after.

3            Our reasoning on this was we have been in talks with

4    the City saying that this TRO was coming.  They're not

5    surprised by this.  From the very beginning, we said we're

6    going to file a TRO.  And they've had plenty of time to prepare

7    for that TRO.  And we had hoped that there would be a voluntary

8    stay because this is a constitutional matter.  That didn't

9    happen.  And so to suggest that there's some surprise here is

10    not accurate.

11            Now --

12            THE COURT:  I don't know if I heard -- I don't think I

13    heard him arguing that there was a surprise.  I'm really just

14    trying to get back to this issue of irreparable harm.

15            Can you -- aside from the gun ownership constitutional

16    value that you have addressed, what about this argument that

17    the sale -- the lack of sales would somehow put you out of

18    business?

19            MR. ARRINGTON:  So the -- we can't demonstrate lack of

20    sales now because the ordinance hasn't gone into effect yet.

21    We will be able to demonstrate, obviously, lack of sales after

22    it goes into effect.

23            But let me suggest this, your Honor.  It's a complete

24    red herring.  Complete red herring.  We do not have to

25    establish irreparable harm through establishing prospective

1    lost sales in January.

2              Here's how we establish irreparable harm.  You go to

3    the Seventh Circuit standard for granting TROs and preliminary

4    injunctions, which is the standard, where it says in cases

5    involving an alleged violation of a constitutional right, the

6    likelihood of success on the merits would be the determinative

7    factor.  And that's -- let me get you the cite on that, your

8    Honor.

9              That's *Higher Society of Indiana*, 858 F.3d.  Pin cite

10   is 1116.

11             Counsel suggested that we were trying to collapse this

12   TRO analysis into a single matter.  That's not what we did.

13   The Seventh Circuit did that as a constitutional case.  The

14   deprivation of constitutional rights, even for a minimum amount

15   of time, that's always been considered irreparable harm.  So

16   all we have to do is establish a likelihood of success on the

17   merits.  That automatically establishes irreparable harm.

18             And then when it comes to the second and third parts

19   of the test, the City has no interest, and you cannot balance

20   the equities.  The City has no interest in enforcing an

21   unconstitutional ordinance.  And it's never equitable to

22   enforce an unconstitutional order.  This is not the plaintiffs

23   making this up.  This is very clear Seventh Circuit --

24             THE COURT:  Right, and I don't disagree with you on

25   either of those points.

1    But are you arguing then that *Bruen* has essentially

2 wiped out all of the pre-*Bruen* cases regarding how things were

3 decided?  For example, the history-based language in *Friedman*,

4 every precedent that had the old step two, is -- are you saying

5 that is all overruled now?

6    MR. ARRINGTON:  *Bruen* specifically abrogated every

7 case that applied a two-step analysis to assault weapon bans.

8 And that's including all the cases that counsel mentioned that

9 have upheld assault weapon bans.  It specifically abrogated

10 those.

11    THE COURT:  Doesn't Alito say that it's not talking

12 about the kind of gun, though?

13    MR. ARRINGTON:  So all Alito is saying is that the

14 specific holding in *Bruen* as a New York statute isn't

15 constitutional.

16    In Thomas's controlling majority opinion, it's much,

17 much more sweeping.  You can't come away with -- so I --

18 frankly -- I was, frankly, astonished, astonished, when I read

19 the brief this morning and it was argued that *Bruen* didn't

20 really do much.  *Bruen* was a sea change in Second Amendment

21 law.  It was a specific reaction against practically all the

22 appellate cases that are essentially ignored in *McDonald*.

23    You can't come away from *Bruen* without the distinct

24 impression that Justice Thomas was offended by the way that

25 they essentially ignored the clear invocations of *Heller*, that

1    it's a historical test, end of story.

2           And so for counsel to say that it had no effect on

3    these assault weapon bans that were upheld, for example, in the

4    Fourth Circuit, no.  The *Kolbe* case was specifically abrogated,

5    by name, in *Bruen*.  That's just not true.

