IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Robert Bevis, et al., | Case No. 1:22−cv−04775 |
| Plaintiff, | Honorable Virginia M. Kendall |
| v. | |
| CITY OF NAPERVILLE, ILLINOIS, a municipal corporation; | |
| Defendant. | |

## CITY OF NAPERVILLE'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

BACKGROUND .................................................................................................................1

ARGUMENT ....................................................................................................................2

I.     *Bruen* established a text-and-history standard for analyzing Second Amendment claims. .........................................................................................................................2

II.    The plain language of the Second Amendment does not apply to Naperville's Ordinance. ...................................................................................................................2

      A.     The plain text of the Second Amendment only protects the right to keep and bear certain firearms and says nothing about commercial sales of guns. ...........3

      B.     Plaintiffs have not proven assault rifles under the Ordinance are in "common use" for self-defense. .........................................................................5

      C.     Plaintiffs' reading of the Second Amendment is contradicted by reliable canons of textual interpretation. .........................................................................9

      D.     Since *Bruen*, no courts have held that the plain text of the Second Amendment covers the commercial sale of firearms. .......................................10

III.   Naperville's Ordinance is consistent with the Nation's traditional regulation of firearms and other dangerous weapons. .......................................................................11

      A.     The Second Amendment does not limit the states' police powers to address public safety threats as they arise. ....................................................................12

      B.     The Ordinance is consistent with common historical regulations of dangerous or unusual weapons in American history, including the relevant periods surrounding the ratification of the Second and Fourteenth Amendments. .....................................................................................................14

IV.   The Court should forgo answering these questions at this preliminary stage and allow the parties to develop a complete factual record. ...............................................18

CONCLUSION ................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Antonyuk v. Bruen*,
No. 122CV0734GTSCFH, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) ..........................10

*Antonyuk v. Hochul*,
No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ..........................10

*Associated Builders & Contractors, E. Pennsylvania Chapter, Inc. v. Cnty. of Northampton*,
376 F. Supp. 3d 476 (E.D. Pa. 2019) ......................................................................................18

*Associated Builders & Contractors E. Pennsylvania Chapter Inc v. Cnty. of Northampton*,
808 F. App'x 86 (3d Cir. 2020) ...............................................................................................18

*Cassell v. Snyders*,
458 F. Supp. 3d 981 (N.D. Ill. 2020), aff'd, 990 F.3d 539 (7th Cir. 2021) .............................18

*Christian v. Nigrelli*,
No. 22-CV-695 (JLS), 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022) .................................10

*Com. of Va. v. State of Tenn.*,
148 U.S. 503 (1893) ..................................................................................................................9

*Commodity Futures Trading Comm'n v. Bd. Of Trade of City of Chi.*,
657 F.2d 124 (7th Cir. 1981) ...................................................................................................19

*Def. Distributed v. Bonta*,
No. CV 22-6200-GW-AGRX, 2022 WL 15524977 (C.D. Cal. Oct. 24, 2022) ...............10, 11

*District of Columbia v. Heller*,
554 U.S. 570 (2008)....................................................................3-6, 8, 9, 11, 12, 13, 16, 17

*Duncan v. Bonta*,
19 F.4th 1087 (9th Cir. 2021) ....................................................................................7, 16, 17

*Duncan v. Bonta*,
Case No. 17-cv-1017-BEN-JLB (S.D. Cal.).............................................................................12

*Firearms Pol'y Coal., Inc. v. McCraw*,
No. 4:21-CV-1245-P, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022) ....................................10

*Friedman v. City of Highland Park, Ill.*,
    784 F.3d 406 (7th Cir. 2015), *cert. denied.* 577 U.S. 1039, 136 S. Ct. 447
    (2015) ..................................................................................................... 4-6, 14

*Greene v. Solano Cnty. Jail*,
    513 F.3d 982 (9th Cir. 2008) ....................................................................... 19

*Hardaway v. Nigrelli*,
    No. 22-CV-771 (JLS), 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ................ 10

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ...................................................................... 4

*In re Globe Bldg. Materials, Inc.*,
    463 F.3d 631 (7th Cir. 2006) .......................................................................... 9

*Jucha v. City of N. Chicago*,
    63 F. Supp. 3d 820 (N.D. Ill. 2014) ............................................................... 13

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ..................................................................... 6, 11

*Marbury v. Madison*,
    5 U.S. 137 (1803) .......................................................................................... 9

*Maum Meditation House of Truth v. Lake County, Ill.*,
    55 F.Supp.3d 1081 (N.D. Ill. July 16, 2014) .................................................. 13

*McDonald v. Chicago*,
    561 U.S. 742 (2010) .......................................................................... 4, 6, 8, 11

*Montana Fish, Wildlife, & Parks Found., Inc. v. United States*,
    91 Fed. Cl. 434 (2010) ................................................................................. 18

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*,
    No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022) ................ 10

*N. Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ................................................... 1-5, 8, 10-12, 14-20

*Ocean State Tactical, LLC, et al., v. State of Rhode Island, et al.*,
    No. 22-CV-246 JJM-PAS, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ............... 20

*Palko v. Connecticut*,
    302 U.S 319 (1937) ...................................................................................... 12

*Park Pet Shop, Inc. v. City of Chicago*,
    872 F.3d 495 (7th Cir. 2017) .......................................................................... 9

*Peruta v. County of San Diego*,
824 F.3d 919 (9th Cir. 2016) (en banc), *abrogated on other grounds by Bruen*,
142 S. Ct. 2111......................................................................................................16

*Presser v. Illinois*,
116 U.S. 252 (1886)................................................................................................17

*Second Amend. Arms v. City of Chicago*,
135 F. Supp. 3d 743 (N.D. Ill. 2015) .....................................................................5

*State v. Philpotts*,
194 N.E.3d 371 (Ohio 2022) .................................................................................19

*United States of America v. Brandon Walker Cage*,
No. 3:21-CR-68-KHJ-FKB, 2022 WL 17254319 (S.D. Miss. Nov. 28, 2022) ......11

