**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ROBERT C. BEVIS, and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation; | ) ) ) ) | Case No. 22-cv-04775 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| CITY OF NAPERVILLE, ILLINOIS, | ) ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs submit the following Reply in support of their Motion for Preliminary Injunction against the City of Naperville, Illinois (the "City").

## I. The Second Amendment Protects the Right to Acquire Arms

### A. The Right to Keep and Bear Arms Subsumes the Ancillary Right to Acquire Arms

The City argues for an interpretation of the *Heller* textual analysis that would preclude the protection of ancillary rights protected by the Second Amendment. Resp. 3 This is wrong as both *Heller* and *Bruen* make clear. In *Heller*, the Court struck down a District of Columbia ordinance requiring that firearms in the home be rendered and kept inoperable at all times. The Court struck this provision because it "makes it impossible for citizens to use [the regulated weapons] for the core lawful purpose of self-defense . . ." *Heller*, 554 U.S. at 630. Thus, under *Heller*, the Second Amendment protects the right to keep and bear "operable" arms. Indeed, the Court held that the D.C. law was "precluded by the unequivocal text" of the Second Amendment, *Id.*, even though the word "operable" is not in the text itself. Thus, *Heller's*

1

textual analysis does not impose an interpretive straitjacket. Courts are free to use their common sense to protect the express right as well as those rights that are implied by the express right.

In *Bruen*, the Court cited with approval the Third Circuit's decision in *Drummond v. Robinson Twp*., 9 F.4th 217 (3rd Cir. 2021). *Id*., 142 S.Ct. at 2133. In *Drummond*, the Court held that laws "prohibiting the commercial sale of firearms would be untenable in light of *Heller*. *Id*., 9 F.4ᵗʰ at 227 (internal citation and quotation marks omitted). "Commercial sale" is not in the text, but it is nevertheless protected. Thus, the extraordinarily narrow interpretative restraint advanced by the City is belied by *Bruen* as well.

The Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense. For example, *Jackson v. City and County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014), involved a challenge to a San Francisco ordinance that prohibited the sale of a certain kind of ammunition. *Id*. at 958. The Court recognized that although the Second Amendment "does not explicitly protect ammunition . . . without bullets, the right to bear arms would be meaningless." *Id*. at 967. *Jackson* thus held that "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Id*., *quoting Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

Obviously, the right to keep and bear arms would be meaningless if citizens were unable to acquire arms in the first place. Therefore, "[t]he right to possess firearms for protection implies a corresponding right to **acquire** and maintain proficiency in their use . . ." *Ezell v. City of Chicago ("Ezell I")*, 651 F.3d 684, 704 (7th Cir. 2011) (emphasis added).[1]  *See also Ezell v. City of Chicago ("Ezell II")*, 846 F.3d 888, 892 (7th Cir. 2017) (reaffirming *Ezell I's*

---

[1] The City does not attempt to distinguish (or otherwise deal with) *Ezell I* or *Ezell II* in its Response.

holding that the core right recognized in *Heller* and *McDonald* includes a corresponding right to acquire firearms). *Ezell I and II* are, of course, dispositive in this case. The Second Amendment protects the right to acquire arms.

Justice Thomas, the author of *Bruen*, cited both *Jackson* and *Ezell I* with approval in *Luis v. United States*, 578 U.S. 5 (2016), in which he explained that constitutional rights implicitly protect those closely related acts necessary to their exercise:

> The right to keep and bear arms, for example, 'implies a corresponding right to obtain the bullets necessary to use them,' *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (C.A.9 2014) (internal quotation marks omitted), and 'to **acquire** and maintain proficiency in their use,' *Ezell v. Chicago*, 651 F.3d 684, 704 (C.A.7 2011). . . . **Without protection for these closely related rights, the Second Amendment would be toothless.**

*Id.*, 578 U.S. at 26-27 (Thomas J., concurring) (emphasis added).

