**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ROBERT C. BEVIS, and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation, | ) ) ) ) ) | Case No. 22-cv-04775 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CITY OF NAPERVILLE, ILLINOIS, and JASON ARRES, | ) ) ) | |
| Defendants. | ) ) | |

**MOTION FOR TEMPORARY RESTRAINING ORDER
AND FOR PRELIMINARY INJUNCTION**

Plaintiffs submit the following Motion for Temporary Restraining Order and for Preliminary Injunction against Jason Arres ("Arres").

**NOTICE**

On January 24, 2023, the undersigned discussed this motion with Christopher B. Wilson, who stated he had no authority to consent to a TRO. In addition, the undersigned left voicemail messages with Barbara Greenspan and Gretchen Helfrich of the Illinois Attorney General's Office in which he informed them this motion was forthcoming. The undersigned spoke with Aaron Wenzloff of the Illinois Attorney General's Office and informed him this motion was forthcoming. Mr. Wenzloff informed the undersigned that Sarah Hunger was perhaps the best person to contact, and the undersigned also left a voicemail message with Ms. Hunger.

## TERMS

For purposes of this Motion:

(a) the term "State Law" means HB5471, which became effective on January 10, 2023, available at IL LEGIS 102-1116 (2022), 2022 Ill. Legis. Serv. P.A. 102-1116 (H.B. 5471);

(b) the term "State Banned Firearm" shall have the same meaning as "assault weapon" as defined in 720 ILCS 5/24-1.9; and

(c) the term "Banned Magazine" shall have the same meaning as "large capacity ammunition feeding device" as defined in 720 ILCS 5/24-1.10.

## FACTS

1.     Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit membership and donor-supported organization qualified as tax-exempt under 26 U.S.C. § 501(c)(4). Delaraation of Dudley Brown ¶ 2.  NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms. *Id*. NAGR has over 240,000 members nationwide. *Id*. Over 8,000 NAGR members reside in the State of Illinois, several of whom reside in Naperville. *Id*. NAGR is not required to provide identifying information regarding its members; nevertheless, the following are the initials of a sample of NAGR's members who reside in the City of Naperville (the "City"):  B.S., D.B., G.S., G.K., L.J., and R.K. *Id*. NAGR represents the interests of its members whose Second Amendment rights are infringed by the State Law. *Id*.

2.     Plaintiff Robert C. Bevis is a business owner in the City and a law-abiding citizen of the United States. Declaration of Robert C. Bevis ¶ 2.  Mr. Bevis is a member of NAGR. *Id*.

3.     Plaintiff Law Weapons, Inc. d/b/a Law Weapons & Supply ("LWI") is an Illinois corporation which operates in the City. Bevis Dec. ¶ 3. LWI is engaged in the commercial sale

2

of firearms. *Id*. A substantial part of LWI's business consists of the commercial sale of State Banned Firearms and Banned Magazines. *Id*.

4.      Arres is the City's Chief of Police.  He is responsible for the performance of the City's Police Department.  Naperville Municipal Code 1-8A-2. Arres has the duty to see to the enforcement of all applicable laws, including the Ordinance and the State Law. Naperville Municipal Code 1-8A-3. Arres is or will perform his duty to enforce the Ordinance and State Law. Thus, Arres is or will deprive Plaintiffs of their constitutional rights by enforcing these unconstitutional laws against them.

5.      The State Law states that a person commits the offense of unlawful use of weapons when he knowingly carries, possesses, sells, delivers, imports, or purchases any State Banned Firearm in violation of 720 ILCS 5/24-1.9. Section 1.9 in turn states that with certain exceptions not applicable to Plaintiffs it is "unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase . . . [a State Banned Firearm].  In addition, Section 1.9 states that with certain exceptions, "beginning January 1, 2024, it is unlawful for any person within this State to knowingly possess [a State Banned Firearm]."

6.      720 ILCS 5/24-1.10(b) states that with certain exceptions not applicable to Plaintiffs "it is unlawful for any person within this State to knowingly manufacture, deliver, sell, purchase, or cause to be manufactured, delivered, sold, or purchased a [Banned Magazine]. 720 ILCS 5/24-1.10(c) states that with certain exceptions after April 9, 2023, it will be "unlawful to knowingly possess a [Banned Magazine].

