**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ROBERT C. BEVIS, and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation, | |
| Plaintiffs, | **Case No. 1:22-cv-04775** |
| v. | **Hon. Virginia M. Kendall** |
| CITY OF NAPERVILLE, ILLINOIS, and JASON ARRES, | |
| Defendants. | |

## CITY OF NAPERVILLE AND JASON ARRES' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs' motion seeks a TRO preventing Naperville's Police Chief, Jason Arres, from enforcing the Protect Illinois Communities Act, HB 5471—the comprehensive statute adopted by the State of Illinois on January 10, 2023, concerning assault weapons and large capacity magazines. Plaintiffs' motion fails on procedural, legal and factual grounds. As set forth at oral argument and in more detail below, Plaintiffs' Motion for TRO and Preliminary Injunction should be denied.[1]

Plaintiffs' motion ignores that nearly identical prohibitions on the sale of such weapons have been found constitutional in the Seventh Circuit and other circuits across the country. The Seventh Circuit held in *Friedman v. City of Highland Park* that a municipal's ban on assault weapons and large capacity magazines (sale, possession and ownership) was constitutional.

---

[1] Naperville's Ordinance is attached as Ex. B. Naperville previously filed a motion opposing Plaintiffs' Motion For Temporary Restraining Order And Preliminary Injunction filed attacking the Ordinance. Dkt. 12.

*Friedman* is binding precedent, and Plaintiffs cite nothing that says otherwise. Despite Plaintiffs' contention, *Friedman* has not been abrogated by the Supreme Court's decision in *New York State Rifle and Pistol Association v. Bruen,* 521 U.S. 898 (2022). In fact, while the *Bruen* decision lists a series of cases ostensibly abrogated by its holding, *Friedman* is not among them.

Because of the problems with their constitutional arguments, Plaintiffs will not succeed on the merits. Plaintiffs also cannot establish any irreparable harm that demands this Court immediately enjoin HB5471 in its entirety given that only the prohibition on the sale of assault weapons took immediate effect and the remainder of HB5471 will not take effect until January 1, 2024. In fact, Plaintiffs' "irreparable harm" argument focuses solely on Plaintiff Robert Bevis and his corporation Law Weapons, Inc. because "[t]he State Law prohibits or soon will prohibit us from exercising their Second Amendment rights . . . ." Decl. of Robert Bevis, at ¶ 5, Dkt. 10 at 4. Additionally, in oral argument, Plaintiffs' counsel noted that Bevis' inability to sell the prohibited assault weapons constituted irreparable harm. The absence of a preliminary injunction will not stop Bevis or his store from selling firearms generally, nor will it deprive Bevis from exercising his Second Amendment right to arm himself in self-defense. He may still lawfully sell firearms that fall outside the scope of the HB5471. *See* Exhibit C, HB5471, 102nd Gen. Assembly (Ill.). Because an adequate alternative "can be had," "the lack of an injunction does not lead to irreparable harm." *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) (affirming denial of preliminary injunction in First Amendment case because plaintiff had not shown an irreparable harm).

Even if Plaintiffs could establish the elements necessary for emergency injunctive relief, the balance of hardships tip in Defendants' favor. Any alleged hardships to Plaintiffs are clearly avoidable. Defendants, on the other hand, have a compelling interest in protecting the public within

its jurisdictional limits from the horrible risk of assault weapons. HB5471 was passed by a publicly elected legislature and is a legitimate exercise of the State's police power to regulate behavior for the betterment of its citizens health and safety. Plaintiffs allege no harm that would justify, in the absence of a fully-developed record, upending a democratically-enacted law. The balance of hardships favors Naperville and the State of Illinois, and Plaintiffs' Motion should be denied.

