# Exhibit H

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

NATIONAL ASSOCIATION FOR GUN
RIGHTS, and SUSAN KAREN GOLDMAN,

          Plaintiffs,

      v.

CITY OF HIGHLAND PARK, ILLINOIS,

          Defendant.

No. 1:22-cv-04774

Honorable Harry D. Leinenweber

Honorable Jeffrey T. Gilbert

## DECLARATION OF RANDOLPH ROTH

## DECLARATION OF RANDOLPH ROTH

I, Randolph Roth, declare under penalty of perjury that the following is true and correct:

1.        I am an Arts and Sciences Distinguished Professor of History and Sociology at

The Ohio State University.  I have personal knowledge of the facts set forth in this declaration,

and if called upon as a witness, I could and would testify competently as to those facts.

2.        I have been retained by the City of Highland Park, Illinois to render expert

opinions in this case.  I am being compensated at a rate of $250 per hour.

### BACKGROUND AND QUALIFICATIONS

3.        I received a B.A. in History with Honors and Distinction in 1973 from Stanford

University, where I received the James Birdsall Weter Prize for the outstanding honors thesis in

History.  I received a Ph.D. in History in 1981 from Yale University, where I received the

Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George

Washington Eggleston Prize for the outstanding dissertation in American history.  I have taught

courses in history, the social sciences, and statistics since 1978, with a focus on criminology and

the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to

this declaration.

4.        I am the author of *American Homicide* (The Belknap Press of the Harvard

University Press, 2009), which received the 2011 Michael J. Hindelang Award from the

American Society of Criminology awarded annually for the book published over the three

previous years that "makes the most outstanding contribution to research in criminology over the

previous three years,"[1] and the 2010 Allan Sharlin Memorial Book Award from the Social

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

1

Science History Association for outstanding books in social science history.[2] *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by *reason.com*. The book is an interregional, internationally comparative study of homicide in the United States from colonial times to the present. I am a Fellow of the American Association for the Advancement of Science, and I have served as a member of the National Academy of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board of the *American Historical Review*, the most influential journal in the discipline. And in 2022 I received the inaugural Distinguished Scholar Award from the Historical Criminology Division of the American Society of Criminology.

5.      I am the principal investigator on the National Homicide Data Improvement Project, a project funded by the National Science Foundation (SES-1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID=1228406) and the Harry Frank Guggenheim Foundation to improve the quality of homicide data in the United States from 1959 to the present. The pilot project on Ohio has drawn on a wide range of sources in its effort to create a comprehensive database on homicides (including narratives of each incident) based on the mortality statistics of the Ohio Department of Health, the confidential compressed mortality files of the National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports, death certificates, coroner's reports, the homicide case files of Cincinnati, Cleveland, and Columbus, obituaries, and newspaper accounts.

6.      I have published numerous essays on the history of violence and the use of firearms in the United States, including a) "Guns, Gun Culture, and Homicide: The Relationship

---

[2] See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240 (https://www.jstor.org/stable/3491655#metadata_info_tab_contents); b) "Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708 (https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c) "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); and d) "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of Research in Crime and Delinquency* (2021) (https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_Homicide_in_the_United_States).

7.      I am also co-founder and co-director of the Historical Violence Database.  The web address for the Historical Violence Database is: http://cjrc.osu.edu/research/interdisciplinary/hvd.  The historical data on which this declaration draws are available through the Historical Violence Database.  The Historical Violence Database is a collaborative project by scholars in the United States, Canada, and Europe to gather data on the history of violent crime and violent death (homicides, suicides, accidents, and casualties of war) from medieval times to the present. The project is described in Randolph Roth et al., "The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods* (2008) 41: 81-98 (https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-98?casa_token=PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-L4wqloRc2DFsM4eRmKEc

346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU).  The only way to obtain reliable historical homicide estimates is to review every scrap of paper on criminal matters in every courthouse (indictments, docket books, case files, and judicial proceedings), every jail roll and coroner's report, every diary and memoir, every article in every issue of a number of local newspapers, every entry in the vital records, and every local history based on lost sources, local tradition, or oral testimony. That is why it takes months to study a single rural county, and years to study a single city.[3]

8.     My work on data collection and my research for *American Homicide*, together with the research I have conducted for related essays, has helped me gain expertise on the causes of homicide and mass violence, and on the role technology has played in changing the nature and incidence of homicide and mass violence.  I hasten to add that the insights that my colleagues and I have gained as social science historians into the causes of violence and the history of violence in the United States stem from our tireless commitment to empiricism.  Our goal is to

---

[3] It is also essential, in the opinion of historians and historical social scientists involved in the Historical Violence Database, to use capture-recapture mathematics, when multiple sources are available, to estimate the number of homicides where gaps or omissions exist in the historical record. The method estimates the percentage of the likely number of homicides that appear in the surviving records by looking at the degree to which homicides reported in the surviving legal sources overlap with homicides reported in the surviving non-legal sources (newspapers, vital records, diaries, etc.). A greater degree of overlap means a higher percentage in the surviving records and a tighter confidence interval. A lesser degree of overlap, which typically occurs on contested frontiers and during civil wars and revolutions, means a lower percentage and a wider confidence interval. See Randolph Roth, "American Homicide Supplemental Volume: Homicide Estimates" (2009) (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth, "Child Murder in New England," *Social Science History* (2001) 25: 101-147 (https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M. Denham,  "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly* 86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings." *Social Science History* 25 (2001): 67-91 (https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

gather accurate data on the character and incidence of violent crimes and to follow the evidence wherever it leads, even when it forces us to accept the fact that a hypothesis we thought might be true proved false. As my colleagues and I are fond of saying in the Criminal Justice Network of the Social Science History Association, the goal is not to be right, but to get it right. That is the only way to design effective, pragmatic, nonideological laws and public policies that can help us address our nation's problem of violence.

9. I have previously served as an expert witness in cases concerning the constitutionality of state and municipal gun laws, including *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.), *Duncan v. Bonta*, No. 3:17-cv-1017 (S.D. Cal.), *Ocean State Tactical v. Rhode Island*, No. 22-cv-246 (D.R.I.), and *Hanson v. District of Columbia*, No. 1:22-cv02256-RC (D.D.C.).

## SUMMARY OF OPINIONS

10. I have been asked by the City of Highland Park, Illinois to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

11. For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today. I discovered

that the key to low homicide rates over the past 450 years has been successful nation-building. High homicide rates among unrelated adults—friends, acquaintances, strangers—coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[4]  As a nation, we are still feeling the aftershocks of our catastrophic failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the rise of Jim Crow.

12.    Our nation's homicide rate would thus be high today even in the absence of modern technologies that have made firearms far more capable of injuring multiple people over a short span of time than they were in colonial and Revolutionary era.  But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been.

13.    My opinions will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did

---

[4] See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177 /1088767912442501?casa_token=dkP_nZZxCaYAAAAA:vL522E2inh9U2gr4X2qAhPnqRmin WEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwiRWPEom7M), for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building.  My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present.  In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random. They reveal deep patterns that are causal.

occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in every state by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I—a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; and 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder.

