```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3   ROBERT C. BEVIS, et al.,         )   Docket No. 22 C 04775
                                      )
 4                  Plaintiffs,       )   Chicago, Illinois
                                      )   January 27, 2023
 5             v.                     )   3:36 p.m.
                                      )
 6   CITY OF NAPERVILLE, ILLINOIS, a  )
     municipal corporation,           )
 7                                    )
                    Defendant.        )
 8

 9           TRANSCRIPT OF PROCEEDINGS - Motion Hearing
             BEFORE THE HONORABLE VIRGINIA M. KENDALL
10
     APPEARANCES:
11
     For the Plaintiffs:     ARRINGTON LAW FIRM by
12                           MR. BARRY KEVIN ARRINGTON (Via Telephone)
                             3801 East Florida Avenue, Suite 830
13                           Denver, CO  80210

14                           LAW OFFICE OF JASON R. CRADDOCK by
                             MR. JASON R. CRADDOCK SR. (Via WebEx)
15                           2021 Midwest Road, Suite 200
                             Oak Brook, IL  60523
16

17   For the Defendants:     PERKINS COIE LLC by
                             MR. CHRISTOPHER B. WILSON
18                           110 North Wacker Drive, Suite 3400
                             Chicago, IL  60606
19


20
     Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
21                           Official Court Reporter
                             219 S. Dearborn Street, Room 2504
22                           Chicago, IL 60604
                             312.435.6047
23                           gayle_mcguigan@ilnd.uscourts.gov

24

25
```

1    (Proceedings heard in open court.)

2         LAW CLERK:  22 C 4775, Bevis versus City of

3    Naperville.

4         Your Honor, plaintiff counsel Barry Arrington and

5    Jason Craddock are joining us via WebEx.

6         THE COURT:  Hold on a second then.  I see them over

7    there.

8         Okay.  All right, gentlemen, please introduce

9    yourselves.

10        MR. WILSON:  For the record, your Honor, Chris Wilson

11   of Perkins Coie for defendant City of Naperville.

12        THE COURT:  Okay.  Thank you.

13        MR. ARRINGTON:  (inaudible) Barry Arrington for

14   plaintiff appearing with (inaudible) Craddock.

15        THE COURT:  Oh, boy, did you get that cleanly?

16        COURT REPORTER:  No.

17        THE COURT:  I didn't either.  Hold on.

18        Say your name again.

19        MR. ARRINGTON:  Barry Arrington appearing (inaudible)

20   for -- appearing with me is Jason Craddock.

21        THE COURT:  All right.  Good afternoon.  I am a little

22   worried about your -- not your connection, but your speaker, so

23   we'll see how that goes in a minute.

24        My courtroom deputy [sic.] will let me know if she's

25   not able to get everything down and we have to look to use

1    something else.

2            Do you have a headset?

3            MR. ARRINGTON:  I do.  Let me see if I can --

4            THE COURT:  I wonder if that might help a little.

5            MR. ARRINGTON:  I have a headset that has ears on it,

6    but not a microphone.

7            THE COURT:  Oh, I don't think that's -- yes.

8            Okay.  Let's just start from the beginning.

9            And there is a TRO that has been presented.

10           You should all know that I had two final pretrial

11   conferences on two juries that are beginning in the next couple

12   weeks, so I have not gone through in detail this new motion.

13           I told Lynn that I would accommodate oral argument.

14   So consider that I've skimmed it at this point.  I'll listen to

15   your oral argument.  But my heavy-duty research and writing

16   will be after this moment because of the schedule that I had.

17   Okay?

18           I did not want to send it to the magistrate -- I mean,

19   to the emergency judge based upon the fact that we have done so

20   much reading and researching up until this point.

21           So that's why I am in the situation that I'm in.

22           So let's begin.  Let me hear from the defendant first.

23           MR. WILSON:  From the defendant first?

24           THE COURT:  Oh, the TRO -- I'm sorry.  Let's hear from

25   the plaintiff first.

1          MR. ARRINGTON:  Thank you, your Honor.

2          May I inquire whether the Court has read in more depth

3     the previous TRO that we filed in the fall?

4          THE COURT:  Of course, yes, in-depth.  The first one

5     and all the research, no problem.  It's just the latest one

6     that you filed last night, I was working on the other two

7     cases.  So I am, of course, up to speed on that.  So I just

8     have, you know, the variation of whatever was just filed in

9     your amended complaint and the variation of the arguments, if

10    any, based upon recent considerations, okay?

11         MR. ARRINGTON:  Thank you, your Honor.

12         So that is (inaudible) because the Court has had, in

13    fact -- (inaudible) TRO, but read the previous filing in

14    detail, it had 95 percent of what's in the new one.  It's

15    essentially the same case.

16         THE COURT:  I was kind of thinking -- I was kind of

17    thinking that that was hopefully where I was at since -- when

18    it came in last night, I knew if I could just get to talk to

19    you for a bit, I would be able to get up to speed.

20         MR. ARRINGTON:  So what I will do is I will kind of

21    hit the highlights, including the differences, assuming that

22    the Court is basically familiar with the law in the area.

23         So what we have in this case, was filed in the fall, a

24    motion -- a complaint and a motion to enjoin a city ordinance

25    that prohibited the commercial sale, and I (inaudible) use the

1    term "assault weapon," even though I think that it's

2    essentially a political term.  It's one that everybody

3    understands, and I'm not going -- I'm not going to waste time

4    fighting it today.  But it enjoins the commercial sale of those

5    semiautomatic firearms.

6            The parties got together and met, and the Court did

7    not rule on that TRO because that has been stayed, and the

8    Court entered an order including our stipulation to stay that.

9            And the reason we were so adamant about getting an

10   early stay is Mr. Bevis's store (inaudible) Weapons, Inc., a

11   large part of what it sells, we're not going to be able to sell

12   after January 1 if that ordinance had taken place (inaudible)

13           THE COURT:  Hold on.  The court reporter has lost your

14   train there.  Let's go back to where she left off.  Go ahead

15   and tell him --

16       (Record read.)

17           MR. ARRINGTON:  (inaudible) so the stay was in place.

18           Would it be better if I phoned in?

19           THE COURT:  I think maybe we should try.  The only

20   thing you have to know is that you have to turn off the

21   computer sound if you dial in, because we can't have both of

22   them at the same time.

23           MR. ARRINGTON:  I'll call.

24           THE COURT:  Let's try.

25       (Pause in proceedings.)

1          THE COURT:  Not exactly what you wanted to be trying

2    to type on Friday at 5:00, right?  Listening --

3          COURT REPORTER:  There's just a lot of echo.

4          THE COURT:  I know.  I hear it, too.  I'm having

5    difficulty as well.

6       (Pause in proceedings.)

7          THE COURT:  You know what?  Lynn is gone.  Do we need

8    her to help us with this or not?

9          LAW CLERK:  He should be there.  847 number.

10      (Pause in proceedings.)

11         THE COURT:  Do you want to say something?

12         MR. ARRINGTON:  So I just now was able to come on

13   line.

14         THE COURT:  Okay.  So it sounds much better.

15         Is your computer sound off?

16         MR. ARRINGTON:  My computer is muted.  Now it's off,

17   so I think we're in -- are we in good shape?

18         THE COURT:  Yes, much better.  Right?  Is that right,

19   Gayle?

20         MR. ARRINGTON:  Okay, great.

21         COURT REPORTER:  Yes.  If you can just ask him to

22   speak slowly.

23         THE COURT:  If you can just speak slowly so we can

24   make sure we get a good record, okay?

25         MR. ARRINGTON:  Thank you, your Honor.

1       So as I was saying, as of January 1, the stay of their

2   local ordinance was in place, so the Law Weapons, Inc. store

3   was able to continue operating, and it did continue to operate.