6           THE COURT:  But there's limiting language by Alito, as

7    I mentioned, as well as Kavanaugh, right?

8           So -- I'm just trying to understand if they didn't

9    come right out and say we are abrogating *Friedman*, and then we

10   have the other two justices talking about the types of guns in

11   their concurring opinions, how are you reaching the conclusion

12   that those different types of guns that they mentioned, that

13   that doesn't impact *Friedman* at all, *Friedman* is just gone?

14   Give me your insights on that.

15          MR. ARRINGTON:  So the reason *Friedman* is gone, it's

16   inconsistent with *Bruen*.  It's -- to say that *Friedman* is still

17   good law, you have to ignore *Bruen*.

18          And so the Seventh Circuit states in -- let me grab

19   this specific citation.

20          So I'm quoting from *Federal Trade Commission versus*

21   *Credit Bureau*.  That's 937 F.3d, pinpoint 767.  "*Stare decisis*

22   could not justify adherence to an approach that the Supreme

23   Court precedent forecloses*.*"  *Bruen* flatly forecloses the

24   approach taken in *Friedman*.

25          THE COURT:  Okay.  So then I guess maybe I'm hearing

1    two different arguments, and maybe it's me conflating them, so

2    you can help me.

3            The idea of the history, the historical tradition,

4    right?  I thought you were bringing up the fact that these

5    AR-15s are so popular and that they're the most owned weapon in

6    the United States, et cetera, that that was the historical

7    tradition of accepting this type of weapon.

8            But then you're saying essentially that *Bruen* got rid

9    of that two-part test.  And if it did, then did it get rid of

10   the history-based language in *Friedman*?  Is that what you're

11   saying?

12           MR. ARRINGTON:  I do apologize, your Honor.  The fact

13   that modern sporting rifles are in common usage precludes a

14   finding that there's a historical tradition of banning them,

15   categorically.  That's *Heller*.

16           THE COURT:  I see.

17           MR. ARRINGTON:  The fact that -- *Heller* said the fact

18   that handguns are the most popular method of self-defense in

19   the country precludes a finding that there's a historical

20   tradition banning them.

21           It's not our -- maybe I shouldn't have even gone there

22   because it's not our burden to prove there's no historical

23   tradition of banning these types of weapons.  It's the

24   government's burden -- very clear on this point -- it's the

25   government's burden to come in and show that there's historical

1  tradition of banning weapons analogous to these modern sporting

2  rifles.

3          Now, *Friedman* did, in fact, do a historical analysis,

4  but not the one called for by *Bruen*.  The historical analysis

5  done by *Friedman* was whether this would ban something that was

6  common in 1789.  That's not the analysis -- or, I'm sorry, was

7  whether these types of weapons were common in 1789.  That's not

8  the historical analysis that *Bruen* has said required.  As a

9  matter of fact, the *Friedman* analysis, is this something that

10 was common in 1789, is, in fact, foreclosed by *Heller*, which

11 says that you -- that this is not based upon something -- that

12 just because it wasn't a weapon that was common in 1789, that's

13 irrelevant to the constitutional inquiry.  That's the inquiry

14 that *Friedman* went into, and it's irrelevant under *Heller* and

15 *Bruen*.

16         THE COURT:  Under *Bruen*, the fact that there has been

17 a large number of sales but also a fairly strong number of

18 weapons bans, banning the type of weapon that is, as you called

19 it -- I forgot your term for it -- sporting --

20         MR. ARRINGTON:  Modern sporting rifle.

21         THE COURT:  -- modern sporting rifle, I mean, they're

22 kind of coming hand-in-hand.  They haven't been around that

23 long, but they've been around long enough to get a number of

24 bans in place.

25         How does that play out with your analysis of the way

1    *Bruen* versus *Friedman* analyzed the case?

2         MR. ARRINGTON:  Excellent question, your Honor.

3         And the answer is that the ban on the modern sporting

4    rifle, this type of thing is a product that relates to the 20th

5    Century.  They actually started in about 1989, so more than 200

6    years after the founding.  And so that's way too late to

7    establish an historical tradition.