*United States v. Alaniz*,
No. 1:21-CR-00243-BLW, 2022 WL 3700834 (D. Idaho Aug. 26, 2022).............10

*United States v. Bullock*,
No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S. D. Miss. Oct. 27,
2022) ......................................................................................................................19

*United States v. Carrero*,
No. 2:22-CR-00030, 2022 WL 9348792 (D. Utah Oct. 14, 2022) ........................10

*United States v. Chafin*,
423 F. App'x 342 (4th Cir. 2011) ...........................................................................5

*United States v. Charles*,
No. MO:22-CR-00154-DC, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022)............11

*United States v. Collette*,
No. MO:22-CR-00141-DC, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022) ........10

*United States v. Coombes*,
No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022).............10

*United States v. Gray*,
No. 22-CR-00247-CNS, 2022 WL 16855696 (D. Colo. Nov. 10, 2022) ...............10

*United States v. Jackson*,
No. CR-22-59-D, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022) .......................10

*United States v. Kays*,
No. CR-22-40-D, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022) .......................10

*United States v. Perez-Gallan*,
No. PE:22-CR-00427-DC, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) ........................10

*United States v. Price*,
No. 2:22-CR-00097, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022) ...................................10

*United States v. Quiroz*,
No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022) ..........................10

*United States v. Slye*,
No. 1:22-MJ-144, 2022 WL 9728732 (W.D. Pa. Oct. 6, 2022) ...........................................10

*United States v. Stambaugh*,
No. CR-22-00218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022) .....................10

*United States v. Tilotta*,
No. 3:19-cr-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ........................10, 11

*United States v. Young*,
No. CR 22-054, 2022 WL 16829260 (W.D. Pa. Nov. 7, 2022) .............................................10

*Wilson v. Cook County*,
937 F.3d 1028 (7th Cir. 2019) ........................................................................................4, 5

*Worman v. Healey*,
922 F.3d 26 (1st Cir. 2019) .....................................................................................................6

*Yates v. United States*,
574 U.S. 528 (2015) ..............................................................................................................10

**STATUTES**

Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322,
tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (1994) ................................................................2

**RULES**

Fed. R. Civ. P. 26(a)(2).....................................................................................................18, 19

Fed. R. Civ. P. 702.....................................................................................................................2

**OTHER AUTHORITIES**

Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include
Buffalo and Uvalde*, Bus. Insider (May 26, 2022),
https://www.businessinsider.com/deadliest-mass-shootings-in-us-history-
2017-10 ......................................................................................................................................7

Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 221 (2011) ................................................................................................................12

Follman et al., *US Mass Shootings, 1982-2022: Data From Mother Jones' Investigation*, Mother Jones (Nov. 23, 2022), https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ ..............................................................................................7

James E. Fleming & Linda C. Mcclain, *Ordered Liberty: Rights, Responsibilities, and Virtues* (Harvard University Press, 2013) .........................................................12

John J. Zubly, *The Law of Liberty* (1775) ...............................................................12

John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution,* 1 Cardozo L. Rev. 257 (1979) ..............................................................................................12

Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J. L. & Pub. Pol'y 569 (2017) ........................................................................................12

*Number of victims of the worst mass shootings in the United States between 1982 and May 2022*, Statista (2022), https://www.statista.com/statistics/476101/worst-mass-shootings-in-the-us/ ..........7

Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 155 (2018) ...............................................................13

Patrick Sauer, *The Story of the First Mass Shooting in U.S. History*, Smithsonian Mag. (Oct. 14, 2015), https://www.smithsonianmag.com/history/story-first-mass-murder-us-history-180956927/ ...................................................................15

*Pritzker Pushes for Assault Weapons Ban, Federal Action,* Daily Herald, (July 12, 2022), https://www.dailyherald.com/news/20220712/pritzker-pushes-for-assault-weapons-ban-federal-action .......................................................................1

*State legislators urged to outlaw assault weapons: 'If we don't do something about this, shame on us'*, Chicago Sun Times (Dec. 12, 2022) .................................1

*Survivors of mass shootings in Highland Park, East Garfield Park voice support for proposed assault weapon ban*, Chicago Tribune (Dec. 12, 2022) ......................1

U.S. Const. Amend. I ...............................................................................................13

U.S. Const. Amend. II ........................................................................................1-20

At the request of the Court (Dkt. 15, 33), Defendant City of Naperville, Illinois ("Naperville") submits this supplemental brief in opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. The Court asked the parties to brief two questions: "(1) whether the Second Amendment's plain text covers the conduct at issue in Naperville's ordinance banning the sale of so-called 'assault weapons,' and (2) if so, whether the 'regulation is consistent with this Nation's historical tradition of firearm regulation.' *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022)." First, the Second Amendment's plain text does not cover Naperville's ban on the sale of certain assault rifles within city limits. Second, Naperville's Ordinance is consistent with this Nation's historical tradition of regulating firearms, including the wide latitude afforded to governments to restrict dangerous weapons.

## BACKGROUND

On August 16, 2022, weeks after a gunman killed multiple people with an assault weapon at the Fourth of July parade in Highland Park, Illinois, and in response to concerns raised by citizens, Naperville's City Council adopted its Ordinance prohibiting the commercial sale of certain assault rifles within the city. The Ordinance's definition of "assault rifle" closely mirrors the definition in what was commonly known as the Federal Assault Weapons Ban.[1] *Compare* the

---

[1] Naperville uses the term "assault rifle" as defined in the Ordinance. *See* Wilson Decl., Exhibit A (the "Ordinance") at Section 3-19-1. It also refers more generally to "assault weapons," which encompasses "assault rifle" as defined in the Ordinance. Plaintiffs' repeated argument that "assault weapon" is a political term should be ignored. The weapons contemplated by the Ordinance and other weapons like them are commonly referred to in the news media and accepted in everyday language as "assault weapons." *See, e.g., State legislators urged to outlaw assault weapons: 'If we don't do something about this, shame on us'*, Chicago Sun Times (Dec. 12, 2022), https://chicago.suntimes.com/2022/12/12/23505898/assault-weapons-ban-highland-park-state-legislators-judiciary-large-capacity-magazines; *Survivors of mass shootings in Highland Park, East Garfield Park voice support for proposed assault weapon ban*, Chicago Tribune (Dec. 12, 2022), https://www.chicagotribune.com/politics/ct-illinois-assault-weapons-ban-hearing-20221212-mvp37q4ecvf2jjt5svronlixli-story.html; *Pritzker Pushes for Assault Weapons Ban, Federal Action,* Daily Herald, (July 12, 2022), https://www.dailyherald.com/news/20220712/pritzker-pushes-for-assault-weapons-ban-federal-action.