Nevertheless, in the teeth of binding Seventh Circuit precedent, the City asserts that "the Second Amendment *only* protects an individual's right to 'keep and bear arms.'" Resp. 3 (emphasis in original). It is impossible to square this assertion with *Ezell I's* unambiguous holding that the right to keep and bear arms subsumes the right to acquire arms.[2] Naperville's ordinance bans the sale of a category of arms. Banning the sale of a category of arms is the same as banning the purchase of those arms. Thus, the Naperville ordinance burdens the right to acquire arms recognized in *Ezell I*, and this implicates the Second Amendment. A division of this Court summarized this rule succinctly in *Kole v. Vill. of Norridge*, 2017 WL 5128989 (N.D. Ill. 2017). In that case, the Court held: "This Court agrees with the courts in *Teixeira [v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017)] and *Illinois Association of Firearms Retailers [v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014)] that the Second Amendment right to keep and bear arms for self-defense necessarily includes the right to acquire a firearm, **and that**

---

[2] It is also impossible to square this assertion with *Heller* as discussed above.

**this right is implicated by local laws directly or functionally banning firearm sales**. This conclusion plainly follows from the Seventh Circuit's reasoning in *Ezell I* and *II*." *Id.* *9 (emphasis added).

Other courts are in accord. In *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014), a division of this Court held that the right to keep and bear arms "must also include the right to *acquire* a firearm . . ." (emphasis in the original). Analogizing to *Ezell I* in its en banc decision in *Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017), the Ninth Circuit explained that "[a]s with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense **'wouldn't mean much' without the ability to acquire arms.**" 873 F.3d at 677, *quoting Ezell I*, 651 F.3d at 704 (emphasis added). In an early case, the Tennessee Supreme Court observed: "[t]he right to keep arms, necessarily involves the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871). Similarly, as noted above in *Drummond, supra,* the Third Circuit held that laws "prohibiting the commercial sale of firearms would be untenable in light of *Heller. Id*., 9 F.4ᵗʰ at 227 (internal quotation marks omitted). *See also*, *Altman v. Cnty. of Santa Clara*, 464 F. Supp. 3d 1106, 1123 (N.D. Cal. 2020) (ban on sales "untenable under *Heller*"); *Rachlin v. Baumann*, 2022 WL 4239790 at *11 (D.N.J. 2022) (several courts have also recognized under *Heller* a corresponding right to acquire firearms); and *Radich v. Guerrero*, 2016 WL 1212437, at *7 (D.N.Mar.I. 2016) ("If the Second Amendment individual right to keep and bear a handgun for self-defense is to have any meaning, it must protect an eligible individual's right to purchase a handgun, as well as the complimentary right to sell handguns.").

### B. Plaintiffs Are Asserting the Right to Acquire Firearms

The City asserts that the Second Amendment does not protect the right to sell firearms.[3] Resp. 4. This argument misses the mark. As set forth above, Naperville's ban on the commercial sale of certain firearms burdens the right to acquire arms protected by the Second Amendment. Mr. Bevis asserts this right on his own behalf. NAGR asserts this right on behalf of its members who reside in Naperville. *Ezell I*, 651 F.3d at 696. And Law Weapons, Inc. asserts this right on behalf of third parties who seek access to its services. *Id. See also Craig v. Boren*, 429 U.S. 190, 195 (1976) ("[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function."); and *Teixeira, supra,* 873 F.3d 678 (gun store may assert the subsidiary right to acquire arms on behalf of potential customers).

### C. The City Erred When It Relied on Abrogated Cases

The City states that federal courts of appeals have consistently held that the Second Amendment does not protect the right to possess so-called assault weapons, let alone sell them. Resp. 4. But the City's reliance on these cases is misplaced.

Under *Heller* and *Bruen* the Supreme Court applied the following two-step analysis: [1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Id.*, 142 S. Ct. at 2129–30. Step one asks whether the activity is covered by the text. If it is, step two asks whether under the Nation's history and tradition, it is nevertheless unprotected.

---

[3] The City's assertion that no court has held that the Second Amendment protects the sale of firearms is wrong. *See*, e.g.,*Kole v. Vill. of Norridge*, 2017 WL 5128989 *9 (N.D. Ill. 2017) (Second Amendment implicated by law banning firearm sales). But it does not matter. As discussed above, even if it were true that the Second Amendment is not implicated by a ban on the sale of firearms, it is certainly implicated by the corresponding ban on the purchase (i.e., the acquisition) of firearms.