7.      The State Law provides for substantial criminal penalties for violation of its provisions.

8.      Plaintiffs and/or their members and/or customers desire to exercise Second Amendment right to acquire, possess, carry, sell, purchase and transfer State Banned Firearms and Banned

Magazines for lawful purposes, including, but not limited to, the defense of their homes. Brown Dec. ¶ 3. Bevis Dec. ¶ 4. The State Law prohibits or soon will prohibit Plaintiffs from exercising their Second Amendment rights in this fashion. *Id.* LWI asserts the claims set forth in this action on its own behalf and on behalf of its customers who are prohibited by the State Law from acquiring arms protected by the Second Amendment. *Id.*

9.      At least 20 million semi-automatic firearms such as those defined as "assault weapons" in the State Law are owned by millions of American citizens who use those firearms for lawful purposes. Declaration of James Curcuruto ¶ 6. Mr. Curcuruto's declaration was originally submitted in *Rocky Mountain Gun Owners, et al. v. Town of Superior*, 22-CV-1685-RM. It is used with permission in this action.

10.     At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes. Declaration of James Curcuruto ¶ 7.

## STANDARD FOR GRANTING TRO AND PRELIMINARY INJUNCTION

The standard for issuing a temporary restraining order is identical to that governing the issuance of a preliminary injunction. *Mays v. Dart*, 453 F. Supp. 3d 1074, 1087 (N.D. Ill. 2020). To be entitled to preliminary relief, Plaintiffs must establish as a threshold matter: (1) they are likely to suffer irreparable harm in the absence of preliminary relief; (2) inadequate remedies at law exist; and (3) they have a reasonable likelihood of success on the merits. (3) the balance of the equities tips in their favor. *Whitaker v. Kenosha Unified School District,* 858 F. 3d 1034, 1044 (7th Cir. 2017). If the movant successfully makes this showing, the court must engage in a balancing analysis, to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's

interests. *Id., Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017), *citing Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).

In a case involving an alleged violation of a constitutional right, the likelihood of success on the merits will often be the determinative factor. *Id*., *citing Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012).[1] That is because even short deprivations of constitutional rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional. *Id*. So "the analysis begins and ends with the likelihood of success on the merits" of the constitutional claim. *Id*., *citing Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013).

In *Ezell v. City of Chicago*, 651 F.3d 684, 997 (7th Cir. 2011), the Court equated the standard for obtaining a preliminary injunction in the Second Amendment context with the standard for obtaining that relief in a First Amendment case. Also in *Ezell*, the Court granted preliminary relief against a Chicago ordinance which *inter alia* prohibited commercial activity found to be protected by the Second Amendment.  Namely, the ordinance prohibited all shooting galleries, firearm ranges, or any other places where firearms are discharged.

## THE GOVERNMENT BEARS THE BURDEN OF DEMONSTRATION

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court unambiguously placed on the government a substantial burden of demonstrating

---

[1] *Higher Soc'y of Indiana* was a First Amendment case, but that difference does not matter, because in *Bruen*, *infra*, the Supreme Court held that Second Amendment rights should be protected in the same way First Amendment rights are protected. *Id*., 142 S. Ct. at 2130.

that any law seeking to regulate firearms is consistent with this Nation's historical tradition of firearm regulation.[2] Specifically, the Court stated:

> "To support that [its claim that its regulation is permitted by the Second Amendment], the burden falls on [the government] to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct."

*Bruen*, 142 S. Ct. at 2135.

In this case, the Second Amendment's plain text covers Plaintiffs' conduct. *Bruen*, 142 S. Ct. at 2132 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms"). Accordingly, Plaintiff's conduct is **presumptively** protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2126 ("when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"). It is impossible for the government to rebut that presumption by demonstrating that the law is consistent with this Nation's historical tradition of firearm regulation because no such tradition exists.

## ARGUMENT

### I.      The Supreme Court has Reaffirmed the *Heller* Standard

#### A.      A Regulation Burdening the Right to Keep and Bear Arms is Unconstitutional Unless it is Consistent with the Text of the Second Amendment and the Nation's History and Traditions

In *Bruen*, the Court rejected the two-part balancing test for Second Amendment challenges that several courts of appeal adopted in the wake of *Heller* and *McDonald v. City of*

---

[2] "Significantly, the plaintiff need not demonstrate the absence of regulation in order to prevail; the burden rests squarely on the government to establish that the activity has been subject to some measure of regulation." *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 415 (7th Cir. 2015) (Manion, J., dissenting).

*Chicago, Ill*., 561 U.S. 742 (2010). Instead, it reiterated the *Heller* standard, which it summarized as follows:

> "Today, we decline to adopt that two-part approach. In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command."

*Bruen*, 142 S. Ct. at 2126 (internal quotation marks omitted).