## FACTUAL BACKGROUND

Because the Court is familiar with the core factual issues in this case, Defendants describe here only those new elements introduced by Plaintiffs' attack on the Protect Illinois Communities Act, HB 5471. Specifically, on January 10, 2023, Governor Pritzker signed the Act into law immediately banning the commercial sale of assault weapons and, beginning January 1, 2024, banning the possession, use, delivery, and manufacture of assault weapons and large capacity magazines.[2] In doing so, Illinois joined multiple states and municipalities with similar bans. In all, approximately 30 percent of the United States population lives under the safety of bans of these highly dangerous weapons and accessories.

HB5471, the portion of the Act specifically banning assault weapons in Illinois, is attached as Ex. C.[3] Under, HB5471, it is illegal in Illinois to manufacture, deliver, sell, import, or purchase"

---

[2] HB5471's definition of assault weapons is similar to that of the Naperville Ordinance. HB5471's definition of "large capacity ammunition feeding device" is "(1) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns; or (2) any combination of parts from which a device described in paragraph (1) can be assembled." *See* Ex. C.

[3] Under HB5471, and as previously noted, every ban on the possession, ownership, or use of assault weapons in Illinois will not take effect until January 1, 2024 making Plaintiffs' motion irrelevant for every aspect of HB5471 except the immediate statewide prohibition on the sale of assault weapons, which Defendants address. *See* Ex. C ("[B]eginning January 1, 2024, it is unlawful for any person within this State to knowingly possess an assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge."). On the other hand, the ban of sale of assault weapons takes effect immediately. *See id.* ("[O]n or after the effective date of this amendatory Act of the 102nd General Assembly, it is unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge."

any "assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber rifle." 720 ILCS 5/24-1.9. The law defines "assault weapon" in great detail. *See* Ex. C at p. 84-93 or 720 ILCS 5/24-1.9(a)(1).

Under the Act, Illinois exercised its police power to address the public safety threats posed by assault weapons. While HB5471 was passed in reaction to the devastating Highland Park parade, it is a reaction to mass shootings across the country in Uvalde, Texas; Buffalo, New York; El Paso, Texas; Pittsburgh, Pennsylvania; Parkland, Florida; Sutherland Springs, Texas; Las Vegas, Nevada; San Bernadino, California; Orlando, Florida; and Newtown, Connecticut. As the full record will establish, in each of these mass shootings, the gunman used an assault weapon covered by HB5471 to kill multiple people.

## ARGUMENT

Temporary restraining orders and preliminary injunctions are "extraordinary and drastic" remedies. *See, e.g., Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) ("[G]ranting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."); *Pozo v. Hompe*, 2002 WL 32357081, at *2 (W.D. Wis. July 30, 2002) ("[T]emporary restraining orders are disfavored because they deprive the opposing parties of the opportunity to respond to the movant's allegations."). Courts must carefully scrutinize any request for either form of relief.

Under controlling law, movants must demonstrate, "*by a clear showing,*" the following four elements: "(1) they have a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will not harm the public interest." *E.g., Goodman v. Illinois Dep't of Fin. & Pro. Regul.*,

430 F.3d 432, 437 (7th Cir. 2005) (emphasis in original). Plaintiffs, however, ask this Court to ignore clear, binding authority and fashion a new standard under which the "the analysis begins and ends with the likelihood of success on the merits" in cases relating to firearms regulations. *See* Dkt. 50 at 5. In other words, they manufacture a standard that excises three of the four elements they are required to prove. But even under their own proffered test, Plaintiffs' Motion fails because they cannot establish a likelihood of success on the merits. For this reason alone, the Court should deny Plaintiffs' Motion.