## OPINIONS

I.   **GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS**

    A.   **Homicide and Firearms in the Colonial Era (1688-1763)**

14.    In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated. For instance, the first General Assembly of Virginia passed a law in 1619 which declared that "no man do sell or give any Indians any piece, shot, or powder, or any other arms offensive or defensive, upon pain of being held a traitor to the colony and of being hanged as soon as the fact is proved, without all redemption." And the province of North Carolina passed a statute in 1723 that made it illegal for

7

African Americans, enslaved or free, to possess any firearm or weapon, offensive or defensive.[5] But laws restricting the use or ownership of firearms by colonists of European ancestry were less common, for two reasons. First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[6] By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater, Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[7] Violence among colonists was not a pressing problem on the eve of the Revolution.

15. Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread. Approximately 50 to 60 percent of households

---

[5] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 57-58, available at https://scholarship.law.duke.edu /cgi/viewcontent.cgi?article=4825&context=lcp; and Alexandra Lanzetta, "The Racist History of Gun Control Policy and Rhetoric in the United States" (Ph.D. dissertation, University of Colorado Boulder, 2021), 10-13, available at file:///C:/Users/roth.5/Downloads/The_Racist_ History_of_Gun_Control_Policy_and_Rhetoric_in_the_United_States-_Lanzetta.pdf. See also Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016), available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961; and Adam Winkler, "Racist Guns Laws and the Second Amendment," Harvard Law Review 135 (June 21, 2022) F 537, available at https://harvardlawreview.org/2022/06/racist-gun-laws-and-the-second-amendment/.

[6] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together. The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[7] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91. By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year. See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed December 20, 2022).

in the colonial and Founding eras owned a working firearm, usually a musket or fowling piece.[8]

Fowling pieces, like muskets, were muzzle-loading. But unlike muskets, which were heavy,

single-shot firearms used for militia service, fowling pieces were manufactured specifically to

hunt birds and control vermin, so they were designed to fire shot, primarily, rather than ball, and

were of lighter construction than muskets.[9] Family, household, and intimate partner homicides

were rare, and only 10 to 15 percent of those homicides were committed with guns. In New

England, the rate of family and intimate partner homicides stood at only 2 per million persons

per year for European Americans and 3 per million for African Americans for the seventeenth

and most of the eighteenth centuries, and fell to 1 per million for both European and African

Americans after the Revolution. The rates in the Chesapeake were likewise low, at 8 per million

per year for European Americans and 4 to 5 per million for African Americans.[10]  And not only

was the nondomestic homicide rate low, but also the proportion of nondomestic homicides

committed with guns was low—never more than 10 to 15 percent.[11]

      16.     Firearm use in homicides was generally rare because muzzle-loading firearms, such

as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.[12]

They were lethal and accurate enough at short range, but they were liable to misfire, given the

---

[8] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116; and Roth, "Guns, Gun Culture, and Homicide," 224-227.

[9] *See, e.g.*, Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment," in Saul A. Cornell and Nathan Kozuskanich, eds., *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (University of Massachusetts Press, 2013), 310, 327 & nn. 101-102.

[10] Roth, "Why Guns Are and Aren't the Problem," 116; and Roth, American Homicide, 108-109, and 520 n.3.

[11] Ibid., 116-119.

[12] Ibid., 117.

limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[13]  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat.  They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[14]  And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[15]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[16]  The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[17]  The firing mechanism also had to be readied, often with a fresh flint.[18]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[19]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage.[20]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[21]

---

[13] Ibid.

[14] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[15] Roth, "Why Guns Are and Aren't the Problem," 117.

[16] Ibid.

[17] Ibid.

[18] Ibid.

[19] Ibid.

[20] Ibid.

[21] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

17. The infrequent use of guns in homicides in colonial America reflected these limitations. Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[22] It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[23] Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[24]

18. When colonists anticipated violence or during times of political instability, gun use was more common. When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[25] so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier.[26] Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so 60 percent of homicides of Native Americans by European Americans in New England were committed with firearms.[27] And slave catchers and posses kept their firearms at the ready, so 90 percent of runaway slaves who were killed in Virginia were shot.[28] Otherwise, however, colonists seldom went about with loaded

---

[22] Roth, "Why Guns Are and Aren't the Problem," 117.
[23] Ibid.
[24] Ibid. Contrary to popular belief, dueling was also rare in colonial America. Roth, *American Homicide*, 45, 158.
[25] Roth, "Why Guns Are and Aren't the Problem," 118-119.
[26] Ibid., 116-117.
[27] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").
[28] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

11

guns, except to hunt, control vermin, or muster for militia training.[29]  That is why firearms had a modest impact on homicide rates among colonists.

### B.  The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)

19.     The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.  At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and could thus threaten the security of the government and the safety of citizens.[30]  The threats that such citizens posed to public safety could be checked in most instances by ordinary criminal statutes, drawn largely from British common law.  But at times those threats could be checked only by statutes that placed limits on basic rights.[31]

---

[29] Ibid., 118-119.

[30] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70, 282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

[31] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints on freedom of speech and the press during the administration of John Adams; Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions on searches and seizures during the administration of Thomas Jefferson; and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121, especially 108-109, as well as Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The New Press, 2000), 74-116, on the limited scope of the Second Amendment. Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996), 291, notes that "[n]early all the activities that constituted the realms of life, liberty, property, and religion were subject to regulation by the state; no obvious landmarks

20.     The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[32]  And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England during the Revolution.[33]  But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England.  Only New York City stood out, at 6 per 100,000 adults per year.[34]  And the proportion

---

marked the boundaries beyond which its authority could not intrude, *if* its actions met the requirements of law." See also Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-Kent Law Review 76 (2000), 157 (https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=3289&context=cklawreview): "[At] the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands."

[32] Roth, American Homicide, 145-149; Holger Hoock, Scars of Independence: America's Violent Birth (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution (New York: Knopf, 2006), 91-102; George C. Daughan, Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, All God's Children: The Bosket Family and the American Tradition of Violence (New York: Vintage, 1996), 3-18.

[33] Roth, "Why Guns Are and Aren't the Problem," 119-120.

[34] Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

of domestic and nondomestic homicides committed with firearms was correspondingly low—between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[35]

21.     The keys to these low homicide rates and low rates of gun violence in New England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and the degree to which the promise of the democratic revolution was realized.  Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[36]  And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread.  By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[37]  African Americans still faced discrimination and limits on their basic rights in most Northern states.  But despite these barriers, most African Americans in the North were optimistic, after slavery was abolished in the North, about earning their own living and forming their own churches and voluntary organizations.[38]

---

[35] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf).  On weapons use in homicides in the North, see Figures 25 through 46.

[36] Roth, *American Homicide*, 180, 183-186.

[37] Ibid., 180, 183-186.

[38] Ibid., 181-182, 195-196; Leon F. Litwack, North of Slavery: The Negro in the Free States, 1790-1860 (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860 (Ithaca: Cornell University Press, 1998); Sean White, Somewhat More Independent: The End of Slavery in New York City, 1780-1810 (Athens: University of Georgia Press, 1991); and Graham R. Hodges, Root and Branch: African Americans in New York and East Jersey, 1613-1863 (Chapel Hill:

22.     That is why there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels. They took a strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the practice posed for the nation's democratic polity and the lives of public men: editors, attorneys, military officers, and politicians.[39]

23.     Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states,[40] where violence among citizens increased after the Revolution to extremely high levels. Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year.[41] Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical.[42] Prominent whites were subjected to the rough and tumble of partisan politics and their position in society was threatened by people from lower social positions.[43] African Americans despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of African American rebellion.[44] As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw a dramatic increase in the number of deadly

---

University of North Carolina Press, 1999).

[39] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=vlr).