4   But, unfortunately, from our perspective, the State passed the

5   law that was effective on January 10th.  And that's when we

6   asked the Court for leave to supplement the complaint and --

7   which we did, and we filed this new motion seeking to -- so

8   let's talk about what this motion seeks.

9       We added a party, the Chief of Police, who is in

10  charge of enforcing this new state statute in Naperville.  And

11  what we said is that the provisions in the ordinance that --

12  I'm sorry, the state law that prohibits possession and sale and

13  later -- of these arms and later the magazines is

14  unconstitutional, for the same reasons, basically the *Bruen*

15  test.

16      And just to go over that briefly, the *Bruen* test is a

17  text history and tradition test.  It's two steps.  The only

18  burden that the plaintiff has is that the text of the Second

19  Amendment on its -- applies to the conduct.  And, obviously,

20  the possession and acquisition of firearms and, of course, sale

21  of firearms, simply the converse of acquisition, is protected

22  by the Second Amendment.  And so the state law is even more

23  unconstitutional than the city ordinance was.  And so we have

24  met -- the plaintiffs have met their burden.  If we did nothing

25  else other than say we had these arms, we're prevented from

1    possessing and acquiring more arms, that's enough to make a

2    *prima facie* case under *Bruen*.

3           The City is entitled to rebut -- let me just back up.

4           Under *Bruen*, the state law is presumptively

5    unconstitutional if it affects the Second Amendment right.

6    That presumption can be rebutted by the City if they come in

7    and provide evidence that there's a historical analogue, that

8    the regulation is consistent with the nation's traditions of

9    firearm regulation.

10          Well, the City didn't do that with respect to their

11   prior ordinance, and of course they hadn't had an opportunity

12   to do it now, but -- and that would be for the preliminary

13   injunction stage of this matter.

14          But the ordinance -- or the state law is presumptively

15   unconstitutional.  And it really -- it upsets the status quo at

16   this point, so that's why we're coming in for a TRO.  Mr. Bevis

17   is -- a lot of his business is just out the window right now,

18   and that's why we're asking for the TRO.

19          So the Court should know two things about TROs in this

20   area.

21          First, there have already been a couple of TROs

22   entered nationwide against new ordinances basically identical

23   to this one in all substantive respects.

24          Secondly, this exact state law is already subject to a

25   TRO.

1          Is the Court aware of that?

2          THE COURT:  Yes.  The Southern -- is it the Southern

3    District?  Or the Central District?  Is that right?

4          MR. ARRINGTON:  So, actually, there are lawsuits that

5    are proceeding in the Southern District, but the TRO that has

6    been -- and they've asked for a TRO and those are pending, but

7    the one I have in mind that has actually been entered is in the

8    Circuit Court of the 4th Judicial Circuit, which is Effingham

9    County, Illinois, state court.

10         THE COURT:  State court.

11         MR. ARRINGTON:  And, essentially -- I should add that

12   that is a procedural TRO.  The legislature ran this through in

13   a manner that violates the State Constitution, and the trial

14   court held, and entered a TRO against its enforcement already.

15   That TRO is not a state-wide TRO.  The Court there just held so

16   that it just protects the plaintiff in that case.  And that's

17   why we have to come in to get our own separate TRO in this

18   matter.

19         And with that, your Honor, I know you -- it's late in

20   the day on Friday and you have a heavy docket, and I won't

21   burden you with things that you probably already know and have

22   already read, and I'll just throw it open.  Do you have any

23   questions at this point?

24         THE COURT:  Well, one of the things that I'm wondering

25   is what is the status before Judge Pallmeyer?  Because I

1    thought that you moved -- or did you move?  You moved -- oh,

2    that's right.  The defendant moved to have it reassigned.

3        Did you all have a hearing in front of Judge Pallmeyer

4    regarding the reassignment yet?

5        MR. WILSON:  We haven't yet.  She asked for a briefing

6    schedule for the plaintiffs to respond.

7        THE COURT:  Oh, okay.

8        MR. WILSON:  But there's no dispute.  The plaintiffs

9    have consented to the transfer or don't object to the transfer

10   to Judge Pallmeyer, so we're just waiting for her to rule.

11       THE COURT:  Okay.  So is there anybody who is

12   concerned about the fact that this might be going to another

13   judge and you're seeking a TRO from me?  Anybody worried about

14   that?

15       MR. WILSON:  I think that's one of several concerns

16   defendants have, but if -- I don't mean to interrupt the

17   plaintiffs.

18       THE COURT:  No, that's fine.

19       Go ahead.

20       MR. ARRINGTON:  The very nature of a TRO is we need

21   immediate relief.  And we don't know when we can get to the new

22   judge.

23       Secondly, the TRO is, by its nature, temporary.  And

24   if there is a transfer, we can go back and ask for it to be --

25   they can ask for it to be vacated after 14 days.  And then the

1    new judge can hear it, that request.

2              And, secondly -- or maybe I'm thirdly, this -- we're

3    not asking for a state-wide TRO.  We're just asking for a TRO

4    that affects this municipality.

5              THE COURT:  Right, Naperville.  Okay.  Fair enough.

6    Okay.

7              Anything else that you want to add right now before I

8    talk to the defendants?  You're certainly free to come back

9    onboard again.

10             MR. ARRINGTON:  That's our presentation at this time

11   with the understanding the Court is pretty much up to speed

12   with the law.

13             THE COURT:  I am, because of all of the work I did

14   before you said you wanted to stay it.  Okay?

15             All right.  Let me turn to the defendants then.

16             MR. WILSON:  Thank you, your Honor.

17             I wanted to start with how we got here on this present

18   TRO --

19             THE COURT:  Okay.

20             MR. WILSON:  -- because I know you have been busy on

21   other things.

22             THE COURT:  Right.

23             MR. WILSON:  But on Monday, we appeared before you for

24   a status.

25             THE COURT:  Right.

1          MR. WILSON:  And part of that was the question of

2     reassignment to Judge Pallmeyer and your discussions with

3     Judge Pallmeyer about where these cases would be.

4          There's a similar motion by the plaintiffs --

5     defendants in the Highland Park case, which is *Goldman versus*

6     *Highland Park*, 4774.  We're 4775.  4774 is pending before

7     Judge Leinenweber.  That also has a pending motion to reassign

8     to Judge Pallmeyer, the idea being that the *Viramontes* case,

9     the lowest number, 21 04595, and the two cases filed last year,

10    would all be before the same judge for similar rulings on the

11    constitutional question of the Second Amendment's application

12    to assault weapons in light of *Bruen*.

13         When we were -- so that -- our piece of that has been

14    briefed before you.  We haven't argued the matters since you

15    asked for supplemental briefing.  So we -- I don't know that

16    we've had a full presentation to your Honor.

17         THE COURT:  That's true.  I did not get argument on

18    the supplemental briefing.  That's right.

19         MR. WILSON:  And I think -- I'm glad that we have that

20    opportunity today, if your Honor wants to go that far.

21         THE COURT:  Absolutely, absolutely.

22         MR. WILSON:  But the most important thing is that as

23    of Monday, all of this was ostensibly being transferred to

24    Judge Pallmeyer.

25         During the hearing on Monday, you granted the motion

1    for leave to amend to include a count challenging the Protect

2    Illinois Communities Act, which contains an assault weapons

3    ban.  That involves the State.

4            So on Tuesday, Mr. Arrington and Mr. Craddock filed

5    their amended complaint pursuant to your leave.  That hasn't

6    been litigated in any way.  You just gave them leave.  We

7    haven't been able to file a motion to dismiss.  We haven't

8    challenged.  But, most importantly, 5.1(b) of the Federal Rules

9    of Civil Procedure has not been complied with.  They --

10           MR. ARRINGTON:  That's not true.

11           THE COURT:  Hold on.  I'll definitely give you an

12   opportunity, okay?  Hold on.