8         So what about -- what does *Bruen* say?

9         Obviously, these types of weapons were not in

10   existence in 1789 or in the 19th Century when the Fourteenth

11   Amendment, so the *Bruen* case, the government's burden is to

12   show that analogous weapons, analogous weapons, were being

13   banned at the time of the founding or the ratification.  And

14   there is -- the government has an obligation to show that

15   analogous weapons were being banned at that time.  Not these

16   precise weapons, but analogous weapons.

17        It hasn't even begun to show that.  Hasn't even

18   attempted to show that.  We win.

19        It's just that clear.  The government hasn't attempted

20   to carry its burden.  We win.

21        THE COURT:  So right now for the TRO, the burden is on

22   you to prove the elements of the TRO.  Right?

23        MR. ARRINGTON:  That's correct.

24        THE COURT:  Right, so --

25        MR. ARRINGTON:  And the main element -- the main

1    element of the TRO is probable success on the merits.  And the

2    main element of the probable success on the merits is whether

3    the government has carried its burden to show that there's a

4    historical tradition, which they haven't even attempted to do.

5    We win.  This is not a close case, your Honor.

6         THE COURT:  Okay.  All right.  Let me turn it back to

7    Mr. Wilson for a response.

8         MR. WILSON:  Thank you, your Honor.  A few points in

9    response.

10         I think Mr. Arrington and I agree that the historical

11    framework is established by *Heller*.

12         The question from *Heller* that *Bruen* resolves was

13    whether there could be a second step of intermediate scrutiny

14    and a means/ends test.  That was certainly eliminated by *Bruen*.

15    And I agree with Mr. Arrington that that part was a sea change.

16         But what we can't get around is that *Friedman* applied

17    the historical analysis.  They didn't apply a means/end test.

18    And they applied the historical framework from *Heller*.  That's

19    what Judge Easterbrook did in the majority.  And that case was

20    taken up, and cert. was denied over dissent by Scalia and

21    Thomas.  So it's not as if this issue hasn't been vetted.

22    *Friedman* applied a historical analysis under -- under *Heller*,

23    determined that these weapons were historically protected, went

24    through the kind of analysis that you were describing, your

25    Honor, which is, well, how do you do this?  They didn't exist

1    at the time of the founding.  Assault weapons became popular in

2    '60, '70s, '80.  Bans started happening in the '80s and '90s.

3    So what is the historical framework?  And that's exactly the

4    test that Judge Easterbrook went through.  So the idea that

5    somehow *Bruen* reversed Easterbrook and *Friedman* when *Friedman*

6    was looking to *Heller*, it's a lot of dominoes that don't quite

7    line up.

8        If I could turn to the one point I want -- the

9    question that Mr. Arrington raised about, you know, that we're

10   trying to whipsaw him, that they waited too long to file the --

11   but it's too soon.  We're not claiming that at all.

12       But I'd also like to just say for the record,

13   Mr. Arrington has been a complete gentleman.  He called me

14   about this and their intention to file a TRO, could we respond.

15   So certainly -- I'm certainly not taking the position that we

16   haven't gotten notice or that we were surprised.  So I wanted

17   to say on the record that they certainly followed all the

18   procedures and gave us notice and we weren't caught flatfooted.

19   I didn't know the exact day he would file it, but we knew he

20   would file it.  But the issue remained that there just isn't an

21   emergency before the Court.  This law isn't going to take

22   effect for six weeks.  And it's been more than -- you know, I

23   think two months since the complaint was filed.  So it's just

24   an unusual procedural posture for you to be confronting a TRO.

25   You know, Meigs Field is not going to get torn down tomorrow.

1    The building is not going to get shut.  Fire laws aren't being

2    violated at an event at the United Center.  There isn't

3    anything exigent, as we look at it.  The law provided a long

4    ramp-up period so people could prepare for this, could change

5    their inventory, could change their, you know, selection.

6            And to that end, you know, you were asking, it's only

7    paragraph five of Mr. Bevis' affidavit, and that paragraph just

8    says, "Which means I and my business will go out of business,

9    but even worse, the citizens of Naperville will be left as

10   sitting ducks for criminals who will still get guns."