Ordinance at Section 3-19-1, *with* Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996–2010 (1994). Plaintiffs' motion for a temporary restraining order and preliminary injunction ("Motion") seeks to enjoin Naperville from enforcing the Ordinance. Dkt. 10. As part of a stipulation between the parties, Naperville has agreed to stay the effect of the Ordinance — which was scheduled to start January 1, 2023 — until the Court rules on Plaintiffs' pending Motion. *See* Stipulation at Dkt. 26. This moots Plaintiffs' request for a TRO. Plaintiffs' Motion for a preliminary injunction, however, remains pending. Dkt. 10.

## ARGUMENT

I. ***Bruen* established a text-and-history standard for analyzing Second Amendment claims.**

As recognized by the Court's November 23, 2022 Order, the current controlling precedent on this issue is *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). In *Bruen*, the Supreme Court's analysis of the Second Amendment challenge "centered on constitutional text and history." *Id.* at 2128–29. Under this approach, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129–30. The government must then justify its regulation by "demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* "Demonstrating consistency," however, is a factual question that requires evidence as well as expert evidence under Fed. R. Civ. P. 702. *See Bruen*, 142 S. Ct. at 2177 (Breyer, J., dissenting) ("Courts are, after all, staffed by lawyers, not historians.").

II. **The plain language of the Second Amendment does not apply to Naperville's Ordinance.**

Plaintiffs' claims fail because the Ordinance does not burden conduct protected by the plain text of the Second Amendment. Naperville's Ordinance is a limited restriction on the commercial

sales of one type of weapon — it is not a blanket ban on sales of firearms, let alone a ban on possession and ownership of assault weapons. The plain text of the Second Amendment says nothing about sale of arms, only their use. Beyond this, the Second Amendment protects only those arms which are "in common use" for lawful self-defense and Plaintiffs have offered no evidence that assault rifles are used in such a manner. Third, reliable canons of statutory interpretation support the constitutionality of the Ordinance. Finally, before or after *Bruen*, no court has held prohibiting the commercial sale of assault rifles violates the Second Amendment. The Ordinance is constitutional on its face.

> **A.** **The plain text of the Second Amendment only protects the right to keep and bear certain firearms and says nothing about commercial sales of guns.**

The plain text of the Second Amendment recites "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to *keep and bear Arms*, shall not be infringed." U.S. Const. amend. II. (emphasis added). The Supreme Court in both *Heller* and *Bruen*—cases that Plaintiffs argue govern this dispute—conducted a textual analysis and expressly held that the plain language of the Second Amendment only covers *ownership and possession of handguns for self-defense*. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); *Bruen*, 142 S. Ct. at 2134. Lower courts across the country have reached the same conclusion, and Plaintiffs have not identified a single court that reached a contrary conclusion. This Court should not be the first and only court to hold otherwise.

The *Heller* Court determined that the Second Amendment *only* protects an individual's rights to "keep and bear arms." Parsing the plain text of the Second Amendment, the Court noted that (1) the phrase "keep arms" means to "have weapons" and "possess[] arms," *Heller*, 554 U.S. at 582–83; and (2) "bear arms" simply means "to carry" or "to wear, bear, or carry . . . upon the person or in the clothing or in a pocket." *Id.* at 584 (quoting Black's Law Dictionary 214 (6th ed.

1990)). And in holding that the Second Amendment "guarantee[s] the individual right to *possess and carry* weapons in case of confrontation," *id.* at 592 (emphasis added), the Court explicitly noted that "[n]othing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The *Bruen* Court concluded the same with respect to *carrying* handguns outside the home for self-defense. *Bruen*, 142 S. Ct. at 2134. Relying on *Heller*'s textual analysis, it determined that the "textual elements" of the Second Amendment cover the "individual right to *possess and carry* weapons" and said nothing about the right to possess or sell assault rifles. *Id.* (emphasis added). The Supreme Court has thus determined *twice* that the plain text of the Second Amendment only protects the right to keep and bear handguns.

Consistent with the *Heller* Court's admonition that "the right secured by the Second Amendment is not unlimited,"[2] *Heller*, 554 U.S. at 626, Federal Courts of Appeals have consistently held that the Second Amendment does not even protect the right to *possess* assault weapons, *let alone to sell them*. *See, e.g.*, *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015), *cert. denied.* 577 U.S. 1039, 136 S. Ct. 447 (2015); *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011). Plaintiffs' argument that the cases cited above are abrogated by *Bruen* misses the mark. These cases did not rely on the means-end test foreclosed by *Bruen*. Instead, they relied on the analytical framework established by *Heller* that *Bruen* affirmed. *See, e.g.*, *Friedman*, 784 F.3d at 410 (rejecting the means-end test and instead relying on *Heller*); *Wilson*, 937 F.3d at 1035–36 (relying

---

[2] *Bruen* reaffirmed this important principle. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742, 130 S. Ct. 3020, 177 L.Ed.2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns.").

on *Friedman*). Either way, courts have also noted that the Second Amendment does not protect the sales of firearms. *See United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) ("[W]e have found [no authority], that remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to sell a firearm."); *Second Amend. Arms v. City of Chicago*, 135 F. Supp. 3d 743, 762 (N.D. Ill. 2015) (citing *Chafin*, 423 F. App'x at 344) (noting that courts have held that the sales of firearms are not protected by the Second Amendment). These decisions are clear: there is no Second Amendment right to own assault weapons, much less sell the subset contemplated by the Ordinance. The Court may stop its analysis here and find the Ordinance constitutional.