The City made a mistake by citing as part of its textual analysis several pre-*Bruen* cases that held assault weapons are unprotected. None of the cases engaged in a textual analysis in which they held that assault weapons are not "arms" as that word is used in the Second Amendment. Nor could they, because the semi-automatic firearms banned by the City clearly are arms under any reasonable interpretation of that word. The City has confused the first question with the second question.

Moreover, the fact that prior to *Bruen* several courts of appeals upheld assault weapons bans using a test or tests abrogated by or inconsistent with *Bruen* has absolutely no bearing on the Court's resolution of this post-*Bruen* case. The whole point of *Bruen* was that the Supreme Court needed to interpose a course correction because the vast majority of courts that had considered Second Amendment issues after *Heller* got it wrong. *Bruen*, 142 S.Ct. 2127.

### D. *Friedman* Did Not Apply Heller's Historical Analysis

The City's assertion that the Court in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), actually applied the *Heller* test is glaringly wrong. This is easily demonstrated. In *Friedman* the Court announced a unique three-part test to determine Second Amendment questions. Under this test, a court asks: whether a regulation [1] bans weapons that were common at the time of ratification or [2] those that have some reasonable relationship to the preservation or efficiency of a well regulated militia and [3] whether law-abiding citizens retain adequate means of self-defense. *Id.*, 784 F.3d at 410. This test is not supported by *Heller*. Indeed, two of the three prongs of the test are specifically **foreclosed** by *Heller* as the Court made plain in *Bruen*.

6

[1] The Second Amendment's "reference to 'arms' does not apply only to those arms in existence in the 18th century." *Bruen*, 142 S. Ct. at 2132 (cleaned up). Indeed, *Heller* characterized this argument as "bordering on the frivolous." *Heller*, 554 U.S. at 582.

[2] The Second Amendment's operative clause "does not depend on service in the militia." *Bruen*, 142 S. Ct. at 2127, *citing Heller*, 554 U.S. at 592.

[3] As for the third prong, "[T]he right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016), *quoting Heller*, 554 U.S. at 629.

"Stare decisis cannot justify adherence to an approach that Supreme Court precedent forecloses." *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 767 (7th Cir. 2019). And *Bruen* flatly forecloses the approach taken by the Court in *Friedman*. *See also United States v. Wahi*, 850 F.3d 296, 302 (7th Cir. 2017) ("When an intervening Supreme Court decision unsettles [the Seventh Circuit's] precedent, it is the ruling of the [Supreme] Court that . . . must carry the day.").

### E. The City's Attempt at Burden Shifting is Meritless

The City attempts to turn the *Bruen* test on its head by arguing that the "'common use' inquiry comes in the textual stage of [the] analysis." Resp. 5. The City is obviously attempting to shift its burden under the "history and tradition" prong to Plaintiffs, and this is plainly wrong. Whether an arm is in common use obviously requires an empirical analysis, not an analysis of the Second Amendment's text. Moreover, in *Heller* the Court held that the "typically possessed by law-abiding citizens for lawful purposes" test . . . "accords with the **historical understanding of the scope of the right**." *Id*., 554 U.S. at 625 (emphasis added). *See also Bruen*, 142 S.Ct. at 2128 (common use part of historical analysis). Thus, not only does the

City's argument make no sense, but it is also foreclosed by both *Heller* and *Bruen*. The burden is on the City, not Plaintiffs. In *Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021), *vacated and remanded on other grounds*, 2022 WL 3095986 (9th Cir. 2022), the Court rejected a similar argument, holding that the starting point is that no arm may be prohibited, and if a plaintiff challenges a prohibition, it is "on the government" to prove the banned arm is dangerous and unusual. *Id.*, 542 F. Supp. 3d at 1029.

## F. The Second Amendment Protects the Right to "Keep" Arms

Unable to rebut the overwhelming evidence that the firearms the sale of which has banned are "typically possessed for lawful purposes," the City retreats to yet another specious argument. According to the City, an arm is not protected unless it is in fact frequently used for self-defense. Resp. 5-6. The City's interpretation flies in the face of *Heller's* plain language. In *Heller* the Supreme Court did not focus on "use" in isolation; the Court held that the Second Amendment conferred an individual right to **keep and bear** arms. *Id.*, 554 U.S. at 595. The Court held that "keep arms" means "possessing arms." *Id.*, 554 U.S. at 583.[4] Finally, the Court held that banning "the most preferred firearm in the nation to **keep** and use for protection of one's home and family [fails] constitutional muster." *Id.*, 554 U.S. at 628–29 (cleaned up). The conjunctive is important. If the City's interpretation of *Heller* were correct, the word "keep" in that sentence would be superfluous. It is not. *Heller* held that the Second Amendment protects both the right to possess (i.e., keep) arms and the right to use those arms should the occasion arise. To be sure, the Court used the phrases "commonly used" and "commonly possessed" in