The *Bruen* court spent significant time describing how lower courts are to proceed in Second Amendment cases. As particularly relevant here, *Bruen* described the proper analysis of the term "arms." That word, *Bruen* affirmed, has a "historically fixed meaning" but one that "applies to new circumstances." *Id*. at 2132. It thus "covers modern instruments that facilitate armed self-defense." *Id*., *citing Caetano v. Massachusetts*, 577 U.S. 411, 411—412 (2016) *(per curiam)* (stun guns). Accordingly, the text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*.

The Court then explained that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Id*. In considering history, courts are to engage in "reasoning by analogy." *Id*. This analogical reasoning requires the government to identify a well-established and representative historical analogue to the challenged regulation. *Id*. at 2133. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the Court

today. *Id*. at 2132. Two metrics are particularly salient in determining if a historical regulation is relevantly similar: [1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense. *Id*. at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a modern-day regulation is analogous enough to historical precursors that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id*.

As noted above, the Court held that the judicial balancing of means and ends pursuant to intermediate scrutiny review plays no part in Second Amendment analysis. "*Heller* does not support applying means-end scrutiny." *Id*., 142 S. Ct. at 2127; *see also Id*., 142 S. Ct. at 2129 (inquiry into the Code's alleged "salutary effects" upon "important governmental interests" is not part of the test).

### B. Only "Dangerous and Unusual Arms" Can be Categorically Banned Consistent with Our History and Tradition

This case involves a categorical ban of two classes of arms. Both *Bruen* and *Heller* identified only one aspect of the nation's history and tradition that is sufficiently analogous to – and therefore capable of justifying – such a ban: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons" that are not "in common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of arm is in common use, there is, by definition, no historical tradition of banning it. Thus, for the type of restriction at issue in this case, the Court has already analyzed the relevant historical tradition and established its scope: "dangerous and unusual" weapons may be subject to a blanket ban, but arms "in common use at the time" may not be. *Id*.

The *Heller* test is based on historical practice and "the historical understanding of the scope of the right," but with reference to modern realities of firearm ownership. *Heller*, 554

U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *Rocky Mountain Gun Owners v. Town of Superior*, Colo., 1:22- cv-01685, Doc. 18 at 9 (D. Colo. 2022) (granting, post-*Bruen*, a temporary restraining order against enforcement of a ban on certain semiautomatic rifles and noting "the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes"); and *Rocky Mountain Gun Owners v. Bd. of Cnty. Commissioners of Boulder Cnty.*, 2022 WL 4098998 (D. Colo. 2022) (also granting TRO against similar law).

In summary, in the context of blanket bans on bearable arms, the Supreme Court has already done the historical spadework, and the only restrictions of this kind that it has deemed consistent with the historical understanding of the right to keep and bear arms are restrictions limited to dangerous and unusual arms that are not in common use.

This Court's task is therefore a simple one: it merely must determine whether the banned arms are "dangerous and unusual." Importantly, this is a "conjunctive test: A weapon may not be banned unless it is both dangerous and unusual." *Caetano*, 577 U.S. at 417 (Alito, J., *concurring*). An arm that is in common use for lawful purposes is, by definition, not unusual. Such an arm therefore cannot be both dangerous and unusual and therefore cannot be the subjected to a blanket ban. *Bruen*, 142 S. Ct. at 2143*; Heller*, 554 U.S. at 629.

To determine whether an arm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people nationwide, not just, say, in this State. *See id*. at 2131 ("It is this balance – struck by the traditions of the American people – that demands our unqualified deference."); *Heller*, 554 U.S. at 628

(handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420 (Alito, J., *concurring*) ("stun guns are widely owned and accepted as a legitimate means of self-defense across the country"). Therefore, the Second Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms from outlier legislation just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions.

Furthermore, courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several reasons that a citizen may prefer a handgun for home defense, the Court held that "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.*, 554 U.S. at 629. The Court reaffirmed that the traditions of the American people, which includes their choice of preferred firearms, demand the courts' "unqualified deference." *Id.*, 142 S. Ct. at 2131.

As set forth below, the State Banned Firearms and the Banned Magazines are "typically possessed by law-abiding citizens for lawful purposes." **Under *Heller* and *Bruen*, that is the end of the analysis**. The Second Amendment "[does] not countenance a complete prohibition on the use of the most popular weapon chosen by Americans for self-defense in the home." *Id.*, 142 S. Ct. at 2128 (internal quotation marks omitted).