**A.      Plaintiffs' Motion is Premature Because FRCP 5.1 Has Not Been Satisfied**

This Motion is improperly before the court because Rule 5.1 has not been satisfied. Rule 5.1 requires that a pleading involving a constitutional question must: (1) provide notice to the government and the court of the specific constitutional issue involved; (2) the constitutional issue must then be certified by the court; and (3) the government must then be afforded an opportunity to intervene and to assert the fundamental interests of its citizens under 28 U.S.C. § 2403. Plaintiffs completed the first step on January 24, 2023 (Dkt. 49), and this Court completed the second step on January 30, 2023. However, under Rule 5.1, "the attorney general may intervene within 60 days after the notice is filed or after the court certifies the challenge, whichever is earlier." Therefore, the Illinois attorney general has 60 days from January 24, 2023 (March 25, 2023) to intervene in this litigation. Until Rule 5.1 is fully satisfied, litigation attacking HB5471—including litigation on this motion—is improperly before the court.  Plaintiffs could have avoided this procedural delay by simply adding the State of Illinois or a state actor as a defendant. They chose not to do so. 28 U.S.C. §2403 and Rule 5.1(b) provide critical protections for the government in the event Plaintiffs seek to bypass their interests as Plaintiffs have done here.

**B.      Plaintiffs Do Not Have a Likelihood of Success on the Merits.**

The Seventh Circuit has explicitly ruled that a ban on the commercial sale of assault weapons does not violate the Second Amendment. In *Friedman v. City of Highland Park*, the Seventh Circuit upheld a prohibition that banned the sale, transfer, manufacture, and ownership of assault weapons. *Friedman v. Cty. of Highland Park, Ill.*, 784 F.3d 406 (7th Cir. 2015). Plaintiffs' reliance on the recent Supreme Court decision in *Bruen* does not affect the analysis. *Bruen* did not concern the sale of assault weapons and, like *Friedman*, relied on *Heller*. Even if the Court finds *Bruen* does affect this analysis, HB5471 survives under the text-and-history standard established by the *Bruen* court. Plaintiffs cite no case that confers a constitutional right to sell or even own assault weapons like those contemplated in the State law. Plaintiffs cannot succeed on the merits and their Motion should be denied.

**1.      Illinois HB5471 Comports with the Second Amendment Under Both *Heller* and *Friedman*.**

Plaintiffs flatly ignore controlling law that prohibitions like HB5471 on the sale, transfer, manufacture, ownership, and possession of assault weapons are constitutional. While the Supreme Court in *Heller* recognized a limited constitutional right to handguns for self-defense in the home, it made clear that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *D.C. v. Heller*, 554 U.S. 570, 626–27 (2008). Notably, the Court explicitly left open the ability for municipalities to regulate the commercial sales of arms. *Id*. ("Nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms.").

*Heller* carefully explained that the Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626. Rather, "the Second Amendment right . . . extends only to certain types of weapons." *Id*. at

623. Since *Heller* was decided, Courts of Appeals have uniformly rejected claims that state and local bans on ownership of assault weapons violate the Second Amendment. *See Wilson*, 937 F.3d 1028 (7th Cir. 2019); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) (same); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).

In *Friedman,* the Seventh Circuit relied on *Heller* to uphold Highland Park's ban on the sale, transfer, manufacture, or ownership of assault weapons and large capacity magazines. Similar to Illinois, Highland Park passed its ordinance to "address the potential threat of mass shooting involving semi-automatic weapons." *See Friedman v. City of Highland Park,* 68 F. Supp. 3d 895, 897 (N.D. Ill. 2014), aff'd 784 F.3d 406 (7th Cir. 2015). After establishing a full record, the District Court granted Highland Park's summary judgment and ruled the ordinance should remain in full force. *Friedman*, 68 F. Supp. 3d at 909. The *Friedman* holding is fatal to Plaintiffs' claim. Plaintiffs do not confront that the *Friedman* Court conducted a similar historical analysis as the one Plaintiffs demanded, but reached the opposite conclusion. *See generally* Dkt. 50. Applying *Heller*, the Seventh Circuit queried whether (1) the banned weapons were "common at the time of ratification [of the Second Amendment] or those that have 'some reasonable relationship to the preservation or efficiency of a well-regulated militia,'" and (2) whether "law-abiding citizens retain adequate means of self-defense." *Id.* at 410 (quoting *Heller*, 544 U.S. at 622–25).[4] *Bruen* has not abrogated *Friedman* because *Friedman* did not apply the means-end test *Bruen* held was inconsistent with *Heller. See Bruen,* 142 S. Ct. at 2129*,* ("[T]he Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny."). Instead of applying the means-end test, *Friedman* rooted its analysis in *Heller. See Friedman*, 784 F.3d at 410 (declining