[40] Clayton E. Cramer, Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform (Westport, Connecticut: Praeger, 1999); and Cornell, Well-Regulated Militia, 141-144.

[41] Roth, *American Homicide*, 180, 199-203.

[42] Ibid., 182.

[43] Ibid.

[44] Ibid.

quarrels, property disputes, duels, and interracial killings.[45]  The violence spread to frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever Southerners settled in the early national period.[46]  During the Early National period, the proportion of homicides committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[47]

24.     Citizens and public officials in these states recognized that concealable weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an alarming proportion of the era's murders and serious assaults.[48]  They were used to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights.  As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[49]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[50]

---

[45] Ibid., 182, 199-203.

[46] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

[47] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[48] Roth, American Homicide, 218.

[49] Ibid., 218-219.  See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[50] Roth, American Homicide, 219.

16

25.    The pistols of the early national period represented a technological advance. Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber.  Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[51]  The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting.  Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[52]

26.    The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838.  These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct. Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep,
> or have about their person or elsewhere . . . Bowie, or any other kind of knives,

---

[51] Roth, "Why Guns Are and Aren't the Problem," 117.
[52] Harold L. Peterson, American Knives: The First History and Collector's Guide (New York: Scribner, 1958), 25-70; and Peterson, Daggers and Fighting Knives in the Western World, from the Stone Age till 1900 (New York: Walker, 1968), 67-80.

> manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers. But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances. Indiana made an exemption for travelers.[53] These concealed weapons laws were notably difficult to enforce and did not address underlying factors that contributed to rising homicide rates. Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

27. Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[54]

---

[53] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws, attached to this declaration as **Exhibit B**. Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols. See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed December 20, 2022). Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms. That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[54] Cramer, Concealed Weapons Laws, 69-96; Cramer, For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, Frontier Law and Order—10 Essays (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," Georgetown Law Journal 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article

### C. Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

28.     By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession.[55]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.  Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[56]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Trans-Mississippi West, where rates had already risen in the early national period, but in the North. Rates that had ranged in the North in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities. In the South, rates in the plantation counties of Georgia rose from 10 per 100,000 adults to 25 per 100,000, and rates soared even higher in rural Louisiana to 90 per

---

=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, For the Defense of Themselves and the State, 74, 83-85, 97-140.

[55] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22. These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

[56] Roth, *American Homicide*, 297-300.

19

100,000 and in mountain communities in Georgia and Missouri from less than 5 per 100,000 adults per year to 60 per 100,000. And in the West, the rates reached 65 per 100,000 adults per year in California, 76 per 100,000 in Texas, 119 per 100,000 in mining towns in South Dakota, Nevada, and Montana, and 155 per 100,000 in cattle towns in Kansas. Americans, especially men, were more willing to kill friends, acquaintances, and strangers. And so, the United States became—and remains today—by far the most murderous affluent society in the world.[57]

29. The increase occurred because America's heretofore largely successful effort at nation-building failed catastrophically at mid-century.[58] As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust.[59] Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors.[60] They were losing the sense that they were participating in a great adventure with their fellow Americans.[61] Instead, they were competing in a cutthroat economy and a combative political system against millions of strangers whose interests and values were antithetical to their own.[62] And most ominously, law and order

---

[57] Ibid., 199, 297-300, 302, 337, 347; and Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[58] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

[59] Roth, *American Homicide*, 299-302, 384-385. See also Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide."

[60] Roth, American Homicide, 300.

[61] Ibid.

[62] Ibid.

broke down in the wake of the hostile military occupation of the Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[63]

30.    The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[64] Because the pistols, muskets, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[65]  Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons.  But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

31.    Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[66]  They retained some of the limitations of earlier firearms, because their rotating cylinders—two of which came with each revolver—had to be loaded one chamber at a time. Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever.  Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded

---

[63] Ibid., 299-302, 332, 337, 354.
[64] Roth, "Why Guns Are and Aren't the Problem," 116-117.
[65] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.
[66] Patricia Haag, The Gunning of America: Business and the Making of American Gun Culture (New York: Basic Books, 2016).

quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun. But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[67]

32.     Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway. But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers. It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[68] And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[69] As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
>
> The convenience and safety with which both the arm and ammunition may be carried;
>
> The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
>
> Certainty of fire in damp weather;
>
> That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[70]

---

[67] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.
[68] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.
[69] Ibid., 38-57.
[70] Ibid., 39.

33.     Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[71]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading. The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[72]

34.     These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[73]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[74]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide

---

[71] Ibid., 38-57.

[72] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

[73] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).

[74] Ibid., 124-125.

rates fell for a short time, as they did at the end of Reconstruction. By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico. Homicide rates whipsawed, however, in the South. They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and Tennessee, and 35 per 100,000 in Virginia and North Carolina.[75] Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history.[76] That is why the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[77] And that is why every state in the Union restricted the right to carrying certain concealable weapons.

35.     It is important to note that state legislators experimented with various degrees of firearm regulation, as the nation became more and more violent. In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June, 1865, to June, 1868,[78] the legislature passed a bill in 1870 to prohibit the open or concealed carry of a wide range of

---

[75] Ibid., 125-127, 388, 403-404; and Roth, "American Homicide Supplemental Volume: American Homicides in the Twentieth Century," Figures 4a and 5a.
[76] Ibid., 125.
[77] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.
[78] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 192.

weapons, including firearms, on social occasions;[79] and it followed in 1871 with a bill banning in most circumstances the carrying, open or concealed, of small deadly weapons, including pistols, that were not designed for hunting or militia service.[80]  These laws were enforced with little or

---

[79] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues /55/5/articles/files/55-5_Rivas.pdf). "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."  An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63. See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019) (https://repository.tcu.edu/handle/116099117/26778).

[80] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611.  Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.'  An Act to

no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[81]

36.     Tennessee and Arkansas went farther than Texas to stem the tide of post-Civil War interpersonal violence.  In 1871, Tennessee flatly prohibited the carrying of pocket pistols and revolvers, openly or concealed, except for the large army and navy pistols commonly carried by members of the military, which could be carried openly, but not concealed.[82]  Arkansas

---

Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25.  The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.'  Id. § 3."  The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces.  Also, the deadly weapon law did not apply to all guns or firearms but just pistols.  The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'" See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 (Ph. D. dissertation: Texas Christian University, 2019), 72-83, 124-163 (https://repository.tcu.edu/handle/116099117/26778).
[81] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620.  The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication.  See also Rivas, "Deadly Weapon Laws of Texas," 164-195.
[82] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872) ("It shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be

followed suit in 1881.[83]  Tennessee's law withstood a court challenge, and Arkansas's was never challenged.[84]  And both states moved to prevent the sale or transfer of pocket pistols or ordinary revolvers.  In 1879, Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[85]  Arkansas passed a similar prohibition in 1881, but went even further by prohibiting the sale of pistol cartridges as well: "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[86]

---

lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.").

[83] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[84] See Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan. 20, 2022), https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/.

[85] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[86] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

37. California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[87] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons. A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[88]

38. But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves. And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[89] A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[90] In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's

---

[87] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[88] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851).

[89] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[90] Ibid., 11.

Record of Sale to local law enforcement.[91]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[92]

39.     Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons:

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[93]

The burden of proof remained with the person who carried the concealed weapon.

40.     It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

## II.     ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY TWENTIETH CENTURY

41.     The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing

---

[91] Ibid., 11-13.