13           MR. WILSON:  So the plaintiffs did file a notice of

14   constitutional question as required by Federal Rule of Civil

15   Procedure 5.1.  And that is, as the Court knows, but for the

16   record, that's the operative rule implementing 28 U.S.C.,

17   Section 2403.  So if a -- either a federal statute is

18   implicated on constitutional grounds or a state statute is

19   implicated on constitutional grounds, notice has to be

20   provided, which they provided, but also served on the requisite

21   party so that the Illinois Attorney General, in this case,

22   would be given an opportunity to weigh in, to intervene if

23   necessary, to defend the State's interest.

24           I represent the City of Naperville.  I'm not the

25   proper vessel.  I'm happy to do it and I -- if asked, but I am

1    not a representative of the State of Illinois.  I'm a citizen

2    of the State of Illinois.

3            So it's an unusual position to put me in, your Honor,

4    to have to defend the State's interests before this Court or

5    else a TRO being issued.

6            The appropriate, I would submit, appropriate step is

7    for service to be effected pursuant to Rule 5.1 for the Court

8    then to certify the question and allow the Attorney General to

9    come in and defend the State of Illinois.

10           Otherwise, we're just shooting in the dark.

11           And I'm in an unusual position of Chris Wilson and my

12   law firm of Perkins Coie is suddenly the state representative,

13   without authorization, without being deputized, without the --

14           THE COURT:  Right.

15           MR. WILSON:  -- Attorney General's -- so you get the

16   sense of where we are.

17           THE COURT:  All right.  On that, let me hear your

18   response to that.

19           MR. ARRINGTON:  Thank you, your Honor.

20           We did comply with 5.1.  We provided the Attorney

21   General with a notice of the constitutional question that we

22   filed with the Court.  We served that on them.  We provided the

23   Attorney General with the amended complaint.  We provided the

24   Attorney General with the motion for TRO.  And I spoke to the

25   Attorney General's office.  And specifically -- you know, I

1    didn't leave -- I wasn't satisfied with leaving voicemails or

2    sending emails.  I spoke to them.  They know about this.  I

3    absolutely know that they knew about this.

4            Now, the Attorney General is permitted under that rule

5    to intervene.  They're not required to.  They are absolutely

6    not required to.

7            And this law is like any other law where the

8    constitutionality of the matter is challenged at a local level.

9            The Attorney General has the permission to intervene,

10   but not the obligation.  And if they haven't, then the local --

11   it's defended at the local level.  And if the defendant doesn't

12   want to defend it, they can just then consent to the TRO and

13   not enforce it.  They can't have both -- they can't have it

14   both ways.  They can't let it hang over our heads and say, you

15   know what, if you do this, we will enforce this law against

16   you.  At the same time, that's unconstitutional when we can't

17   defend it.  That's not the way to run a railroad.

18           THE COURT:  So did you get a response from those

19   individuals that you spoke to as to whether they intended to

20   file an appearance to aid this Perkins Coie Naperville lawyer

21   in his representation or not?

22           MR. ARRINGTON:  They have not responded to me, which

23   is bizarre, in my view.  I mean, maybe they're busy.  But it's

24   not because they don't know about it and that they don't know

25   that it's an urgent matter.

1          THE COURT:  Okay.  And so you served that on who?  On

2    Kwame Raoul?

3          MR. ARRINGTON:  I did.  And I spoke to his staff.

4          THE COURT:  Got it.  Okay.

5          MR. ARRINGTON:  I didn't speak to Mr. Raoul.

6          THE COURT:  Got it.

7          MR. WILSON:  And just to be clear, your Honor, and

8    certainly -- I'm not casting aspersions on Mr. Arrington and

9    saying -- I did not see in the record that the return of

10   service was filed.  That's usually the step I see.  But that's

11   part one of the process.

12         Part two is then for your Honor to certify it pursuant

13   to 2403, and then for the State to be given an opportunity to

14   intervene as a party to represent their interests.

15         So we're talking about three steps.

16         Mr. Arrington is representing that he has met step

17   one.

18         Step two, your Honor hasn't been given the opportunity

19   to certify the question.

20         And even if you were to do that *sua sponte* now, the

21   State has to be given an opportunity to intervene as a party.

22         THE COURT:  So what I'm looking at on the record is

23   the plaintiff's notice of constitutional question.  That's just

24   on our record.  And it says it was certificate of service to

25   Kwame Raoul and Barbara Lynn Greenspan, Erin Wanzloff.  This is

1    Docket Number 49.  So it looks like he gave them notice.  And,

2    frankly, I don't know what the process is for him to appear.  I

3    mean, are they -- based upon that notice, in your experience,

4    Mr. Arrington, do they then appear, normally?

5            MR. ARRINGTON:  Your Honor, I would assume that at

6    some point they're going to appear in this case.  I don't -- I

7    can't imagine that they won't.

8            On the other hand, I think it's critical to realize

9    that we are asking for breathing space.  We're asking for

10   temporary relief.  This is not trial on the merits or even a

11   preliminary injunction.  This is a TRO.  And, by definition, it

12   will last only 14 days.

13           And so in our view, having a TRO that lasts 14 days in

14   one town in the entire state is not such an overwhelming matter

15   that you can't give us relief, especially if we've met our

16   burden of showing that our constitutional rights are likely

17   impaired here.

18           THE COURT:  Okay.  So with that now, I'm going to turn

19   to the defense to talk substantively about the TRO, okay?

20           MR. WILSON:  Thank you, your Honor.

21           THE COURT:  All right.

22           MR. WILSON:  And I think the important thing is to

23   focus on what this TRO does and doesn't do.

24           The TRO as presented to your Honor affects the Chief

25   of Police of Naperville and anyone working for Judge -- for

1    Chief Arres, A-R-R-E-S.  It doesn't enjoin the statute.  It
2    doesn't affect the Illinois State Police's ability to effect
3    the statute or implement the statute or the Sheriff of DuPage
4    County.  So there are any number of people who could then cause
5    Mr. Bevis to comply with the Illinois statute.  So it's
6    completely ineffective relief that they're seeking.  It's just
7    to tell the Chief of Police of Naperville that he can't comply
8    with state law, which is an unusual order for a federal judge
9    to enter anyway, "Don't comply with state law," to one Chief of
10   Police in one community.
11          That said, let's look at -- Mr. Arrington says sort of
12   blithely, "We've met the standard."  But they have a TRO
13   standard, which, one, this has to be an extraordinary
14   emergency, and, two, then they have to meet the constitutional
15   standard under *Bruen*.
16          So let's look at the extraordinary emergency, which is
17   Mr. Bevis and his gun shop can't sell, because of an Illinois
18   statute, a subset of weapons while this law is under review.
19   He's not being shut down.  He's allowed to sell handguns.  He's
20   allowed to sell a variety -- he just can't sell assault weapons
21   as defined by the Illinois General Assembly.
22          There is no constitutional right to sell assault
23   weapons.  No court has ever found that.  The Supreme Court in
24   *Bruen* didn't address that.  In fact, they said the opposite:
25   We're not addressing what kind of weapons anybody can own.  So

1    Mr. Arrington is asserting to the Court a constitutional right

2    to sell a subset of weapons that the Illinois General Assembly

3    has said are too dangerous for the State of Illinois.

4         So your Honor before asked for clarification or

5    supplement on two questions:  Text and history.

6         Now, text is Mr. Arrington's burden to prove.  He's

7    got to prove that the text of the Second Amendment covers a

8    right to sell assault weapons.  And he hasn't come close to

9    meeting that burden.

10        The two touchstones in *Heller* and *Bruen* on the textual

11   analysis are:  Is this a weapon in common use?  And, second, is

12   it a dangerous or unusual weapon?  If it's in common use, then

13   you turn to the second one, but you've got to look at this

14   first prong:  Is it in common use?