11           Those are three absolute conclusions without any

12   factual framework provided for the Court.  We don't know why he

13   will go out of business, what would put him out of business,

14   when he would go out of business.  We don't know why citizens

15   would be sitting ducks.  We don't know how these criminals will

16   get assault weapons or get guns or how -- it's just -- it's

17   exactly the kind of conclusory statement that doesn't lead to

18   injunctive relief, typically.

19           And, finally, they make a point that First Amendment

20   cases often presume constitutional harm, presume irreparable

21   harm as a result, but that's the First Amendment.  That has

22   never been applied to a Second Amendment case that we're aware

23   of, and with good reason.  You've got to balance some competing

24   interests here, which are the safety of the community versus

25   the interests of the Second Amendment.

1          Now, I agree with Mr. Arrington that *Bruen* certainly

2    puts a greater thumb on the scale for the interests of the

3    Second Amendment, but that doesn't end the inquiry.  You still

4    have to look at the interests of the municipality or the state

5    or the government in protecting its citizens from very

6    dangerous weapons.  So I don't think the First Amendment

7    framework transports over a particular, you know, one-for-one

8    to a Second Amendment case.

9          And then, finally, I noted the cases that were relied

10   upon other than *Friedman.  Ezell, Retailers* -- first of all*,

11   Retailers* was Judge Chang's opinion.  It is a district court

12   opinion.  *Ezell* is an entirely different framework where the

13   City of Chicago required licensing with hours at a range, and

14   then said that they were outlawing ranges within the City of

15   Chicago.  So it was I think Judge Rovner who said it was too

16   clever by half.  But that was a very extreme example and got to

17   the type of licensing sort of protocol that was at issue in

18   *Bruen*, not assault weapons.

19         Assault weapons -- the decision of *Friedman* was

20   affirmed in *Wilson* in 2019 by the Seventh Circuit and has

21   been -- you know, at no point has the Supreme Court indicated

22   any appetite for overturning assault weapons bans.

23         I know Mr. Arrington is saying that somehow the *Kolbe*

24   case was overturned.  But that's on the means/end test and

25   never indicated that they are particularly interested in

1    permitting assault weapons without considering the interests of
2    the State.
3              So with that, I'll leave it, your Honor.  We just
4    don't think it met any of the four elements, but particularly a
5    likelihood of success on the merits in light of *Friedman*.
6              *Bruen*, you know, goes to some length to indicate we're
7    not talking about what types of weapons might be permitted.
8    We're talking about how the standard should apply and that it
9    should apply to handguns.
10             THE COURT:  Got it.
11             MR. WILSON:  With that, I'll turn it back over to the
12   Court.
13             THE COURT:  Okay.  Mr. Arrington, you get the last
14   word.
15             MR. ARRINGTON:  Thank you, your Honor.
16             So there was a statement made about whether, after
17   *Bruen*, the Court can take into account the interests of the
18   community as opposed to the Second Amendment.  Well, that was
19   the whole holding of *Bruen*, that -- that it can't, that *Bruen*
20   said, in no uncertain terms, means/ends scrutiny in the Second
21   Amendment context is forbidden.  If there's no historical
22   analogue to the regulation, that's the end of the inquiry.  You
23   don't get to means/ends scrutiny.  Ever.  And so -- and also
24   with respect to the First Amendment, *Bruen* said that these
25   cases should be decided like the First Amendment.  We're

1    talking about Justice Thomas here for -- who, for over a

2    decade, railed against the denial of cert. in these cases and

3    over and over's again used the phrase "the Second Amendment is

4    not a second-class right."

5          What counsel has just suggested to the Court is you

6    treat the Second Amendment as a second-class right.  Not as

7    good as the First Amendment.  Oh, we can't treat the Second

8    Amendment like the First Amendment.  But, interestingly enough,

9    *Ezell* says exactly the opposite.  *Ezell* draws on several First

10   Amendment cases in a Second Amendment context with respect to

11   the injunction there.