**B.      Plaintiffs have not proven assault rifles under the Ordinance are in "common use" for self-defense.**

Even regulations related to the actual possession and carrying of weapons have been found outside the plain text of the Second Amendment when those arms are not commonly used for self-defense. *See Bruen*, 142 S. Ct. at 2128. The *Bruen* Court was clear that this "common use" inquiry comes in the textual stage of its analysis, rather than the historical stage at which the government bears the burden. *Id.* at 2134. According to the plain terms of the Supreme Court's Second Amendment precedents, the test for Second Amendment protection of a particular weapon is common use, not common ownership.[3] Indeed, assault weapons, like those implicated by the Ordinance, are "most useful in military service," *Heller*, 554 U.S. at 627, and are unsuited and

---

[3] The Second Amendment protects only those weapons that are "'in common use at the time' *for lawful purposes like self-defense*." *Heller*, 554 U.S. at 624 (emphasis added) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also Bruen*, 142 S. Ct. at 2134 (referencing whether the subject "weapons [are] 'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)). This "important limitation on the right to keep and carry arms," recognized in *Heller*, remains a critical limitation on the Second Amendment following *Bruen*. *See id.* at 2162 (Kavanaugh, J., concurring).

uncommon for self-defense purposes. *See Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) ("[M]ost individuals choose to keep other firearms for [self-defense].").

Tellingly, Plaintiffs point to no evidence, such as survey data or studies, showing that assault rifles are used frequently in self-defense or have ever been needed to engage in effective self-defense. Plaintiffs instead argue that firearms subject to the Ordinance are in common use because of their popularity, quoting statistics of the number of these firearms sold in recent years. *See* Motion at 13–14 ("The AR-15 is America's 'most popular semi-automatic rifle,'" quoting *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) . . . "According to industry sources, as of 2018, roughly thirty-five percent of all newly manufactured guns sold in America are modern semiautomatic rifles . . . ."). But common ownership is not enough. The phrase "in common use" as used in *Heller* and *McDonald* does not simply refer to a weapon's prevalence in society, or the quantities manufactured or sold. *See Kolbe*, 849 F.3d 142 (noting that "the *Heller* majority said nothing to confirm that it was sponsoring the popularity test"). Relying solely on "how common a weapon is at the time of litigation" would be "circular," because commonality depends in part on what the law allows. *Friedman*, 784 F.3d at 409. For example, machine guns were "all too common" during Prohibition, but that did not immunize them from heavy regulation and an eventual ban on the grounds they were military-grade weapons. *Id*. at 408–09; *see also Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical"). Courts instead must consider the suitability of the weapon and the *actual use of the weapon for lawful self-defense* (rather than military or law-enforcement applications). *See Duncan v. Bonta*, 19 F.4th 1087, 1127 (9th Cir. 2021) (Berzon, J., concurring) ("Notably, however, *Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon."); *see also Heller*, 554 U.S. at 629

(explaining the "reasons that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand while the other hand dials the police). Plaintiffs provide no evidence for the Court to conclude assault rifles are "in common use" for lawful individual self-defense.

On the other hand, evidence exists that assault weapons, including those contemplated by the Ordinance, are used to commit mass murder all too often. As the list below shows, the mass shootings with the most deaths in recent years—including the Fourth of July Highland Park Parade shooting that prompted Naperville's City Council to pass the Ordinance in August 2022—were carried out with assault weapons.[4]

| Date | Mass Shooting | Deaths | Injured | Weapon(s) Used |
|------|---------------|--------|---------|----------------|
| July 4, 2022 | Highland Park Parade Shooting | 7 | 48 | AR-15 |
| May 24, 2022 | Uvalde, Texas Elementary School Shooting | 21 | 17 | AR-15 |
| May 14, 2022 | Buffalo, New York Supermarket Shooting | 10 | 3 | AR-15 |
| August 3, 2019 | El Paso Wal-Mart Shooting | 23 | 23 | AK-47 |
| October 27, 2018 | Pittsburgh Synagogue Shooting | 11 | 6 | AR-15; Glocks |
| February 14, 2018 | Stoneman Douglas High School Shooting | 17 | 17 | AR-15 |
| November 5, | Sutherland Springs | 26 | 22 | AR-15; semi-automatic |

---

[4] *Number of victims of the worst mass shootings in the United States between 1982 and May 2022*, Statista (2022), https://www.statista.com/statistics/476101/worst-mass-shootings-in-the-us/; Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Buffalo and Uvalde*, Bus. Insider (May 26, 2022), https://www.businessinsider.com/deadliest-mass-shootings-in-us-history-2017-10; Follman et al., *US Mass Shootings, 1982–2022: Data From Mother Jones' Investigation*, Mother Jones (Nov. 23, 2022), https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/.

| Date | Mass Shooting | Deaths | Injured | Weapon(s) Used |
|---|---|---|---|---|
| 2017 | Church Shooting | | | pistols |
| October 1, 2017 | Las Vegas Strip Shooting | 60 | 867 | AR-15; AR-10; bolt-action rifle; revolver |
| June 12, 2016 | Orlando Pulse Nightclub Shooting | 49 | 58 | Sig Sauer MCX; Glock |
| December 2, 2015 | San Bernardino Shooting | 14 | 24 | AR-15; semi-automatic pistols |
| December 14, 2012 | Sandy Hook Elementary School Shooting | 26 | 2 | AR-15; Glock; bolt-action rifle |
| July 20, 2012 | Aurora, Colorado Movie-Plex Shooting | 12 | 70 | AR-15; shotgun; Glock |
| March 10, 2009 | Geneva County Shootings | 10 | 6 | AR-15; SKS semiautomatic rifle; handgun |