---

[4] In a passage that conflicts with its own later argument, the City admits that the Second Amendment protects the right to possess arms (Resp. 3-4). As the Seventh Circuit held in *Ezell I*, the right to possess arms would be meaningless without the right to acquire them in the first place.

discussing categories of arms that are constitutionally protected. *Id.*, 554 U.S. at 624-25. But nothing in the opinion suggests that it used one phrase to the exclusion of the other.

As the Court in *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), held, "Second Amendment rights do not depend on how often the [arms] are used. Indeed, the standard is whether the prohibited [arms] are 'typically possessed by law-abiding citizens for lawful purposes,' not whether the [arms] are often used for self-defense." 25 F. Supp. 3d at 1276, *quoting Heller*, 554 U.S. at 625. It is enough that the arms in question are commonly possessed for self-defense and other lawful purposes, not that their actual uses in self-defense meet some threshold the City has not identified. If it were otherwise, the City's reasoning would justify banning **any** firearm because the overwhelming majority of firearms have never actually been used in self-defense at all. Surely, that cannot be the result contemplated by the Supreme Court in *Bruen* or *Heller*.

Thus, under *Heller*, the issue is whether the arm is commonly possessed by law abiding citizens. Justice Alito's has provided guidance on this issue: "[T]he more relevant statistic is that 'hundreds of thousands of [the arms at issue] have been sold to private citizens,' who it appears may lawfully possess them in 45 states." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring). Other courts are in accord. *See Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (analyzing commonality by reviewing raw number percentage and jurisdiction counting); *Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133, 1147 (9th Cir. 2020)[5] ("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned

---

[5] *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

because the record shows that "millions" are owned); *Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017*), abrogated by Bruen*, (2022) (Traxler, J. dissenting)[6] (consensus among courts is that the test is an "objective and largely statistical inquiry); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*."); *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'").

### G.     The Court Should Reject the City's Attempt to Inject Means-End Analysis Through the Back Door

According to the FBI, a murder victim is more than twice as likely to be killed by hands and feet than by a rifle of any type. *See* discussion at Motion 15. Moreover, mass shootings are "an infinitesimally rare event." *Miller, supra*, at 1041. And there is no evidence to show that bans on so-called assault weapons alleviate the harm of mass shootings. *Id*.

But Plaintiffs get it. Even though "[m]ass shootings are rare, [] they are highly salient." *Friedman*, 784 F.3d at 412. The emotional impact of these events has always been the government's go-to argument for banning assault weapons even if such bans do no good. Indeed, astoundingly, the *Friedman* court expressly stated that one of the reasons it upheld the ban was because even if the ban did no good it made people feel safer. *Id*.

*Friedman's* "gun bans are constitutional because they make people feel better" rationale was never supported by Supreme Court precedent. That is clearer today than it ever was. The holding in *Bruen* was unambiguous. "*Heller* does not support applying means-end scrutiny."

---

[6] The Court might wonder why Plaintiffs have cited dissenting opinions in this brief. The answer is that the whole point of *Bruen* was that the vast majority of courts that had considered Second Amendment issues after *Heller* got it wrong. *Bruen*, 142 S.Ct. 2127. It follows that the judges who dissented from those erroneous opinions were more likely correct, as is the case here.

*Id.*, 142 S. Ct. at 2127; *see also Id.*, 142 S. Ct. at 2129 (inquiry into the Code's alleged "salutary effects" upon "important governmental interests" is not part of the test).

Despite this clear holding, the City continues its emotional appeal and suggests that its ban on the sale of certain semi-automatic firearms should be upheld because such arms have been used in 13 shooting incidents. Resp. 8. In other words, the City's argument is that the Court should disregard the fact that tens of millions of these arms are possessed by law abiding citizens for lawful purposes (See Declaration of James Curcuruto attached to motion for preliminary injunction) and instead base its decision on the fact that the City's means (banning the sale of the arms) is justified by the end it seeks to achieve.[7] The City's argument is foreclosed by *Heller* and *Bruen*.