Finally, the Second Amendment inquiry focuses on the choices commonly made by contemporary law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *Id.* at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that arms protected by the

Second Amendment need not have been in existence at the time of the Founding. 577 U.S. 411-12, *quoting Heller*, 554 U.S. at 582. The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id*. And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

## II.     The Seventh Circuit's Decision in *Friedman* is no Longer Good Law

In *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015), the Seventh Circuit upheld as constitutional an ordinance similar to the State Law challenged in this action, and normally that case would preclude this challenge.  However, "[s]tare decisis cannot justify adherence to an approach that Supreme Court precedent forecloses."  *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 767 (7th Cir. 2019).  And *Bruen* flatly forecloses the approach taken by the Court in *Friedman*.  *See also United States v. Wahi*, 850 F.3d 296, 302 (7th Cir. 2017) ("When an intervening Supreme Court decision unsettles [the Seventh Circuit's] precedent, it is the ruling of the [Supreme] Court that . . . must carry the day.").

In *Friedman* the Court announced a unique three-part test to determine Second Amendment questions.  Under this test, a court asks: whether a regulation [1] bans weapons that were common at the time of ratification or [2] those that have some reasonable relationship to the preservation or efficiency of a well regulated militia and [3] whether law-abiding citizens

11

retain adequate means of self-defense. *Id.*, 784 F.3d at 410. This test is not supported by *Heller*. Indeed, two of the three prongs of the test are specifically **foreclosed** by *Heller* as the Court made plain in *Bruen*.

[1] The Second Amendment's "reference to 'arms' does not apply only to those arms in existence in the 18th century." *Bruen*, 142 S. Ct. at 2132 (cleaned up). Indeed, *Heller* characterized this argument as "bordering on the frivolous." *Heller*, 554 U.S. at 582.

[2] The Second Amendment's operative clause "does not depend on service in the militia." *Bruen*, 142 S. Ct. at 2127, *citing Heller*, 554 U.S. at 592.

[3] As for the third prong, "[T]he right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016), *quoting Heller*, 554 U.S. at 629.

But there are more problems with *Friedman*. Not only is its three-part test no longer viable, but other central parts of its holding are inconsistent with *Bruen*. First, the *Friedman* Court based its decision in large part on its view of the benefits of the ordinance. *Id.*, 784 F.3d at 411-12 (reviewing the benefits of the ordinance, including the fact that the ban on arms reduced "perceived risk" and "makes the public feel safer"). But, as discussed *supra*, *Bruen* emphatically rejected exactly this sort of means-end scrutiny. *Id.*, 142 S. Ct. at 2127; *see also Id.*, 142 S. Ct. at 2129 (inquiry into the Code's alleged "salutary effects" upon "important governmental interests" is not part of the test). Second, the *Friedman* court held that categorical bans on kinds of weapons may be proper even if the limits did not "mirror restrictions that were on the books in 1791." *Id.*, 784 F.3d 410. This holding is contradicted by the central thrust of *Bruen's* holding that a restriction on Second Amendment rights will survive

scrutiny only if "the government identif[ies] a well-established and representative historical analogue" to the regulation. *Id*. 142 S. Ct. 2133.

In summary, for many reasons it is not possible to square subsequent Supreme Court precedent with the Seventh Circuit's holding in *Friedman*. Accordingly, that case is no longer binding precedent,, and in rendering is decision on this motion, this Court must reject the Seventh Circuit's *Friedman* analysis in favor of the Supreme Court's *Bruen* analysis.

## III. The State's Prohibition on Possession of State Banned Firearms is Unconstitutional

### A. Introduction

Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen*, 142 S. Ct. at 2126. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. Here, the Second Amendment's plain text covers the State Banned Firearms, so it falls to the government to attempt to justify the law as consistent with historical tradition rooted in the Founding. It cannot possibly do so, because the State Banned Firearms are commonly possessed by law abiding citizens, and *Bruen* has already established that, by definition, there cannot be a tradition of banning an arm if it is commonly possessed.

### B. The State Banned Firearms are in Common Use

This case thus reduces to the following, straightforward inquiry: are State Banned Firearms in "common use," according to the lawful choices by contemporary Americans? They unquestionably are. There is no class of firearms known as "assault weapon." "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." *Stenberg v. Carhart*, 530 U.S. 914, 1001 (2000) at n. 16

(Thomas, J., dissenting). But while "assault weapon" is not a recognized category of firearms, "semiautomatic rifle" is. And it is semiautomatic rifles that the "assault weapon" ban targets. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic rifle, a semiautomatic rifle will not fire continuously on one pull of its trigger; rather, a semiautomatic rifle requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 (1994) at n. 1.

There is therefore a significant practical difference between a truly automatic and a merely semiautomatic rifle. According to the United States Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms is between forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. Dept. of the Army, RIFLE MARKSMANSHIP: ML6-/M4-SERIES WEAPONS, 2-1 tbl. 2-1 (2008), available at https://bit.ly/3pvS3SW.