---

[4] In their Motion, Plaintiffs apply a similar *Heller* analysis, which they claim the Supreme Court "reaffirmed" in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). *See* Motion at 6-8 (asking the Court to apply a test "based on historical practice and the historical understanding of the scope of the right, but with reference to modern realities of firearm ownership.").

to "decide what level of scrutiny applies").

In fact, the dissenting opinion in *Friedman* specifically criticize the majority for not using the means-end test. *See id.* at 415 (Manion, J., dissenting) (arguing that the court should "assign a level of scrutiny . . . and determine whether the regulation survives such scrutiny"). *Friedman* applied the test the *Bruen* Court kept intact. *See Bruen*, 142 S. Ct. at 2127 ("Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."). Unless Plaintiffs argue that *Bruen* abrogated *Heller* (which they do not), *Friedman* remains good law and is binding precedent. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004) ("[D]istrict judges must follow the decisions of this court whether or not they agree.").

*Ezell v. City of Chicago*, decided before *Friedman*, is similarly unavailing. *Ezell v. City of Chicago,* 651 F.3d 684, 689–90 (7th Cir. 2011). *Ezell* did not concern a ban on assault weapons and the Seventh Circuit has subsequently held that *Friedman* fits comfortably with *Ezell*. *See Wilson v. Cook Cnty.,* 937 F.3d 1028, 1036 (7th Cir. 2019) (holding that Cook County's ban on the sale and possession of assault rifles is constitutional). Moreover, *Ezell* relied on the two-step approach Plaintiffs argue is now abrogated by *Bruen*. Plaintiffs cannot have it both ways.[5] Ultimately, Plaintiffs cite no case that supports a Second Amendment right to sell, own, or possess assault weapons. Their claim is unlikely to succeed on the merits and a TRO is improper on that basis alone.

2. ***Bruen'* Approach to the Second Amendment Supports Illinois HB5471**

---

[5] At the January 27, 2023 hearing, Plaintiffs cited two cases, *Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) and *Staples v. United States*, 511 U.S. 600 (1994) arguing both cases supporting their argument that a categorical ban of assault weapons must be unconstitutional. Neither is applicable. *Drummond* simply held that *Heller* does not automatically exempt all gun sales bans from Second Amendment scrutiny. *Staples* is a case about the mens rea required to convict under the National Firearms Act and has nothing to do with the Second Amendment jurisprudence. Both are irrelevant.

Neither prong of the two-part test established in *Heller* and affirmed by *Bruen* supports Plaintiffs' constitutional challenge here. In *Bruen*, the Supreme Court's analysis of the Second Amendment challenge "centered on constitutional text and history." *Id.* at 2128–29. Under this approach, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129–30. The burden then shifts to the government authority to establish that a given restriction is consistent with historical limitations on firearms. Critically, the Supreme Court has split the burden of proof in Second Amendment cases between the parties. Challengers bear the burden at the first step, and the government bears the burden at the second step. Plaintiffs here proceed as if they have no burden at either step. *See* Mot. 5–10. But the Supreme Court was clear: It shifted the burden of proof to the government *only* for step two. *Bruen,* 142 S. Ct. at 2130. As a result, the general rule applies at step one: "As the party challenging the statutory [] scheme," the plaintiff "bears the burden of demonstrating its unconstitutionality," and "statutes [are] presumed constitutionally." *Lujan v. G & G Fire Sprinklers, Inc.* 523 U.S. 189, 198 (2001).