[92] Ibid., 13-15.  Note that the title of the Cramer and Olson essay is misleading.  It does not refer to the origins of the laws discussed here or to the ways in which they were enforced.  It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

[93] Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452.

technologies.[94]  The only way to kill a large number of people was to rally like-minded

neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons

that were certainly lethal but did not provide individuals or small groups of people the means to

inflict mass casualties on their own.  Mass killings of this type were rare in the colonial,

Revolutionary, and Early National eras, outside of massacres of Native Americans or irregular

warfare among citizens seeking political power.[95]  But from the 1830s into the early twentieth

century, mass killings were common.

42.    Examples include Nat Turner's rebellion in Southampton County, Virginia, in

1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia

men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky,

where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two

people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in

1871.  Because these mass killings were almost always spontaneous and loosely organized, and

because each involved scores of perpetrators, they were difficult for the government to prevent.

---

[94] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996).

[95] For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644 (https://www.jstor.org/stable/25096733#metadata_info_tab_contents)]. For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

Worse, in some incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[96]

43.     The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments. The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[97] But when federal troops were withdrawn, white supremacist mass killings resumed. In New Orleans, for example, an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[98] And the Klan Acts did nothing to prevent mass murders by spontaneous

---

[96] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates*, The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney*, The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.
[97] Alan Trelease, White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction (New York: Harper and Row, 1975).
[98] Dennis C. Rousey, Policing the Southern City: New Orleans, 1805-1889 (Baton Rouge: Louisiana State University Press, 1996), 151-158. See also LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction (New York: Oxford University Press, 2008); and Gilles Vandal, Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884 (Columbus: Ohio State University Press,

mobs and loosely organized vigilantes. Rioters and vigilantes remained a threat well into the twentieth century. In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[99]

### III. ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE PRESENT

44.     The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time. These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers. The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the Thompson submachine gun, invented in 1918 by General John T. Thompson, who improved upon a pioneering German design.

45.     The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare. The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[100]

---

2000), 67-109.

[99] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

[100] Herta E. Pauli, Alfred Nobel: Dynamite King, Architect of Peace (New York: L. B. Fisher, 1942); and Bill Yenne, Tommy Gun: How General Thompson's Submachine Gun Wrote History (New York: Thomas Dunne Books, 2009).

46. Criminals and terrorists quickly discovered how accessible and useful these new technologies were. They could be purchased legally by private citizens. In the 1920s, Thompson submachine guns were expensive. They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, while now a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[101] That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers. Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), so it was favored by labor activists and anarchists.[102] Federal, state, and local officials and law enforcement officers suddenly confronted novel threats to their personal safety. Submachine guns were used most notoriously in gangland slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day Massacre and the Kansas City Massacre.[103] Dynamite was used in a string of anarchist bombings in 1919-1920. Those included the murder of 38 people and the

---

[101] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today. See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022. The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed October 4, 2022. The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[102] Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6. Note that a pound of dynamite would be far more expensive today—potentially hundreds of thousands of dollars—because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker. See U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012* (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download), accessed December 20, 2022.

[103] William Helmer and Arthur J. Bilek, The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone (Nashville: Cumberland House, 2004); and Yenne, Tommy Gun, 74-78, 91-93.

wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[104]  Dynamite was also used effectively for malicious, private ends.  For example, Osage Indians were murdered by an individual in Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[105]

47.     Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons.  Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[106] and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[107]  And the Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives, building upon regulations that began in 1917 with the passage of the Federal Explosives Act,

---

[104] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).
[105] For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).
[106] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238 (https://scholarship.law.duke.edu/lcp/vol83/iss3/13).  In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.
[107] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu /docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national _firearms_act_of_1938.pdf).

which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[108]

48.     Since 1970, public officials have continued to reserve the right to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder.  The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder.  The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[109]  And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks.  It gave owners 90 days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[110]

49.     In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons with large capacity magazines.  These weapons, which were designed for offensive military applications rather than individual self-defense, emerged from technologies developed for military use during the Cold War, beginning with the Soviet AK-47 assault rifle, which was invented in 1947, adopted by the Soviet Army in 1949, and used in the 1950s by the Soviets or

---

[108] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

[109] Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J).  The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007.  Accessed December 20, 2022.

[110] *New York Times*, December 18, 2018 (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html), accessed December 20, 2022.

their allies during the Hungarian Revolution, the Vietnam War, and the Laotian Civil War.[111]
The signature U.S. military firearm of the Cold War era—the M-16 rifle, developed in 1959 with
a 30-round magazine and a muzzle velocity of over 3,000 feet per second[112]—was capable of
firing 750 to 900 rounds per minute when set on fully automatic.[113]  But the M-16 was used more
often in combat—and more accurately, effectively, and sustainably as a weapon for inflicting
mass casualties—when set on semiautomatic, which was standard military procedure.  That is
why the U.S. Army defines "rapid fire" as 45 rounds per minute (the rate of fire of an M-16
when set on semiautomatic), not 750 to 900.[114]  And that is why in 1998 the U.S. Marine Corps
adopted the M-16A4, which replaced the "fully automatic" switch with a three-round burst (but
is otherwise the same weapon as the M-16)—an alteration that slows the potential rate of fire,
conserves ammunition, and improves accuracy.[115] The civilian version of the M-16—the
ArmaLite AR-15—has approximately the same muzzle velocity as the M-16 (3,300 feet per
second) and the same rate of fire as the M-16 on semiautomatic: 45 rounds per minute.[116]

50.     The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower
than that of an M-16 or its civilian counterparts: around 1,350 feet per second.  But technological
advances have increased the speed at which semiautomatic handguns can be fired.  An expert can

---

[111] Edward Ezell, *The AK-47 Story: Evolution of the Kalashnikov Weapons* (Harrisburg, Pennsylvania: Stackpole Books, 1986.

[112] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[113] Edward Ezell, *The Great Rifle Controversy: Search for the Ultimate Infantry Weapon from World War II through Vietnam and Beyond* (Harrisburg, Pennsylvania: Stackpole Books, 1984).

[114] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016).  Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed December 20, 2022.

[115] See military-today.com (http://www.military-today.com/firearms/m16.htm), accessed December 20, 2022.

[116] Ezell, *The Great Rifle Controversy*, 177-192.

fire an entire 30-round magazine from a Glock 17 handgun in five seconds.[117] And they are affordable.  A new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15.[118]

51.      It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire semiautomatic handguns and rifles with large capacity magazines that arrived in the domestic market in the 1970s and 1980s.  These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff, which is why many police and sheriff departments across the United States have purchased semiautomatic rifles and armored vehicles to defend themselves and decrease the likelihood that officers are killed or wounded.[119]

52.      Manufacturers soon discovered ways to increase the rate of fire of these new semiautomatic weapons even further.  Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*—a modification that doubles the rate at which semiautomatic weapons can be fired.[120]

---

[117] See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM." YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs), accessed December 20, 2022.
[118] See guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms /handguns/semi-auto?priceRange=Less%20than%20%24250) and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.
[119] Sam Bieler, "Police Militarization in the USA: The State of the Field," Policing: An International Journal 39 (2016): 586-600, available at https://www.emerald.com/insight /content/doi/10.1108/PIJPSM-03-2016-0042/full/pdf?casa_token=TYUuIouUCc8AAAAA :IWXQRQOtW90KZ2AKwzHNMX2tfRix0zAxRRkjQSy3rA- uUpnylZrnp0Xolhj7UFIf05WGZkr_92L__QGk_OAxnSH-3h26oxKC4e7vM79VCBpFl9_cHg.
[120] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-

53.    Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[121]

54.    The threat to public safety and law enforcement posed by semiautomatic rifles—with or without dangerous modifications—is a modern phenomenon that has a direct correlation with mass murder and mass shootings.  The danger these firearms pose is intrinsically different from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

**Figure 1 – Mass Shootings (1966–2022): Firearm Type**

| Weapon Used By Shooter | Non-semiautomatic/non-automatic firearm | Semiautomatic handgun | Semiautomatic rifle | Automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |

---

reset-triggers-frts/download), accessed December 20, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement.  Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida.  (https://lundestudio.com/are-binary-triggers-legal/), accessed December 20, 2022.  See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed December 20, 2022.
[121] See "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed December 20, 2022.

| | | | |
|---|---|---|---|
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been as deadly as mass shootings with fully automatic weapons.