15        For his support for that, all Mr. Arrington has

16   offered is a single statistic.  There are, allegedly, 24

17   million assault weapons in circulation.  Now, that has to get

18   broken down further because "in circulation" means owned by

19   police, used by sheriffs, used by federal agents, used by

20   criminals.  It's only in -- what percentage of the population

21   of that 24 million are used by individuals for self-defense in

22   the home?  There's very, very limited evidence.  And it's

23   Mr. Arrington's burden to prove to your Honor that assault

24   rifles or assault weapons are used for self-defense in the

25   home.  That's -- the constitutional right is not implicated

1    unless they are.

2         And then of that -- once you've peeled off assault

3    weapons that are used by police, used by criminals, it's a

4    relatively repetitive group of people who buy assault weapons.

5    It's not as if -- you know, at the time of the founding, the

6    historical documents as cited in *Heller* said 50 to 60 percent

7    of the people had some sort of firearm at that time.  Makes

8    sense.  It was a different time.  Today, approximately

9    50 percent of the population has a handgun for self-defense in

10   the home.  Nowhere near those percentages apply to

11   semi-automatic assault weapons with the kind of defined terms

12   in any of the Illinois assault weapons ban or the Naperville

13   ordinance.  Less than 2 1/2 percent of people -- because so

14   many people who buy assault weapons buy multiple times -- less

15   than 2 1/2 percent of house -- of people own assault weapons.

16        So the idea that Mr. Arrington has met his burden of

17   showing that these are in common use simply because of the

18   number in circulation, a category left out in circulation.

19   Also just ones that, like are at issue here, that are waiting

20   to be sold count as in circulation, so that takes it out

21   further.  They have not met their burden of showing that these

22   are in common use for self-defense.  And it's their burden.

23        If they have, then we look at the second prong, which

24   is still their burden to prove:  Are these dangerous or

25   unusual?

1          Well, to just clarify, it's a bit of a -- Blackstone,

2    in his commentary, he's talked about dangerous "or" unusual

3    weapons.

4          In the *Heller* opinion, they talk about dangerous "and"

5    unusual and combine them.

6          I think the proper analysis is to use the disjunctive

7    "or," dangerous "or" unusual.  "Unusual" obviously would be

8    backed up by the 2 1/2 percent, is that usual or unusual.  But

9    "dangerous," these definitely meet the critical definition and

10   the historic definition of "dangerous."  Blackstone called

11   dangerous or unusual weapons ones that are used to terrify

12   people across the land.  That's precisely what all too often

13   assault weapons are used for.  They're military-grade weapons

14   that are made to look like military weapons that are used in a

15   military fashion that engender or cause military-type injuries.

16   They are an entirely different class of weapons than handguns

17   used for self-defense in the home.

18         That is Mr. Arrington's burden to prove that either of

19   those things have been implicated under the text.  He simply

20   cannot.

21         And the idea that there's a constitutional right to

22   sell handguns has not been found by any court and was not

23   implicated in *Heller* or *Bruen*.

24         If he's able to demonstrate that, though, your Honor,

25   we move over to the second prong of the analysis that you asked

1    for supplemental briefing on:  History.

2         What's the history of firearm regulation relevant to

3    assault weapons sales -- or an assault weapon ban?  There isn't

4    any direct analogue.  Mass murderers using weapons weren't a

5    problem at the time of the founding.  That's a modern problem

6    that legislators are trying to address.

7         What *Bruen* and *Heller* instruct, though, is look for

8    analogous situations.  Look for analogues; not twins, not dead

9    ringers.  And what we presented in our briefing to you is this

10   has been a common sort of process since the time of the

11   founding of a weapon being introduced, it causes -- sorry -- it

12   causing societal problems, and then governments addressing

13   those societal problems with either a ban or some sort of

14   regulation.

15        And the first one, muskets and fouling weapons, the

16   type common at the founding, were not of concern, but there

17   were weapons that were of concern like clubs.  People would

18   carry clubs.  Those were banned once they were being used to

19   promote riots or to injure multiple people.  Bowie knives in

20   the early 19th century were considered too dangerous.  And

21   states such as Georgia and I believe Tennessee, but I need to

22   look at my notes, banned bowie knives, which are not a firearm,

23   but an arm that people bore for military purposes.  But when

24   they were used for civilian purposes criminally, they were then

25   banned.  The most close analogy is this century, the Tommy gun

1    and the Browning automatic rifle were introduced during World

2    War I, became popular civilian weapons, became popular with

3    criminals, were used in notorious crimes like the St.

4    Valentine's Day massacre, which is coming up --

5            MR. ARRINGTON:  I'm going to object to evidence --

6    actually, this is not evidence.  This is counsel argument.  But

7    *Bruen* and *Heller* are both very, very clear.  20th century laws

8    do not establish historical tradition going back to the

9    founding.  Neither does anything else he's mentioned so far.

10   But now we're just wasting time if we're talking about laws

11   that were not passed until the 20th century.

12           The issue is whether there's a tradition going back to

13   the founding to support the regulation.

14           THE COURT:  Okay.  I'll give you an opportunity to

15   reply when he's done with his presentation, okay?

16           MR. WILSON:  And I certainly don't want to waste time,

17   your Honor.  What I --

18           THE COURT:  No, you're not.

19           MR. WILSON:  -- wanted to point out for the Court is

20   that the example of the automatic weapons ban of the 1934

21   National Firearms Act is of a piece with the banning of Bowie

22   knives, banning of clubs, the efforts that governments have

23   made going all the way back to the founding to regulate weapons

24   when they are determined by government that they are too

25   dangerous.  And that's what I was trying to set forth.  I'm not

1    arguing that, well, because they were banned in 1934, boom.

2    No, I'm saying that this is of a piece with how governments --

3    like the City of Naperville, like the State of Illinois, like

4    the federal government -- have responded to societal issues

5    when they become problematic for too many people.

6        THE COURT:  Okay.

7        MR. WILSON:  The last piece I would offer you is how

8    have people been treating assault weapons?  Those were banned

9    by the federal government in 1994, from '94 to 2004.  They were

10    banned by the State of California in 1989.  Since they have --

11    they were introduced during the Cold War and then offered for

12    commercial sale during the '60s and '70s, but they weren't a

13    prominent weapon until the '80s when we started seeing mass

14    shootings with assault weapons.  That's when California acted,

15    and then the federal government acted.  So just like with

16    machine guns in 1934, assault weapons were addressed with bans

17    beginning in 1989.  And now 30 percent of the population --

18    District of Columbia, Illinois, Maryland, Connecticut, Hawaii,

19    Colorado -- all have bans on these weapons.

20        So both under the text, which is Mr. Arrington's

21    burden, and the history, which is our burden, indicate that

22    there is not a constitutional protection under the Second

23    Amendment for assault weapons.

24        And I'll say it one last time and then move on:  There

25    is not a constitutional right to sell an assault weapon.  And

1    that's what Mr. Bevis is trying to -- no court has ever found

2    that.  No court has come close to finding that.  In fact, the

3    prevailing law in the Seventh Circuit is still *Friedman*, and

4    the plaintiffs have not identified what in *Friedman* is

5    overturned by the *Bruen* decision.

6         Finally, this is a TRO.  They need to meet the

7    likelihood of success.  I submit they can't.  But even if they

8    were able to, they've got to hit the other prongs, which are

9    irreparable harm.

10        Mr. Bevis is -- or Bevis -- I apologize if I'm

11   mispronouncing it, Mr. Arrington -- is asserting that he is

12   losing sales of these weapons, losing money because of the

13   sales.  Your Honor, we do that every day in every court here.

14   We assess how much are the lost sales, what are your profits.

15   There's not harm to Mr. Bevis from not being able to sell an

16   assault weapon.