12         And, finally, this idea that if you go outside the

13   city and buy guns there, it's also precluded by *Ezell*, which

14   specifically said that the fact that you can go to a range

15   somewhere else doesn't fix this.  That's not an answer to a

16   constitutional ban.

17         And so the bottom line is this:  Yes, *Bruen* did not

18   reach out and overturn or say, in so many words, that

19   assault -- that modern sporting rifles are permitted under the

20   Second Amendment; but it did abrogate a number of cases that

21   said they weren't.  So where should -- and the reason it did

22   that is because those cases did not decide the matter consonant

23   with the proper level of review, which is historical textural

24   review.

25         And so the bottom line is this:  After *Bruen*, the

1     Court has a single inquiry.  Has the State identified an

2     historical analogue from the time of the founding similar to

3     this regulation?

4              In this case, the State hasn't attempted to do that.

5              In *Friedman*, the Court did not attempt to do that, so

6     you can't rely on *Friedman* to say that that's been done.

7              Therefore, the State has not met its burden.  We are

8     clearly entitled, probably going to succeed on the merits when

9     the State hasn't met its burden.  And in a constitutional case,

10    including a Second Amendment case, where there's a probable

11    success on the merits, the other elements are more or less

12    automatic and taken care of.

13             Thank you, your Honor.

14             MR. WILSON:  Your Honor, if I could.  I don't -- Mr.

15    Arrington gets the last word, but I wanted to just clear up a

16    misunderstanding that perhaps I created.

17             I wasn't saying that a means/ends test is required for

18    the constitutional analysis.  *Bruen* clearly removes that from

19    the consideration.

20             I was saying in considering the other factors for

21    injunctive relief, which is what is before the Court today,

22    that the Court should consider the impact on the community

23    there.  So it was only in the context of injunctive relief.

24             I look forward to a full record and summary judgment

25    briefing before your Honor on all the other issues.  But it was

1    just the difference between that and the injunctive relief.

2              So, with that, I will gladly be quiet.

3              THE COURT:  All right.  Thank you, Gentlemen.  That

4    was enjoyable because it was a very well argued case.  And I

5    will turn my attention to it right away and get you a written

6    opinion on it.  And it will be shortly because we are in the

7    TRO stage.  Okay?

8              MR. WILSON:  Your Honor, if I could raise one

9    procedural question first.

10             Our answer is due today.  In light of the arguments

11   today, could we have until Wednesday to file our answer without

12   an objection from Mr. Arrington?

13             THE COURT:  Yes, of course.

14             MR. ARRINGTON:  I obviously don't object.  As a matter

15   of fact, there's no sense in hurrying during the holidays.  If

16   you need more time, I'm fine with that.

17             THE COURT:  There you go.  Go have turkey with your

18   family.

19             I always say, when lawyers take time with their

20   family, they're always nicer to me, so I never mind giving them

21   that break.

22        (Laughter.)

23             THE COURT:  So go right ahead.  If you need until next

24   week, I believe that Mr. Arrington is being generous to say you

25   may have it until then as well.

1          MR. WILSON:  He's certainly trying to get the sympathy

2    of all of us.

3          So, yes, with the Court's indulgence, Monday, the

4    28th.

5          In the words of Mr. Cohan, "My father thanks you, my

6    brother thanks you."

7       (Laughter.)

8          THE COURT:  Right, right.  Go enjoy the holiday,

9    Gentlemen.  Thank you for the arguments.  I'll get a ruling for

10   you shortly.  Thank you.

11         MR. ARRINGTON:  Thank you, your Honor.

12         MR. WILSON:  Thank you.

13         THE CLERK:  Court is in recess until 1:30.

14         You can please log off.

15      (Proceedings concluded at 1:05 p.m.)

16                   C E R T I F I C A T E

17     I certify that the foregoing is a correct transcript, to

18   the extent possible, of the record of proceedings in the

19   above-entitled matter, given the limitations of conducting

20   proceedings via videoconference.

21

22

     _/s/ GAYLE A. McGUIGAN_____        _December 9, 2022_
23   Gayle A. McGuigan, CSR, RMR, CRR              Date
     Official Court Reporter

24

25