Even assuming Plaintiffs could meet their burden of demonstrating that assault rifles are suited for self-defense and are commonly used for that purpose, Naperville's Ordinance does not ban, prohibit, or prevent anyone from keeping or bearing arms for self-defense in the home or in public, unlike the laws struck down in *Heller*, *McDonald*, and *Bruen*. *Heller*, 554 U.S. at 628, 630 (striking down law that "totally bans handgun possession in the home" and "makes it impossible" to use guns for self-defense); *McDonald*, 561 U.S. at 750 (striking down law "banning handgun possession"). Indeed, the Ordinance does not regulate the possession of firearms or affect one's right to self-defense in any way, whether inside the home or in public. It merely regulates the commercial sale of goods within its borders, a situation wholly unrelated to the possession of handguns for self-defense, and one within the common and ordinary power of governmental entities. *See, e.g., Heller,* 554 U.S. at 626-27, n. 26 ("[L]aws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful"); *Park Pet Shop, Inc.*

*v. City of Chicago*, 872 F.3d 495, 499-500 (7th Cir. 2017) (ordinance regulating the sale of animals within city limits consistent with home-rule authority under Illinois Constitution).

### C. Plaintiffs' reading of the Second Amendment is contradicted by reliable canons of textual interpretation.

Two venerable canons of textual interpretation support that the plain text of the Second Amendment encompasses only the possession of firearms, and not the sale of them.

The first, *expressio unius est exclusion alterius*, has been employed in interpreting constitutional and statutory languages. *See, e.g.*, *Marbury v. Madison*, 5 U.S. 137, 174 (1803) ("Affirmative words are often, in their operation, negative of other objects than those affirmed."); *In re Globe Bldg. Materials, Inc.*, 463 F.3d 631, 635 (7th Cir. 2006) (quoting Black's Law Dictionary 620 (8th ed. 2004)) ("[T]o express or include the one thing implies the exclusion of the other."). The Second Amendment never mentions sales of firearms or assault weapons; therefore, by implication, the plain text of the Second Amendment does not cover them.

Next, *noscitur a sociis*—Latin for "it is known by its associates"—advises that the meaning of unclear language can be determined by the context in which it is used. *See State of Virginia v. State of Tennessee*, 148 U.S. 503, 519 (1893) ("'Noscitur a sociis' is a rule of construction applicable to all written instruments. Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words; and the meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used.").

Here, the Supreme Court has been clear about its understanding of the meaning of "keep" or "bear." *Heller*, 554 U.S. at 582–84. Inferring that *selling* assault weapons is protected by language concerning the "individual right to *possess and carry*" handguns would expand the meaning of the Second Amendment well past the breaking point. *Heller*, 554 U.S. at 592 (emphasis

added). *Noscitur a sociis* cautions against such an expansive interpretation. *See generally Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of noscitur a sociis—a word is known by the company it keeps—to '*avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words* . . . .'") (emphasis added). At least one district court, post-*Bruen*, has expressly held just that. *See United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, *5 (S.D. Cal. Aug. 30, 2022) ("The plain text of the Second Amendment does not cover Mr. Tilotta's proposed course of conduct to commercially sell and transfer firearms.").

> ### D. Since *Bruen*, no courts have held that the plain text of the Second Amendment covers the commercial sale of firearms.

Finally, since *Bruen*, as of this filing, as many as 23 district court decisions have concluded that the plain text of the Second Amendment covers possession and ownership of firearms only, and not one has held otherwise.[5] At least one district court has held that the plain text of the Second Amendment does not cover any rights unrelated to possession. *See, e.g.*, *Def. Distributed v. Bonta*,

---

[5] Though not for lack of opportunities to analyze firearms-related issues. *See, e.g.*, *United States v. Price*, No. 2:22-CR-00097, 2022 WL 6968457 (S.D.W. Va. Oct. 12, 2022); *Hardaway v. Nigrelli*, No. 22-CV-771 (JLS), 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022); *United States v. Slye*, No. 1:22-MJ-144, 2022 WL 9728732 (W.D. Pa. Oct. 6, 2022); *Firearms Pol'y Coal., Inc. v. McCraw*, No. 4:21-CV-1245-P, 2022 WL 3656996 (N.D. Tex. Aug. 25, 2022); *Christian v. Nigrelli*, No. 22-CV-695 (JLS), 2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022); *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022); *Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022); *United States v. Alaniz*, No. 1:21-CR-00243-BLW, 2022 WL 3700834 (D. Idaho Aug. 26, 2022); *Antonyuk v. Hochul*, No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022); *Antonyuk v. Bruen*, No. 122CV0734GTSCFH, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) ; *Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRX, 2022 WL 15524977 (C.D. Cal. Oct. 24, 2022); *Tilotta*, 2022 WL 3924282); *United States v. Jackson*, No. CR-22-59-D, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022); *United States v. Kays*, No. CR-22-40-D, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022); *United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) (same); *United States v. Young*, No. CR 22-054, 2022 WL 16829260 (W.D. Pa. Nov. 7, 2022); *United States v. Collette*, No. MO:22-CR-00141-DC, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Coombes*, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022); *United States v. Carrero*, No. 2:22-CR-00030, 2022 WL 9348792 (D. Utah Oct. 14, 2022); *United States v. Gray*, No. 22-CR-00247-CNS, 2022 WL 16855696 (D. Colo. Nov. 10, 2022); *United States v. Stambaugh*, No. CR-22-00218-PRW-2, 2022 WL 16936043 (W.D. Okla. Nov. 14, 2022); *United States v. Charles*, No. MO:22-CR-00154-DC, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States of America v. Brandon Walker Cage*, No. 3:21-CR-68-KHJ-FKB, 2022 WL 17254319 (S.D. Miss. Nov. 28, 2022) .