### H. The City's "Canons of Textual Interpretation" Argument is Foreclosed by *Ezell I and II*

The City invokes "canons of textual interpretation" to argue that its ban does not implicate the Second Amendment. Resp. 9-10. As discussed above, the City's argument is foreclosed by *Ezell I* and *Ezell II*. The City does not argue otherwise. Indeed, it ignores the most directly relevant Seventh Circuit precedents. The City instead cites *United States v. Tilotta*, 2022 WL 3924282 (S.D. Cal. 2022). But that case is readily distinguishable. Unlike in this case, in *Tilotta* the criminal defendant made no effort to argue that his right to acquire firearms was burdened. *Id.* *5. The issue in that case was whether the defendant violated several regulations governing the sale of firearms. *Id.* Plaintiffs have not argued that the government does not have the authority to regulate firearms sales. But there is an obvious difference between *regulation* (which is allowed under *Heller* and was at issue in *Tilotta*) and *prohibition* (which is not allowed under *Heller* and is at issue in this case). As discussed in more detail

---

[7] Never mind that the City has not provided any evidence that its means would actually achieve this end.

above, a prohibition implicates the right to acquire arms, which is protected by the Second

Amendment.

## II.     The City Has Not Met its Burden of Showing its Ban is Supported by the Nation's Historical Tradition of Firearms Regulation

## A.     The City Ignores the Most Clearly Relevant Precedent

In *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill.

2014), a division of this Court invalidated Chicago's ordinance banning the commercial sale of

firearms.  It stated:

> Although the City argues that 'state bans of the sale of even popular and common
> arms stretch back nearly 200 years,' [] the only historical support that it musters are
> three statutes from Georgia, Tennessee, and South Carolina banning the sale,
> manufacture, and transfer of firearms within their borders. *See* [] Georgia Act of
> Dec. 25, 1837, ch. 367, § I; [] Tennessee Act of Mar. 17, 1879, ch. 96, § 1 [], South
> Carolina Act of Feb. 20, 1901, ch. 435, § 1. But these isolated statutes were enacted
> 50 to 110 years after 1791, which is 'the critical year for determining the
> amendment's historical meaning.' *Moore*, 702 F.3d at 935. These statutes are thus
> not very compelling historical evidence for how the Second Amendment was
> historically understood.  And citation to a few isolated statutes – even to those from
> the appropriate time period –  'fall[ ] far short' of establishing that gun sales and
> transfers were historically unprotected by the Second Amendment. *Ezell*, 651 F.3d
> at 706. **The City's proffered historical evidence fails to establish that
> governments banned gun sales and transfers at the time of the Second
> Amendment's enactment** . . .

*Id*., 961 F. Supp. 2d at 937 (emphasis added).

Chicago failed to identify a historical tradition justifying its ban. As set forth below,

Naperville has also failed.

## B.     The Court Should Reject the City's Attempt to Rewrite *Heller*

Shockingly, the City literally attempts to rewrite the *Heller* test. Resp. 12-13. In *Heller*

the Supreme Court held that the Nation's historical tradition of firearms regulation supports

banning weapons that are both "dangerous **and** unusual." *Heller*, 554 U.S. at 627 (emphasis

added). Importantly, this is a "conjunctive test: A weapon may not be banned unless it is both

dangerous and unusual. Justice Alito provided critical guidance regarding this issue in *Caetano v. Massachusetts*, 577 U.S. 411 (2016):

> [T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. *See Heller, supra*, at 627, 128 S.Ct. 2783 (contrasting "'dangerous and unusual weapons'" that may be banned with protected "weapons . . . 'in common use at the time'"). . . . **If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous.**

*Id.*, 577 U.S. at 418 (Alito, J. concurring) (emphasis added).

An arm that is commonly possessed by law abiding citizens for lawful purposes is, by definition, not unusual. Thus, such an arm cannot be both dangerous and unusual and therefore it cannot be subjected to a blanket ban. *Bruen*, 142 S. Ct. at 2143*; Heller*, 554 U.S. at 629. The City mispresents the *Heller* test when it uses brackets to delete "and" and insert "or" in the relevant passage. Resp. 13. This is not *Heller's* holding and the Court should reject the City's attempt to rewrite the law with the clever use of brackets.