There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles. The Supreme Court has held as much.  In *Staples,* it concluded that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTMP. L. 381, 413 (1994).

In contrast to this long history of legal ownership of semi-automatic rifles, the first "assault weapon" ban was not enacted until California did so in 1989, a full 200 years after the Constitution became effective.  Obviously, that is far too late to demonstrate anything about the

14

original meaning of the Second or Fourteenth Amendment, no matter which is the relevant historical reference point. *Bruen*, 142 S.Ct. at 2126 (cautioning against giving post enactment history more weight than it can rightly bear). Even today, the vast majority of states (42 out of 50)[3], do not ban semiautomatic weapons that would be deemed "assault weapons" under the Code at issue in this action.[4]

Thus, there is no historical tradition of banning semi-automatic firearms. This is borne out by the fact that millions of law-abiding citizens choose to possess firearms in that category. *Duncan v. Becerra ("Duncan IV")*, 970 F.3d 1133, 1147 (9th Cir. 2020) ("Commonality is determined largely by statistics."); *Ass'n of N.J Rifle & Pistol Clubs, Inc. v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an arm is commonly owned because the record shows that "millions" are owned); *New York State Rifle & Pistol Ass 'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by *amici*, the assault weapons at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'").

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the*

---

[3] The federal government banned semi-automatic rifles from 1994 to 2004 when Congress allowed that law after the Justice Department concluded that it produced "no discernible reduction" in gun violence. Christopher S. Koper, Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms, 19 Crim'y & Pub. Pol'y 96 (2020).
[4] The bans and the year each was enacted are: CAL. PENAL CODE §§ 30600, 30605 (**1989**); N.J. STAT. §§ 2C:39-5(f), 2C:39-9(g) (**1990**); HAW. REV. STAT. § 134-8(a) (**1992**); CONN. GEN. STAT. § 53-202c (**1993**); MD. CODE ANN., CRIM. LAW §§ 4-301, 4-303 (**1994**); MASS. GEN. LAWS ch. 140, § 131M (**1994**); N.Y. PENAL LAW §§ 265.02(7), 265.10(1)-(3) (**2000**); 11 DEL. CODE § 1466 (**2022**).

*Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009); *see also Duncan v. Becerra*

("*Duncan III*"), 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019).

This issue was addressed in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), abrogated by

*Bruen*, *supra*. In his dissent (which, after *Bruen*, likely represents the correct interpretation of

the law), Judge Traxler stated:

> "It is beyond any reasonable dispute from the record before us that a statistically
> significant number of American citizens possess semiautomatic rifles (and
> magazines holding more than 10 rounds) for lawful purposes. Between 1990 and
> 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were
> manufactured in or imported into the United States. In 2012, semiautomatic
> sporting rifles accounted for twenty percent of all retail firearms sales. In fact, in
> 2012, the number of AR- and AK- style weapons manufactured and imported into
> the United States was more than double the number of the most commonly sold
> vehicle in the U.S., the Ford F-150. In terms of absolute numbers, these statistics
> lead to the unavoidable conclusion that popular semiautomatic rifles such as the
> AR-15 are commonly possessed by American citizens for lawful purposes within
> the meaning of *Heller*."

*Id.*, 849 F.3d at 153, Traxler, J. dissenting (internal citations and quotation marks omitted).

Today, the number of AR-rifles and other modern sporting rifles in circulation in the

United States exceeds twenty-four million. The Firearms Industry Trade Ass'n, *Commonly*

*Owned: NSSF Announces Over 24 Million MSRS in Circulation*, (July 20, 2022), available at

https://bit.ly/3pUj8So.[5]

According to industry sources, as of 2018, roughly thirty-five percent of all newly

manufactured guns sold in America are modern semiautomatic rifles, Bloomberg, *Why*

*Gunmakers Would Rather Sell AR-15s Than Handguns*, FORTUNE (June 20, 2018), available at

https://bit.ly/3R2kZ3s, and an estimated 5.4 million Americans purchased firearms for the first

time in 2021. The Firearms Industry Trade Ass'n, *NSSF Retailer Surveys Indicate 5.4 million*

---

[5] *See also* Declaration of James Curcuruto ¶ 6 ("At least 20 million semi-automatic firearms such as those defined
as "assault weapons" are owned by millions of American citizens who use those firearms for lawful purposes."

16

*First-Time Gun Buyers in 2021,* (Jan. 25, 2022), available at https://bit.ly/3dV6RKI.  In fact, a recent survey of gun owners estimated that 24.6 million Americans have owned AR-15 or similar rifles. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), available at https://bit.ly/3yPfoHw .