### a. **Plaintiff's Burden**

*Bruen* first requires Plaintiffs to establish that the weapons in question are "Arms" protected by the Second Amendment. Only weapons "in common use" that are not "dangerous [or] unusual" are protected. *Heller*, 554 U.S. at 627 (citing 4 Blackstone 148–49 (1769)). Plaintiffs must satisfy *both* standards. On the merits, Plaintiffs will not likely carry their burden as to either.

Plaintiffs have not demonstrated that assault weapons are "in common use" as that term was understood at the time of the Founding. According to the plain term of the Supreme Court's Second Amendment precedents, the test for Second Amendment protection of a particular weapon

is common use, not common ownership.[6] Tellingly, Plaintiffs point to no evidence, such as survey data or studies, showing that assault weapons are used frequently in self-defense or have ever been needed to engage in effective self-defense.[7] Plaintiffs instead argue that firearms subject to HB5471 are in common use because of their popularity, quoting statistics of the number of these firearms sold in recent years. *See* Motion at 15–16 ("The AR-15 is America's 'most popular semi-automatic rifle,'" quoting *Heller II*, 670 F.3d at 1287(citation omitted). The phrase "in common use" as used in *Heller* and *McDonald* does not simply refer to a weapon's prevalence in society, or the quantities manufactured or sold. Relying solely on "how common a weapon is at the time of litigation" would be "circular," because commonality depends in part on what the law allows. *Friedman*, 784 F.3d at 409. For example, machine guns were "all too common" during Prohibition, but that did not immunize them from heavy regulation and an eventual ban on the grounds they were military-grade weapons. *Id.* at 408–09; *see also Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical").

Plaintiffs provide no evidence for the Court to conclude assault weapons are "in common use," let alone in "common use" for lawful individual self-defense. Out of the 462 million firearms in circulation nationwide, only 24 million (5%) were assault weapons in circulated circulation in the United States. Ex. G, Klarevas' Highland Park Decl. ¶ 13.[8] And unlike handguns, which are

---

[6] The Second Amendment protects only those weapons that are "'in common use at the time' for *lawful* purposes like self-defense." *Heller*, 554 U.S. at 624 (emphasis added) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also Bruen*, 142 S. Ct. at 2134 (referencing whether the subject "weapons [are] 'in common use' today for self-defense" (quoting Heller, 554 U.S. at 627)). This "important limitation on the right to keep and carry arms," recognized in Heller, remains a critical limitation on the Second Amendment following *Bruen. See id.* at 2162 (Kavanaugh, J., concurring).

[7] In fact, an FBI database covering 2000–2021 reflects defensive use of an assault weapon in only 0.2% of active shooter incidents. Klarevas' Highland Park Decl. ¶ 25.

[8] Defendants attach the Wilson Declaration, Ex. A, which attaches several expert declarations from *Goldman v. City*

owned broadly across the country, ownership of assault weapons is highly concentrated—less than 2% of the current population of approximately 333 million Americans own an assault weapon. *Id.* ¶ 27.[9]

Plaintiffs have similarly not demonstrated that assault weapons are not "dangerous [or] unusual," ignoring entirely the "dangerous" component of this test. On the other hand, evidence exists that assault weapons, including those contemplated by HB5471, are highly dangerous and used to commit mass murder all too often. Assault weapons have been used in the majority of mass shootings in America. Ex. G, Klarevas's Highland Park Decl. ¶¶ 11–23. The mass shootings with the most deaths in recent years—including the Fourth of July Highland Park Parade shooting— were carried out with assault weapons. *See* Ex. L, Mass Shootings Involving Assault Weapons.[10] Unsurprisingly, assault weapons are preferred by mass murders, as they are the "perfect killing machine" designed to kill as many people as possible in as short a time as possible. Ex. D, Andrew's Highland Park Decl., ¶ 34, n.40. Accordingly, assault weapons are not "in common use for self-defense" nor are they commonly accepted. Instead, assault weapons clearly fall into Blackstone's definition of dangerous or usual weapons as ones that are used to "terroriz[e] the good people of the land." Blackstone's Commentaries on the Laws of England (1769).