55.     And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

**Figure 2 – Mass Shootings (1966–2022): Magazine Type**

| | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

56.     Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and 26 percent more than semiautomatic handguns.  But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns.  And extended magazines are two-and-a-half times more likely to be used in mass shootings with semiautomatic rifles than with semiautomatic handguns: in 30 percent versus 12 percent of incidents.  Semiautomatic rifles and extended magazines are deadly on their own.  But in combination, they are extraordinarily lethal.

57.     The data in Figures 1 and 2, and in the immediately above paragraph, are from the Violence Project.[122]  The Violence Project, which has compiled data on mass shootings from 1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." Other authorities have adopted similar definitions of "mass shootings" and "mass murder." For example, the FBI has defined mass murder as "a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murderers."[123] Federal

---

[122] The Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022. The Violence Project database provides information on the weapons used in the shootings.  It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons. Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic.  I have not participated in Violence Project or in the collection of their data.  In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, not yet included in the Violence Project's data, that fit the Violence Project's definition of a mass shooting: the Buffalo, New York, supermarket shooting on May 14; the Robb Elementary School shooting in Uvalde, Texas, on May 24; the Tulsa, Oklahoma medical center shooting on June 1; the concrete company shooting in Smithsburg, Maryland, on June 9; the Highland Park, Illinois, Fourth of July Parade shooting; and the Greenwood, Indiana, Park Mall shooting on July 17.  Three were committed with semiautomatic rifles and three with semiautomatic handguns.  The table in my declaration, unlike the tables in the Violence Project, does not include the Las Vegas shooting of 2017 (58 killed,  887 wounded). The Las Vegas shooting is an outlier in the number killed and wounded which would skew the results of my analysis.

[123] FBI, *Serial Murder: Multi-Disciplinary Perspectives for Investigators* at 8 (2005) (https://www.fbi.gov/stats-services/publications/serial-murder#two), accessed January 3, 2023.

legislation enacted in 2013 authorized the Attorney General to assist in the investigation of mass killings, defined to mean "3 or more killings in a single incident."[124]

58.     In other recent litigation, researcher Clayton Cramer has opined that "individual mass murder," as opposed to mass murders committed by groups, "is neither particularly modern no[r] dependent on technological advances."[125] Clayton's opinion is flawed because it is based on his decision to define "mass murder" to include "at least two murder victims committed in multiple locations within 24 hours."[126] His definition is not accepted among criminologists. His opinion is also flawed because it fails to take into account many mass murders committed by groups of people before and during the early twentieth century, such as mass murders in connection with the draft riots in New York City in 1863 or the race riots of the early twentieth century, as well as others referenced above in paragraphs 42, 43, and 46.

59.     What is remarkable about the mass shootings that have plagued the United States since 1965 is that all but four involved a lone shooter, and those that have involved more than one assailant have involved only two: in 1998 in Jonesboro, Kentucky; in 1999 in Littleton, Colorado; in 2015 in San Bernardino, California; and in 2019 in Jersey City, New Jersey. In the nineteenth and early twentieth centuries, it required scores of individuals to gather together as mobs, rioters, vigilantes, or terrorists to kill or wound dozens of people in a short space of time— generally because of their race, ethnicity, or faith.

60.     Today, thanks especially to extended magazines and certain classes of semiautomatic firearms, it requires only one or two individuals to kill or wound that many

---

[124] 28 U.S.C. § 530C(b)(1)(M).
[125] *See, e.g.*, *Bevis v. City of Naperville*, No. 22-cv-4775, Dkt. 35-1 (N.D. Ill. Dec. 23, 2022) ("Declaration of Clayton Cramer") at ¶ 19.
[126] Declaration of Clayton Cramer at ¶ 4.

people. And because of these modern technologies, which were developed for warfare, angry, alienated individuals can commit mass murder for reasons that are simply personal. Mass murderers no longer require collaborators to rally to a cause. For example, they can kill large numbers of people simply because they feel slighted at school, because they don't get along with their coworkers, because they were rejected romantically, or because they simply want to make a name for themselves. And since it is impossible in our society—indeed, in any society—to ensure that no one is angry or alienated, restricting access to extended magazines and certain classes of semiautomatic firearms mitigates the risk to every American.

61.    For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004.  And local governments have banned the sale of large capacity magazines, because they allow mass murderers to prolong their attacks before citizens or law enforcement can intervene—usually when the shooter is reloading.  For example, the shooter who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011 was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before bystanders could disarm him as he changed magazines.  Every one of those rounds hit an individual, killing six and injuring twelve.[127]

## IV.  CONCLUSION

62.    From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions.  That is why the

---

[127] "2011 Tucson Shooting," Wikipedia (https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed December 20, 2022.

majority of states passed and enforced laws against the carrying of concealable weapons, why the federal government passed the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership or control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit mass murder. Public officials are not required to pass such laws, of course, but historically, they have always retained the ability to do so. There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on weapons and armed voluntary organizations. And mass murders by individuals, including mass shootings, are a recent phenomenon, caused by changes in technology that emerged in the late nineteenth through the late twentieth century. Public officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 6, 2023 at Columbus, Ohio.

/s/ Randolph Roth

# Exhibit A

Randolph Roth                                                    Page 1


Curriculum Vitae

RANDOLPH ROTH

Department of History                    6987 Grandee Cliffs Drive
The Ohio State University                Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                           (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

**Table of Contents**

**Personal**                                                        2

Education                                                           2
Academic Positions                                                  2
Honorary Positions                                                  2
Professional Honors and Awards for Scholarship                      2
Professional Honors and Awards for Teaching                         3
Grants                                                              3

**Bibliography and Research**                                       4-17

**Teaching**                                                        18-20

**Service**                                                         21-26

Randolph Roth                                                                    Page 2

**Personal**

| | | |
|---|---|---|
| Marital Status: | Married | Allison Sweeney |
| Children: | Alexander | |

**Education**

1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire? Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis and Howard R. Lamar, advisors)

1973, B.A., with honors and distinction, in History, Stanford University (thesis, "Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl Degler and Barton Bernstein, advisors)

**Academic Positions**

1985-present, The Ohio State University: College of Arts and Sciences Distinguished Professor of History and Sociology
1978-1985, Grinnell College: Assistant Professor of History
1978, University of Vermont: Instructor in History
1974-1977, Graduate Teaching Assistant, Yale University