17        Last, if you were to find both of those prongs, you've

18   got to balance the equities.  Not on a constitutional basis.  I

19   agree with Mr. Arrington that a constitutional violation may be

20   a presumption of injury.  But he still has to show that the

21   equities for a TRO weigh in his favor.  Here, we have a

22   population that's terrorized by assault weapons and Mr. Bevis'

23   right to sell those weapons.  Those equities have to tip, in

24   the short term, towards allowing the Illinois law to go forward

25   until we can have further briefing and for the State of

1    Illinois to weigh in.

2            So thank you.

3            THE COURT:  Thank you very much.

4            Mr. Arrington, now come on and join in with your

5    reply.

6            MR. ARRINGTON:  Thank you, your Honor.

7            I will start with the last part, and that's

8    irreparable harm.

9            What counsel has done is focus on part of the harm,

10   say that's all of the harm and that's not irreparable.  Well,

11   that's not what's going on here.

12           Sure, Mr. Bevis is harmed by the fact that he can no

13   longer operate his store, but that's not the only thing that

14   this law harms.

15           The law is a burden on not just the right to sell and

16   acquire firearms, but to own and possess and use an entire

17   category of arms.  That itself is unconstitutional.  And the

18   Courts have held over and over again that a showing of probable

19   success on the merits on a constitutional case is probably

20   dispositive of the other issues as well, because irreparable

21   harm, of course, your constitutional rights are being deprived.

22   That's irreparable.

23           Burden -- public interest and the equities, well, the

24   public has no interest in enforcing an unconstitutional law.

25   There is no equitable way to enforce an unconstitutional law.

1    So that's why the courts have held -- numerous courts have held

2    that if you show a constitutional violation, that's pretty much

3    all you have to do to get a preliminary injunction or TRO,

4    which is the same standard.

5          Going back to the burden issue, Mr. Wilson has the

6    burden flipped right on its head.  The text burden is simple,

7    very, very simple.  Does the regulation concern a bearable arm?

8    And this regulation concerns bearable arms on its face.

9          You don't have to have a lot of briefing --

10         THE COURT:  But you agree that that's your burden to

11   show.

12         MR. ARRINGTON:  To show that it does affect a bearable

13   arm.

14         THE COURT:  Right.

15         MR. ARRINGTON:  Right.

16         THE COURT:  Okay, just making sure.  Okay.

17         MR. ARRINGTON:  And I don't see how anybody can say

18   that the state law does not affect a bearable arm.  The whole

19   purpose of the law is to ban a whole category of bearable arms.

20   And we're focusing now just on assault weapons, but it also

21   bans another category of bearable arms that the City didn't

22   even try to defend, and that's -- there are over 100 million of

23   magazines, firearm magazines, that are essential, absolutely

24   essential, to the operation of modern semi-automatic weapons

25   that this law bans.  That is another bearable arm that this law

1    affects.  So we've met our burden just by showing that.

2           Now, Mr. Wilson says we have the burden of showing

3    that it's in common use.  We absolutely do not have that

4    burden.  We absolutely do not have that burden.

5           The common use issue is part of the historical

6    tradition.  Basically, Justice Scalia said if it is in common

7    use, you can establish a historical tradition.  And that's --

8    that's what -- that's part of the second prong.

9           And so he's trying to shift his burden onto us,

10   understandably, because he can't meet it.  But we can show,

11   if -- if we do show that it's in common use, we preclude them

12   from meeting their burden, which is the historical tradition.

13          Now, in terms of, you know, ineffective remedy, that's

14   what all laws do when a local law enforcement officer is a

15   defendant.  I think *Roe v. Wade*, the parties in that case were

16   Roe, of course the plaintiff, and *Wade*, an individual, and an

17   injunction was entered against him, and that affected everybody

18   in terms of trying to -- and so nobody could come into Dallas

19   after that and overturn that.

20          And so I guess I don't understand why the argument

21   that if the Court were to grant the relief that the law can't

22   be enforced in Naperville, that that's not effective relief.

23          The argument we can sell other weapons, we can acquire

24   other weapons, there are other weapons available, *Heller* speaks

25   exactly to that.  Justice Scalia said it is no answer to say

1  that you can get other weapons if you ban constitutionally

2  protected weapons.  Quote/unquote.  And so that is precluded by

3  *Heller* itself.

4        He says there is no case that says that you have a

5  constitutional right to sell weapons.  Other than *Ezell*, which

6  we quoted -- quoted from in the briefs and the Court has read,

7  it flat out said the opposite.  And I don't know why he

8  continues to say that that's not the case.

9        We have evidence here that there are 20 -- over 20

10  million, tens of millions of these firearms commonly used by

11  law-abiding citizens for self-defense.  That is unrebutted,

12  your Honor.  Unrebutted.

13        What we have in response?  Speculation about, well,

14  maybe some of those are used by criminals.  Maybe some of those

15  are used by police.  Well, speculation is not evidence, your

16  Honor.  If he has evidence that a significant part of those are

17  used by criminals, then he's welcome to bring it.  He won't be

18  able to bring that.  Do you know why?  Because the evidence

19  is -- and we quote this in our brief -- that of the 15,000

20  homicides in the United States in the average year, about 300

21  of them are committed by rifles of all types, of which this is

22  a subset.

23        So for him to suggest that this is an overwhelming

24  problem, it's not.  Handguns are by (inaudible) several times

25  more likely to be used in homicides.  And guess what?

1   Handguns, as a category, are protected by the First -- the

2   Second Amendment.  That's the holding of *Heller*.

3           And so what he's saying is we've got this weapon that

4   kills less than 300 people a year.  We can ban that, even

5   though we can't ban the one that kills 14,700 per year.  How

6   does that even make sense, your Honor?

7           And let's talk about the advanced technology that --

8   and the modern issue of the mass shootings.  Go back to 2007.

9   There was a mass shooting at Virginia Tech University, just

10  down the road from D.C.  At the time, it was the largest mass

11  shooting in the history of the country.

12          *Heller* was argued, again, just up the road, less than

13  a year later.  And the District of Columbia said, look, we're

14  trying to prevent things like Virginia Tech.  It's in the

15  brief.

16          The Supreme Court was aware that the handguns -- let

17  me back up.

18          Why is Virginia Tech relevant here?

19          It was committed entirely with handguns.  It wasn't --

20  there was not a rifle involved there.  Two handguns.

21          So the timeline is largest mass shooting in the

22  history of the nation.  About one year later, Supreme Court

23  says the weapons that were used in that mass shooting are

24  constitutionally protected under the Second Amendment and an

25  absolute ban on those weapons is unconstitutional.

1          So for Mr. Wilson to come in and say, well, you know,

2     *Heller* doesn't really apply because they didn't really think

3     about how that might affect the situation in mass shootings is

4     absolutely false.

5          The last paragraph of *Heller* is this:  We are aware of

6     the problems that are associated with firearms.  One of the

7     things they were aware was the mass shooting that had occurred

8     a few months earlier with handguns.

9          Nevertheless, you cannot absolutely ban a class of

10    weapons that is in common use by law-abiding citizens for

11    defense of their home.  And let me just say that that was a

12    defense of the home situation.

13         Well, *Bruen* now says it goes outside the home.  You

14    can't limit it to the home.  That was the whole point of *Bruen*,

15    that the right to self-defense is not limited to the home.

16         And so the law now is weapons in common use for

17    self-defense, period -- home, outside the home -- are protected

18    by the Second Amendment.  We have unrebutted evidence.  There

19    are tens of millions of these firearms that are in common use

20    by law-abiding citizens for lawful purposes.  We have

21    unrebutted evidence that there's over 100 million of these

22    magazines that are banned for self-defense by law-abiding

23    citizens.  This is not -- not a difficult question, your Honor.

24         And, finally, let's talk about analogues.

25         THE COURT:  Can I just ask you a question before

1    you -- can I ask you a question?

2           Can you tell me where -- where in *Ezell* does it say

3    there's a constitutional right to sell guns?

4           MR. ARRINGTON:  The defendants -- there was a store

5    defendant in that case that was asserting a right to sell guns,

6    and then the Court granted them preliminary injunction to

7    continue their business.