No. CV 22-6200-GW-AGRX, 2022 WL 15524977 at *4 (C.D. Cal. Oct. 24, 2022) (holding that the plain text does not cover conduct that "has nothing to do with 'keep[ing] or 'bear[ing]' arms"). Another district court has expressly held that the plain text of the Second Amendment does not cover the sale of firearms. *Tilotta*, 2022 WL 3924282 at *5. Simply put, no Court pre- or post-*Bruen* has found the plain text of the Second Amendment covers the commercial sale of any weapons (because it does not). As such, this Court does not need to reach question two because no historical analysis is necessary. The Ordinance is constitutional.

### III.   Naperville's Ordinance is consistent with the Nation's traditional regulation of firearms and other dangerous weapons.

Under *Bruen's* text-and-history standard, if a firearm regulation falls within the plain text of the Second Amendment, the Court must then determine whether the regulation is consistent with the "historical traditional" of such regulations. Thus, even if Plaintiffs could meet their burden that limitations on the commercial sale of assault rifles is governed by the text of the Second Amendment, the Ordinance would still be constitutionally valid because its prohibition is consistent with the Nation's tradition of regulating "dangerous [or] unusual weapons." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).[6] Historically, governments have retained substantial latitude in enacting restrictions on certain weapons deemed to be susceptible to criminal misuse and to pose significant dangers to the public—from trap guns to certain knives, blunt objects, and pistols—provided that law-abiding citizens retained access to traditional arms for effective self-defense. Governments have also regulated weapons in this way throughout our Nation's history, including around the time that the Second and Fourteenth Amendments were

---

[6] While *Heller* and *McDonald* refer to prohibitions on "dangerous and unusual weapons," Blackstone refers to the crime of carrying "dangerous *or* unusual weapons." *Kolbe*, 849 F.3d at 131 n.9 (quoting 4 Blackstone 148-49) (1769).

ratified. As counsel for Mr. Heller acknowledged during oral argument, the Second Amendment "always coexisted with reasonable regulations of firearms." Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 221 (2011). Naperville's Ordinance is consistent with the Nation's historical tradition of regulating firearms and is constitutional.

### A. The Second Amendment does not limit the states' police powers to address public safety threats as they arise.

The Second Amendment is not absolute. Since our founding, American governments have exercised broad police powers to limit access to and use of certain types of weapons deemed especially dangerous. As historian Saul Cornell explains, the "dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace."[7] [8] Government regulation of arms is unquestionably permitted, even though the text of the Second Amendment provides that the right to keep and bear arms "shall not be infringed." *Bruen,* 142 S. Ct. at 2126 (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961)). Indeed, the Supreme Court has recognized that governments have had the power to

---

[7] Wilson Decl., Exhibit B ("Cornell *Miller* Decl.") ¶ 9. Naperville attaches the Wilson Declaration that, among other exhibits, attaches several expert declarations from the cases *Miller v. Bonta*, Case No. 3:19-cv-01537-BEN-JLB (S.D. Cal.) and *Duncan v. Bonta*, Case No. 17-cv-1017-BEN-JLB (S.D. Cal.), which involve similar *Bruen* issues in challenges to California laws. Naperville notes that it will retain similar experts to opine on similar issues, but due to the accelerated timeline it could not yet do so. It attaches relevant expert declarations from these prior cases simply to demonstrate the likelihood of factual issues for the Court to consider on the merits. Naperville again requests the time needed to develop the factual record in this case prior to a ruling in favor of Plaintiffs.

[8] On Founding-era conceptions of liberty, *see* John J. Zubly, *The Law of Liberty* (1775). The modern terminology to describe this concept is "ordered liberty." See *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). For a more recent elaboration of the concept*, see generally* James E. Fleming & Linda C. Mcclain, *Ordered Liberty: Rights, Responsibilities, and Virtues* (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, *see Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr.*, Ordered Liberty: Cardozo and the Constitution,* 1 Cardozo L. Rev. 257 (1979); Jud Campbell*, Judicial Review, and the Enumeration of Rights*, 15 GEO. J. L. & Pub. Pol'y 569 (2017).

regulate "dangerous [or] unusual weapons" since at least the time of Blackstone. *Heller*, 554 U.S. at 627 (citing 4 Blackstone 148–49 (1769)).

Courts, however, have only just begun to explore the historical origins of the right to keep and bear arms and to define its precise scope and exceptions. *See Heller*, 554 U.S. at 625–26. As has been explained in a number of learned treatises, when the Second Amendment is viewed in its proper historical context, it is clear that colonial and early republican governments enjoyed robust police powers to regulate weapons—including who may possess them, where they may be possessed, and what weapons may be possessed and used:

> For most Americans, the right to own weapons for self-defense and other purposes, was, like other rights, limited by governmental police power, and therefore was subject to reasonable regulation, including limiting what types of weapons could be owned . . . .

Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 155, 312 (2018).

The Ordinance does not contradict this historical record: State and local governments have always been extended wide latitude to protect public safety. Naperville's Ordinance is therefore consistent with a local government's general powers to regulate conduct within its borders. *See, e.g., Maum Meditation House of Truth v. Lake County, Ill.*, 55 F.Supp.3d 1081, 1088–89 (N.D. Ill. July 16, 2014) ("In general, zoning ordinances imposing restrictions on use and occupation of private land ... satisfy the rational basis test."); *Jucha v. City of N. Chicago*, 63 F. Supp. 3d 820, 829–30 (N.D. Ill. 2014) (First Amendment protection of tattoos, as speech, does not mean that cities cannot regulate tattoo parlors with taxes, health regulations, or nuisance ordinances).