**C.      The Arms the Sale of Which the City Bans Are Commonly Possessed for Lawful Purposes**

The City bears the burden of showing that its regulation is consistent with the Nation's historical tradition of firearm regulation. Plaintiffs are not required to demonstrate the negation of that proposition.[8] Plaintiffs have, however, demonstrated that no such historical tradition exists. The City's ban extends to weapons that include the most popular rifle in America, tens of millions of which are owned by law abiding citizens for lawful purposes. (See discussion at Motion 11-16). There cannot be the slightest doubt that Judge Manion was correct. "[T]he evidentiary record is unequivocal: a statistically significant amount of gun owners . . . use semiautomatic weapons . . . for lawful purposes." *Friedman*, 784 F.3d at 415 (Manion, J.,

---

[8] *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 415 (7th Cir. 2015) (Manion, J., dissenting).

13

dissenting). See especially footnote 3 to Judge Manion's opinion where he summarized the evidence. *Id*. The arms the City has banned are commonly possessed by law abiding citizens for lawful purposes. Accordingly, there is no historical tradition of banning these weapons or their sale. Therefore, the City cannot demonstrate such a tradition exists and its ban is unconstitutional. The Court's inquiry should end here.

### D. The City's "Unusually Dangerous" Argument is Precluded by *Bruen*

The City argues that it can ban the sale of this class of weapon because they are "unusually dangerous." Again, this argument fails because, as already discussed, the City cannot rewrite *Heller*. The "relative dangerousness" of these weapons is irrelevant because they are certainly not both "dangerous and unusual." *Caetano*, 577 U.S. at 418.

### E. The City Has Failed to Meet its Burden of Demonstrating an Historical Analogue

Notwithstanding the hundreds of pages of material it attached to its brief, the City could not point to a single founding-era law, regulation, or practice that allowed the government to prohibit the sale of an entire class of firearms. That is because the practice was unheard of by the founders. Instead, the City tosses a couple of isolated examples out and asserts an analogous regulation exists when none does. But not just any law or tradition can be plucked from the history books. While the City need not identify a "historical twin," it must present a genuine analogue – one that is "relevantly similar" to the modern restriction it seeks to defend. *Id*. at 2122. Thus, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted.'" *Id*. at 2133 (internal quotation marks omitted). The word "analogue" generally requires a thing to be so similar to another thing as to be useful for some purpose (such as a determination of whether the two things form part of the same tradition). *Antonyuk v. Hochul*,

14

2022 WL 5239895, at *8 (N.D.N.Y. 2022). Therefore, generally, a historical statute cannot earn the title "analogue" if it is clearly more distinguishable than it is similar to the thing to which it is compared. *Id*. In short, dissimilar historical laws cannot meet the *Bruen* standard even if they impose comparable burdens.

The City begins its analysis by admitting that there is an "absence of precise founding-era historical precedent." Resp. 14 (internal quotation marks omitted). If by "precise" the City means "any," this is surely correct and this admission is fatal to the City's defense. The City hardly even bothers trying to point to actual historical analogues. **Indeed, the City does not point to a single founding era law** as a potential analogue to its regulation. Instead, it points to a 1541 statute banning certain weapons. Resp. 16. The problem with this citation is that the Supreme Court specifically held in *Bruen* that the 1541 statute cited by the City is "inconsistent with *Heller's* historical analysis regarding the Second Amendment's meaning at the founding and thereafter." *Id*., 142 S. Ct. at 2141 n.10.

Next, the City cites laws from the 1800s restricting Bowie knives, slungshots and certain kinds of pistols. Resp. 16. It is unclear why the City believes that pointing to unspecified laws passed sometime between 1800 and 1899 meets its burden of demonstrating a historical tradition of regulation. How widespread were such laws? This is a critical question because if the government is able to point to only one or a few laws, it has failed to support a historical tradition. *Bruen*, 142 S.Ct. at 2153. Moreover, the City does not explain why it believes the laws it alludes to (but does not actually cite in its brief) are analogous to its ban on the sale firearms that are commonly possessed by law abiding citizens for lawful purposes. Surely the historical analysis required by *Heller* and *Bruen* requires more than citing unspecified laws regulating wholly different weapons and baldly asserting those laws are analogous.