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes.  In a 2021 survey of 16,708 gun owners, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English, *supra*, at 33-34. This is consistent with the findings of an earlier 2013 survey of 21,942 confirmed owners of such firearms, in which home-defense again followed (closely) only recreational target shooting as the most important reason for owning these firearms. *See also Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 904 (N.D. Ill. 2014), *aff'd* 784 F.3d 406 (7th Cir. 2015). "An additional survey estimated that approximately 11,977,000 people participated in target shooting with a modern sporting rifle." *Id.* Indeed the "AR-15 type rifle . . . is the leading type of firearm used in national matches and in other matches sponsored by the congressionally established Civilian Marksmanship program." *Shew v. Malloy*, 994 F. Supp. 2d 234, 245 n.40 (D. Conn. 2014).

The fact that "assault" rifles are used extremely rarely in crime underscores that AR-15s and other State Banned Firearms are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'" Gary Kleck, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997).  This conclusion is borne out by FBI statistics.  In the five years from 2015 to 2019 (inclusive), there were an average of 14,556 murders per year in the United States.  On average, rifles of all types (of

17

which so-called "assault weapons" are a subset) were identified as the murder weapon in 315 murders per year. U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V.  By way of comparison, on average 669 people are murdered by "personal weapons" such as hands, fists and feet.  *Id*.  According to the FBI, a murder victim is more than twice as likely to have been killed by hands and feet than by a rifle of any type.

Even in the counterfactual event that a modern semiautomatic rifle had been involved in each rifle-related murder from 2015 to 2019, an infinitesimal percentage of the approximately 24 million modern sporting rifles in circulation in the United States during that time period – around .001 percent – would have been used for that unlawful purpose. More broadly, as of 2016, only 0.8 percent of state and federal prisoners reported using any kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates*, 2016, U.S. DEPT OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), available at https://bit.ly/31VjRa9

Finally, the Supreme Court's decision in *Caetano* further confirms that the banned arms are in common use.  That case concerned Massachusetts's ban on the possession of stun guns, which that state's highest court had upheld on the ground that such weapons are not protected by the Second Amendment.  *Id*., 577 U.S. at 411.  In a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id*. at 411-12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, Justice Alito filed a concurring opinion expressly concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of

thousands of Tasers and stun guns have been sold to private citizens." *Id*. at 420 (Alito, J., concurring) (cleaned up) (citation omitted). If hundreds of thousands" of arms constitute wide ownership, *a fortiori* so does the tens of millions of semiautomatic rifles sold to private citizens nationwide.

The Massachusetts court got the message. In a subsequent case, that court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the State to rebut the prima facie presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019). This reasoning is sound, and it necessarily entails the invalidity of the categorial ban at issue here, which restricts arms that are many times more common than stun guns.

## III. The Prohibition on Possession of Banned Magazines is Unconstitutional

### A. Magazines Capable of Holding More Than 10 Rounds Are in Common Use

Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth-century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty.*

19

*of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (without bullets, the right to bear arms would be meaningless).

Just as the First and Fourteenth Amendments protect modern forms of communications and search, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *Caetano*, *supra* (stun guns). Thus, as the Supreme Court reiterated in *Bruen*, when assessing whether arms are protected by the Second Amendment, the question is whether they are "in common use today." 142 S.Ct. at 2134. If they are, then they are presumptively protected by the Second Amendment, and it is the government's burden to prove that any efforts to restrict their possession or use have a "well- established and representative historical analogue." *Bruen*, 142 S.Ct. at 2133. But, as noted above, in the context of a categorial ban such as that at issue here with respect to the Banned Magazines, establishing such an analogue is impossible. The government may impose a blanket prohibition only on "dangerous and unusual" arms, but by definition, an arm in common use is not unusual. The Second Amendment "[does] not countenance a complete prohibition on the use of the most popular weapon chosen by Americans for self-defense in the home." *Id.*, 142 S. Ct. at 2128 (internal quotation marks omitted).

The Banned Magaziens unquestionably satisfy the "common use" test. *See Duncan III*, 366 F.Supp.3d at 1143-45; *Duncan IV*, 970 F.3d at 1142, 1146-47. Magazines capable of holding more than 10 rounds of ammunition are commonly owned by millions and millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting.[6] They come standard with many of the most popular handguns and long guns on the market, and

---

[6] *See* Declaration of James Curcuruto ¶ 7 ("At least 150 million magazines with a capacity greater than ten rounds are owned by law-abiding American citizens, who use those magazines for lawful purposes.")