Plaintiffs have not met their constitutional burden under *Heller* and *Bruen*. They have not demonstrated that assault weapons are "in common use," nor have they that demonstrated assault

---

*of Highland Park,* Case No. 1:22-cv-04774 (N.D. Ill.) and *Miller v. Bonta,* Case No. 3:19-cv-01537-BEN-JLB (S. D. Cal.), cases involving similar *Bruen* and Second Amendment issues, in support of its motion. These expert declarations are labeled Exhibits D–K.

[9] For population and household data, *see e.g.,* U.S. Census Bureau, https://www.census.gov/

[10] *Number of victims of the worst mass shootings in the United States between 1982 and May 202*2, Statista (2022), https://www.statista.com/statistics/476101/worst-mass-shootings-in-the-us/; Abadi et al., *The 30 Deadliest Mass Shootings in Modern US History Include Buffalo and Uvalde,* Bus. Insider (May 26, 2022), https://www.businessinsider.com/deadliest-mass-shootings-in-us-history-2017-10; Follman et al., *US Mass Shootings, 1982–2022: Data From Mother Jones' Investigation, Mother Jones* (Nov. 23, 2022), https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/.

weapons are not "dangerous [or] unusual," ignoring entirely the "dangerous" component of this test. The Court should end its analysis at step one and deny Plaintiffs' motion.

### b. **Defendants' Burden**

Even if Plaintiffs could meet their burden at step one, Defendants have more than met their burden at step two to justify HB5471. Under *Bruen*'s text-and-history standard, if a firearm regulation falls within the plain text of the Second Amendment, the Court must then determine whether the regulation is consistent with the "historical traditional" of such regulations. Thus, even if Plaintiffs could meet their burden that limitations on the commercial sale of assault rifles is governed by the text of the Second Amendment, HB5471 would still be constitutionally valid because its prohibition is consistent with the Nation's tradition of regulating "dangerous [or] unusual weapons." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).

Historically, governments have retained substantial latitude in enacting restrictions on certain weapons deemed to be susceptible to criminal misuse and to pose significant dangers to the public—from trap guns to certain knives, blunt objects, and pistols—provided that law-abiding citizens retained access to traditional arms for effective self-defense. Governments have regulated weapons in this way throughout our Nation's history, including when the Second and Fourteenth Amendments were ratified. As counsel for Mr. Heller acknowledged during oral argument, the Second Amendment "always coexisted with reasonable regulations of firearms." Adam Winkler, *Gunfight: The Battle Over the Right to Bear Arms in America* 221 (2011).[11] In fact, since our founding, American governments have exercised broad police powers to limit access to and use of

---

[11] Naperville incorporates by reference its supplemental brief filed on December 18, 2023 (Dkt. 34). While the supplemental brief was filed in response to Plaintiffs' first TRO against the Ordinance, Defendants maintain that the same historical analysis conducted in the supplemental briefing supporting a finding that the Ordinance was constitutional now supports a finding that the State's prohibition on the sale of assault weapons under HB5471 is constitutional.

certain types of weapons deemed especially dangerous. As historian Saul Cornell explains, the "dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace." Ex. K, Cornell Bonta Decl. ¶ 9.[12] For example, dangerous weapons in the 18th century—such as Bowie knives and trap guns—were widely banned as the new technology for those weapons emerged. Ex. J, Spitzer's Highland Park Decl. ¶¶ 82–85, 61–71. Thus, government regulations of dangerous arms have been unquestionably permitted, even though the text of the Second Amendment provides that the right to keep and bear arms "shall not be infringed." *Bruen,* 142 S. Ct. at 2126 (citing *Konigsberg v. State Bar of Cal*., 366 U.S. 36, 49 n.10 (1961)). Indeed, the Supreme Court has recognized that governments have had the power to regulate "dangerous [or] unusual weapons" since at least the time of Blackstone. *Heller*, 554 U.S. at 627 (citing 4 Blackstone 148–49 (1769)).