**Honorary Positions**

2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa

**Professional Honors and Awards for Scholarship**

2022, Distinguished Scholar Award, Division of Historical Criminology, American Society of Criminology

2013-2016, Member, Roundtable on Crime Trends in America, National Research Council, National Academy of Sciences

2012, Fellow, American Association for the Advancement of Science

2011, Michael J. Hindelang Award, American Society of Criminology, for the outstanding contribution to criminology over the previous three years

2010, Allan Sharlin Memorial Award, Social Science History Association,

for an outstanding book in social science history

2010, Outstanding Academic Books, *Choice*

1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village Research Society, for distinguished work in the history of rural society

1982, Theron Rockwell Field Prize, Yale University, for the outstanding dissertation in the Humanities

1982, George Washington Eggleston Prize, Yale University, for the outstanding dissertation in American history

1973, James Birdsall Weter Prize, Stanford University, for the outstanding senior thesis in history

## Professional Honors and Awards for Teaching

2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and Mentoring, College of Arts and Humanities

2013, Outstanding Teaching Award, College of Arts and Sciences Student Council

2009, Ohio State University Alumni Award for Distinguished Teaching

2007, Distinguished Teaching Award, Ohio Academy of History

1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in History at Ohio State University

## Grants

2013-2014, Research Grant, Harry Frank Guggenheim Foundation

2012-2015, Research Grant, National Science Foundation (SES-1228406)

2000, Fellowship for University Teachers, National Endowment for the Humanities

1998-2000, Research Grant and Supplemental Research Grant, National Science Foundation (SBR-9808050)

1992, Fellow, Workshop on the Rhetoric of Social History, University of Iowa

1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

1987, National Endowment for the Humanities, Summer Stipend

1983, Research Fellowship for Recent Recipients of the Ph.D., American Council of Learned Societies

1981, Fred Harris Daniels Fellowship, American Antiquarian Society

## Bibliography and Research

### Books

*American Homicide* (an interregional study of violent crime and violent death in America from colonial times to the present). The Belknap Press of Harvard University Press (2009), 655 pp.

*The Democratic Dilemma: Religion, Reform, and the Social Order in the Connecticut River Valley of Vermont, 1791-1850.* Cambridge University Press (1987), 399 pp.

### Edited Volumes

Co-founder and co-director, Historical Violence Database (on-line database on violent crime, violent death, and collective violence). Web address: www.sociology.ohio-state.edu/cjrc/hvd

American Homicide Supplementary Volume (on-line supplement to *American Homicide*, including detailed appendices on methods, supplemental tables, graphs, and statistical analyses), approx. 750 pp. Web address: http://cjrc.osu.edu/researchprojects/hvd/AHsup.html

### Essays on Historical Subjects

"Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with Richard Rosenfeld and Joel Wallman. *Homicide Studies* (forthcoming).

"The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and Delinquency* 58: 1 (2021): 1-46.

"Homicide-Suicide by Women against Intimate Partners," co-authored with Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections* 44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing." *Crime, History, and Societies* 21: 2 (2017): 387-400.

"How Exceptional Is the History of Violence and Criminal Justice in the United States? Variation across Time and Space as the Keys to Understanding Homicide and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

"Emotions, Facultative Adaptation, and the History of Homicide," *American Historical Review* (2014) 119: 1529-1546.

"Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender, Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online: Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence

in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon, Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is Empirically, Mathematically, and Theoretically Sound," *Crime, History, and Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology* (2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods* (2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods*. Randolph Roth, Cornelia Hughes Dayton, Kenneth Wheeler, James Watkinson, Robb Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

 "Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?" *Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds., *Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708.

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels, ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865*. Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont," in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.

**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a Naïve, Costly, and Misdirected Goal." *Journal of the American College of Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism? The Rhetoric and Politics of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds., *Contesting the Master Narrative: Essays in Social History*. University of Iowa Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central

Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods* (1986) 19: 103-117.

## Public History Essays

"Can Faith Change the World?  Religion and Society in Vermont's Age of Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.

## Works in Progress

*Child Murder in America*. An interregional study of murders of and by children from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of Speaking for Nature" (essay in manuscript)

## Editorial Boards

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*
2004- , *Crime, History, and Societies*

## Invited Lectures

"Trust, Legitimacy, and the Recent Rise in Homicide in the United States," Council on Criminal Justice, Washington, D.C., October 19, 2022.

"The History of Police Involved Homicides in the United States," Mary Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime Historians Symposium, Leeds University, Great Britain, Scheduled for September

2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the Available Historical Data, and Why We Have to Worry about Learning the Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020. Postponed.

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15, 2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of Buffalo, October 10, 2013.

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects for a New Institute on History and the Sciences," Max Planck Institutes, Berlin, Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law, November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5, 2012

"Quantitative Analysis of the History of Crime and Violence: Achievements and Prospects," Keynote Address, Conference on "Making Sense of Violence," University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Conference on Emerging Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May 25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Presidential Plenary Address, Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the "From Borderland to Backcountry Conference: Frontier Communities in Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15, 2007

"American Homicide: Its History," Ohio State University at Newark, Nov. 6, 2007

"American Homicide: A Political Hypothesis" and "The Case for Social Science History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the Historical Approaches in the Social Sciences series, State University of New York at Binghamton, Oct. 12, 2006

"The History of American Homicide," Winter College, Ohio State University, Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group,

Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western Democracies?  A Political and Psychological Hypothesis," Center for Historical Research and Documentation on War and Contemporary Societies, Belgian Ministry of Scientific Research, Brussels, Belgium, December 2004

"The History of American Homicide," Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family," Plenary Session, Society of Historians of the Early American Republic, July 22, 2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History, Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University, February, 2003

"American Homicide," School of Law, Northwestern University, September, 2003

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University, November, 2001

"Why Northern New Englanders Seldom Commit Murder:  An Interregional History of Homicide in America," and "The Historical Database Project on Crime and Violence in America," two lectures presented at the Charles Warren Center, Harvard University.  May, 2000

"Understanding Homicide in America:  An Interregional Approach," presentation to the Early American History Seminar, University of Pennsylvania, October,

1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the Center for Research on Vermont, the University of Vermont, and the Vermont Council on the Humanities.  The presentation was televised in Vermont.  It also made the evening news in Burlington and an AP wire story on my presentation was printed widely in newspapers in New Hampshire and Vermont, April, 1999

**Papers Delivered at Professional Meetings (recent)**

"The Social and Geographical Context of Child Homicides in the United States, 1989-2015," Homicide Research Working Group, June 2, 2022, Excelsior Springs, Missouri, and Social Science History Association, November 17, 2022, Chicago.

"The Difficulty of Counting the Number of Children Killed in Homicides in the United States, 1959-Present." Social Science History Association, November 23, 2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in the Future?" Social Science History Association, November 3, 2017, Montreal.

"Comparing Data Sources on the Police Use of Lethal Force," American Society of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and Rania Issa.

 "The History of Mass Murder," American Historical Association, January 6, 2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social Behavior," American Historical Association, New York City, January 4, 2015

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

"Author Meets Critics" session on *American Homicide* at the European Social Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic,"Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

 "The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports,"

Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April 12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the Presidential Panel on "History in the Social Science History of Association: Disciplinary Developments," Social Science History Association, Chicago, Nov. 15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable?  The Impact of Non-Emergency Medicine," Social Science History Association, Chicago, Nov. 15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-Century West Was Violent."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had Enough Money to Study It Properly? Possibilities for Collaborative Research Projects," Social Science History Association, Portland, Oregon, November 3-6, 2005

## Reviews

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*. (Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at the Power Cabin, 1918*. (Western Historical Quarterly, 2020).