8           THE COURT:  Okay.  I'll take a look.

9           All right.  Go ahead.  You were going on to your last

10   one.

11          MR. ARRINGTON:  Okay.  So let me back up.

12          *Ezell* does not say that there's a right to sell guns.

13   It says there's a right to acquire guns.  Selling is the

14   flip-side of acquisition, and that's why it gave the store the

15   preliminary injunction.

16          Historical analogue.  It's important to remember

17   that -- the context of the *Heller* decision.

18          Justice Scalia, a few months after the Virginia Tech

19   shooting, and the rest of the court struck down an absolute ban

20   on handguns because there's no historical analogue for an

21   absolute ban on that category of weapons.  The category that

22   happened to be at issue in *Heller* was handguns.  There is no

23   historical analogue for an absolute ban on any of the weapons

24   that are subject to the law that we seek to have enjoined.

25          And so there's a difference between regulation and

1    absolute ban.  Yes, they can be regulated.  There's no question

2    about that.  The right to carry can be regulated in some

3    respects.  That's the holding of *Bruen*.  But an absolute ban is

4    unconstitutional.  That's the holding of *Heller*, of any --

5    unless you can see -- show a historical analogue of an absolute

6    ban on a weapon that is in common use, you're done.  That's the

7    end of the analysis.

8            The City has not even attempted to show an absolute --

9    or historical analogue of an -- quoting an absolute ban on a

10   firearm that's in common use.  And, therefore, their case

11   fails.

12           Finally, the whole issue of weapons of war, you know,

13   that's a -- you know, sometimes in court, it's difficult to

14   separate our politics from our -- our political-type arguments

15   from legal-type arguments, but that's more political rhetoric

16   than anything else.

17           How do I know this?

18           Well, *Heller* said -- when Justice Scalia said that

19   weapons that are for the -- for military use are not protected,

20   he cited three things, in 16, basically machine guns, tanks,

21   and bombers.  And he contrasted that with weapons that are in

22   common use by private citizens that could be used in a militia,

23   and which -- in that case included handguns.  For example,

24   the -- 1911, .45 automatic 1911 has been used as a weapon of

25   war in every war in the 20th century -- World War I, World

1    War II, Korea, Viet Nam -- yet Justice Scalia said that weapon

2    of war is protected by the Second Amendment, so to speak.

3             So the issue is not whether it's used -- it can be

4    used in a war.  The issue is whether it's a special type of

5    weapon that only governments have, like machine guns, bombers,

6    and tanks, not -- not commonly used weapons that citizens

7    employ.

8             And so, with that, I will ask the Court if it has any

9    questions.

10            THE COURT:  It's "dangerous or unusual," not

11   "special," right?  The language --

12            MR. ARRINGTON:  So that's a separate -- that's a

13   separate issue.

14            The Court held that -- and Mr. Wilson succeeded when

15   he got you using the disjunctive instead of the conjunctive.

16            The issue is whether a weapon is dangerous "and"

17   unusual.

18            THE COURT:  Okay.

19            MR. ARRINGTON:  The conjunctive is critical.

20            Why is the conjunctive critical?

21            Because all firearms are dangerous.  And so if you

22   can outlaw firearms just because they're dangerous, you could

23   outlaw all firearms.  The issue is whether they're dangerous

24   "and" unusual.

25            And I would cite the Court to Justice Alito's

1    concurrence in *Caetano* where he specifically says this.  The

2    conjunctive is critical.  They have to -- the relative

3    dangerousness of a firearm, Justice Alito said, is irrelevant

4    if they're in common use.  And in these cases -- in this case,

5    the relative dangerousness of the arms that they're trying to

6    ban is irrelevant if they are in common use, which we have

7    demonstrated.

8              THE COURT:  Okay.  Just for a correction, I don't

9    think that the largest -- not that this matters, but I don't

10   think that the largest mass shooting was the Virginia shooting.

11   Isn't the Las Vegas shooting the largest mass shooting in the

12   U.S.?

13             MR. ARRINGTON:  It was largest at the time.

14             THE COURT:  Oh, at the time.

15             MR. ARRINGTON:  In 2008.

16             THE COURT:  At the time is what you're saying.

17   Understood.  Okay.  2008.  Thank you for that clarification.

18             What is your support, by the way -- because I didn't

19   go through all this -- that less than 2.5 percent own assault

20   weapons?

21             MR. WILSON:  It's attached to one of the expert

22   reports that we put in with our supplemental materials.

23             THE COURT:  Okay.  All right.  Thank you.

24             MR. WILSON:  And I'll get the name, but --

25             THE COURT:  But if it's in there, that's fine.

```
 1              MR. WILSON:  It's among those materials.

 2              THE COURT:  Okay.  All right.  Do you want to say

 3      something?

 4              MR. WILSON:  Just a couple things, your Honor.

 5              One is we are talking about the sales of weapons in

 6      Naperville that's at issue, because they're -- this is a TRO.

 7              THE COURT:  Right.

 8              MR. WILSON:  This is, you know, keep the building from

 9      being torn down, keep the --

10              THE COURT:  Right, right.

11              MR. WILSON:  -- airport from being -- the runway from

12      being torn up.  Because the possession and ownership issues

13      don't go in effect under the state law until 2024.

14              What we're talking -- what went into effect

15      immediately was a ban on the sales of these weapons.

16              THE COURT:  Okay.

17              MR. WILSON:  And I stand by my -- I listened to

18      Mr. Arrington carefully.  And other than *Ezell*, which I'll

19      address, I didn't hear any support for the sale of weapons --

20              THE COURT:  Yes.  What is your take on the *Ezell*

21      language?

22              MR. WILSON:  I think the Seventh Circuit said, well,

23      that Ezell was too -- a case of by -- too clever by half.

24              The City of Chicago said you can't get a permit, a

25      license for a gun, unless you had I think 30 hours at a range,
```

1    and then they said and we've outlawed ranges in the City of

2    Chicago.  And the Seventh Circuit said that you can't do that.

3    You can't put a condition on getting a license that's

4    impossible to fulfill because then you've banned the part

5    that -- so that's what *Ezell* stands for.  It didn't provide --

6    and in that opinion in dicta they talked about the right to own

7    or buy --

8                THE COURT:  Or acquire.

9                MR. WILSON:  -- or acquire.

10               But the flip-side wasn't -- at least in my reading of

11   it, your Honor -- was not you have a right to sell any weapon

12   you want at your shop.

13               And taking this out of the firearm context for a

14   minute, the police power to regulate what can and can't be sold

15   in a community goes back all the way to the founding.  I mean,

16   putting liquor stores next to schools or adult bookshops next

17   to, you know, a high school or a church, communities are

18   constantly analyzing where should our police power be used to

19   effectuate the interests of the citizens.  So the idea that

20   there's -- if every ski shop has a constitutional right

21   tomorrow to decide -- I'm thinking about the Viking Ski Shop in

22   Chicago.  If they said, "You know what?  We're tired of selling

23   skis.  Those assault weapons, they're so much more profitable

24   than trying to sell a pair of skis."  They now, according to

25   Mr. Arrington, have a constitutional right to change and start

1    selling right in the middle of Chicago and there's nothing that

2    the City of Chicago or Cook County can do about it because they

3    have a constitutional right to sell anything.  I think the

4    police power, going all the way back to the founding, to say

5    what can and can't be sold in your community is much broader

6    than the right -- than the purported right to sell, to buy

7    firearms.

8            I was struck by that distinction about the Protect

9    Illinois Communities Act between the ban on sales, which is

10   immediate, and which I'm now defending for the State of

11   Illinois --

12           THE COURT:  Right, right.

13           MR. WILSON:  -- and the possession and ownership that

14   Mr. Arrington transferred to, indicates why a TRO, why an

15   immediate ban isn't -- isn't appropriate here.