**B.** **The Ordinance is consistent with common historical regulations of dangerous or unusual weapons in American history, including the relevant periods surrounding the ratification of the Second and Fourteenth Amendments.**

Regulating the sale of assault weapons is analogous to well-established prohibitions against unusually dangerous weapons that are associated with unlawful activities rather than lawful self-defense. Although that category of historical precursor may not be a "dead ringer" for the Ordinance, that is not what *Bruen* requires. *Bruen*, 142 S. Ct. at 2133. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. In an era when "[m]ost guns available then could not fire more than one shot without being reloaded," *Friedman*, 784 F.3d at 410, government officials and courts had no occasion to consider the lawfulness of assault weapons. In this instance, when modern laws implicate "unprecedented societal concerns or dramatic technological changes," and therefore involve "regulations that were unimaginable at the founding," courts must reason by analogy. *Bruen*, 142 S. Ct. at 2132. And although analogical reason is not a "regulatory blank check," it also is not a "regulatory straightjacket." *Id.* at 2133. What matters is not how comparable a modern law is to historical analogues in form or substance, but how comparable it is in "how and why the regulations burden a law-abiding citizens' right to armed self-defense." *Id.* The *Bruen* Court explained that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (quotation marks and emphasis omitted).

Assault weapons are an example of a "dramatic technological change" that explains the absence of precise "founding-era historical precedent." *Id.* at 2131–32. Assault weapons "were not common in 1791." *Friedman*, 784 F.3d at 410. "Most guns available then could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until

the 19th century. Semi-automatic guns…are more recent developments." *Id; see also* Wilson Decl., Exhibit C ("Spitzer Decl."), at ¶¶ 18-30 (discussing differences in 19th century and the 20th century firearms technologies). In 1791, "virtually all firearms were single-shot" and "guns capable of firing more than a single round could best be described as exotic." *See* Wilson Decl., Exhibit G ("Cornell *Duncan* Decl.") at ¶ 37; *see also* Spitzer Decl. at ¶¶ 18-31 (describing early "experimental" multi-shot guns and the difficulty of developing reliable, commercially successful multi-shot guns until after the Civil War). To the extent there were high-capacity firearms, they were regarded as weapons for the military or law enforcement. *See* Wilson Decl. Exhibit D ("Vorenberg Decl.") at ¶ 7. They were not widely marketed to civilians until recent decades. *See* Wilson Decl. Exhibit E ("Klarevas Decl.") at ¶ 16 & Table 2.

Assault weapons like those covered by Naperville's Ordinance also implicate societal concerns that have no founding-era precedent. From the colonial period into the early 20th century, mass murder occurred in the United States, but typically was carried out by multiple perpetrators, because technological limitations impaired the ability of a single person to kill multiple people in a short period. *See* Wilson Decl. Exhibit F ("Roth Decl.") at ¶ 35. Mass shootings by a single individual that results in 10 or more deaths are a modern phenomenon. Patrick Sauer, *The Story of the First Mass Shooting in U.S. History*, Smithsonian Mag. (Oct. 14, 2015), https://www.smithsonianmag.com/history/story-first-mass-murder-us-history-180956927/. *See* Roth Decl. ¶ 48. Indeed, every mass shooting since 2004 that resulted in 14 or more deaths involved assault weapons. *See* Klavares Decl. at Figure 2.

Since mass shootings with assault weapons have no precedent in the founding or reconstruction eras, *Bruen* instructs the courts to look for a "well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133 (emphasis in original). In

seeking that analogue, *Bruen* instructs the court to focus on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. Here, the Ordinance's burden is minimal. There is no shortage of widely available firearms that Naperville citizens can purchase in Naperville for self-defense. The Ordinance only prohibits the sale of certain assault rifles. Firearms that are compliant with the Ordinance are widely available, and firearm owners who currently use non-compliant assault rifles are able to possess and use those weapons in a lawful manner. Owners, and future owners, who wish to purchase an assault rifle will simply not be able to purchase those weapons within Naperville city limits.

Indeed, the Ordinance is what courts have described as a "minimal burden," if any, on Plaintiffs' use of firearms for armed self-defense. *Duncan,* 19 F.4th at 1104. "The law has no effect whatsoever on which firearms may be owned; as far as the challenged statute is concerned, anyone may own any firearm at all. Owners of firearms also may possess as many firearms, bullets, and magazines as they choose." *Id.* Certainly, the burden imposed by the Ordinance is no heavier than that imposed by the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller*, 554 U.S. at 627. As far back as 1541, the English parliament prohibited members of the public from owning or carrying certain kinds of weapons. *See Peruta v. County of San Diego*, 824 F.3d 919, 930–31 (9th Cir. 2016) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (citing a 1541 statute banning "little shorte handguns and little hagbutts"). In the 1800s, states enacted a range of laws restricting weapons like "Bowie knives," "slungshots," and certain kinds of pistols. *See* Spitzer Decl. Ex. C. Those weapons were commonly used for fighting or other criminal activities rather than lawful self-defense. *See* Spitzer Decl. ¶¶ 36–37, 44, 49. More recently, the twentieth-century ban on machine guns continued the historical tradition of restricting unusually dangerous weapons unneeded for legitimate self-defense. *Heller*, 554 U.S. at

627; *Duncan*, 19 F.4th at 1131–32 (Berzon, J., concurring) (noting the history). Such historical restrictions completely disallowed certain weapons with particularly dangerous features. If anything, the burden of those historical restrictions was heavier than the burden imposed by the Ordinance given that the possession and use of lethal weapons is not being regulated in Naperville, only the commercial sale of assault rifles within a small geographic boundary.

Other well-established historical regulations similarly sought to prevent criminal actors from assembling the sort of firepower a semiautomatic assault rifle provides. In an era of single-shot weapons, that sort of firepower likely could come only from a group rather than an individual, and the Supreme Court confirmed in *Heller* that the Second Amendment "does not prevent the prohibition of private paramilitary organizations." *Heller*, 554 U.S. at 621 (discussing *Presser v. Illinois*, 116 U.S. 252 (1886)). Laws that prohibit "private paramilitary organizations" from drilling or parading burden the right of self-defense in a manner, and for a reason, that is analogous to restrictions on assault weapons: making it difficult to discharge multiple rounds rapidly. Like laws prohibiting unusually dangerous weapons, laws restricting paramilitary organizations impose practical limits on firepower for armed self-defense.