The City points to 20th century prohibitions on machine guns to justify its law. Resp. 16-17. But this argument is precluded by the Supreme Court's holding in *Staples v. United States*, 511 U.S. 600, 611–12 (1994), in which the Court contrasted machineguns with semi-automatic rifles like the AR-15, which "have been widely accepted as lawful possessions." *Id*., 511 U.S. 611-12. Moreover, the justification for regulating machineguns is that they "are dangerous and unusual and therefore not in common use [and therefore] do not receive Second Amendment protection. *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016). In contrast, as demonstrated above, the arms subject to the City's ban are not both dangerous and unusual.

None of these regulations supports the existence a "well-established and representative historical analogue" to banning the sale of an entire class of rifles commonly possessed by law abiding citizens for lawful purposes. Nevertheless, the City pushes on and asserts that these historical examples support its case, because they disallowed "certain weapons with particularly dangerous features." Resp. 17. Again, the relative dangerousness of a weapon, standing alone, is irrelevant to the analysis. *Caetano*, 577 U.S. at 418 (see discussion above).

Finally, the City suggests that private militia laws such as the one upheld in *Presser v. Illinois*, 116 U.S. 252 (1886), establish a historical tradition analogous to banning the sale of a firearm commonly possessed by law abiding citizens for lawful purposes. Resp. 17 This is wrong. Indeed, the City's argument is expressly foreclosed by *Heller* where the Court stated: "*Presser* **said nothing about the Second Amendment's meaning or scope**, beyond the fact that it does not prevent the prohibition of private paramilitary organizations." *Heller*, 554 U.S. at 621 (emphasis added).

**F.      The City's Technological Change Argument is Meritless**

The City implies that its ban is constitutional because the weapons the purchase and sale of which it seeks to ban represent an advance in technology. Resp. 14. But in *Bruen* the Court held that just as the First Amendment protects modern forms of communication and the Fourth Amendment applies to modern forms of search, the Second Amendment extends to all arms, "even those that were not in existence at the time of the founding." *Id.*, 142 S. Ct. at 2132.[9]

Moreover, the "dramatic technological change" argument advanced by the City is foreclosed by *Heller*. The City advances two grounds to justify its ban on the purchase and sale of semiautomatic rifles [1] the advance from single shot weapons in the 18th century to semiautomatic weapons today is a dramatic technological change. Resp. 14-15. And [2] The ban is justified because it makes it difficult for citizens "to discharge multiple rounds rapidly." Resp. 17. But when it decided *Heller*, the Supreme Court was keenly aware that semiautomatic weapons can be used in mass shootings. Indeed, a shooting involving semiautomatic weapons had occurred only months before, and D.C. made sure the Court was aware of this fact. It wrote: "In the recent Virginia Tech shooting, a single student with two **handguns** discharged over 170 rounds in nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *District of Columbia v. Heller*, 2008 WL 102223, 53 (emphasis added). Nevertheless, the Court rejected D.C.'s argument and held that its "ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [of self-defense]" and was therefore unconstitutional. *Id.*, 554 U.S. at 628. Thus, the Court invalidated D.C.'s ban on handguns, including semiautomatic handguns like those that had recently been used in the mass shooting at Virginia Tech. It follows that

---

[9] Even assuming a regulation is based on "dramatic technological changes," it remains the government's burden to show that there were analogous regulations at the founding. *United States v. Price*, 2022 WL 6968457, at *6 (S.D.W.Va. 2022).

Naperville's argument that it can ban the sale of another class of commonly possessed arms because its semiautomatic feature has been implicated in mass shootings is inconsistent with *Heller*.

Indeed, as the Court in *Miller, supra*, explained, almost all of the negative aspects of prohibited semiautomatic rifles, like faster firing, are shared with Second Amendment-protected handguns. *Id*., 542 F. Supp. 3d at 1060. The "vast majority of handguns today are semi-automatic." *Heller v. D.C*., 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). And if the City were correct, "then all semiautomatic firearms – including the vast majority of semiautomatic handguns – enjoy no constitutional protection since the rate of fire for any semiautomatic firearm is determined by how fast the shooter can squeeze the trigger. Such a conclusion obviously flies in the face of *Heller*, which never mentions rate of fire as a relevant consideration." *Kolbe*, 849 F.3d at 158 (Traxler, J. dissenting). Under *Heller* the City obviously could not ban semiautomatic handguns because they can fire more than one shot and are capable of "discharge[ing] multiple rounds rapidly." It makes no sense for it to argue that it can ban semiautomatic rifles for those same reasons.