Americans own roughly **115 million of them**, *Duncan IV*, 970 F.3d at 1142, accounting for "approximately half of all privately owned magazines in the United States," *Duncan v. Bonta* *("Duncan V")*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).  Indeed, the most popular handgun in America, the Glock 17 pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145. In short, there can be no serious dispute that magazines capable of holding more than 10 rounds are bearable arms that satisfy the common use test and thus are presumptively protected by the Second Amendment.

In his dissent in *Kolbe v. Hogan*, Judge Traxler also addressed magazines such as the Banned Magazines.  He stated:

> "The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States.  These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.  Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds."

*Id.*, 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

Magazines such as those banned by the Banned Magazines are without the slightest question commonly possessed by law abiding citizens for lawful purposes (again, the dispositive fact under *Heller* and *Bruen*).  Therefore, based on this fact alone, the Code is unconstitutional.

**B.      There Is No Historical Tradition of Restricting Firearms Capable of Firing More Than 10 Rounds Without Reloading.**

Even if Banned Magazines were not in common use, the City cannot come close to proving that restrictions on firing or magazine capacity are part of the nation's historical tradition. To the contrary, history and tradition establish the exact opposite.  *See Duncan III*,

21

366 F.Supp.3d at 1149-53; *Duncan IV*, 970 F.3d at 1147-51 (when the Founders ratified the Second Amendment, no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years); *Duncan V*, 19 F.4th at 1148-59 (Bumatay, J., dissenting) (summarizing history)

Firearms capable of firing more than 10 rounds without reloading are nothing new. "[T]he first firearm that could fire more than ten rounds without reloading was invented around 1580," and several such handguns and long guns "pre-date[d] the American Revolution." *Duncan IV*, 970 F.3d at 1147. Well before the framing of the Fourteenth Amendment, they had become "common," as witnessed by popular firearms such as the Pepperbox-style pistol, which could "shoot 18 or 24 shots before reloading individual cylinders." *Id*. By the end of the Civil War, "repeating, cartridge-fed firearms" were ubiquitous, and many of the most popular models had magazines that held more than 10 rounds. *Id*. at 1148. For example, the Winchester 66 had a 17- round magazine and could fire all 17 rounds plus the one in the chamber in under nine seconds. *Id*. Later models, including the famed Winchester 73 ("the gun that won the West"), likewise had magazines that held more than 10 rounds and sold a combined "over 1.7 million total copies" between 1873 and 1941. *Id*.

As detachable box-style magazines became more popular around the turn of the twentieth century, so too did rifles and handguns with box magazines capable of holding more than 10 rounds, such as Auto Ordnance Company's semi-automatic rifle (1927, 30 rounds) and the Browning Hi-Power pistol (1935, 13 rounds). *Id*. In 1963, the U.S. government sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount. *Id*. That same year, the first AR-15 rifle was released. *Id*. The AR-15 comes standard with a 30-round magazine and as noted above, remains the most popular rifle in America today.

*Id*.; *Duncan III*, 366 F.Supp.3d 1145.  Today, the most popular handgun in America is the Glock 17, which comes standard with a 17-round magazine.  *Duncan IV*, 970 F.3d at 1142, 1148.  Many other popular pistols likewise come standard with magazines that hold more than 10 rounds. For example, the Beretta Model 92 comes standard with a sixteen-round magazine, Smith & Wesson M&P 9 M2.0 nine-millimeter magazines contain seventeen rounds, and the Ruger SR9 has a 17-round standard magazine. *Id*. at 1142 & n.4.

Firearms capable of firing more than 10 rounds predate the founding by more than a century. *See Duncan IV*, 970 F.3d at 1147. Such arms were neither novelties nor confined to the military; to the contrary, they were marketed to and bought by civilians from the start. "[I]n 1821, the New York Evening Post described the invention of a new repeater as 'importan[t], both for public and private use,' whose 'number of charges may be extended to fifteen or even twenty.'" *Ass 'n of N J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N J.* ("ANJRPC II"), 974 F.3d 237, 255 (3d Cir. 2020) (Matey, dissenting). The popular Pepperbox-style pistol was marketed to civilians, the Girandoni air rifle "was famously carried on the Lewis and Clark expedition," and millions of Winchesters were sold to civilians in the decades following the ratification of the Fourteenth Amendment. *Duncan IV*, 970 F.3d at 1147-48; *Duncan V*, 19 F.4th at 1154-55 (Bumatay, J., dissenting). And the federal government itself sold hundreds of thousands of surplus 15- and 30-round M-1 carbines to civilians at a steep discount just as the AR-15 and its standard 30-round magazine came on the market.  *Duncan IV*, 970 F.3d at 1148.