HB5471 does not contradict this historical record: State and local governments have always been extended wide latitude to protect public safety. Illinois' law is therefore consistent with a local government's general powers to regulate conduct within its borders. *See, e.g., Maum Meditation House of Truth v. Lake County, Ill.*, 55 F.Supp.3d 1081, 1088–89 (N.D. Ill. July 16, 2014) ("In general, zoning ordinances imposing restrictions on use and occupation of private land ... satisfy the rational basis test."); *Jucha v. City of N. Chicago*, 63 F. Supp. 3d 820, 829–30 (N.D. Ill. 2014) (First Amendment protection of tattoos, as speech, does not mean that cities cannot

---

[12] On Founding-era conceptions of liberty, *see* John J. Zubly, *The Law of Liberty* (1775). The modern terminology to describe this concept is "ordered liberty." See *Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept*, see generally* James E. Fleming & Linda C. Mcclain, *Ordered Liberty: Rights, Responsibilities, and Virtues* (Harvard University Press, 2013). On Justice Cardozo and the ideal of ordered liberty, *see Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr*., Ordered Liberty: Cardozo and the Constitution,* 1 Cardozo L. Rev. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J. L. & Pub. Pol'y 569 (2017).

regulate tattoo parlors.). Plaintiffs are not likely to succeed on the merits and their Motion should be denied.

**C.      Plaintiffs will not suffer irreparable harm if the Ordinance goes into effect.**

Plaintiffs claim HB5471 will cause irreparable harm because it deprives Plaintiffs of a constitutional right. This claim is defective. LWI does not have a protected right to sell assault weapons. *Heller*, 554 U.S. at 626–27. Nor will Plaintiffs suffer a constitutional injury from its enforcement.[13] Recognizing this, Plaintiffs ask the Court to adopt a standard for evaluating requests for emergency injunctive relief that would contravene binding precedent.

In doing so, Plaintiffs ask the Court to ignore the controlling standard for evaluating requests for emergency relief and presume that they have been injured under HB5471. But in support, they offer nothing to support this alleged injury. Rather, Plaintiffs lean heavily on cases that have nothing to do with firearms and ask this court to presume injury. *See* Mot. at 4-6. And *Ezell* and *Bruen*, the two firearms-related cases Plaintiffs cite, are distinguishable. Neither support Plaintiffs' proposed standard, which the Court should reject.

Unable to show irreparable harm, Plaintiffs argue that they need not, citing cases holding that an alleged loss of First or Second Amendment rights can sometimes be presumed to cause irreparable harm. *See* Mot. 4–5. But no authority has ever held that such a presumption applies to any purported rights to sell assault weapons. *See Ditton v. Rusch*, 2014 WL 4435928, at \*5 (N.D. Ill. Sept. 9, 2014) ("injury to constitutional rights does not a priori entitle a party to a finding of irreparable harm").

Plaintiffs offer no other support for their contention that a presumption of irreparable harm

---

[13] LWI's previous conclusory statement that it will "go out of business" (Decl. of Robert Bevis, Dkt. 10 at ¶ 5) if the Ordinance is enforced does not justify granting preliminary injunctive relief either. The company offers no information about potential lost sales or profits, which precludes it from making a "*clear showing*" that it will be irreparably harmed.

should apply in cases involving regulations of commercial sales of assault weapons. *See Heller*, 544 U.S. at 626–27 ("Nothing in our opinion should be taken to cast doubt on . . . laws imposing condition and qualifications on the commercial sale of arms."); *Bruen*, 142 S. Ct. at 2157 (Alito, concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess."). Plaintiffs' Motion should be denied.