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont History, 2006).

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty:  A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic: Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness: Management of Christian Service Organizations* (American Historical Review, 1996).

N. Prabha Unnithan, *The Currents of Lethal Violence: an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love: Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America: Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws: Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

David G. Hackett, *The Rude Hand of Innovation: Religion and Social Order in Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen: The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change: Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power: The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life: Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture*
(Journal of the Early Republic, 1988).

William Lynwood Montell, *Killings:  Folk Justice in the Upper South*
(International Journal of Oral History, 1987).

David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early
Industrial New England* (Journal of American History, 1987).

Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of
Rational Religion in New England* (New England Quarterly, 1985).


**Languages**

German
Spanish
French (reading)


**Quantitative Skills**

Probability and Statistics (including econometric techniques of political analysis,
exploratory data analysis, and log-linear and logit analysis)
Calculus and Analytical Geometry
Linear Algebra and Nonlinear Dynamics
Differential and Series Equations
Abstract Algebra

Randolph Roth                                                          Page 18

## Teaching

### Graduate

| | |
|---|---|
| History 7000 | Topics in American History to 1877 |
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| | |
|---|---|
| History 2001 | American Civilization, 1607-1877 (and Honors) |
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

## Publications on Teaching

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

## Ph.D Students Supervised

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

University fellowship for senior graduate students. Assistant Professor of History, University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in Santa Fe, New Mexico, 1837-1853," June 2012. Assistant Professor of History, University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in Western Virginia, 1844-1865," December 2011. Former Assistant Professor of History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education and the Defining of the Midwest," January 1999. Professor of History, Reinhardt College. Author of *Cultivating Regionalism: Higher Education and the Making of the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in Popular Culture, 1765-1820," May 1995. Professor of Social and International Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-1850," November 1993. Professor of History, Union College

**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do Americans Commit Suicide More Often during Economic Crises?" (Anticipated 2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated 2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020). Prospective applicant to graduate school in history.

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities, Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017). Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points, New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West Virginia's Multiracial Community" (2010). Ph.D. candidate in early American history at the College of William and Mary. Recipient of the first Annual Prize at Ohio State for the outstanding senior honors thesis in the Department of History.

Randolph Roth                                                    Page 21

## Service

### Service in Professional Organizations

2018-present, Allen Sharlin Book Prize Committee, Social Science History Association

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

1987-1993, Chair, Methods and Theory Network, Social Science History Association

Randolph Roth                                                          Page 22

1987, Program Committee, Social Science History Association


**Reviews of Manuscripts**

American Historical Review
Journal of American History
William and Mary Quarterly
Journal of the Early Republic
Social Science History
Journal of Interdisciplinary History
Historical Methods
Journal of Women's History
Journal of the Family
Crime, History, and Societies
European Journal of Criminology
American Journal of Sociology
Sociological Quarterly
Criminology
Criminal Justice Review
Journal of Criminal Law and Criminology
Law and Social Inquiry
Homicide Studies
International Criminal Justice Review
International Journal of Law, Crime, and Justice
Law and Society Review
City and Community
Eras Review
Western Historical Quarterly
Canadian Journal of Sociology
Journal of the Gilded Age


**Memberships in Professional Organizations (current)**

American Historical Association
Organization of American Historians
Social Science History Association
European Social Science History Association
American Society of Criminology
Homicide Studies Working Group
American Association for the Advancement of Science


**Service at Ohio State University**

**Department**

2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

1994-2015, 2018-present, Undergraduate Teaching Committee

2017-2018, Chair of Grievance Committee

2015-2017, 1991-1993, Chair of Graduate Studies

2012-2013, Chair of Undergraduate Studies

2011-2013, Advisory Committee and Salary Committee

1987-1991, History Department Promotion & Tenure Committee

**College of Humanities**

2007-2009, Curriculum Committee, College of Humanities

2002-2005, College of Humanities Computing Advisory Committee

1996-1997, College of Humanities Committee on the Center for the Study and Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-

**College of Arts and Sciences**

2006-2009, Alternate, Arts and Sciences Faculty Senate

2006- , Advisory Board, Criminal Justice Research Center, Department of Criminology and Sociology

2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of Law

2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior Sciences

**Graduate School**

2018- , Graduate Awards Review Committee

### Ohio Department of Higher Education

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer Network

## Service at Grinnell College

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

## Community Service

2001-2008, Chair, Community Services Advisory Commission, City of Dublin: advises City Council on all matters concerning utilities, policing, transportation, parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit Badge Counselor / Eagle Scout Association / Philmont Staff Association / Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic association officers and city commission members

1995-1998, Vice-Chair, Transportation Task Force, City of Dublin

1995-1997, Community Plan Steering Committee, City of Dublin

Randolph Roth                                                              Page 25

     1988-present, President / Vice President / Trustee, East Dublin Civic Association

     1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew Leader

**Outreach / Media Appearances**

     Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on so-called "Stand Your Ground" laws.

     B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility Equality and Dignity), January 13, 2020, on gun violence in central Ohio.

     Testimony to Federalism Committee of the Ohio House of Representatives, June 12, 2019, on concealed carry laws.

     Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019

     Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S. with Undergraduate Students, April 10, 2019

     "Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.

     "How the Erosion of Trust Leads to Murders and Mass Shootings," invited editorial, *Washington Post*, October 6, 2017

     "Mass Murder in American History," CSpan-3, April 2, 2017

     All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism," December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the United States," March 14, 2017.

     Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-2014

     Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-span.org/LocalContent/Columbus/)

     Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E Home Video)

     "It's No Mystery: Why Homicide Declined in American Cities during the First Six Months of 2009," History News Network, November 22, 2009

Randolph Roth

(http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-22-2009%205-2010.pdf and http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%20Thoughts%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of 2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL, Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio, KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009; The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury, Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC, Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9, 2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012; and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012; *American Homicide* was the subject of an editorial by op-ed writer Gregory Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010 **(http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-2010apr12,0,3217212.column)**

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*, Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine* in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the *Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the *Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*, the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's work in a Sunday edition

# Exhibit B

Appendix A

# Text of the Laws

Concealed weapon statutes adopted before 1846, in chronological sequence.

## KENTUCKY (1813)

CHAP. LXXXIX.

*AN ACT to prevent persons in this Commonwealth from wearing concealed Arms, except in certain cases.*

Approved, February 3, 1813.

Sec. 1. *BE it enacted by the general assembly of the commonwealth of Kentucky,* That any person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less than one hundred dollars; which may be recovered in any court having jurisdiction of like sums, by action of debt, or on the presentment of a grand jury — and a prosecutor in such presentment shall not be necessary. One half of such fine shall be to the use of the informer, and the other to the use of the commonwealth.

This act shall commence and be in force, from and after the first day of June.[1]

## LOUISIANA (1813)

### AN ACT

Against carrying concealed weapons, and going armed in public places in an unnecessary manner.

Preamble. Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same armed in an unnecessary manner, therefore;

Sect. 1. *Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened,* That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine not to exceed fifty dollars nor less than twenty dollars, one half to the use of the state, and the balance to the informer, and should any person be convicted of being guilty of a second offence before any court of competent jurisdiction, shall pay a fine of not less than one hundred dollars to be applied as aforesaid, and be imprisoned for a time not exceeding six months.