16           The other piece I want to -- Mr. Arrington is right

17   that frequently an administrator is sued when you're

18   challenging a state law or federal statute for standing

19   purposes so that you have standing to get into federal court.

20   And that's why the Texas lawsuit and the challenges to the

21   abortion laws were problematic because we don't have an officer

22   that we can attach.

23           That's not the case here.

24           What they're trying to do is enjoin Chief Arres from

25   enforcing an Illinois statute.  That's why we're mixing apples

1    and oranges to say, oh, well, because I've pled Chief Arres --

2    which I don't think is a proper constitutional officer for the

3    State of Illinois, but it may be, we haven't analyzed that --

4    but the question is now do they have standing to challenge this

5    law, not do they have standing to enjoin Chief Arres himself,

6    which is completely ineffectual if the Illinois State Police,

7    if the DuPage County Sheriff, if others can enforce that law.

8            And that was the point I was trying to make for your

9    Honor.

10            Just the final point, because we seem to be not

11    helping the Court by going back and forth --

12            THE COURT:  Oh, you're -- I'm finding it helpful.

13    I've got lots of notes.  No problem.

14            MR. WILSON:  I meant on the burden and what you have

15    to --

16            THE COURT:  Oh, right, right.

17            MR. WILSON:  So Mr. Arrington's assertion is all we

18    have to do is say this is an arm, this is a bearable arm, and

19    we met our burden and then everything shifts.

20            *Bruen* and *Heller* do not create that.  What they say is

21    that you have to analyze whether the text of the Second

22    Amendment is implicated.  Obviously, the text is -- doesn't

23    mention assault weapons and couldn't have.  No founder could

24    have anticipated an assault weapon.

25            So what they outline is the test that Mr. Arrington,

1    what a plaintiff has to meet, to say that this is covered by

2    the Second Amendment, is it in common use, and it's not

3    dangerous or unusual.

4            So that's why I went through the statistics on -- it's

5    a relatively small percentage of people who have assault

6    weapons.

7            So it's -- the idea that, oh, there are millions out

8    there, by a small -- nothing like the handguns that were at

9    issue in *Heller*.

10           THE COURT:  Where are you getting the disjunctive

11   interpretation of dangerous "or" unusual?

12           MR. WILSON:  From Blackstone.

13           THE COURT:  Oh, okay.

14           MR. WILSON:  The Scalia opinion in *Heller* and the

15   Thomas opinion in *Bruen* cite Blackstone.  And Blackstone talks

16   about the disjunctive, dangerous "or" unusual.  So that's --

17   and anything that flows from the Blackstone commentaries and

18   the discussion -- historical discussion about what kind of

19   weapons are banned, those talk about dangerous "or" unusual

20   weapons.

21           Mr. Arrington is right, all guns are unusual.  What

22   we're talking about here, though, is an unusually dangerous

23   weapon, weapons that leave military types of injuries in

24   people, that vaporize bones.

25           THE COURT:  Well, I think he said just the -- I think

1    he said all guns are dangerous.

2              MR. WILSON:  No, no, and that --

3              THE COURT:  And then you flipped -- but this is an

4    unusual --

5              MR. WILSON:  This is unusually dangerous.

6              THE COURT:  Right, right.

7              MR. WILSON:  And the -- he also talked about large

8    capacity magazines, which I didn't address, in part because

9    that's part of this law.  Large capacity magazines I think,

10   even under Mr. Arrington's test, don't meet the Second

11   Amendment because that's an accessory.  That's not an arm.

12   We're not talking about banning bullets.  We're talking about

13   capacity magazines that are part and parcel of almost every

14   mass shooting, at least all the mass shootings that have left

15   more than 20 people dead.  We're talking about 100 percent

16   assault weapons with large capacity magazines.  If you go down

17   a little bit to ones that kill ten people, we're talking about,

18   you know, 95 percent.  These, for some reason -- it could be

19   the marketing, it could just be the way -- assault weapons are

20   used in mass shootings, of multiple deaths, far more than --

21   the Virginia Tech is an outlier in that it was just a handgun

22   or a series of handguns.  But the Highland Park shooting,

23   Uvalde, Sulfur Spring -- Sutherland Springs, Las Vegas, it's

24   assault weapons.  And that's what Naperville and now the State

25   of Illinois are trying to address.

1    THE COURT:  So when you go back in time in the

2  historical analysis, I think I understood your argument to

3  mean, when you started mentioning certain bans on weapons in

4  the -- like, at the turn of the century, you were relating

5  those back, I think you were doing that.  So, like, what about,

6  like, World War I weapons?  Can you go back -- is that

7  sufficient in historical perspective?

8    MR. WILSON:  Well, it's interesting because *Bruen*

9  talks about where do you focus your gaze for historical

10  analysis.

11    THE COURT:  Right.

12    MR. WILSON:  And what they said is, well, it could be

13  post Civil War 1868 era, or it could be the founding, 1791, and

14  the Second Amendment or Fourteenth Amendment, but we don't,

15  because this is a licensing regime in New York that we find to

16  be unconstitutional, we don't care.

17    THE COURT:  Okay.

18    MR. WILSON:  So it's -- it's not clear -- and Justice

19  Coney Barrett said I think you should do 1791, 1868 is

20  irrelevant.

21    Here's what -- what I was trying to do for your Honor

22  was say let's go back to the time of the founding.  We know

23  that the clubs that were used by the, you know, hooligans in

24  riots in the founding times, that then cities, states, started

25  banning heavy clubs.  Bowie knives in the 19th century started

1    being banned.  That's an arm.  It's sort of three steps.

2    Introduction of a weapon, popular use for criminal activity or

3    improp -- dangerous activities, banned by a state legislature.

4    And that goes all the way back to the founding, that those

5    things happened.  Once it's a societal problem, where does it

6    come from?  How do we address it?

7           So your question is exactly right.  In World War I,

8    the Tommy gun, the Thompson machine gun, and the Browning

9    automatic weapon were introduced.  After the end of the war, it

10   started to become popular -- a popular weapon in the

11   United States.  It started to be used in prohibition gangsters.

12   There were mass shootings on the covers of the *Tribune* and the

13   Chicago papers.  And that then led to action by the federal

14   government in 1934.

15          So I'm not saying, well, because they did that in

16   1934, we should be permitted to do that --

17          THE COURT:  Right.

18          MR. WILSON:  -- in 2023.  It's just that 1934, is the

19   same as Bowie knives, is the same as clubs, is the same as

20   Blackstone.  That's what --

21          THE COURT:  The progression -- okay.

22          MR. WILSON:  -- the founders anticipated.

23          THE COURT:  I get your argument then.

24          Okay.  Mr. Arrington, would you like to reply to

25   anything he just said, sir?

1        MR. ARRINGTON:  Yes, your Honor.  Thank you.

2        I'll reply to the first one.  States have always been

3  able to -- (inaudible) have always been able to regulate where

4  things are sold in local businesses, it's true, unless a

5  constitutional right is implicated.

6        So let's take the First Amendment.

7        Can a state say to a sexually-orient business, you

8  can't locate in our town?  And the answer, of course, is no.

9  Why?  Because the sexually-orient business's First Amendment

10 rights trump the state's police powers to -- to -- now, that

11 doesn't mean that it can be totally free of regulation, but you

12 can't flat-out ban them, the sale of sexually-oriented

13 materials in a town.  Same thing with the Second Amendment.

14       I think it's interesting that the courts, especially

15 in *Bruen*, are analogizing First Amendment cases and Second

16 Amendment cases all the time now.  *Ezell* did this in

17 particular.  And I think that the whole idea that, well, we got

18 police powers, we can do what we want, is -- is -- doesn't

19 apply when it impacts First Amendment rights.  It also doesn't

20 apply when it impacts Second Amendment rights.