Those restrictions are analogous to restrictions on assault weapons in "how and why" they affect the right to armed self-defense. *Bruen*, 142 S. Ct. at 2133. Assault weapons, like the weapons prohibited in other eras, are suited to unlawful purposes, are not needed for legitimate self-defense, and pose significant risks to public safety and security.

For all of these reasons, Plaintiffs' Second Amendment challenge to the Ordinance's prohibition on the commercial sale of assault rifles weapons fails. The Ordinance's prohibition on the commercial sale of assault rifles is justified by similar public safety interests that have historically been understood to justify the exercise of police powers in regulating the possession,

use, and storage of firearms. Further, assault rifles are analogous to dangerous weapons that have historically been restricted without infringing on the core right of self-defense. Moreover, the Ordinance is significantly less restrictive than historical legislations given that it regulates only the commercial sale of assault rifles and not the possession, use, and storage of them. For these reasons, the Ordinance is consistent with the United States' tradition of firearm regulations. Plaintiffs are unlikely to succeed on their Second Amendment claims.

## IV.   The Court should forgo answering these questions at this preliminary stage and allow the parties to develop a complete factual record.

As the Court is aware, to obtain injunctive relief, Plaintiffs bear the burden of establishing a likelihood of success on the merits of their constitutional claims. The type of historical research called for by *Bruen,* however, is difficult and requires time, resources, and expertise. The agreed stay has mooted Plaintiffs' motion for a temporary restraining order. *See Cassell v. Snyders*, 458 F. Supp. 3d 981, 991 (N.D. Ill. 2020), *aff'd*, 990 F.3d 539 (7th Cir. 2021) (claim for injunctive relief moot when challenged law was no longer in effect); *Associated Builders & Contractors, E. Pea. Chapter, Inc. v. Cnty. of Northampton*, 376 F. Supp. 3d 476, 486 (E.D. Pa. 2019), aff'd sub nom. *Associated Builders & Contractors E. Pa. Chapter Inc v. Cnty. of Northampton*, 808 F. App'x 86 (3d Cir. 2020) (application for TRO moot when parties stipulated that government would temporarily stay conduct at issue); *Montana Fish, Wildlife, & Parks Found., Inc. v. United States,* 91 Fed. Cl. 434, 438 (2010) (same). For the preliminary injunction motion, the parties proposed a three-month briefing schedule that would have provided time for Naperville and Plaintiffs to retain expert historians to conduct original research, collect primary sources, and formulate an analysis pursuant to *Bruen's* text-and-history standard, and for those experts to prepare the reports required by FRCP 26(a)(2), and likely undergo depositions. *See* Dkt. 32. The proposed briefing schedule

was reasonable in length and would not have caused undue delay. The Court did not accept the briefing schedule. *See* Dkt. 33.

While Naperville has done its best to marshal a historical record on an accelerated timetable and has provided numerous citations to learned treatises in this brief, it has been unable to conduct primary source research or to retain and disclose an expert under FRCP 26(a)(2). Undoubtedly, relevant historical analogues remain to be discovered and interpreted through further historical research conducted by a trained historian. *See Bruen*, 142 S. Ct. at 2130 (citing *McDonald.*, 561 U.S. 742, 803–04) ("[H]istorical analysis can be difficult . . . it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it."); *see also United States v. Bullock*, No: 3:18-CR-165-CWR-FKB, 2022 WL 16649175, Dkt. 65 (S. D. Miss. Oct. 27, 2022) ("[The *Bruen* Court's observation about historical analysis] is an understatement. . . . The sifting of evidence that judges perform is different than the sifting of sources and methodologies that historians perform."); *State v. Philpotts,* 194 N.E.3d 371, 372 (Ohio 2022) (Brunner, J., dissenting) (describing the complexities of history and historical research, which is not a "once-and-for-all process that will eventually produce a single, final version of what happened in the past"). If the existing record (including the citations submitted in support of this brief), is insufficient to justify the constitutionality of the Ordinance, Naperville respectfully renews its request to conduct formal expert discovery to develop a more comprehensive record responsive to *Bruen*.[9] "Unlike the Supreme Court, trial courts have the ability to receive evidence and rely on that evidence to find facts that support the legal reasoning

---

[9] If this briefing results in the Court issuing a final ruling on the merits, the lack of formal discovery will have deprived the parties of a "full and fair opportunity to ventilate the issues" involved in the post-*Bruen* analysis. *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 990 (9th Cir. 2008); *see also Commodity Futures Trading Comm'n v. Bd. Of Trade of City of Chi.*, 657 F.2d 124, 128 (7th Cir. 1981).

and lead to conclusions." *Ocean State Tactical, LLC, et al., v. State of Rhode Island, et al.,* No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at \*6 (D.R.I. Dec. 14, 2022) (conducting *Bruen* text-and-history analysis and denying request to enjoin state from enforcing large-capacity-magazine ban based on evidence elicited through expert discovery).

## <u>CONCLUSION</u>

For the reasons stated above, the Court should deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

Dated: December 19, 2022

Respectfully submitted,

By: /s/ *Christopher B. Wilson*

Christopher B. Wilson, Bar No. 06202139
CWilson@perkinscoie.com
**PERKINS COIE LLP**
110 North Wacker Drive, Suite 3400
Chicago, Illinois 60606-1511
Telephone: +1.312.324.8400

Attorney for City of Naperville

## CERTIFICATE OF SERVICE

I, Christopher B. Wilson, certify that on December 19, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record:

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com
*Pro Hac Vice pending*

Designated Local Counsel:
Jason R. Craddock
Law Office of Jason R. Craddock
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(708) 964-4973
cradlaw1970@gmail.com or craddocklaw@icloud.com

Attorneys for Plaintiffs

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 19th day of December, 2022.

*s/ Christopher B. Wilson*
Christopher B. Wilson
PERKINS COIE LLP
110 North Wacker Drive, Suite 3400
Chicago, Illinois 60606-1511
Phone: +1.312.324.8400
Fax: +1.312.324.9400

Attorney for City of Naperville