### G. Alternate Avenues Do Not Save the Ordinance

The City argues that its ordinance is constitutional because even though it bans the sale of one kind of firearm, it is a "minimal" restriction that allows the sale of other kinds of firearms. Resp. 16. Once again, the City's argument is precluded by *Heller*, which rejected essentially the same argument when it dismissed the contention that it is permissible to ban the possession of handguns so long as the possession of other firearms is allowed. *Heller*, 554 U.S. at 629. Similarly in this case, the City cannot justify its ban of the purchase and sale of the most

18

popular rifle in America by pointing to the fact that it has left people free to purchase less popular firearms.

## H.  Sadly, Mass Murder is Not New

The City contends that its ban addresses the supposedly unprecedented social problem of mass murder. Resp. 15. There are at least two problems with the argument. First, even if mass murder were a new problem (it is not), that does not excuse the City from pointing to historical analogues, *Bruen*, 142 S. Ct. at 2132,[10] which, as discussed above, it has failed to do. Secondly, mass murder is not new, and "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

Tragically, "Mass murder is not particularly new . . . Almost everything can be, and has been, used to commit mass murder in America." Declaration of Clayton Cramer. ¶46; see also *Id*., ¶ 24 (over 1,600 known mass murders by 1960). Mass murders were not rare, even with "primitive" technology. *Id*. And "individual mass murder is neither particularly modern nor dependent on technological advances." *Id*. ¶ 19. In other words, the problem the City says it is addressing is not "unprecedented." Moreover, as discussed above, when it decided *Heller*, the Supreme Court knew that mass murders could be committed with semiautomatic weapons when it held that a categorical ban on handguns (including the handguns used at Virginia Tech) was unconstitutional. Surely that holding would not have been possible if the Supreme Court believed that mass shootings such as the Virginia Tech shooting posed an unprecedented societal problem that gave D.C. a license to ban semiautomatic weapons. Yet, that is precisely

---

[10] New problems do not excuse the historical inquiry; they merely require a "more nuanced" approach to the inquiry. *Id*.

the proposition advanced by the City. Finally, the City's premise that mass shootings today rise to the level of an "unprecedented societal concern" is inconsistent with the fact that, while each of these shootings is indeed horrible, they remain very rare. *Friedman*, 784 F.3d at 412; *Miller*, 542 F. Supp. 3d at 1041.

## III. Conclusion

As discussed in Plaintiffs' motion (Motion 4-5), in a case involving an alleged violation of a constitutional right, the likelihood of success on the merits will often be the determinative factor. *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017). A plaintiff has the burden of demonstrating likelihood of success on the merits, and normally it does this by submitting evidence on all relevant factors. But in this case, Plaintiffs activities are "presumptively" protected by the Second Amendment, and it is the City's burden to prove that its ordinance has a "well- established and representative historical analogue." *Bruen*, 142 S.Ct. at 2133. This means that the burden of establishing a likelihood of success is flipped. If the City fails to carry its burden of establishing a "well-established and representative historical analogue" then Plaintiffs are likely to prevail on the merits. That is what has happened in this case. The City has failed to show any historical analogue justifying its banning of the purchase and sale of the most popular rifle in America, a weapon that is unquestionably commonly possessed by millions of law abiding citizens for lawful purposes. Accordingly, the factors for entering a preliminary injunction have been established, and Plaintiffs renew their motion for the Court to enter such an injunction.

Respectfully submitted this 23rd day of December 2022.

Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033

Voice:  (303) 205-7870
Email:  barry@arringtonpc.com
*Pro Hac Vice*

Designated Local Counsel:
Jason R. Craddock
Law Office of Jason R. Craddock
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(708) 964-4973
cradlaw1970@gmail.com or craddocklaw@icloud.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2022, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Barry K. Arrington*
_____
Barry K. Arrington