The historical record confirms that, "[l]ong before 1979, magazines of more than ten rounds had been well established in the mainstream of American gun ownership." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 862 (2015). In short, arms that could fire more than 10 rounds without reloading would by no

23

means have been "unforeseen inventions to the Founders." *Duncan IV*, 970 F.3d at 1147. They have been available for centuries, and "magazines of more than ten rounds had been well established in the mainstream of American gun ownership" "long before" a handful of capacity restrictions started to pop in the late twentieth century. *See Kopel, supra* at 862-64.

There were no restrictions on firing or magazine capacity when either the Second or the Fourteenth Amendment was ratified. The first such laws did not come until the Prohibition Era, and, even then, they were few and far between. Many states and the federal government began regulating automatic weapons almost as soon as they came on the market in the 1920s and 1930s. In contrast, only during Prohibition did a handful of state legislatures enact capacity restrictions, many of which were soon repealed. *Duncan IV*, 970 F.3d at 1150. These states included Michigan (1927, repealed in 1959), Rhode Island (1927, repealed in 1975), and Ohio (1933, repealed in 2014). *Id.* at n.10. It is important to note that the Rhode Island and Michigan statutes applied only to weapons rather than magazines, and the Ohio statute was interpreted to only forbid the simultaneous purchase of a firearm and compatible 18-round magazine. *Id*.

These anomalous laws not only were "short lived," *Bruen*, 142 S.Ct. at 2155, but emerged several decades after the isolated "late-19th-century" territorial laws that the Supreme Court found to be too few and too late to have meaningful historical relevance. *Id.* at 2154; *cf Heller II*, 670 F.3d at 1292 (Kavanaugh, J., dissenting) (six states not enough to make a "strong showing that such laws are common"). Here too, then, "the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting law-abiding citizens to keep and bear arms with a firing capacity of more than 10 rounds.

24

The first state to restrict magazine capacity as such (New Jersey) did not do so until 1990 – more than two centuries after the founding. As with "assault weapon" bans, that is far too late to demonstrate anything about the original meaning of the Second or Fourteenth Amendment. The federal government did not restrict magazine capacity until 1994, and Congress allowed that law to expire in 2004. Since 1990, when the first magazine capacity restriction was adopted, a total of 12 states have enacted such restrictions, with half of those restrictions enacted within the last decade.[7] The City thus cannot even identify a "well-established" tradition of restricting magazine capacity today, let alone identify any representative historical analogue that might justify its confiscatory magazine ban. *Bruen*, 142 S.Ct. at 2133 (emphasis omitted).

Yet, despite a long historical tradition of law-abiding citizens possessing these firearms for lawful purposes, there is no similar tradition of government regulation, let alone confiscation. To the contrary, the historical tradition of advancement in firearms technology reflects a steady trend toward increasing the firing capacity of the most popular and common arms, with no corresponding trend of government restrictions on firing capacity. The City thus cannot possibly meet its burden of "affirmatively prov[ing] that its [magazine ban] is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

Respectfully submitted this 24th day of January 2023.

*/s/ Barry K. Arrington*

_____

Barry K. Arrington

_____

[7] The Codes and the year they were enacted are: N.J. Stat. Ann. §2C:39- l(y), - 3G) (**1990**); 1992 Haw. Sess. Laws 740, 742 (**1992**); Md. Code Ann., Crim. Law §4-305 (**1994**); Cal. Penal Code §§32310, 16740 (**1999**); Mass. Gen. Laws ch. 140 §§121, 131a (**1998**); N.Y. Penal Law §265.36 (**2000**); Colo. Rev. Stat. §18-12-302(1)) (**2013**); Conn. Gen. Stat. §53- 202w (**2013**); Vt. Stat. Ann. tit. 13, §4021 (**2017**); Wash. Rev. Code Ann. §§9.41.010, .370 (**2022**); 11 R.I. Gen. Laws Ann. § 11-47.1-3 (**2022**); Del. Code Ann. tit. 11, § 1469 (**2022**).

Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice: (303) 205-7870
Email: barry@arringtonpc.com
*Pro Hac Vice*

Designated Local Counsel:
Jason R. Craddock
Law Office of Jason R. Craddock
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(708) 964-4973
cradlaw1970@gmail.com or craddocklaw@icloud.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record.

In addition, a true and correct copy of this Notice and the First Amended and Supplemented Complaint were emailed to:

barbara.greenspan@illinois.gov
aaron.wenzloff@ilag.gov
gretchen.helfrich@ilag.gov
sarah.hunger@ilag.gov

*/s/ Barry K. Arrington*
_____
Barry K. Arrington