### D. The balance of hardships favors Naperville and Illinois.

Plaintiffs' Motion should be denied because an immediate TRO would harm Defendants' significant interest the safety of its citizens. Plaintiffs' alleged harm is that LWI will go out of business if it cannot sell assault weapons and that "the citizens of Naperville . . . will be unable to purchase Banned Firearms in Naperville." Decl. of Robert Bevis, at ¶ 5, Dkt. 10 at 19. Defendants' purpose, on the other hand, is to ensure public safety and to protect its citizens from mass shootings. Any balance of these interests favors Defendants.

Defendants have a compelling interest in regulating assault weapons to protect its citizens. Assault weapons account for four of the five deadliest mass shootings in U.S. history, killing 164 people in total.[14] When an assault weapon is used in a mass shooting, nearly 14 times as many people are injured, and twice as many people are killed.[15] Courts of Appeals across the country repeatedly have observed these weapons' deadly nature. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 262; *see also Kolbe*, 849 F.3d at 139; *see also Friedman*, 784 F.3d 406 ("[A]ssault weapons with large-capacity magazines can fire more shots, faster, and thus can be more dangerous

---

[14] Defendants point to the Las Vegas Strip massacre; Orlando nightclub massacre; Sandy Hook Elementary massacre; and the Texas First Baptist Church massacre. *See Weapon Types Used in Mass Shootings in the United States Between 1982 and October 2022, by Number of Weapons and Incidents*, Statista (Oct. 18, 2022), https://www.statista.com/statistics/476409/mass-shootings-in-the-us-by-weapon-types-used/.

[15] *The Effects of Bans on the Sale of Assault Weapons and High-Capacity Magazines*, RAND Corp. (Apr. 22, 2020), https://www.rand.org/research/gun-policy/analysis/ban-assault-weapons.html

in aggregate. Why else are they the weapons of choice in mass shootings?").

Because of the unique threats assault weapons pose to public safety, state and local governments are afforded great deference to regulate them *Friedman*, 784 F.3d at 410 ("[S]tates, which are in charge of militias, should be allowed to decide when civilians can possess military-grade firearms . . . ."). Plaintiffs' alleged harm, on the other hand, is severely outweighed by Defendants' and the public's interest in regulating the sale of these dangerous weapons under the City's inherent home-rule authority. As explained above, Plaintiffs have no constitutional right to sell (or own) an assault weapon, and therefore no constitutional injury. The Naperville Ordinance and HB5471 also do not restrict the right of people to keep or bear arms for self-defense. LWI's conclusory statement that it will "go out of business," with no information about potential lost sales or profits, does not make a "clear showing" that it will be harmed in a manner that outweighs the public's clear interest in protection. The balancing of harms strongly favors Defendants, and Plaintiffs' request for injunctive relief should be denied.

## **CONCLUSION**

For the reasons stated above, the Court should deny Plaintiffs' Motion.


Dated: January 30, 2023                       Respectfully submitted,


                                              */s/ Christopher B. Wilson*
                                              Christopher B. Wilson, Bar No. 06202139
                                              CWilson@perkinscoie.com
                                              PERKINS COIE LLP
                                              110 North Wacker Dr., Suite 3400
                                              Chicago, Illinois 60606-1511
                                              Tel: 312.324.8400

                                              Attorney for City of Naperville

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that in accordance with Federal Rule of Civil Procedure 5 and Local Rule 5.5, the following document was served on January 30, 2023 through the district court's ECF system to the following counsel of record:

Jason Craddock
Attorney at Law
2021 Midwest Rd., Ste 200
Oak Brook, IL 60523
craddocklaw@icloud.com

Barry K. Arrington
Arrington Law Firm
3801 East Florida Avenue, Suite 830
Denver, Colorado 80210
barry@arringtonpc.com

*/s/ Christopher B. Wilson*
Christopher B. Wilson