Sect. 2. *And be it further enacted,* That should any person stab or shoot, or in any way disable another by such concealed weapons, or should take the life of any person, shall on conviction before any competent court suffer death, or

1. *Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky* (Frankfort: Gerard & Berry, 1813), 100-101.

---

such other punishment as in the opinion of a jury shall be just.

Sect. 3. *And be it further enacted,* That when any officer has good reason to believe that any person or persons have weapons concealed about them, for the purpose of committing murder, or in any other way armed in such a concealed manner, on proof thereof being made to any justice of the peace, by the oath of one or more credible witnesses, it shall be the duty of such judge and justice to issue a warrant against such offender and have him searched, and should he be found with such weapons, to fine him in any sum not exceeding fifty dollars nor less than twenty dollars, and to bind over to keep the peace of the state, with such security as may appear necessary for one year; and on such offender failing to give good and sufficient security as aforesaid; the said justice of the peace shall be authorized to commit said offender to prison for any time not exceeding twenty days.[2]

## INDIANA (1820)

### CHAPTER XXIII.

*AN ACT to prohibit the wearing of concealed weapons.*

Approved, January 14, 1820.

Sec. 1. *BE it enacted by the General Assembly of the State of Indiana,* That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be fined in any sum not exceeding one hundred dollars, for the use of county seminaries: *Provided however,* that this act shall not be so construed as to affect travellers.[3]

## INDIANA (1831)

Sec. 58. That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other

2. *Acts Passed at the Second Session of the First Legislature of the State of Louisiana* (New Orleans: Baird and Wagner, 1813), 172-175.

3. *Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly* (Jeffersonville: Isaac Cox, 1820), 39.

dangerous weapon concealed, shall upon conviction thereof, be fined in any sum not exceeding one hundred dollars.[4]

## ALABAMA (1837)

### AN ACT

### To suppress the use of Bowie Knives.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That if any person carrying any knife or weapon, known as Bowie Knives or Arkansas Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

Sec. 2. *And be it further enacted,* That for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

Approved June 30, 1837.[5]

## GEORGIA (1837)

AN ACT to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Georgia, in General Assembly met,*

---

4. *Revised Laws of Indiana, in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session* (Indianapolis: Douglass & Maguire, 1831), 192.

5. *Acts Passed at the Called Session of the General Assembly of the State of Alabama* (Tuscaloosa: Ferguson & Eaton, 1837), chap. 11, 7.

*and it is hereby enacted by the authority of the same.* That from and after the passage of this act, it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols, &c.

Sec. 2. *And be it further enacted by the authority aforesaid,* That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

Sec. 3. *And be it further enacted by the authority aforesaid,* That is shall be the duty of all civil officers, to be vigilent [sic] in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

Sec. 4. *And be it further enacted by the authority aforesaid,* That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: *Provided, nevertheless,* that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: *Provided, also,* that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: *And provided, nevertheless,* that

the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

Sec. 5. *And be it further enacted by the authority aforesaid,* That all laws and parts of laws militating against this act, be, and the same are, hereby repealed.[6]

## TENNESSEE (1838)

CHAPTER CXXXVII.

An Act to suppress the sale and use of Bowie Knives and Arkansas Tooth Picks in this State.

Section 1. *Be it enacted by the General Assembly of the State of Tennessee,* That if any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever, shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any other manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick, such merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons for every such Bowie knife or knives, or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick  so sold, given or otherwise disposed of, shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a person not less than one month nor more than six months.

Sec. 2.  That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum

not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

Sec. 3.  That if any person shall maliciously draw or attempt to draw any Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick, from under his clothes or from any place of concealment about his person, for the purpose of sticking, cutting, awing, or intimidating any other person, such person so drawing or attempting to draw, shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State for a period of time not less than three years, nor more than five years.

Sec. 4.  That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State, for a period of time not less than three years, nor more than fifteen years.

Sec. 5.  That this act shall be in force from and after the first day of March next.  And it shall be the duty of the several judges of the circuit courts in this State to give the same in charge to the grand jury every term of the respective courts, and any civil officer who shall arrest and prosecute to conviction and punishment any person guilty of any of the offences enumerated in this act, shall be entitled to the sum of fifty dollars, to be taxed in the bill of costs, and the attorney general shall be entitled to a tax fee of twenty dollars in each case, when a defendant shall be convicted, and no prosecutor required on any presentment or indictment for any of the offences enumerated in this act.[7]

---

6. *Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837* (Milledgeville: P. L. Robinson, 1838), 90-91.

---

7. *Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-8* (Nashville: S, Nye & Co., 1838), 200-201.

## ARKANSAS (1838)

Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.[8]

## VIRGINIA (1838)

Chap. 101.—An ACT to prevent the carrying of concealed weapons.

[Passed February 2, 1838.]

1. *Be it enacted by the general assembly.* That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offence forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and for each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

2. *And be it further enacted,* That if any person shall hereafter be examined in any county or corporation court upon a charge of murder or felony, perpetrated by shooting, stabbing, maiming, cutting or wounding, and it shall appear that the offence charged was in fact committed by any such weapon as is above mentioned, and that the same was hidden or concealed from or kept out of the view of the person

---

8. *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837* (Boston: Weeks, Jordan and Co., 1838), Div. VIII, Art. I, § 13, p. 280.

against whom it was used, until within the space of one half hour next preceding the commission of the act, or the infliction of the wound, which shall be charged to have caused the death, or constituted the felony, it shall be the duty of the examining court to state that the fact did so appear from the evidence; and if the court shall discharge or acquit the accused, such discharge or acquittal shall be no bar to an indictment for the same offence in the superior court having jurisdiction thereof, provided the same be found within one year thereafter. And whether the accused shall be by such court sent on for further trial or discharged, it shall be lawful to charge in the indictment that the offence was committed in any of the modes herein before described; and upon the trial it shall be the duty of the jury (if they find the accused not guilty of the murder or felony) to find also whether the act charged was in fact committed by the accused, though not feloniously, and whether the same was committed or done with or by means of any pistol, dirk, bowie knife, or other dangerous weapon, which was concealed from or kept out of the view of the person on or against whom it was used, for the space before mentioned, next preceding such use thereof; and if the jury find that the act was so committed, they shall assess a fine against the accused, and it shall be lawful for the court to pronounce judgment as in cases of misdemeanor.

3. This act shall be in force from and after the first day of June next.[9]

## ALABAMA (1839)

AN ACT

To suppress the evil practice of carrying weapons secretly.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansaw [sic] tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending, shall on conviction thereof, before any court having competent ju-

---

9. *Acts of the General Assembly of Virginia, Passed at the Session of 1838* (Richmond: Thomas Ritchie, 1838), 76-77.

risdiction, pay a fine not less than fifty nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

Sec. 2. *And be it further enacted*, That it shall be the duty of the Judges of the several Circuit Courts of this State to give this act specially in charge of the Grand Juries, at the commencement of each term of said Courts.

Sec. 3. *And be it further enacted*, That the Secretary of State shall cause this act to be published for three months in the papers of Mobile, Montgomery, Tuscumbia, Huntsville, Wetumpka and Tuscaloosa, which publishers shall be paid out of any money in the Treasury not otherwise appropriated.

Approved Feb. 1, 1839.[10]

---

10. *Acts Passed at the Annual Session of the General Assembly of the State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77, 67-68.