21       Blackstone.  Yes, Blackstone did say -- did use the

22 disjunctive.  But *Heller* used the conjunctive.  *Bruen* used the

23 conjunctive.  And Justice Alito says it matters.  It absolutely

24 matters.  He said the relative dangerousness of a firearm is

25 irrelevant if it's in common use.

1          And I thought it was -- it was a very clever that

2     slight of hand there, and it's admirable, that Mr. Wilson kind

3     of changed the test from "dangerous and unusual" to "unusually

4     dangerous."  Well, those are not the same thing, obviously.

5     It's not the test, if it's unusual dan -- unusually dangerous.

6     And Alito says in *Caetano* that's -- he specifically said that's

7     not the test, "unusually dangerous."

8          THE COURT:  Let me just interrupt you to go back to

9     the sale question again.

10          I think you gave a better analogy, rather than skis,

11     though, selling of pornography, First Amendment protected,

12     right?  And whether or not --

13          MR. ARRINGTON:  Exactly --

14          THE COURT:  -- the City has -- so your position is

15     because of the constitutional complete ban, right?  Like,

16     police power can -- you agree that the police power could limit

17     where that would be sold, but not a complete ban on it.

18     Correct?

19          MR. ARRINGTON:  Not a complete ban on sales.  Not a

20     complete ban on -- in the category of weapons.

21          And I'm glad you reminded me of that, your Honor.

22     That's my next point.

23          Mr. Wilson said there's no case holding that you have

24     the right to sell weapons.  Well, that's not true.  Let me give

25     you a cite.  It is *Drummond*.  And the cite for *Drummond* is 9

1    F.4th 227.   In *Drummond*, the Third Circuit held that laws,

2    quote, "prohibiting the commercial sale of firearms would be

3    untenable in light of *Heller*," closed quote.  So not only did

4    the Third Circuit say that complete bans on the commercial sale

5    of firearms is untenable under *Heller*.  In *Bruen*, the Supreme

6    Court cited *Drummond* with approval.  Not on this specific

7    issue, but it -- the Court held that the regulation there

8    prohibiting sales was an outlier, and that is why it cited it

9    with approval.  So it's simply not true that the courts haven't

10   held that the Second Amendment doesn't speak to commercial

11   sales.

12          Finally, on the common use issue, I would cite the

13   Court the Supreme Court case of *Staples*.  Let me get you a cite

14   on that.  That's 511 U.S. 600.  And, you know, much has been

15   said, AR-15s are like M16s.  Well, yes and no.  I mean, they're

16   both rifles.  But in *Staples*, the Supreme Court specifically

17   distinguished them.  It said the AR-15 is a civilian version of

18   that weapon, and it's a semiautomatic firearm.  And that

19   distinction is important because whereas machine guns, like the

20   M16, semiautomatic weapons, like the AR-15 that was at issue in

21   that case, have, quote, now I'm quoting, "traditionally been

22   widely accepted as lawful possession," quote/unquote.

23          So the Supreme Court in *Staples* specifically held that

24   semi-automatic rifles -- as opposed to M16s, machine guns --

25   are traditionally accepted as lawful possession.  And, in fact,

1    they have been sold by the tens of millions since then, and are

2    in common use for protection both inside the home, *Heller*, and

3    outside the home, *Bruen*.

4          Thank you, your Honor.

5          THE COURT:  Okay.

6          MR. WILSON:  Last -- one last word?

7          THE COURT:  One little comment at the end.  Hang on.

8          MR. WILSON:  I just want to be very clear.

9          What I said, multiple times, is that there is no

10   holding that there is a right to sell assault weapons.

11         And what *Bruen*, the most recent Supreme Court decision

12   on the Second Amendment, went out of their way to say -- and

13   this was in Judge Alito's concurrence -- "Our holding decides

14   nothing about the kinds of weapons that people may possess."

15         So the question of assault weapons is one that the

16   Supreme Court has avoided, they may take up, but they have not

17   decided.  Mr. Arrington very cavalierly says it's clear.  They

18   have made it very clear that they didn't decide the assault

19   weapon question.

20         And that second -- they made clear that new standards

21   apply, that they want people to look at text and history, but

22   they didn't go so far as to say, "And, therefore, assault

23   weapons would be acceptable."

24         Mr. Arrington is asking this Court to be the first

25   federal court in Illinois to strike down the Protect Illinois

1    Communities Act without giving notice -- without having the

2    State of Illinois here and, beyond that, without addressing

3    *Friedman*, which is the law of the Seventh Circuit which talked

4    about all these issues and said that it is constitutionally

5    appropriate to completely ban assault weapons, *Friedman versus*

6    *Highland Park*.  Justice Easterbrook wrote the opinion for the

7    court.  It's still good law.  They want you to overturn

8    *Friedman* and strike down the Illinois ban on assault weapons.

9              It's just a bridge too far.

10             THE COURT:  Okay.

11             MR. WILSON:  Thank you.

12             THE COURT:  Mr. Arrington, any last words that you're

13   chomping at the bit to throw in?

14             MR. ARRINGTON:  Well, I assume the Court read the

15   lengthy discussion of *Friedman* and why it's no longer good law

16   in our previous briefings.

17             THE COURT:  I do.  I have it.

18             Oh, your colleague left.  I was going to ask him if he

19   wanted to add anything, but I don't see him any longer.

20             MR. WILSON:  He may just have his --

21             THE COURT:  Oh, maybe he turned his --

22             MR. WILSON:  -- camera --

23             THE COURT:  -- camera off.

24             Mr. Craddock, I always ask, if you're in front of me,

25   if you have anything to say.  I don't want anyone to feel that

1    they did not get an opportunity.

2            Did you want to add anything, sir?

3            MR. CRADDOCK:  Just kind of following up on what

4    Mr. Arrington was starting to say, *Friedman* is no longer good

5    law in light of -- in light of *Bruen*.  Even the Seventh Circuit

6    itself, as we quoted in our brief, it says that where Supreme

7    Court precedent unsettles Seventh Circuit case law, Supreme

8    Court carries the day.

9            So that's all, I think.  Mr. Arrington covered --

10   covered everything.

11           THE COURT:  Okay.  All right.  Well, gentlemen, thank

12   you very much.  I will dig into this this weekend because I

13   have, as I mentioned to you, not dug into your recent briefs

14   based upon schedule that I had, but I will get you something

15   shortly.  Okay?

16           Thank you very much.

17           MR. WILSON:  Thank you, your Honor.

18           To that end, your Honor --

19           MR. ARRINGTON:  We really do appreciate you spending

20   your weekend for us, your Honor.  Thank you.

21           THE COURT:  You're welcome.

22           MR. WILSON:  If you would like a brief from us, we're

23   glad to submit something to you on these issues.

24           THE COURT:  You're absolutely welcome to do so.  Can

25   you do it quickly, though?

1       MR. WILSON:  I'm about to look back at the people

2   whose lives are affected here --

3       THE COURT:  Yes, they're, like, "Wait, I'm getting

4   married this weekend," right?

5       (Laughter.)

6       THE COURT:  That's what you're supposed to say, "I'm

7   getting married, don't make me do this."

8       MR. WILSON:  It's almost Valentine's Day.

9       THE COURT:  Right, exactly.

10      MR. WILSON:  We will get something to you by Monday.

11      THE COURT:  Thank you very much.

12      MR. WILSON:  Thank you.

13      THE COURT:  Thanks, everyone.  Have a good night.

14      LAW CLERK:  All rise.  Court is adjourned.

15      (Concluded at 4:52 p.m.)

16                  C E R T I F I C A T E

17      I certify that the foregoing is a correct transcript of the

18  record of proceedings in the above-entitled matter.

19

20  */s/ GAYLE A. McGUIGAN*                    *February 3, 2023*
    GAYLE A. McGUIGAN, CSR, RMR, CRR
21  Official Court Reporter

22

23

24

25