# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SUSAN KAREN GOLDMAN, and NATIONAL ASSOCIATION FOR GUN RIGHTS | Case No. 1:22-cv-04774 |
| | Hon. Harry D. Leinenweber |
| *Plaintiffs*, | |
| v. | |
| CITY OF HIGHLAND PARK, ILLINOIS, | |
| *Defendant*; | |
| | |
| ROBERT C. BEVIS, and NATIONAL ASSOCIATION FOR GUN RIGHTS, and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation, | Case No. 1:22-cv-04775 |
| | Hon. Virginia M. Kendall |
| *Plaintiffs*, | |
| v. | |
| CITY OF NAPERVILLE, ILLINOIS, and JASON ARRES, | |
| *Defendants*; | |
| | |
| JAVIER HERRERA, | Case No. 1:23-cv-00532 |
| | Hon. Mary M. Rowland |
| *Plaintiff*, | |
| v. | |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity | |

County Board of Commissioners President,
KIMBERLY M. FOXX, in her official capacity
as Cook County State's Attorney, THOMAS J.
DART, in his official capacity as Sheriff of Cook
County, CITY OF CHICAGO, a body politic
and corporate, DAVID O'NEAL BROWN, in
his official capacity as Superintendent of Police
for the Chicago Police Department,

*Defendants.*

## PLAINTIFF'S MOTION
## FOR RULE 40.4 REASSIGNMENT OF RELATED CASES

Counsel for Dr. Javier Herrera respectfully moves to reassign a related case to be heard together with other related cases as permitted by Local Rule 40.4. Detailed in the attached motion, the related cases are Second Amendment challenges with pending motions for temporary restraining orders and/or preliminary injunctions: (1) Dr. Herrera's case in *Herrera v. Raoul*, No. 1:23-cv-00532 (N.D. Ill.), pending before Judge Mary M. Rowland; (2) *Goldman v. Highland Park*, No. 1:22-cv-04774 (N.D. Ill.), pending before this Court; and (3) *Bevis v. Naperville*, No. 1:22-cv-04775 (N.D. Ill.), pending before Judge Virginia M. Kendall. The *Goldman* and *Bevis* Plaintiffs agree that the cases should be reassigned so that they can all be heard together.[1]

Counsel files this motion, the accompanying memorandum of law, and relevant pleadings in the lowest-numbered case for which reassignment of all cases could be appropriate, which is this Court's case in *Goldman*. Counsel is also filing notice of this motion in *Bevis*, which also appears to be an appropriate Court for reassignment of all cases, and in *Herrera*. Hearing these related Plaintiffs' pending requests for temporary restraining orders and/or preliminary injunctions in one forum is

---

[1] On February 14, 2023, counsel for Dr. Herrera asked all Defendants' counsel in *Herrera v. Raoul* whether they would also consent to this request for reassignment in light of the related nature of the cases. Defendants' counsel did not respond. Counsel will contemporaneously serve copies of this motion and the accompanying memorandum of law on counsel for the *Herrera* Defendants by electronically filing a notice of the filing that attaches the motion, memorandum of law, and relevant pleadings.

contemplated by Local Rule 40.4 and in furtherance of judicial economy. Doing so will streamline review of constitutional issues that are uniform across all cases and ensure the speedy resolution of the Plaintiffs' constitutional claims.

Defendants in *Goldman* and *Bevis* previously filed motions to reassign those cases to *Viramontes v. Cook County*, No. 1:21-cv-04595 (N.D. Ill.), pending before Chief Judge Pallmeyer. The motions have not been ruled on. Since the filing of those motions, the *Viramontes* Plaintiffs have moved to stay that litigation such that the Rule 40.4(b) factors are no longer satisfied for reassignment to *Viramontes*. But the relatedness of the constitutional challenges in *Goldman*, *Bevis*, and *Herrera* remain.

Dr. Herrera respectfully requests that this Court exercise its discretion and grant this Motion for the reasons set forth in the accompanying memorandum of law.

Dated: February 16, 2023

Respectfully submitted,

 */s/ Taylor A.R. Meehan*

| | |
|---|---|
| Gene P. Hamilton* | Thomas R. McCarthy* |
| Reed D. Rubinstein* | Jeffrey M. Harris* |
| Michael Ding (IL ARDC 6312671) | Taylor A.R. Meehan (IL ARDC 6313481) |
| AMERICA FIRST LEGAL FOUNDATION | C'Zar D. Bernstein* |
| 300 Independence Avenue SE | Matthew R. Pociask* |
| Washington, DC 20003 | CONSOVOY MCCARTHY PLLC |
| Tel: (202) 964-3721 | 1600 Wilson Blvd., Ste. 700 |
| gene.hamilton@aflegal.org | Arlington, VA 22209 |
| reed.rubinstein@aflegal.org | (703) 243-9423 |
| michael.ding@aflegal.org | tom@consovoymccarthy.com |
| | jeff@consovoymccarthy.com |
| * *Admitted pro hac vice* | taylor@consovoymccarthy.com |
|   *in Herrera v. Raoul*, No. 1:23-cv-0532 (N.D. Ill.) | czar@consovoymccarthy.com |
| | matt@consovoymccarthy.com |

*Counsel for Plaintiff Javier Herrera*
*in Herrera v. Raoul et al.*, No. 1:23-cv-0532

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to counsel of record.

Dated: February 16, 2023

*/s/ Taylor A.R. Meehan*
Taylor A.R. Meehan

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SUSAN KAREN GOLDMAN, and NATIONAL ASSOCIATION FOR GUN RIGHTS | Case No. 1:22-cv-04774 |
| | Hon. Harry D. Leinenweber |
| *Plaintiffs,* | |
| v. | |
| CITY OF HIGHLAND PARK, ILLINOIS, | |
| *Defendant;* | |
| | |
| ROBERT C. BEVIS, and NATIONAL ASSOCIATION FOR GUN RIGHTS, and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation, | Case No. 1:22-cv-04775 |
| | Hon. Virginia M. Kendall |
| *Plaintiffs,* | |
| v. | |
| CITY OF NAPERVILLE, ILLINOIS, and JASON ARRES, | |
| *Defendants;* | |
| | |
| JAVIER HERRERA, | Case No. 1:23-cv-00532 |
| | Hon. Mary M. Rowland |
| *Plaintiff,* | |
| v. | |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity | |

County Board of Commissioners President,
KIMBERLY M. FOXX, in her official capacity
as Cook County State's Attorney, THOMAS J.
DART, in his official capacity as Sheriff of Cook
County, CITY OF CHICAGO, a body politic
and corporate, DAVID O'NEAL BROWN, in
his official capacity as Superintendent of Police
for the Chicago Police Department,

                    *Defendants.*

## MEMORANDUM IN SUPPORT OF MOTION
## FOR RULE 40.4 REASSIGNMENT OF RELATED CASES

Counsel for Dr. Javier Herrera moves under Local Rule 40.4 to reassign related cases pending in this District. Counsel for Plaintiffs in the related cases agree that the cases should be reassigned so that they may all be heard and decided together. Dr. Herrera's case is pending in the Northern District before Judge Mary M. Rowland. *See Herrera v. Raoul et al.*, No. 1:23-cv-00532 (N.D. Ill.).[1] He challenges the constitutionality of state and local firearms laws and has a pending preliminary injunction motion. Related cases appropriate for reassignment are pending before Judge Harry D. Leinenweber in *Goldman v. Highland Park*, No. 1:22-cv-04774, and before Judge Virginia M. Kendall in *Bevis v. Naperville*, No. 1:22-cv-04775.[2]

Counsel files this motion in the lowest-numbered case for which reassignment of all cases could be appropriate, which is *Goldman*. Counsel is also filing notice of this motion in *Bevis*, which would also be an appropriate Court for reassignment of all cases. Hearing these related Plaintiffs'

---

[1] On February 14, 2023, counsel for Dr. Herrera asked all Defendants' counsel in *Herrera* whether they would consent to this request for reassignment in light of the related nature of the cases. Defendants' counsel did not respond.

[2] Detailed below, the *Goldman* and *Bevis* Defendants earlier filed Rule 40.4 motions to reassign *Goldman* and *Bevis* cases to *Viramontes v. Cook County*, 1:21-cv-04595, pending before Chief Judge Pallmeyer. Those motions have not been ruled on. After they were filed, circumstances changed. The *Viramontes* Plaintiffs have since moved to stay that litigation pending the resolution of some plaintiffs' related preliminary injunction motion filed in the Southern District of Illinois. ECF 69; ECF 70. If *Viramontes* Plaintiffs are seeking a stay and the *Herrera*, *Goldman*, and *Bevis* Plaintiffs here are seeking temporary restraining orders and/or preliminary injunctions, then Rule 40.4(b) is likely no longer met for reassignment to *Viramontes*. *See Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 2005 WL 8177563 (N.D. Ill. 2005). That said, counsel will re-file this motion in *Viramontes* if the Court so directs.

pending requests for temporary restraining orders and/or preliminary injunctions in one forum is consistent with Local Rule 40.4 and principles of judicial economy. Doing so will streamline review of constitutional issues that are uniform across all cases and ensure the speedy resolution of the Plaintiffs' constitutional claims. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *cf. Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) (discussing considerations for transfer under §1404, including "speed" and "court's relative familiarity with the relevant law").

Dr. Herrera's case, like others in this district, challenges the constitutionality of firearms laws banning the purchase and possession of commonly owned semiautomatic rifles, including the AR-15, and standard magazines for that rifle and commonly owned handguns. *See* Ex. A, Compl., ECF 1, *Herrera v. Raoul*, No. 1:23-cv-523 (filed Jan. 27, 2023). Dr. Herrera seeks a preliminary injunction, warranted in light of the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). *See* Ex. B, Mot., ECF 4; Ex. C, Memo. in Support of Mot., ECF 5; Ex. D, Herrera Dec., ECF5-1. Dr. Herrera is a doctor of emergency medicine, a professor of tactical medicine, and a medic on a Chicago area SWAT team. Compl. ¶¶5, 16, 25-28.[3] He is a law-abiding gun owner. *Id.* ¶¶5, 19-24; Herrera Dec. ¶¶3-6. Operators on his SWAT team carry AR-15 semiautomatic rifles when they deploy for high-risk missions, including hostage situations and active-shooter scenes; it is critical that Dr. Herrera be able to train with those operators and maintain

---

[3] *See* American College of Emergency Physicians, "What is tactical medicine," https://www.acep.org/tacticalem/about-us/what-is-tactical-medicine/ ("Tactical Medicine, or Tactical Emergency Medicine, is the medical specialty that involves the services and emergency medical support necessary to preserve the safety, physical and mental health, and overall well-being of military and law enforcement (SWAT) special operations (tactical) personnel and others at the scene of critical incident deployments and training.... Tactical medical providers are professionals who ideally are trained to function effectively and safely deliver rapid high-quality emergency medical care in austere conditions, and also be competent in preventive medicine, *team tactics and weapons safety and marksmanship*, security, waterborne operations, environmental medicine, wilderness deployment, USAR (urban search and rescue), HazMat, extraction, CasEvac techniques, defensive tactics, and many other skills. The primary goal is to save officer/soldier lives. The secondary goal is to provide medical care for others at the scene and expedite extraction and transportation to augment the EMS system.").

proficiency with those firearms so that he could safely handle and disarm such arms if the need arises during the team's high-risk missions. Compl. ¶¶28-30, 34; Herrera Dec. ¶¶8-10, 12. Cook County and City of Chicago laws, combined with his professional demands, have made it a practical impossibility for him to participate in the team's regular training with his semiautomatic rifle; it is illegal for Dr. Herrera to keep his semiautomatic rifle and standard magazines in his Chicago home, such that retrieving and returning his rifle to participate in the team's shooting drills would entail driving more than four hours round trip. Compl. ¶¶20-24, 24, 29-34; Herrera Dec. ¶¶5-12. Nor can he keep his handgun, which like many handguns comes standard with a 17-round magazine, operable in his home. Compl. ¶¶20-22; Herrera Dec. ¶5. Illinois's newly enacted law compounds those constitutional harms. It immediately banned purchases of AR-15 semiautomatic rifles, rifle components, and standard magazines, which Dr. Herrera otherwise would have made. Compl. ¶¶40-44, 49-50; Herrera Dec. ¶¶5-6. And beginning in April, state law permits some to continue only to "possess" arms at specified locations; it does not indicate whether anyone may "use" arms at those locations, beyond "a properly licensed firing range or sport shooting competition venue." Compl. ¶47 (720 ILCS 5/24-1.10(d)); Ex. C, Memo. at 7. The state law's grandfathering provision, moreover, applies only to those who will submit to additional registration requirements, which the complaint also challenges as ahistorical and unconstitutional. Compl. ¶¶46, 103, 127-35. Together, these laws prohibit Dr. Herrera from keeping and bearing, if necessary, some of the most commonly owned arms today inside his own home, or purchasing replacement parts or magazines. They've made it a practical impossibility for Dr. Herrera to participate in regular training with his SWAT team with his rifle. Dr. Herrera's ability to safely handle an AR-15 on missions is critical, those missions are ongoing, and his skills degrade with each missed monthly opportunity to participate in the team's shooting drills.

As detailed in Dr. Herrera's preliminary injunction motion and those filed by related Plaintiffs challenging the same or materially similar bans, the challenged laws are unconstitutional. The harm is

irreparable. And Rule 40.4 counsels in favor of hearing those claims together before the same Court.

## BACKGROUND

There are various related cases challenging the constitutionality of the same state law and substantially similar local firearms laws. Starting with Dr. Herrera's case, they include:

**1. Dr. Herrera's case, *Herrera v. Raoul*, No. 1:23-cv-00532 (Hon. Mary M. Rowland):** On January 27, 2023, Dr. Herrera filed a complaint (attached as Exhibit A) against Illinois officials, Cook County and Cook County officials, and the City of Chicago and Chicago officials. ECF 1. The same day, Dr. Herrera filed a motion for temporary restraining order and preliminary injunction (attached as Exhibit B), memorandum of law (attached as Exhibit C), and a declaration in support of the motion (attached as Exhibit D). Mot., ECF 4; Memo. of Law in support of Mot., ECF 5; Herrera Dec., ECF 5-1.[4] Described above, Dr. Herrera's complaint and preliminary injunction motion challenge the constitutionality of Illinois, Cook County, and City of Chicago laws that ban the purchase, possession, and use of commonly owned AR-15 semiautomatic rifles and standard magazines for that rifle and commonly owned handguns;[5] he also challenges the new registration requirement in the state law, required for him to continue possessing the banned arms. As argued in his preliminary injunction brief, there are no historical analogues for those bans or registration requirement, as required by *Bruen. See Bruen*, 142 S. Ct. at 2129-30.

On February 1, 2023, Plaintiff's counsel requested a status hearing regarding the pending motion for preliminary injunction filed on January 27. ECF 26. The Court held the status hearing on

---

[4] The civil cover sheet in Dr. Herrera's case marked as related *Viramontes v. Cook County*, No. 1:21-cv-04595, currently pending before Chief Judge Pallmeyer. *See* Dkt. 1-1, *Herrera v. Raoul*, No. 1:23-cv-00532 (filed Jan. 27, 2023). Described below, *Viramontes* challenges the constitutionality of the same Cook County ordinance that Dr. Herrera challenges as part of his suit. The cover sheet noted that Rule 40.4(b)'s conditions might not be met for consolidation with *Viramontes* because the *Viramontes* Plaintiffs, filing their suit before *Bruen*, had not sought preliminary relief. And the *Viramontes* Plaintiffs have since sought a stay of that litigation. ECF 69, *Viramontes v. Cook County*, No. 1:21-cv-04595 (filed Jan. 31, 2023).

[5] State law bans rifle magazines exceeding 10 rounds and handgun magazines exceeding 15 rounds. 720 ILCS 5/24-1.10(a)(1). County law bans all magazines exceeding 10 rounds. Cook Co. Code of Ord. §§54-211, 54-212(a). City law bans all magazines exceeding 15 rounds. Chi. Mun. Code §§8-20-010, 8-20-085(a).

February 9. The Court ordered Defendants' response to the preliminary injunction motion due March 3 and Dr. Herrera's reply by March 10. *Id.* No hearing has been set; the docket states a hearing "will be set after the court has reviewed the briefs." At the status hearing, Judge Rowland noted that she has a criminal drug conspiracy trial starting the week that the motion will be fully briefed. ECF 40 (Transcript at 21:13-20).

Meanwhile, Defendants' responsive pleading is due February 21. Fed. R. Civ. P. 12(a)(1).

2. ***Goldman v. City of Highland Park, Ill.,*** **No. 1:22-cv-04774 (Hon. Harry D. Leinenweber):** The *Goldman* Plaintiffs filed a complaint against the City of Highland Park. ECF 1. They challenge the constitutionality of Highland Park's ordinance—modeled after the Cook County ordinance that Dr. Herrera challenges—that bans the sale and possession of AR-15 semiautomatic rifles and magazines exceeding 10 rounds. *Id.* ¶¶10, 21, 31-35. They are seeking a preliminary injunction. ECF 7. They argue that Highland Park's ordinance unconstitutionally bans a class of arms and that, as required by *Bruen*, there are no historical analogues for such bans. *Id.* at 12-24. The preliminary injunction motion will be fully briefed on March 13, 2023. ECF 36. No hearing date has been set.

The *Goldman* Plaintiffs have also moved to amend their complaint to challenge the newly enacted state law that Dr. Herrera's case also challenges. ECF 42. Highland Park has opposed that motion. ECF 73. It remains pending.

Explained below, in late December 2022, Highland Park moved to reassign the case as related to *Viramontes v. Cook County*, No. 1:21-cv-04595, before Chief Judge Pallmeyer. Given the overlapping arguments with those here, the brief in support of that motion is attached as Exhibit E. The motion has not been ruled on, and the *Viramontes* Plaintiffs have since moved to stay the *Viramontes* litigation.

3. ***Bevis v. City of Naperville, Ill.,*** **No. 1:22-cv-04775 (Hon. Virginia M. Kendall):** The *Bevis* Plaintiffs filed a complaint against the City of Naperville. ECF 1. They initially challenged

the constitutionality of Naperville's ban on the sale of "assault rifles." *Id.* ¶¶12, 28-32. Plaintiffs sought a temporary restraining order and preliminary injunction. ECF 10. They argued that the ban on sales of a class of arms is unconstitutional and that, as required by *Bruen*, there are no historical analogues for such a ban. *Id.* at 10-19. The parties then entered into a stipulation staying the ordinance, and at the Court's request submitted supplemental briefing regarding historical analogues. ECF 29; ECF 34; ECF 35. In late January, the *Bevis* Plaintiffs then amended their complaint to challenge the newly enacted Illinois law banning sales of AR-15 semiautomatic rifles and magazines exceeding 10 rounds for rifles and 15 rounds for handguns, as well as its provisions banning possession of the same. Am. Compl. ¶¶23-26, 30, ECF 48; Notice, ECF 49. On January 24, the *Bevis* Plaintiffs again moved for a temporary restraining order and preliminary injunction to preliminarily enjoin those provisions of state law. ECF 50. Three days later, on January 27, the Court held oral argument on the motion to enjoin the state law and the parties submitted supplemental briefing. ECF 55, 57-58, 60. Briefing on the motion by the parties is complete. The Court has notified the State of the amended complaint and pending motion challenging the state law, but the State has not appeared. ECF 56; Fed. R. Civ. P. 5.1(b); 28 U.S.C. §2043.

Explained below, in January 2023, Naperville moved to reassign the case as related to *Viramontes v. Cook County*, No. 1:21-cv-04595, before Chief Judge Pallmeyer. Given the overlapping arguments with those here, that motion is attached as Exhibit F. The *Viramontes* Plaintiffs have since moved to stay that litigation, and the motion to reassign has not been ruled on.

**4.** ***Viramontes v. Cook County*, No. 1:21-cv-04595 (Hon. Rebecca R. Pallmeyer):** The *Viramontes* Plaintiffs filed a complaint against Cook County officials in 2021 before the Supreme Court's decision in *Bruen*. ECF 1. They challenge the constitutionality of Cook County's ban on the purchase and possession of semiautomatic rifles, including AR-15s. *Id.* ¶¶61-70. They have *not* sought a preliminary injunction and have proceeded through discovery. Dispositive motions were due on

February 2, 2023. ECF 63. But on January 31, the *Viramontes* Plaintiffs moved to stay proceedings. ECF 69. A hearing on the motion to stay will occur on March 8, 2023. ECF 74. Dispositive motions deadlines are stayed until the Court rules on the stay. ECF 73.

Before the *Viramontes* Plaintiffs moved to stay proceedings, the Highland Park defendants in the *Goldman* case moved to reassign the *Goldman* case to be heard with *Viramontes*. Ex. E, ECF 55. The *Goldman* Plaintiffs opposed that motion because of the two different procedural postures of the case, ECF 58, and the *Viramontes* Plaintiffs took no position, ECF 59. Likewise, before the *Viramontes* Plaintiffs moved for a stay, the Naperville defendants in the *Bevis* case moved to reassign the *Bevis* case to be heard with *Viramontes*. Ex. F, ECF 65. The Naperville Defendants' motion explains that "[a]ll actions involve the same essential question of law: whether, in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), legislatures may lawfully prohibit assault weapons," that "all actions raise many common questions of fact," that both the *Goldman* and *Bevis* cases have added challenges to the same provisions of the newly enacted state law, and that all expert reports "heavily overlap." *Id.* at 2, 7. But less than two weeks later, the *Viramontes* Plaintiffs moved to stay their case pending further developments in the Southern District of Illinois cases. ECF 69; ECF 70. Presumably for that reason, the motions to reassign have not been ruled on.

5. ***Kenneally v. Raoul***, **No. 3:23-cv-50039 (Western Division) (Hon. Iain D. Johnston):** Patrick Kenneally, the McHenry County State's Attorney, filed a complaint against State officials challenging the newly enacted state law banning the purchase and possession of semiautomatic rifles, including AR-15s, and magazines. Defendants removed that action on January 27, 2023, to the Western Division. ECF 1. On February 14, Kenneally moved for a preliminary injunction. ECF 5; ECF 6. The motion argues that the state law bans violate the Second Amendment. *Id.* The same day the motion was filed, the Court set a briefing schedule. ECF 7. The motion will be

fully briefed on April 14, 2023. *Id.*

6.      **Actions pending in the Southern District of Illinois:** There are multiple actions pending against Illinois state officials in the U.S. District Court for the Southern District of Illinois. Those actions challenge the constitutionality of the newly enacted Illinois law's ban on the purchase and possession of semiautomatic rifles, including AR-15s, and magazines. *See, e.g.*, *Harrel v. Raoul*, No. 3:23-cv-00141 (S.D. Ill.); *Langley v. Kelly*, No. 3:23-cv-00192 (S.D. Ill.); *Federal Firearms Licensees of Illinois v. Pritzker*, No. 23-cv-00215 (S.D. Ill.); *Barnett v. Raoul*, No. 23-cv-00209 (S.D. Ill.). All actions have been reassigned to Judge Stephen McGlynn. The plaintiffs in these actions are seeking preliminary injunctions, which should be full briefed in early March. *See, e.g.*, ECF 23, *Harrel*, No. 3:23-cv-00141 (S.D. Ill.); ECF 24 (asking state defendants to "provide illustrative examples of each and every item banned" by the State's "assault weapon" ban in preliminary injunction responses).

7.      **Actions pending in state court:** There are various state-court actions that challenge the newly enacted Illinois law on state-law grounds. *See, e.g.*, *Accuracy Firearms, LLC v. Pritzker*, No. 2023-MR-4 (Effingham Cty. Cir. Ct.); *Bailey v. Harmon*, No. 2023-MR-1 (White Cty. Cir. Ct.); *Caulkins v. Harmon*, No. 2023-CH-3 (Macon Cty. Cir. Ct.). Temporary restraining orders have been granted as to the plaintiffs in those cases, and one such temporary restraining order has been affirmed on appeal by the Fifth District. *See Accuracy Firearms, LLC v. Pritzker*, --- N.E.3d ---, 2023 WL 1930130 (Ill. App. Ct. 5th Dist. 2023).

## ARGUMENT

Local Rule 40.4 permits reassignment of related actions where, as here, cases "involve some of the same issues of fact or law." LR40.4(a)(2). Local 40.4(b) requires movants to show:

(1) both cases are pending in this Court;
(2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort;
(3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and
(4) the cases are susceptible of disposition in a single proceeding.

LR40.4(b). Argued below, and as the *Bevis* and *Goldman* Defendants have already extensively briefed, the Rule 40.4(b) factors are met for the *Herrera*, *Bevis*, and *Goldman* cases challenging the constitutionality of identical or substantially similar AR-15 bans and magazine bans, and which seek temporary restraining orders and/or preliminary injunctions. *See* Exs. E & F. The only remaining questions are *which* of the related cases ought to be heard together and *where*.

As for *which* of the related cases ought to be heard together: The *Bevis* and *Goldman* Defendants argued that their cases should be heard with the *Viramontes* litigation. *Id.* But then the *Viramontes* Plaintiffs moved to stay, *supra*. In light of that intervening request to stay and because the *Viramontes* Plaintiffs have no pending request for preliminary injunction or summary judgment, the related Plaintiffs request that reassignment be limited to cases seeking preliminary injunctions.

As for *where* the related cases ought to be heard together: the related Plaintiffs request that the cases be reassigned to whichever Court is able to hear them most expediently. Based on recent hearings and a comparison of scheduling, that appears to be *Bevis* or alternatively *Goldman*. The *Bevis* Court has heard argument on Plaintiffs' motion and has stated it now has "in-depth" familiarity with the Second Amendment issues shared among these cases. *See* ECF 60 (Transcript at 4:2-5, 11:11-14), *Bevis v. Naperville*, 1:22-cv-04775 (Jan. 27, 2023). In *Herrera*, during the February 9 status hearing, the Court stated it had not yet had an opportunity to read Dr. Herrera's preliminary injunction motion, and the Court noted that it had a criminal conspiracy trial starting the week that the motion would be fully briefed. *See* ECF 40 (Transcript at 5:6-7, 21:13-20), *Herrera v. Raoul*, 1:23-cv-00532 (Feb. 9, 2023).

Which Court could most expediently resolve the motions is necessarily a relevant factor for these related cases seeking preliminary relief. The requests for preliminary injunctions involve alleged irreparable harm stemming from the violation of Second Amendment rights, where such harm is presumed. *See Ezell*, 651 F.3d at 699. For Dr. Herrera in particular—his proficiency degrades every month he cannot bring his AR-15 to the SWAT team's training, in addition to being without his

preferred self-defense firearms in his home. And newly enacted state law has compounded the constitutional harm, leaving it uncertain where and how firearms may be lawfully used anywhere within the State's borders, *supra*. Expeditious resolution is also achievable where, as here, the requests for preliminary injunctions present primarily a question of constitutional law, where historical facts are largely undisputed; what's disputed is the legal *relevance* or *application* of such historical facts.[6] *Cf. Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (noting there are "no evidentiary issues" for remand because "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial" and instead concerned "'legislative facts,' which is to say facts that bear on the justification for legislation, as distinct from facts concerning the conduct of parties in a particular case ('adjudicative facts') … determined in trial"). In the related context of 28 U.S.C. §1404 transfers, courts consider "efficient administration of the court system," "docket congestion," "likely speed to trial," and "familiarity with the relevant law." *See Rsch. Automation, Inc.*, 626 F.3d at 978; *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 221 (7th Cir. 1986) ("the interest of justice may be served by a transfer to a district where the litigants are more likely to receive a speedy trial"). Here too, the same considerations of timing ought to guide reassignment.

For the remaining reasons, all Rule 40.4(b) factors are met for reassignment:

1.    **All cases are pending in this Court.** Dr. Herrera's case shares common questions of law and common facts with multiple cases described above that are pending in the Northern District's Eastern Division.[7] *Herrera*, *Bevis*, and *Goldman*, moreover, all have pending motions for

---

[6] For example, in various cases Defendants have or will put in the same or similar expert declarations regarding the dangerousness of the banned arms. *See, e.g.*, State's Mot. for Extension of Time ¶7, ECF 18 *Harrel v. Raoul*, 3:23-cv-00141 (stating Illinois had retained criminology Professor Louis Klarevas); Klarevas Dec. in support of Highland Park Opp'n to Preliminary Injunction, ECF 45-6, *Goldman v. Highland Park*, 1:22-cv-04774. Many of the historical facts in those declarations are unlikely to be disputed, but their legal relevance or application will be, *see Caetano v. Massachusetts*, 577 U.S. 411, 417-18 (2016) (Alito, J., concurring) (observing "dangerous" cannot mean merely objects "designed and constructed to produce death or great bodily harm and for the purpose of bodily assault or defense," otherwise "virtually every covered arm would qualify as dangerous").

[7] *Keneally* also shares common questions of law and fact, but counsel assumes that Defendants would object to reassignment to the Western Division, where that case is pending.

temporary restraining orders and/or preliminary injunctions that have been or will soon be fully briefed. Detailed above, those challenges all target the same or similar semiautomatic rifle and magazine bans imposed by different jurisdictions. As litigation across the country has shown, assessing the constitutionality of those bans has turned on the same arguments by various government defendants.[8]

     **2.**     **The handling of cases by the same judge is likely to result in a substantial saving of judicial time and effort.** There is no reason for multiple judges to decide the same constitutional issue multiple times. "The judiciary has an interest, independent of litigants' goals, in avoiding messy, duplicative litigation" and "[t]hings are simplified" when related suits "are before a single judge," as enabled by Rule 40.4. *Ewing v. Carrier*, 35 F.4th 592, 594 (7th Cir. 2022). As the *Bevis* and *Goldman* Defendants have already extensively explained, these actions "challenge substantially similar ordinances and concern the same key constitutional issues." Ex. F, *Bevis* 40.4 Mot. at 7; *accord* Ex. E, *Goldman* 40.4 Mot. at 4 (noting Highland Park and Cook County are "materially identical ordinances" and that cases challenging "raise the same core legal issue—whether a local ban on the possession of assault weapons are constitutional after *Bruen*" and "will also involve many overlapping issues of fact"). Separately deciding these issues would require each judge to "tread much, if not all, of the same ground." *Sha-Poppin Gourmet Popcorn, LLC v. JP Morgan Chase Bank, N.A.*, 2020 WL 8367421, at *3 (N.D. Ill. Sept. 4, 2020).

     With respect to the pending temporary restraining order and/or preliminary injunction motions, counsel for the *Herrera* Defendants observed during the recent status hearing that defendants' briefs opposing those motions "tend to be 50 pages" with "ten experts." ECF 40, *Herrera v. Raoul*,

---

[8] *See, e.g.*, Highland Park Opp'n to Preliminary Injunction, ECF 45, *Goldman v. Highland Park*, 1:22-cv-04774; Defs.' Opp'n to Preliminary Injunction, ECF 37, *Nat'l Ass'n for Gun Rights v. Lamont*, 3:22-cv-01118 (D. Conn. Jan. 31, 2023); Def.'s Opp'n to Preliminary Injunction, ECF 21, *Capen v. Healey*, 1:22-cv-11431 (D. Mass Jan. 31, 2023); Defs.' Supp. Br., ECF 167, *Miller v. Becerra*, 3:19-cv-01537 (S.D. Cal. Feb. 10, 2023).

1:23-cv-00532 (Transcript at 7:3-4).[9] Defendants have pressed the same arguments in those briefs and put in declarations by the same experts. Relevant here, the State Defendants have retained the same experts as those who have submitted declarations in the *Goldman* case.[10] In the *Bevis* case, the Naperville Defendants have simply reattached Highland Park's expert declarations filed in *Goldman* and in related California litigation.[11] And the Naperville Defendants have said Cook County retained some of the same experts to defend its ordinance.[12]

More broadly, the historical analysis that *Bruen* requires will be the same across all cases. *Bruen* asks whether the challenged restrictions implicate the Second Amendment and, if so, whether the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30. Applied here, the materially similar bans on the purchase and possession of semiautomatic firearms and magazines all warrant the same historical analysis, regardless of which particular jurisdiction is imposing them. That supports reassignment. *See, e.g*, *Stingley v. Laci Transp., Inc.*, 2020 WL 12182491 (N.D. Ill. Dec. 1, 2020) (granting reassignment where two actions share "complex and consequential issues").

The handling of these cases by a single judge will thus save substantial time and effort. That is particularly true if the cases are reassigned to be heard with the *Bevis* case, in which the Court is already deeply familiar with the *Bruen* analysis, research, and historical arguments. ECF 60 (Transcript at 4:2-5 & 11:11-14), *Bevis v. Naperville*, 1:22-cv-04775 (Jan. 27, 2023); *cf. Rsch. Automation, Inc.*, 626 F.3d at

---

[9] Plaintiff disputes the propriety or relevance of so many expert declarations, but for purposes of this motion to reassign related cases, Defendants' intention to submit them is highly relevant. *See, e.g.*, *BP Corp. N.A. Inc. v. N. Tr. Invs., N.A.*, 2009 WL 1684531, at *2–3 (N.D. Ill. June 15, 2009) (granting reassignment where two cases involve the same experts and witnesses).

[10] *Compare, e.g.*, State's Mot. for Extension of Time ¶¶6-7, ECF 18 *Harrel v. Raoul*, 3:23-cv-00141 (stating Illinois had retained Professors Robert Spitzer and Louis Klarevas), *with* Spitzer Dec. & Klarevas Dec. in support of Highland Park Opp'n to Preliminary Injunction, ECF 45-6 & 45-9, *Goldman v. Highland Park*, 1:22-cv-04774 (N.D. Ill.), *and Miller v. Bonta*, 542 F. Supp. 3d 1009, 1040-41 (S.D. Cal. 2021) (discussing Professor Klarevas testimony in similar challenge).

[11] *See* Opp'n 10-11 & n.8, *Bevis v. Naperville*, 1:22-cv-04775 (Jan. 30, 2023).

[12] *See* Ex. F, *Bevis* 40.4 Mot. at 8 ("some of the experts presented by Cook County [then in *Viramontes* before the motion to stay] and Naperville will be the same").

978 (assessing "each court's relative familiarity with the relevant law" in §1404 context).

3.     **The earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially.** Among the cases where requests for preliminary injunctions are pending, no case has progressed to the point where designating a later filed case as related would be likely to delay the proceedings. In particular, the plaintiffs in *Herrera*, *Bevis*, and *Goldman* all challenged the constitutionality of the state law within roughly one week of each other. The *Bevis* motion is briefed and oral argument has been held, but the State has not appeared and no decision has issued, *supra*. The *Herrera* motion will be fully briefed on or before March 10, *supra*. The *Goldman* motion will be fully briefed on March 13, *supra*. All three of these motions could be decided and heard together, with a great savings to judicial economy. *See, e.g., Gautreaux v. Chi. Hous. Auth.*, 2013 WL 5567771, at *4 (N.D. Ill. Oct. 9, 2013) (granting reassignment when neither case had yet addressed the primary legal issue). Alternatively, the *Bevis* motion could be decided now in such a way that could well dictate the resolution of the *Herrera* and *Goldman* motions once they are briefed shortly thereafter. *See Helferich Pat. Licensing, LLC v. New York Times, Co.*, 2012 WL 1368193, at *3 (Apr. 19, 2012) ("Reassignment does not require that the two cases be bound together, proceeding in unison for all purposes," but only that they "will likely be amenable to *dispositive treatment* in unified proceedings." (emphasis added)).

4.     **The cases are susceptible of disposition in a single proceeding.** For the foregoing reasons, *Herrera*, *Bevis*, and *Goldman* are well-poised to be decided in a single proceeding. Applying *Bruen*, the constitutionality of the challenged laws likely rises and falls together. *See Glob. Pat. Holdings, LLC v. Green Bay Packers, Inc.*, 2008 WL 1848142, at *4 (N.D. Ill. Apr. 23, 2008) (granting reassignment where "both actions involve prima facie fundamentally similar claims and defenses that will likely be amenable to dispositive treatment in unified proceedings"). There is either a historical pedigree for the challenged laws, or there is not. *See Bruen*, 142 S. Ct. at 2130.

14

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the *Herrera*, *Bevis*, and *Goldman* cases are deemed related and reassigned to be heard before one Court. As for which Court, Plaintiff respectfully requests that it is whichever Court is able to resolve the pending preliminary injunction motions most expeditiously.

Dated: February 16, 2023

Gene P. Hamilton*
Reed D. Rubinstein*
Michael Ding (IL ARDC 6312671)
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue SE
Washington, DC 20003
Tel: (202) 964-3721
gene.hamilton@aflegal.org
reed.rubinstein@aflegal.org
michael.ding@aflegal.org

\* *Admitted pro hac vice*
  *in Herrera v. Raoul*, No. 1:23-cv-0532 (N.D. Ill.)

Respectfully submitted,

 */s/ Taylor A.R. Meehan*
Thomas R. McCarthy*
Jeffrey M. Harris*
Taylor A.R. Meehan (IL ARDC 6313481)
C'Zar D. Bernstein*
Matthew R. Pociask*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
jeff@consovoymccarthy.com
taylor@consovoymccarthy.com
czar@consovoymccarthy.com
matt@consovoymccarthy.com

*Counsel for Plaintiff Javier Herrera*
*in Herrera v. Raoul et al.*, No. 1:23-cv-0532

15

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email to counsel of record.

Dated: February 16, 2023

*/s/ Taylor A.R. Meehan*
Taylor A.R. Meehan

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JAVIER HERRERA,<br><br>　　　　　*Plaintiff,*<br><br>　　v.<br><br>KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity County Board of Commissioners President, KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney, THOMAS J. DART, in his official capacity as Sheriff of Cook County, CITY OF CHICAGO, a body politic and corporate, DAVID O'NEAL BROWN, in his official capacity as Superintendent of Police for the Chicago Police Department,<br><br>　　　　　*Defendants.* | Case No. |

### COMPLAINT

Dr. Javier Herrera brings this complaint for declaratory and injunctive relief against Kwame Raoul, the Attorney General of Illinois; Brendan F. Kelly, the Director of the Illinois State Police; Cook County; Toni Preckwinkle, President of the County Board of Commissioners; Kimberly M. Foxx, Cook County State's Attorney; Thomas J. Dart, the Sheriff of Cook County; the City of Chicago; and David O'Neal Brown, Superintendent of Police for the Chicago Police Department ("Defendants"). Dr. Herrera alleges as follows:

### INTRODUCTION

1.　　The Second Amendment protects an individual's right to keep and bear arms. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022); *see D.C. v. Heller*, 554 U.S. 570 (2008). That right "is not 'a second-class right, subject to an entirely different body of rules than the

**Exhibit A**

other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156. It is not subject to a "freestanding 'interest-balancing'" test that asks "whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. Nor may the government "simply posit that [gun] regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126. The government must instead "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government cannot do that when it bans arms commonly kept by law-abiding citizens for lawful purposes. *See Heller*, 554 U.S. at 625, 629; *Bruen*, 142 S. Ct. at 2128, 2156. Such laws violate "the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36 50 n.10 (1961)).

2.    This constitutional command binds Illinois. But this month, Illinois flouted them. *See* Ill. Pub. Act 102-1116. The Act bans the purchase and possession of America's most commonly owned semiautomatic rifle, the AR-15. It bans the purchase and possession of the standard magazine for that rifle or other standard magazines for some of America's most commonly owned handguns. That constitutionally protected conduct will now be criminal in Illinois. The Illinois Act flouts the Second Amendment's unqualified command that the "right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

3.    Cook County and the City of Chicago are likewise flouting this constitutional command. These jurisdictions ban the purchase and possession of the same commonly owned rifles. They ban the purchase and possession of standard magazines for that rifle and some of America's most commonly owned handguns. Constitutionally protected conduct is now criminal.

4.    These laws contravene the Second Amendment and what the Supreme Court has said about it. While States may regulate "dangerous *and* unusual weapons," *Heller*, 554 U.S. at 627 (emphasis added), those "in common use" are beyond the State's power to ban, *id.* "The Second Amendment as construed in *Heller* protects weapons that have not traditionally been banned and are in common use by law-abiding citizens. Semi-automatic rifles have not traditionally been banned and are in common

use today, and are thus protected under *Heller*." *D.C v. Heller*, 670 F.3d 1244, 1286-87 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). In adopting the Second Amendment, the American people chose to protect "the right of law-abiding, responsible citizens to use arms." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). That choice "demands our unqualified deference." *Id.*

## PARTIES

5.     Plaintiff, Dr. Javier Herrera, is a resident of Chicago, Illinois. He is an emergency medicine doctor at a Chicago area public hospital and teaches tactical medicine at a public university. Dr. Herrera is also a law-abiding gun owner with a valid firearm owner's identification card and concealed-carry license. He owns firearms for various lawful purposes—among them, self-defense, hunting, and sport shooting. Local ordinances prohibit Dr. Herrera from keeping some of those firearms and their standard magazines in his home and using them for self-defense. Instead, he must keep them more than an hour away. And state law now imposes even more burdens—banning sales of those firearms, components, and magazines and precluding Dr. Herrera's use of those most common arms for self-defense.

6.     Defendant Kwame Raoul is the Attorney General of Illinois. As Attorney General, he has the duty to "institute and prosecute all actions and proceedings in favor of or for the use of the State, which may be necessary in the execution of the duties of any State officer" and to "investigate alleged violations of the statutes which the Attorney General has a duty to enforce." 15 Ill. Comp. Stat. Ann. 205/4. He also has the duty to "defend all actions and proceedings against any State officer, in his official capacity, in any of the courts of this State or the United States." *Id.* He must "consult with and advise the Several State's Attorneys in matters relating to their duties," *id.*, and has publicly advised officers to enforce the Illinois Act. Defendant Raoul maintains a Chicago Main Office, a principal place of business, in 100 West Randolph Street, Chicago, IL 60601. At all relevant times,

Defendant Raoul is and will act under color of state law. Defendant Raoul is sued in his official capacity.

7.    Defendant Brendan F. Kelly is the Director of the Illinois State Police and a resident of Illinois. "The Director shall be responsible for the management and control of the Illinois State Police. The Director shall make and adopt rules and regulations for the direction, control, discipline and conduct of the members of the Illinois State Police and such other rules for the government and operation of the Illinois State Police as he may deem necessary." 20 Ill. Comp. Stat. Ann. 2610/2. Upon information and belief, Defendant Kelly and his subordinates will enforce the Illinois Act. At all relevant times, Defendant Kelly is and will act under color of state law. Defendant Kelly is sued in his official capacity.

8.    Defendant Cook County is a "county which has been … established in" in Illinois. See 55 Ill. Comp. Stat. Ann. 5/5-1001. It is "a body politic and corporate" and it may "be sued." Id. Under Illinois law, the County "with [its] chief executive officer elected by the electors of the county may (1) exercise any power and perform any function pertaining to its government and affairs, or (2) exercise those powers within traditional areas of county activity, except as limited by the Illinois Constitution or a proper limiting statute, notwithstanding effects on competition." Id. §2-5016. The County has used this power to enact the unconstitutional ordinances at issue here.

9.    Toni Preckwinkle is the President of Cook County's Board of Commissioners. As President, she is the Chief Executive Officer of Cook County. In that capacity, she has the power to sign and approve, or veto, ordinances passed by the Board. 55 Ill. Comp. Stat. Ann. 5/2-5010. She also has the duty to "see that all of the orders, resolutions and regulations of the board are faithfully executed." Id. §2-5009(a). Upon information and belief, she approved the unconstitutional ordinances at issue here, and she and her subordinates are enforcing and will continue to enforce them. At all

relevant times, Defendant Preckwinkle is and will act under color of state law. Defendant Preckwinkle is sued in her official capacity.

10. Kimberly M. Foxx is Cook County's State's Attorney. As State's Attorney, Defendant Foxx has the duty to enforce State statutes and the County's ordinances, including those at issue here. *See id.* §3-9005. The enforcement duties include prosecuting those who violate the State's statutes and County's ordinances. Upon information and belief, Defendant Foxx is enforcing and will continue to enforce rifle and magazine bans at issue here. At all relevant times, Defendant Foxx is and will act under color of state law. Defendant Foxx is sued in her official capacity.

11. Defendant Thomas J. Dart is the Sheriff of Cook County. As Sheriff, he enforces the County's ordinances. *See id.* §3-6019. He has authority to enforce the bans at issue here. *See, e.g.*, Cook Co. Ord. §§54-212, 54-213. Upon information and belief, Defendant Dart is enforcing and will continue to enforce rifle and magazine bans at issue here. At all relevant times, Defendant Dart is and will act under color of state law. Defendant Dart is sued in his official capacity.

12. Defendant City of Chicago is a municipal entity organized under the constitution and laws of the State of Illinois.

13. Defendant David O'Neal Brown is the Superintendent of Police for the Chicago Police Department. As Superintendent, he is "the chief executive officer of the Police Department" and is "responsible for the general management and control of the Police Department and shall have full and complete authority to administer the Department, except for those matters under the jurisdiction of the Office of Public Safety Administration, in a manner consistent with the ordinances of the City, the laws of the state, and the rules and regulations of the Police Board." Chi. Mun. Code, §2-84-040; *see also id.* §2-84-050. The superintendent is responsible for enforcing the City's gun ordinances. *See, e.g., id.* §§2-84-070, 2-84-070, 2-84-075. For example, the "superintendent has the authority to seize any firearm, assault weapon, ammunition, laser sight accessories, or firearm silencer

or muffler carried or possessed in violation of this chapter or any applicable state or federal law. Such items are hereby declared contraband and shall be seized by and forfeited to the city." *Id.* §8-20-250. The "superintendent has the authority to promulgate rules and regulations for the implementation of" the City's rifle and magazine bans. *Id.* §8-20-260. Upon information and belief, Defendant Brown is enforcing and will continue to enforce rifle and magazine bans at issue here. At all relevant times, Defendant Brown is and will act under color of state law. Defendant Brown is sued in his official capacity.

## JURISDICTION AND VENUE

14.     This action arises under the United States Constitution and 42 U.S.C. §1983. This Court therefore has subject-matter jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1343.

15.     Venue is proper under 28 U.S.C. §1391. At least one defendant is located in the Northern District of Illinois, all defendants perform official duties there, and all defendants reside in Illinois. Venue is also proper because a substantial part of the events giving rise to the claims occurred within this district.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A.     State and local law infringe Dr. Javier Herrera's lawful exercise of his Second Amendment rights.

16.     Dr. Javier Herrera is a doctor of emergency medicine at a Chicago area public hospital. He was born and raised in Chicagoland and completed his medical training here.

17.     Dr. Herrera currently resides in Chicago, one of the most dangerous cities in the country. In 2019 alone, there were nearly 500 reported murders, more than 1,500 reported rapes, nearly 8,000 reported robberies, nearly 10,000 reported burglaries, and more than 15,000 reported aggravated assaults. *See 2019 Crime in the United States*, FBI, Table 8: Illinois, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-8/table-8-state-cuts/illinois.xls. Crime since then has soared. In 2021, the City of Chicago reported more than 30,000 violent crimes, including

more than 800 homicides, more than 1,800 criminal sexual assaults, nearly 7,000 robberies, and nearly 9,000 aggravated assaults. *See Violence and Victimization Trends*, City of Chicago, https://www.chicago.gov/city/en/sites/vrd/home/violence-victimization.html. In 2022, the City again reported nearly 31,000 violent crimes, including nearly 700 homicides, nearly 2,000 criminal sexual assaults, more than 8,000 robberies, and more than 9,000 aggravated assaults. *Id.*

18.     Dr. Herrera is no stranger to Chicago violence and the acute need for self-defense. During his medical residency, an armed attacker killed the attending physician on duty and two others at the hospital where he was working. He rendered aid at the scene.

19.     Dr. Herrera has a valid firearm owner's identification card and concealed carry permit. He has lawfully kept firearms for self-defense in his home, carried them for self-defense outside his home, and used them for hunting and sport shooting.

20.     Dr. Herrera owns a Glock 45, a common handgun. But state and local law prohibit the standard 17-round magazines that come with it. *See* 720 ILCS 5/24-1.10; Cook Co. Code of Ord. §§54-211, 212, 214; Chi. Mun. Code §§8-20-010, 8-20-085, 8-20-300.

21.     Firearms are designed to function with standard components, and the use of non-standard magazines can impede the firearms' safety, reliability, and warranty. Dr. Herrera has experienced malfunctions with a firearm when used with non-standard magazines.

22.     Because of the ban on the 17-round standard magazine for the Glock 45, Dr. Herrera keeps his Glock 45 inoperable in his home.

23.     Dr. Herrera owns a Glock 43x, a common pistol. As allowed by his concealed carry permit, Dr. Herrera carries a Glock 43x for self-defense outside the home. That firearm comes standard with a 10-round magazine. But for the state and local bans, he would carry a different firearm.

24.     Dr. Herrera owns two AR-15 rifles, the most common semiautomatic rifle in the United States. But local ordinances prohibit him from keeping an AR-15 at home. Cook Co. Code of

7

Ord. §54-212; Chi. Mun. Code §8-20-075. Those ordinances also prohibit the standard 30-round magazines he uses with the AR-15. Cook Co. Code of Ord. §§54-211, 212, 214; Chi. Mun. Code §§8-20-010, 8-20-085, 8-20-300. Because of the ordinances, Dr. Herrera must store his AR-15 rifles, along with the standard magazines for them, more than an hour away, beyond county lines. That has consequences for myriad aspects of Dr. Herrera's life and his fundamental rights.

25.     During Dr. Herrera's residency in 2018, he was recruited to serve as a medic on a Chicagoland SWAT team. He accepted the call and began additional training in tactical medicine—rendering medical aid in high-risk missions conducted by local law enforcement.

26.     Today, Dr. Herrera continues to serve as a medic on the SWAT team, gives presentations on tactical medicine, and teaches tactical medicine to medical students and residents as an assistant professor at a public university.

27.     The SWAT team conducts missions in notoriously dangerous neighborhoods. They respond to high-risk situations, including search-and-arrest warrants on subjects that are known or suspected to carry firearms, hostage situations, and active shooters. The team deploys with operators (area law enforcement officers who carry AR-15 rifles) and a medic.

28.     As the medic, Dr. Herrera is trained to give medical aid to officers, bystanders, perpetrators, or anyone else who may be injured at the scene. He does not carry a firearm on missions, but he trains with them to ensure he could quickly secure, unload, and make safe an injured officer's AR-15 in the field. His inability to do so would threaten his own life, as well as the lives of other officers and bystanders. In addition, because Dr. Herrera is stationed inside the command vehicle until called upon to render aid, the team's operators often hand them their AR-15 when they need to use a breaching tool or other specialized weapon. If Dr. Herrera were not confident with handling his personal AR-15—and if his teammates didn't trust him—that task would fall to another operator, reducing the number of available officers to complete the mission.

29.     As part of the team, Dr. Herrera attends training two to three days per month. He also completed SWAT school to familiarize himself with the tactical aspects of the team's mission set. This cross-training ensures that Dr. Herrera is familiar with the team's maneuvers in the field for his own safety and the safe and effective operation of the team.

30.     Monthly team trainings include shooting and other tactical drills. The team trains with the AR-15, the rifle all operators use in the field. Dr. Herrera can and has participated in these drills using his personal AR-15 as part of his training to ensure he could secure, unload, and render safe another team member's rifle if necessary.

31.     Current law makes Dr. Herrera's participation in these monthly training drills with his AR-15 a practical impossibility.

32.     Because Dr. Herrera cannot keep his AR-15 rifles or necessary magazines and ammunition in his home, he instead keeps them secured at a location more than an hour away from his Chicago residence.

33.     To attend team training with his AR-15, Dr. Herrera would have to make an hour-plus drive outside of Cook County to retrieve his rifle. From there, he would have to make an hour-plus drive south to the teams' training sites. After training, Dr. Herrera would have to make the reverse trip to return his AR-15 to that location beyond county lines, and then drive another hour to return to his Chicago home. Including because training locations change, it is not feasible for Dr. Herrera to store his rifle at training sites.

34.     In practice—due to his working hours as an emergency medicine doctor, his teaching commitments, and the hours of required travel—Dr. Herrera cannot attend training sessions with his AR-15. His inability to do so compromises his safety in the field. He cannot train with the team to ensure that he is familiar with the operators' movements and to ensure that he could swiftly secure,

unload, and make safe an injured team members' rifle. Dr. Herrera believes that this training is essential to his safety and to building trust with his teammates.

35.     If Dr. Herrera could keep his AR-15 and required magazines and ammunition in his home, he could participate in the team's training drills with his AR-15, improving his team's readiness and his ability to protect himself and others when the team is in the field.

36.     Dr. Herrera is a skilled AR-15 user—skilled enough to know that his confidence with a rifle depends on routine training and practice. Local and now state law preclude him from maintaining that proficiency.

37.     Beyond his duties as a SWAT medic, Dr. Herrera uses or would use his AR-15 rifles for self-defense, hunting, and sport shooting.  Given his personal experience with a workplace shooting, Dr. Herrera knows first-hand the stress of an active shooter situation. That is one reason he would prefer to use an AR-15 to defend himself from a violent intruder at home. Based on his own experience, it would be easier to use an AR-15 safely and accurately under stress compared to a handgun. The AR-15's design features, including the foregrip, pistol grip, and buttstock, give him more control over the firearm, reducing the risk of injury to himself or a bystander.

38.     Dr. Herrera also uses an AR-15 for recreational purposes. As a hobby, he visits indoor and outdoor ranges for target shooting. And he uses an AR-15 to hunt small game in neighboring Indiana. But Dr. Herrera's ability to do so is hampered by state and local laws that require him to store his AR-15 rifles far from home.

39.     Dr. Herrera has an individual right to keep and bear arms in Illinois just as he would if he were a resident any other State. But state and local laws have erected serious barriers to Dr. Herrera's exercise of that fundamental right.

**B.** **Illinois enacts outright ban on the sale, purchase, and possession of rifles and magazines.**

40.     On January 10, 2023, Governor Pritzker signed into law the "Protect Illinois Communities Act." Ill. Pub. Act 102-1116, §1. The "Act takes effect upon becoming law." *Id.* §99. The Act's effective date is therefore January 10, 2023, unless otherwise specified.

41.     The Act creates two new sections to the Illinois Compiled Statutes: 720 ILCS 5/24-1.9 (the rifle ban) and 720 ILCS 5/24-1.10 (the magazine ban). *Id.* §25. It also amends section 24-1 of the Criminal Code of 2012. *Id.*

42.     Under the Act's amendments to the criminal code, a "person commits the offense of unlawful use of weapons when he knowingly … [c]arries or possesses any assault weapon … in violation of Section 24-1.9," 720 ILCS 5/24-1(a)(15), or "knowingly … purchases any assault weapon … in violation of Section 24-1.9," 720 ILCS 5/24-1(a)(16). The Act punishes the knowing purchase of an "assault weapon" as a Class A misdemeanor and the knowing possession of an "assault weapon" as a Class C felony. 720 ILCS 5/24-1(b).

43.     Section 24-1.9, in turn, contains the Act's rifle ban. It defines "assault weapon" to include, *inter alia*, "[a] semiautomatic rifle that has the capacity to accept a detachable magazine … if the firearm has … a pistol grip." 720 ILCS 5/24-1.9(a)(1)(A)(i). The Act expressly names "[a]ll AR types, including" the "AR-15." *Id.* §24-1.9(a)(1)(J)(ii)(II).

44.     Section 24-1.9 declares that selling, purchasing, or possessing so-called assault weapons is unlawful. First, it declares that as of January 10, 2023, "it is unlawful for any person within this State to knowingly … sell or purchase … an assault weapon." *Id.* §24-1.9(b). Second, it declares that as of January 1, 2024, "it is unlawful for any person within this State to knowingly possess an assault weapon." *Id.* §24-1.9(c).

45.     Section 24-1.9 contains a grandfather provision requiring registration of rifles that the state deems as "assault weapons." It applies only to those who possessed an "assault weapon" before

January 10, 2023, or "inherited" one from someone who did. *Id.* §24-1.9(d). To be eligible, the grandfather provision requires the detailed registration of such firearms with the Illinois State Police, including "the make, model, caliber, and serial number of the … assault weapon." *Id.*

46.     That intrusive registration requirement is ahistorical, unconstitutional and, in other countries, has been the first step on the way to confiscation of such weapons. *Cf. Thomas v. Collins*, 323 U.S. 516, 540 (1945) ("a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment."); *see* Smilde, *Citizen Security Reform, part 5: Gun Control*, Venezuelan Politics and Human Rights (Aug. 5, 2013) (describing Venezuelan's gun registration law in advance of private gun confiscation), *available at* venezuelablog.org/citizen-security-reform-part-5-gun-control; *see also* Kopel, *In the Wake of a Gun Ban, Venezuela Sees Rising Homicide Rate*, The Hill (Apr. 19, 2018), *available at* thehill.com/opinion/campaign/383968-in-the-wake-of-a-gun-ban-venezuela-sees-rising-homicide-rate.

47.     In addition to the unconstitutional registration requirement, the text of the grandfather provision covers "possession" only and only in certain places. *Id.* §24-1.9(d). It does not indicate whether any grandfathered arms may actually be used for self-defense. The grandfather provision says that those eligible may "possess" rifles on his own "private property"; on "private property that is not open to the public with the express permission of the person who owns or immediately controls such property;" on "the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair;" "at a properly licensed firing range or sport shooting competition venue;" or "while traveling to or from these locations, provided that the assault weapon … is unloaded and the assault weapon … is enclosed in a case … or other container." *Id.*

48.     The Act also includes a magazine ban in section 24-1.10.

49.     Section 24-1.10 defines "'[l]arge capacity ammunition feeding device'" to mean "a magazine … that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns."  720 ILCS 5/24-1.10(a)(1).

50.     Section 24-1.10 bans both the purchase and possession of those magazines. The Act immediately bans the "knowing[] … purchase … [of] a large capacity ammunition feeding device." *Id.* §24-1.10(b). Second, as of April 10, 2023, it will be "unlawful to knowingly possess a large capacity ammunition feeding device." *Id.* §24-1.10(c).

51.     There is a narrow grandfather provision. The possession ban "does not apply … if the person lawfully possessed" them before January 10, 2023, but it again limits the places and circumstances where a person may "possess" the magazines and does not say expressly whether they may actually be used for self-defense. *Id.* §24-1.10(d). A "person shall possess such device only" on his own "private property"; or "on private property that is not open to the public with the express permission of the person who owns or immediately controls such property"; "while on the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair"; "while engaged in the legal use of the large capacity ammunition feeding device at a properly licensed firing range or sport shooting competition venue"; or "while traveling to or from these locations, provided that the large capacity ammunition feeding device is stored unloaded and enclosed in a case … or other container." *Id.* §24-1.10(d)(1)-(5). The grandfather provision does not permit the purchase of new magazines by lawful gun owners.

52.     Section 24-1.10 criminalizes the purchase and possession of magazines. It declares that a "person who knowingly purchases" or "possesses …in violation of this Section a large capacity ammunition feeding device capable of holding more than 10 rounds of ammunition for long guns or

more than 15 rounds of ammunition for handguns commits a petty offense with a fine of $1,000 for each violation." *Id.* §24-1.10(g).

53.     After signing the Act, Governor Pritzker stated, "This legislation will stop the spread of assault weapons [and] high-capacity magazines." As for enforcement, he said "that the State Police is responsible for enforcement … and they will, in fact, do their job or they won't be in their job." Governor Pritzker also promised that the "state police and law enforcement across the state … will, in fact, enforce this law." He promised to defend the Act in court. And he threatened ordinary citizens: "anybody who doesn't comply, there are consequences for that." "You don't get to choose which laws you comply with in the State of Illinois, let's be clear," Governor Pritzker stated.

54.     In a Tweet, Governor Pritzker stated that the Act "immediately bans the sale and distribution of assault weapons" and "high-capacity magazines." He described the Act as "one of the strongest assault weapons bans in the nation." The Governor promised "to end the sale of" the targeted rifles "as soon as possible."

55.     Defendant Raoul has publicly said that law enforcement agencies of the State will enforce the law.

56.     Defendant Dart, as Sheriff of Cook County, testified in support of the State ban during a House Committee hearing. "There is no sane person who's going to sit there and say in our society we should have these," he stated.

57.     An Illinois state court has issued a temporary restraining order that partially enjoins enforcement of the Act as to the named plaintiffs in that state-court litigation. Defendants are appealing that order.

**C.     Cook County bans possession of rifles and magazines.**

58.     Cook County bans both commonly owned rifles and magazines.

59.     The County ordinance declares that "[i]t shall be unlawful for any person to … acquire, carry or possess any assault weapon or large capacity magazine in Cook County." *Id.* §54-212(a). "Any assault weapon or large capacity magazine possessed, carried, sold or transferred in violation of Subsection (a) of this section is hereby declared to be contraband and shall be seized and disposed of." *Id.* §54-212(b).

60.     The ordinance defines "assault weapon" to mean "[a] semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise" and expressly includes the "AR-15" and similar rifles. Cook Co. Code of Ord. §54-211(1), (7)(A)(iii). "*Large-capacity magazine* means any ammunition feeding device with the capacity to accept more than ten rounds." *Id.* §54-211.

61.     If a person violates the County's ban, he "shall be fined not less than $5,000.00 and not more than $10,000.00 and may be sentenced for a term not to exceed more than six months imprisonment." *Id.* §54-214(a).

62.     The County therefore prohibits residents of the County from acquiring, carrying, or possessing AR-15s and so-called large-capacity magazines when in the County.

**D.      The City of Chicago bans the possession of rifles and magazines.**

63.     The Municipal Code of Chicago contains an outright rifle ban. The Code declares that "[i]t shall be unlawful for a person to import, sell, manufacture, transfer, or possess an assault weapon." *Id.* §8-20-075(a). "Any assault weapon carried, possessed, displayed, sold or otherwise transferred in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city." *Id.* §§8-20-075(d).

64.     The Code defines an "assault weapon" to mean "[a] semiautomatic rifle that has the ability to accept a detachable magazine and has … a handgun grip." Chi. Mun. Code §8-20-010. The Code expressly includes the "AR-15" rifle and ones like it. *See id.*

15

65.     "[A]ny person who violates section 8-20-075 … shall be fined not less than $1,000.00 nor more than $5,000.00 and be incarcerated for a term of not less than 90 days nor more than 180 days." *Id.* §8-20-300(a). Penalties increase with subsequent offenses. *Id.* §8-20-300(b). The Code states that the "superintendent has the authority to seize any … assault weapon … carried or possessed in violation of this chapter" and that such "items are declared contraband" that "shall be destroyed at the direction of the superintendent." *Id.* §8-20-250.

66.     The Code also bans so-called high-capacity magazines. *See id.* §8-20-085. The Code defines "high capacity magazines" to mean any "magazine … that has an overall capacity of more than 15 rounds of ammunition." *Id.* §8-20-010. "It is unlawful for any person to carry, possess, sell, offer or display for sale, or otherwise transfer any high capacity magazine." *Id.* §8-20-085(a). "Any high capacity magazine … carried, possessed, displayed, sold or otherwise transferred in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city." *Id.* §8-20-085(b).

67.     "[A]ny person who violates section … 8-20-085 … shall be fined not less than $1,000.00 nor more than $5,000.00 and be incarcerated for a term of not less than 90 days nor more than 180 days." *Id.* §8-20-300(a). Penalties increase for subsequent violations. *Id.* §8-20-300(b).

### E.     The rifles and magazines that Illinois, Cook County, and the City of Chicago target are in common use for lawful purposes.

68.     Semiautomatic rifles like the AR-15 are not a machine guns. "A semi-automatic gun 'fires only one shot with each pull of the trigger' and 'requires no manual manipulation by the operator to place another round in the chamber after each round is fired.'" *Heller*, 670 F.3d at 1285 (Kavanaugh, J., dissenting) (quoting *Staples v. U.S.*, 511 U.S. 600, 602 n.1 (1994)). "That is in contrast to an automatic gun—also known as a machine gun—which 'fires repeatedly with a single pull of the trigger.'" *Id.*

69.     "Semi-automatic rifles [are] in common use." *Heller*, 670 F.3d at 1287-88 (Kavanaugh, J., dissenting). "[A]bout 40 percent of rifles sold in 2010 were semi-automatic." *Id.* And "the Supreme

Court already stated that semi-automatic weapons 'traditionally have been widely accepted as lawful possessions.'" *Id.* (quoting *Staples*, 511 U.S. at 612).

70. Americans purchase semiautomatic rifles for lawful purposes. In 2018, about "34% of buyers purchased" a semiautomatic rifle "for personal protection, while 36% purchased for target practice or informal shooting, and 29% purchased for hunting." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (2021), *vac'd and rem.*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). "In contrast, only 5% of traditional rifles were bought for personal protection." *Id.* "During 2018, approximately 18,327,314 people participated nationally in target and sport shooting specifically with" semiautomatic rifles. *Id.*

71. Among semiautomatic rifles, the AR-15 is by far the most popular for civilian use.

72. The Supreme Court recognized that AR-15s were "widely accepted as lawful possessions" nearly three decades ago in *Staples v. United States*, 511 U.S. 600, 612 (1994); *see also Heller*, 670 F.3d at 1288 (Kavanaugh, J., dissenting).

73. "[T]he AR-15 semiautomatic rifle appeared in 1963 and sold with a standard twenty-round magazine. … Since that time it has become '[t]he most popular rifle in American history.'" *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey (ANJRPC II)*, 974 F.3d 237, 256 (3d Cir. 2020) (Matey, J., dissenting), *cert. granted, judgment vac'd sub nom.* 142 S. Ct. 2894 (2022) (quoting David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859-60 (2015)).

74. At least "1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market." *Id.*

75. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) recognized the ubiquity of AR-15s in a recent rulemaking. There, the agency described the AR-15 as "one of the most popular firearms in the United States," including "for civilian use." *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022).

76. According to the most recent data based in part on reports and data by the ATF and the U.S. International Trade Commission, about 24.5 *million* modern semiautomatic rifles like the AR-15 have been in circulation in the United States since 1990. About 2.8 million were produced in 2020 alone. "There are more [such rifles] in circulation today than there are Ford F-Series trucks on the road." *See* National Shooting Sports Foundation, *Commonly Owned: NSSF Announces over 24 million MSRs in Circulation* (July 20, 2022), https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/.

77. Another report states that "30.2% of gun owners—about 24.6 million individuals—have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total)." William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 2, 20 (May 18, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

78. The standard magazines for AR-15s, which hold 30 rounds, are likewise "in 'common use.'" *Heller*, 670 F.3d at 1261. Similarly, standard magazines for handguns as common as the Glock 45 exceed ten rounds.

79. "[F]ully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000." *Heller*, 670 F.3d at 1261.

80. About half of gun owners—about 39 million people—own magazines that hold more than ten rounds, and "542 million such magazines have been owned." *See* English, *supra.*, at 1-2, 20.

81. These magazines, and the firearms that use them, are used for lawful purposes like self-defense and hunting. *See Ass'n of New Jersey Rifle & Pistol Clubs, Inc. (ANJRPC I) v. Att'y Gen.*, 910 F.3d 106, 116-17 (3d Cir. 2018), *abrogated by Bruen*, 142 S. Ct. 2111 (2022) ("The record shows that millions of magazines are owned, often come factory standard with many semi-automatic weapons,

are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense.").

82. Unsurprising in light of the ubiquity of these rifles and magazines, rifle and magazine bans have no historical pedigree.

83. Firearms with magazines that hold over 15 rounds date back at least to the mid-nineteenth century. By 1855, Volcanic Repeating Arms Company sold carbine rifles with an integrated magazine holding between 20 and 30 rounds, depending on the model. Shortly after, in 1860, the New Haven Arms Company sold the Henry Repeating Rifle with a 16 round integrated magazine.

84. There is no "evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding." *Heller*, 670 F.3d at 1260. The earliest examples of semiautomatic rifle and magazine regulation come from the last century: two isolated bans passed in 1927 and 1932. *See Heller*, 670 F.3d at 1260 & n.*.

85. There is a long lineage of large-capacity magazines sold for civilian use in the United States, but "there is no longstanding history of [large-capacity magazine] regulation." *ANJRPC*, 910 F.3d at 116-17. And while some jurisdictions passed similar bans in later decades, "most of those laws were invalided by the 1970s." *ANJRPC*, 910 F.3d at 117 n.18. And none of those regulations imposed magazine restrictions with "as low as [a] 10-round limit." *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1152-53 (S.D. Cal. 2019).

86. Regulation of modern magazines—which detach from the firearm to facilitate reloading—is even more recent. "The oldest statute limiting the permissible size of a detachable firearm magazine" was introduced in 1990 by New Jersey. *Duncan*, 366 F. Supp. 3d at 1149. A federal statute from 1994 "addressed magazines holding more than 10 rounds" but that statute "lapsed in 2004 and has not been replaced." *Id.*

87. The bans in Illinois, Cook County, and the City of Chicago are ahistorical and unconstitutional.

**F.    AR-15s are far less likely to be used in crime than firearms that Illinois, Cook County, and Chicago permit.**

88. Dangerousness alone is not grounds for banning firearms. *See Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (describing unusual *and* dangerous conjunctive test); *id.* at 417-18 (Alito, J., concurring) ("virtually every covered arm would qualify as dangerous").

89. Semiautomatic rifles like the AR-15 are no more dangerous to society at large than handguns. *See Heller*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) ("[S]emi-automatic handguns are more dangerous as a class than semi-automatic rifles because handguns can be concealed.").

90. Handguns are more frequently used to commit violent crimes like murder than rifles of any kind, including semiautomatic rifles such as the AR-15. *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015) (explaining that although "handguns comprise only about one-third of the nation's firearms, by some estimates they account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes").

91. The Federal Bureau of Investigations publishes crime statistics. The data are broken down by weapon used to commit the offense.

92. The following table includes some of the FBI's data relating to murder victims and the identifiable arms used to kill them in the United States between 2015-2019:

| Weapons | 2015 | 2016 | 2017 | 2018 | 2019 |
|---------|------|------|------|------|------|
| Handguns | 6,194 | 6,778 | 7,052 | 6,683 | 6,368 |
| Rifles | 215 | 300 | 389 | 305 | 364 |
| Shotguns | 248 | 247 | 263 | 237 | 200 |
| Other guns | 152 | 172 | 178 | 164 | 45 |
| Knives | 1,533 | 1,562 | 1,608 | 1,542 | 1,476 |

20

| Personal weapons (hands, fists, etc.) | 651 | 668 | 715 | 712 | 600 |
| Blunt objects | 438 | 466 | 474 | 455 | 397 |

Source: FBI, "2019 Crime in the United States: Murder Victims by Weapon, 2015-2019," https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls

93.     As these statistics show, a victim is multiple times more likely to be killed by a knife than a rifle of any kind, and nearly twice as likely to be killed by an attacker's hands or fists.

94.     Criminals, moreover, are responsible for the danger that these statistics represent, not the firearms they sometimes use. The existence of gun crime cannot erase the fact that the AR-15, Glock 45, and other similar firearms are commonly—and overwhelmingly—used by Americans for lawful purposes.

**G.      Illinois, Cook County, and the City of Chicago laws unconstitutionally infringe fundamental self-defense rights.**

95.     Dr. Herrera has a fundamental right to defend himself, including against gun crime, and to otherwise keep and bear arms for lawful purposes.

96.     State and local laws infringe that fundamental Second Amendment right in several ways.

97.     Foremost, the County and City ordinances mean that Dr. Herrera cannot possess his AR-15 rifles or standard magazines at his Chicago home for self-defense.

98.     The County and City ordinances mean that Dr. Herrera cannot keep his Glock 45 operable at home for self-defense, because the Glock 45 comes standard with 17-round magazines.

99.     The County and City ordinances mean that Dr. Herrera cannot as a practical matter bring his rifle to monthly training with the SWAT team.

100.     The County and City ordinances deny Dr. Herrera easy access to his rifles for hunting and sport shooting in his off time. As a result, Dr. Herrera engages in these hobbies less than he otherwise would.

101.     The State, County, and City magazine bans prohibit Dr. Herrera from purchasing new magazines of standard size for his Glock 45 and AR-15 rifles, and thus ban Dr. Herrera from replacing those essential components as they wear out. But for the state and local bans, Dr. Herrera would purchase new standard magazines.

102.     The State, County, and City rifle bans prohibits Dr. Herrera from purchasing new AR-15 components or a new AR-15 rifle. But for the bans, Dr. Herrera would purchase another AR-15 and AR-15 components to accommodate his multiple uses for that style of firearm. As a result of the bans, he cannot.

103.     And the State ban will soon prohibit Dr. Herrera from possessing his AR-15 rifles anywhere in Illinois, even far away from home, unless he complies with its intrusive and ahistorical registration requirement, which in other countries has been a prelude to gun confiscation. Registration also risks exposing Dr. Herrera's personal information in the event of a data breach—something most everyone, including Dr. Herrera, has experienced.

104.     Even if Dr. Herrera did register his rifles, the State ban prohibits Dr. Herrera from purchasing new rifles, new components, or new magazines. Dr. Herrera could merely "possess" what he has at specified locations—locations that would not include his own home as a result of the County and City bans.

### CLAIMS FOR RELIEF

### COUNT I
**Second and Fourteenth Amendments**
**(Illinois Magazine Ban—State Defendants)**
**42 U.S.C. §1983**

105.     Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

106.     Dr. Herrera has been deprived of his Second and Fourteenth Amendment rights by Defendants, acting under color of law.

107. The Second Amendment secures the right to possess and purchase "arms" that are in "common use" for lawful purposes. *See Heller* 554 U.S. at 627; *see also McDonald v. City of Chicago*, 561 U.S. 742 (2010) (applying the Second Amendment to the City of Chicago and all other States and government subdivisions).

108. Government officials cannot ban commonly owned arms. Those bans are ahistorical. Firearm restrictions are permissible only if "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135.

109. "[M]agazines are 'arms' within the meaning of the Second Amendment." *ANJRPC*, 910 F.3d at 116; *see also United States v. Miller*, 307 U.S. 174, 180 (1939) (The right to arms "implie[s] the possession of ammunition.").

110. The Second Amendment thus forbids enforcement of the laws banning the possession and purchase of magazines.

111. Section 24-1.10 unconstitutionally bans the possession and purchase of rifle and handgun magazines with capacities of greater than 10 and 15 rounds, respectively. Magazines with these capacities are in common use for lawful purposes, including self-defense.

112. Section 24-1.10 also infringes the right to use firearms that use these standard magazines to function. Those firearms include the AR-15 rifle and the Glock 45 handgun.

113. The Second Amendment thus forbids enforcement of section 24-1.10.

114. Dr. Herrera owns firearms designed to use magazines that exceed the capacity limits imposed by section 24-1.10. But for section 24-1.10's ban, Dr. Herrera would purchase new magazines, including to replace his existing magazines as they wear out.

115. State actors who deprive individuals of these federal constitutional rights under color state law violate federal law. *See* 42 U.S.C. § 1983.

116.     Defendants, under color of state law, will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the magazine ban.

117.     For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

**COUNT II**
**Second and Fourteenth Amendments**
**(Illinois Rifle Sale and Purchase Ban—State Defendants)**
**42 U.S.C. §1983**

118.     Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

119.     Semiautomatic rifles such as the AR-15 are "arms" within the meaning of the Second Amendment. Semiautomatic rifles are in common use for lawful purposes. Indeed, the AR-15 is "one of the most popular firearms in the United States," including "for civilian use." 87 Fed. Reg. at 24655; *see also Heller*, 670 F.3d at 1288 (Kavanaugh, J., dissenting) ("[A]s the Supreme Court noted in *Staples* [*v. U.S.*], the AR-15 is in common use by law-abiding citizens and has traditionally been lawful to possess.").

120.     The Second Amendment thus forbids enforcement of state laws that ban the possession and purchase of semiautomatic rifles such as AR-15s. Restrictions on the possession and purchase of these rifles are permitted by the Second Amendment only if they are consistent with a historical tradition of firearm regulation in the United States.

121.     Section 24-1.9 bans the possession and purchase of modern semiautomatic rifles, including the AR-15. The ban prohibits possession, anywhere in the State, if AR-15s are acquired after January 10, 2023, and it allows possession of previously acquired AR-15s only in a narrow set of locations and only if compliant with unconstitutional registration requirements.

122.     The Second Amendment thus forbids enforcement of section 24-1.9.

24

123.    Dr. Herrera owns AR-15s that he acquired before section 24-1.9 was enacted. To continue possessing those rifles, he will have to comply with an unconstitutional registration requirement and, even then, he may only possess those arms in limited locations. But for section 24-1.9's ban, Dr. Herrera would possess his rifles in locations not exempted by the Act and actually use them for self-defense if a need for armed self-defense arose. He would also purchase a new AR-15 and AR-15 components for lawful purposes, including self-defense and hunting.

124.    State actors who deprive individuals of these federal constitutional rights under color state law violate federal law. *See* 42 U.S.C. § 1983.

125.    Defendants, under color of state law, will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the rifle ban.

126.    For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

### COUNT III
### Second and Fourteenth Amendments
### (State registration requirement—State Defendants)
### 42 U.S.C. §1983

127.    Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

128.    Section 24-1.9 bans possession of previously acquired AR-15 rifles anywhere within the State unless they are registered with the Illinois State Police. *See Public Act 102-1116 (HB5471) Frequently Asked Questions*, Illinois State Police, https://isp.illinois.gov/Home/HB5471Faqs ("Illinois residents have to register their AR or assault weapons as defined by the new law.").

129.    Individuals who want to possess a previously acquired AR-15 rifle must submit an affidavit to the Illinois State Police that includes "the make, model, caliber, and serial number." §24-1.9(d).

130.     Registration requirements, especially for semiautomatic rifles, are not supported by a historical tradition of firearm regulation in the United States.

131.     The Second Amendment thus forbids enforcement of the registration requirement in section 24-1.9.

132.     Dr. Herrera does not wish to disclose sensitive information about his AR-15 rifles to state officials, beyond what he has already had to disclose to lawfully acquire those firearms. Among other concerns, registration can be a prelude to confiscation and exposes his personal information to data breaches.

133.     State actors who deprive individuals of these federal constitutional rights under color state law violate federal law. *See* 42 U.S.C. § 1983.

134.     Defendants, under color of state law, will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the registration requirement.

135.     For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

### COUNT IV
### Second and Fourteenth Amendments
### (Cook County Rifle Ban—Cook County and Defendants Preckwinkle, Foxx, and Dart)
### 42 U.S.C. §1983

136.     Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

137.     Defendants are "person[s]" acting under color of law within the meaning of 42 U.S.C. §1983.

138.     The Cook County rifle ban is an official policy for purposes of 42 U.S.C. §1983.

139.     The County bans the acquisition, carriage, or possession of rifles that are commonly owned for lawful purposes such as the AR-15. *See* Cook Co. Code of Ord. §§54-211, 54-211(a)(7)(iii), 54-212(a)-(c), 54-214. The County rifle ban prohibits residents from keeping rifles like the AR-15 in

their homes. They also prohibit them from acquiring or carrying AR-15s, whether inside or outside the home.

140. The Second Amendment forbids the County from banning the purchase or possession of commonly owned rifles.

141. Dr. Herrera owns AR-15 rifles that he must keep outside Cook County. But for the County rifle ban. He would also purchase a new AR-15 and AR-15 components for these lawful purposes.

142. State actors who deprive individuals of these federal constitutional rights under color law violate federal law. *See* 42 U.S.C. § 1983.

143. Defendants, under color of law, are depriving and will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the County rifle ban.

144. For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

## COUNT V
### Second and Fourteenth Amendments
**(Cook County Magazine Ban— Cook County and Defendants Preckwinkle, Foxx, and Dart)**
**42 U.S.C. §1983**

145. Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

146. Defendants are "person[s]" acting under color of law within the meaning of 42 U.S.C. §1983.

147. The Cook County magazine ban is an official policy for purposes of 42 U.S.C. §1983.

148. Cook County's ordinances ban the acquisition, carriage, and possession of magazines that are common and come standard in commonly owned rifles such as the AR-15 or commonly

owned handguns such as the Glock 45. *See* Cook Co. Code of Ord. §§54-211, 54-211(a)(7)(iii), 54-212(a)-(c), 54-214.

149.    The County magazine ban also effectively bans the acquisition, carriage, and possession of firearms that use these standard magazines to function.

150.    The Second Amendment forbids the County from banning magazines in this way.

151.    Dr. Herrera owns firearms designed to use magazines that exceed the capacity limits imposed by the County magazine ban. But for the ban, Dr. Herrera would keep these magazines in his Cook County residence and use them for self-defense if a need for armed self-defense arose. But for the ban, he would keep his Glock 45 operable with its standard 17-round magazine. He would also purchase new magazines, including to replace his existing magazines as they wear out.

152.    State actors who deprive individuals of these federal constitutional rights under color law violate federal law. *See* 42 U.S.C. § 1983.

153.    Defendants, under color of law, are depriving and will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the County magazine ban.

154.    For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

## COUNT VI
### Second and Fourteenth Amendments
### (Chicago Rifle Ban—City of Chicago and Defendant Brown)
### 42 U.S.C. §1983

155.    Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

156.    Defendants are "person[s]" within the meaning of 42 U.S.C. §1983.

157.    The Chicago rifle ban constitutes an official policy for purposes of 42 U.S.C. §1983.

158.    Chicago's Municipal Code bans the possession and carriage of commonly owned semiautomatic rifles such as the AR-15. *See* Chi. Mun. Code §§8-20-010, 8-20-075, 8-20-300. The

Chicago rifle ban prohibits Chicagoans from keeping rifles such as the AR-15 in their homes. It also prohibits them from acquiring or carrying AR-15s, whether inside or outside the home.

159.    The Second Amendment forbids enforcement of the Municipal Rifle Ban.

160.    Dr. Herrera owns AR-15 rifles that he that he must keep outside the City of Chicago. But for the Chicago rifle ban, Dr. Herrera would possess his rifles in his Chicago residence for lawful purposes. He would also purchase a new AR-15 and AR-15 components for these lawful purposes.

161.    State actors who deprive individuals of these federal constitutional rights under color law violate federal law. *See* 42 U.S.C. § 1983.

162.    Defendants, under color of law, are depriving and will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the Chicago rifle ban.

163.    For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

## COUNT VII
## Second Amendment
### (Chicago Magazine Ban—City of Chicago and Defendant Brown)
### 42 U.S.C. §1983

164.    Dr. Herrera repeats and realleges each of the prior allegations as though set forth fully herein.

165.    Defendants are "person[s]" within the meaning of 42 U.S.C. §1983.

166.    The Chicago magazine ban constitutes an official policy for purposes of 42 U.S.C. §1983.

167.    Chicago's Municipal Code bans the possession and carriage of magazines that are common and standard in commonly owned rifles such as the AR-15 or commonly owned handguns such as the Glock 45. *See* Chi. Mun. Code §§8-20-010, 8-20-085, 8-20-300.

168.    The Chicago magazine ban also effectively bans the possession and carriage of firearms that require these magazines to function.

29

169.     The Second Amendment forbids enforcement of the Chicago magazine ban.

170.     Dr. Herrera owns firearms designed to use magazines that exceed the capacity limits imposed by the Chicago magazine ban. But for the ban, Dr. Herrera would keep these magazines in his Chicago home and use them for self-defense if a need for armed self-defense arose. But for the ban, he would keep his Glock 45 operable with its standard 17-round magazine. He would also purchase new magazines, including to replace his existing magazines as they wear out.

171.     State actors who deprive individuals of these federal constitutional rights under color law violate federal law. *See* 42 U.S.C. § 1983.

172.     Defendants, under color of law, are depriving and will deprive the fundamental constitutional rights of Dr. Herrera and others by enforcing the Chicago magazine ban.

173.     For all the reasons alleged here, Defendants have acted in violation of, and will act in violation of, the Constitution and 42 U.S.C. §1983, which compels the relief that Dr. Herrera seeks.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants and provide the following relief:

A.     a declaratory judgment that the Illinois Act is unconstitutional;

B.     a declaratory judgment that the Cook County ordinance is unconstitutional;

C.     a declaratory judgment that the City of Chicago ordinance is unconstitutional;

D.     a temporary restraining order and preliminary injunction barring Defendants from enforcing the Illinois Act;

E.     a temporary restraining order and preliminary injunction barring Defendants from enforcing the Cook County ordinance;

F.     a temporary restraining order and preliminary injunction barring Defendants from enforcing the Cook County ordinance;

G.     a permanent injunction barring Defendants from enforcing the Illinois Act;

H.      a permanent injunction barring Defendants from enforcing the Cook County ordinance;

I.      a permanent injunction barring Defendants from enforcing the City of Chicago ordinances;

J.      reasonable costs and expenses of this action, including attorneys' fees under 42 U.S.C. §1988 and any other applicable laws; and

K.      all other relief that Plaintiff is entitled to, as the Court deems just and proper.

Dated: January 27, 2023

Respectfully submitted,

  /s/ Taylor A.R. Meehan

| | |
|---|---|
| Gene P. Hamilton* | Thomas R. McCarthy* |
| Reed D. Rubinstein* | Jeffrey M. Harris* |
| Michael Ding (IL ARDC 6312671) | Taylor A.R. Meehan (IL ARDC 6313481) |
| AMERICA FIRST LEGAL FOUNDATION | C'Zar D. Bernstein* |
| 300 Independence Avenue SE | Matthew R. Pociask* (IL ARDC 6336568) |
| Washington, DC 20003 | CONSOVOY MCCARTHY PLLC |
| (202) 964-3721 | 1600 Wilson Blvd., Ste. 700 |
| gene.hamilton@aflegal.org | Arlington, VA 22209 |
| reed.rubinstein@aflegal.org | (703) 243-9423 |
| michael.ding@aflegal.org | tom@consovoymccarthy.com |
| | jeff@consovoymccarthy.com |
| * Pro hac vice applications forthcoming | taylor@consovoymccarthy.com |
| | czar@consovoymccarthy.com |
| | matt@consovoymccarthy.com |

Exhibit B

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JAVIER HERRERA, | |
| *Plaintiff,* | |
| v. | Case No. 1:23-cv-00532 |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity County Board of Commissioners President, KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney, THOMAS J. DART, in his official capacity as Sheriff of Cook County, CITY OF CHICAGO, a body politic and corporate, DAVID O'NEAL BROWN, in his official capacity as Superintendent of Police for the Chicago Police Department, | Hon. Mary M. Rowland |
| *Defendants.* | |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, Dr. Javier Herrera, by and through undersigned counsel, seeks a temporary restraining order and preliminary injunction of State, County, and City laws that violate the Second and Fourteenth Amendments of the U.S. Constitution. A memorandum of law in support of this motion will be filed contemporaneously. Detailed in that memorandum of law, Plaintiff seeks relief by February 27, 2023. He seeks a temporary restraining order only to the extent that his request for a preliminary injunction cannot be decided within that time. Plaintiff requests relief as follows:

1.      Plaintiff respectfully requests an order temporarily retraining and preliminarily enjoining Defendants from enforcing provisions of the Illinois arms ban, Ill. Pub. Act 102-1116, that

1

unconstitutionally ban the acquisition, purchase, and possession of commonly owned rifles and impose unconstitutional registration requirements. 720 ILCS 5/24-1.9.

2.      Plaintiff respectfully requests an order temporarily retraining and preliminarily enjoining Defendants from enforcing the provisions of the Illinois arms ban, Ill. Pub. Act 102-1116, that unconstitutionally ban the acquisition, purchase, and possession of commonly owned, standard magazines. 720 ILCS 5/24-1.10.

3.      Plaintiff respectfully requests an order temporarily restraining and preliminarily enjoining Defendants from enforcing the provisions of the Cook County arms ban that unconstitutionally ban the acquisition, purchase, and possession of commonly owned rifles. Cook Co. Code of Ord. §§54-211, 54-212.

4.      Plaintiff respectfully requests an order temporarily restraining and preliminarily enjoining Defendants from enforcing the provisions of the Cook County arms ban that unconstitutionally ban the acquisition, purchase, and possession of commonly owned, standard magazines. Cook Co. Code of Ord. §§54-211, 54-212.

5.      Plaintiff respectfully requests an order temporarily restraining and preliminarily enjoining Defendants from enforcing the provisions of the Municipal Code of Chicago that unconstitutionally ban the acquisition, purchase, and possession of commonly owned rifles. Chi. Mun. Code §§8-20-010, 8-20-075, 8-20-250.

6.      Plaintiff respectfully requests an order temporarily restraining and preliminarily enjoining Defendants from enforcing the provisions of the Municipal Code of Chicago that unconstitutionally ban the acquisition, purchase, and possession of commonly owned, standard magazines. Chi. Mun. Code §§8-20-010, 8-20-085, 8-20-300.

Dated: January 27, 2023

Gene P. Hamilton*
Reed D. Rubinstein*
Michael Ding (IL ARDC 6312671)
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue SE
Washington, DC 20003
Tel: (202) 964-3721
gene.hamilton@aflegal.org
reed.rubinstein@aflegal.org
michael.ding@aflegal.org

* *Pro hac vice applications forthcoming*

Respectfully submitted,

 */s/ Taylor A.R. Meehan*
Thomas R. McCarthy*
Jeffrey M. Harris*
Taylor A.R. Meehan (IL ARDC 6313481)
C'Zar D. Bernstein*
Matthew R. Pociask*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
jeff@consovoymccarthy.com
taylor@consovoymccarthy.com
czar@consovoymccarthy.com
matt@consovoymccarthy.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I filed this motion with the Court via ECF. Because Defendants have not yet entered an appearance, I will attempt to serve the foregoing by process server on Monday, January 30, 2023, or earlier, unless Defendants' counsel agree to service by email. I have also notified counsel who have represented Defendants in other cases in this district of the filing of the underlying complaint and the motion for temporary restraining order and preliminary injunction. I will email a copy of the motion, the memorandum in support of this motion, and all attachments to Defendants' counsel in related cases.

Dated: January 27, 2023

/s/ Taylor A.R. Meehan
Taylor A.R. Meehan

*Counsel for Plaintiff*

**Exhibit C**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JAVIER HERRERA, | |
| *Plaintiff,* | |
| v. | Case No. 1:23-cv-00532 |
| | Hon. Mary M. Rowland |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity County Board of Commissioners President, KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney, THOMAS J. DART, in his official capacity as Sheriff of Cook County, CITY OF CHICAGO, a body politic and corporate, DAVID O'NEAL BROWN, in his official capacity as Superintendent of Police for the Chicago Police Department, | **EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION**<br><br>**EXPEDITED ORAL ARGUMENT REQUESTED** |
| *Defendants.* | |

## MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... iii

Introduction ................................................................................................................... 1

Background ..................................................................................................................... 4

    I.      Illinois enacts an outright ban on selling, purchasing, possessing, and carrying common rifles and standard magazines. ............................................. 6

    II.     Cook County and the City of Chicago ban outright selling, purchasing, possessing, and carrying common rifles and standard magazines. .......................... 8

Argument ........................................................................................................................ 9

    I.      Dr. Herrera is likely to succeed on the merits. ........................................ 10

        A.    *Bruen* abrogates pre-*Bruen* decisions and requires Defendants to prove that analogous laws existed at the Founding. ................................. 10

        B.    The outright bans on the sale, purchase, possession, and self-defense use of semiautomatic rifles as common as the AR-15 violate Dr. Herrera's rights under the Second and Fourteenth Amendments. ..................................... 12

        C.    The outright bans on the sale, purchase, and possession of standard magazines, including the standard magazine for the firearm Dr. Herrera keeps in his home, violate Dr. Herrera's rights under the Second and Fourteenth Amendments. ................................................................. 22

        D.    Illinois's mandatory-registration provision violates Dr. Herrera's Second and Fourteenth Amendment rights. .................................................. 27

    II.     The balance of the equities and the public interest favor an injunction. ........................... 28

Conclusion ................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Am. C.L. Union of Illinois v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ................................................................................ 29

*Andrews v. State,*
  50 Tenn. 165, (1871) ................................................................................ 13, 21

*Ass'n of New Jersey Rifle & Pistol Ass'n, Inc. (ANJRPC I) v. Att'y Gen.,*
  910 F.3d 106 (3d Cir. 2018) ................................................................................ 23, 26

*Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey (ANJRPC II),*
  974 F.3d 237 (3d Cir. 2020) ................................................................................ 16

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ................................................................................ 14, 16, 18

*Com. v. Annis,*
  9 Mass. 31 (1812) ................................................................................ 21

*Connection Distrib. Co. v. Reno,*
  154 F.3d 281 (6th Cir. 1998) ................................................................................ 29

*District of Columbia v. Heller,*
  554 U.S. 570, (2008) ................................................................................ passim

*Denius v. Dunlap,*
  330 F.3d 919 (7th Cir. 2003) ................................................................................ 3, 17

*Duncan (I) v. Becerra,*
  970 F.3d 1133, (9th Cir. 2020) ................................................................................ 23, 24, 26

*Duncan (II) v. Bonta,*
  19 F.4th 1087 (9th Cir. 2021) ................................................................................ 23, 24, 25, 26

*Duncan v. Becerra,*
  366 F. Supp. 1131 (S.D. Cal. 2019) ................................................................................ 2, 26

*Elrod v. Burns,*
  427 U.S. 347 (1976) ................................................................................ 28

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ................................................................................ passim

*Friedman v. City of Highland Park,*
  577 U.S. 1039 (2015) ................................................................................ passim

*Friedman v. City of Highland Park,*
  784 F.3d 406 (7th Cir. 2015) ................................................................................ 11, 17

*Fyock v. City of Sunnyvale,*
  25 F. Supp. 3d 1267 (N.D. Cal. 2014) ................................................................................ 15

*Fyock v. Sunnyvale,*
  779 F.3d 991 (9th Cir. 2015) ................................................................................ 15, 23

*Hatfield v. Barr,*
  925 F.3d 950 (7th Cir. 2019) ......................................................................... 11

*Heller v. District of Columbia*
  670 F.3d 1244 (D.C. Cir. 2011) ............................................................... passim

*Horsley v. Trame,*
  808 F.3d 1126 (7th Cir. 2015) ....................................................................... 11

*Illinois Ass'n of Firearms Retailers (IAFR) v. City of Chicago,*
  961 F. Supp. 928 (N.D. Ill. 2014) ..................................................... 13, 14, 20

*Joelner v. Vill. of Washington Park,*
  378 F.3d 613 (7th Cir. 2004) ......................................................................... 29

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ................................................................... 10, 11

*Kareem v. Haspel,*
  986 F.3d 859 (D.C. Cir. 2021) ....................................................................... 16

*Kolbe v. Hogan,*
  813 F.3d 160 (4th Cir. 2016) ................................................................... passim

*Kole v. Vill. of Norridge,*
  2017 WL 5128989 (N.D. Ill. Nov. 6, 2017) ............................................. 13, 20

*Luis v. United States,*
  578 U.S. 5 (2016) ..................................................................................... 13, 22

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ...................................................................................1, 15

*Midwest Title Loans, Inc. v. Ripley,*
  616 F. Supp. 2d 897 (S.D. Ind. 2009) ........................................................... 29

*Miller v. Bonta,*
  542 F. Supp. 3d 1009 (2021) ......................................................................... 17

*Mills v. District of Columbia,*
  571 F.3d 1304 (D.C. Cir. 2009) ..................................................................... 28

*Mobility Workx, LLC v. United Pats., LLC,*
  15 F.4th 1146 (Fed. Cir. 2021) ...................................................................... 16

*Moore v. Madigan,*
  702 F.3d 933 (7th Cir. 2012) ........................................................................... 3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022) ............................................................................ passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
  804 F.3d 242 (2d Cir. 2015) ............................................................... 14, 16, 18

*O'Neill v. Neronha,*
  594 F. Supp. 3d 463 (D.R.I. 2022) ................................................................ 14

*Planned Parenthood Arizona, Inc. v. Humble*,
   753 F.3d 905 (9th Cir. 2014) ................................................................... 28

*Preston v. Thompson*,
   589 F.2d 300, (7th Cir. 1978) .................................................................. 29

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) ................................................................. 29

*Staples v. United States*,
   511 U.S. 600 (1994) ......................................................................... 15, 20

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ............................................................. 13, 23

*Thomas v. Collins*,
   323 U.S. 516 (1945) ................................................................................. 27

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
   827 F.3d 201 (1st Cir. 2016) ................................................................... 16

*United States v. Gonzalez*,
   2022 WL 4376074 (7th Cir. Sept. 22, 2022) ......................................... 12

*United States v. Seiwert*,
   2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) ........................................ 12

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) ................................................................... 11

*USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*,
   402 F. Supp. 3d 427 (N.D. Ill. 2019) ....................................................... 9

*Villasenor v. Indus. Wire & Cable, Inc.*,
   929 F. Supp. 310 (N.D. Ill. 1996) ..................................................... 10, 12

*White v. Illinois State Police*,
   15 F.4th 801, 805 (7th Cir. 2021) ........................................................... 11

*Wilson v. Cook County*,
   937 F.3d 1028 (7th Cir. 2019) ........................................................... 11, 12

**Statutes**

44 U.S.C. §1507 ............................................................................................ 17

720 Ill. Comp. Stat. Ann. 5/24-1 ......................................................... 6, 12, 19

720 Ill. Comp. Stat. Ann. 5/24-1.10 ............................................................ passim

720 Ill. Comp. Stat. Ann. 5/24-1.9 ............................................................. passim

Chi. Mun. Code §8-20-010 .................................................................. 8, 19, 22

Chi. Mun. Code §8-20-075 ............................................................. 1, 8, 12, 19

Chi. Mun. Code §8-20-085 .................................................................. 1, 8, 22

Chi. Mun. Code §8-20-250 .................................................................... 8, 19

Chi. Mun. Code §8-20-300 ............................................................................. 1, 8, 19, 22

Cook Co. Code of Ord. §§54-211 ............................................................................. passim

Cook Co. Code of Ord. §54-212 ............................................................................. passim

Cook Co. Code of Ord. §54-214 ............................................................................. 1, 8, 19, 22

Ill. Pub. Act 102-1116 (H.B. 5471) ............................................................................. 1, 6

Militia Act, 1 Stat. 271, §1 (May 8, 1792) ............................................................................. 21, 26

## Other Authorities

2 William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia* (1823) ........ 20

Congressional Research Service, House-Reported Assault Weapons Ban of 2022 (H.R. 1808) (July 21, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12174 .................................. 16

David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230 (2014) ............................................................................. 20

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ............................................................................. 16, 25

Herbert L. Osgood, *The American Colonies in the Seventeenth Century* (1904) ............................. 26

Letter from Thomas Jefferson to George Hammond (May 15, 1793), *in 6 The Writings of Thomas Jefferson* 252-53 (P. Ford, ed. 1895) ............................................. 21

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494 (May 18, 2022) ....... 17

## Treatises

11A Charles Alan Wright et al., Federal Practice & Procedure §2948.1 (2d ed. 1995) ........................ 26

## Regulations

87 Fed. Reg. 24652, 24655 (Apr. 26, 2022) ............................................................................. 15

# INTRODUCTION

The Second and Fourteenth Amendments protect an individual right to keep and bear arms. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2156 (2022); *D.C. v. Heller*, 554 U.S. 570, 635 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). That right "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156. It is not subject to "freestanding 'interest-balancing'" such that courts ask "whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. The government may not "simply posit that [gun] regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126. The government must instead "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government cannot do that when it bans arms commonly kept by law-abiding citizens for lawful purposes. *See Heller*, 554 U.S. at 625, 629; *Bruen*, 142 S. Ct. at 2128, 2156. Such laws violate "the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36 50 n.10 (1961)).

Those constitutional guarantees apply in Illinois, no less than every other State. *See McDonald*, 561 U.S. at 791. But on the heels of the Supreme Court's decision in *Bruen*, Illinois enacted an outright ban on selling, purchasing, possessing, and using the most commonly owned semiautomatic rifle in the country as well as standard magazines commonly owned for lawful purposes. *See* Ill. Pub. Act 102-1116 (H.B. 5471). Illinois is not alone. Cook County and the City of Chicago likewise prohibit Dr. Javier Herrera and millions of other Chicagoans from keeping that commonly owned semiautomatic rifle and standard magazines for equally common handguns in their homes, in addition to other prohibitions. *See* Cook Co. Code of Ord. §§54-211, 54-212, 54-214; Chi. Mun. Code §§8-20-010, 8-20-075, 8-20-085, 8-20-300. These bans flout the Second Amendment. All unconstitutionally infringe the right to keep and bear arms. All should be enjoined to prevent further irreparable injury to Dr. Herrera.

**First**, outright bans on commonly owned semiautomatic rifles are unconstitutional. While States may regulate "dangerous *and* unusual weapons," those "in common use" are beyond the State's power to ban. *Heller*, 554 U.S. at 627 (emphasis added). For that reason, the Supreme Court held that people have an individual right to keep operable handguns for self-defense. *Id.* at 635. What mattered in *Heller* was that "the American people have considered the handgun to be the quintessential self-defense weapon," *id.* at 629, not that handguns might also be "the overwhelmingly favorite weapon of armed criminals," *id.* at 682 (Breyer, J., dissenting). By the same logic, there is an individual right to keep common semiautomatic rifles for self-defense. There is "no basis … for drawing a constitutional distinction between semi-automatic handguns and semi-automatic rifles." *Heller v. D.C.*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). Especially so after *Bruen. See Bruen*, 142 S. Ct. at 2153-55, 2127. The Second Amendment precludes the unprecedented State and local bans on the country's most commonly owned semiautomatic rifles.

**Second**, outright bans on the sale, purchase, and possession of standard magazines are unconstitutional. Illinois, Cook County, and the City of Chicago now ban rifle magazines that can hold more than 10 rounds of ammunition and handgun magazines that can hold more than 15 rounds. 720 Ill. Comp. Stat. Ann. 5/24-1.10; Cook Co. Code of Ord. §§54-211, 54-212; Chi. Mun. Code §§8-20-010, 8-20-085. The effect of that is to ban standard magazines for some of the most common rifles and handguns, including both standard magazines for Dr. Herrera's AR-15 and Glock 45. Americans own millions of them for lawful purposes. *See Heller*, 670 F.3d at 1261 ("[M]agazines holding more than ten rounds are indeed in 'common use.'"). These bans are ahistorical, creatures of the last century. *See Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1149 (S.D. Cal. 2019). Defendants will not be able to satisfy their burden to affirmatively prove that there is an early tradition of banning such magazines. *Bruen*, 142 S. Ct. at 2153-55, 2127.

**Finally**, Illinois will unconstitutionally require Dr. Herrera to register his semiautomatic rifles, including the make and serial number, with the state police. *See* §24-1.9(d). The "fundamental problem with [the] gun registration law is that registration of lawfully possessed guns is not 'longstanding.'" *Heller*, 670 F.3d at 1291 (Kavanaugh, J., dissenting). Such registration can be a prelude to confiscation and, as with any registry of personal information, the target of data breaches. The State's mandatory registration provision is ahistorical and unconstitutional. *See Bruen*, 142 S. Ct. at 2129-30. And to what end? Even if he were to register, the Illinois Act would limit the locations where such rifles could be kept and does not expressly say whether they could actually be used for self-defense. And local laws would still ban Dr. Herrera from keeping his rifles and standard magazines in his Chicago home.

These issues are issues of law. There should not be any meaningful dispute over material facts. Any factual issues would concern "legislative facts" or otherwise judicially noticeable facts of which this Court can take account now. *See Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (explaining that the Court determines "'legislative facts,'" or "facts that bear on the justification for legislation, as distinct from facts concerning the conduct of parties in a particular case," without a trial). As such, the constitutionality of the challenged provision should "not present factual questions for determination in a trial." *Id.* And injecting immaterial or irrelevant factual disputes would "simply cause[] additional judicial work by contesting a factual issue that, according to information readily available in the public domain, cannot be reasonably disputed." *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003). These are legal issues, ready for a decision now.

For the reasons detailed below, Dr. Herrera seeks immediate relief by February 27, 2023. *See* Exhibit 1, Herrera Dec. ¶15. Immediate relief is necessary and warranted given the ongoing violation of his constitutional rights. *E.g.*, *id.* ¶¶6-10, 12, 15. Dr. Herrera seeks a temporary restraining order only to the extent that his request for a preliminary injunction cannot be decided within that time.

## BACKGROUND

Dr. Javier Herrera is a law-abiding gun owner. Compl. ¶5; Exhibit 1, Herrera Dec. ¶3. He resides in Chicago, one of the most dangerous cities in the country today. Compl. ¶¶5, 16-17; Herrera Dec. ¶2. As an emergency medicine doctor at a Chicago area public hospital, he has firsthand knowledge of those dangers. Compl. ¶¶16, 18; Herrera Dec. ¶¶2, 11. He teaches tactical medicine at a public university. Compl. ¶5; Herrera Dec. ¶2. And for five years, he has served as a medic on a Chicagoland SWAT team that conducts high-risk missions in some of the Chicago area's most dangerous neighborhoods. Compl. ¶¶26-28; Herrera Dec. ¶8. The team's operators carry AR-15 rifles on these missions, responding to hostage and active shooter situations or executing high-risk search warrants. Compl. ¶27; Herrera Dec. ¶8. Dr. Herrera does not carry a rifle on missions, but he must train regularly to ensure he could handle one if the need arises—for instance, to quickly secure an injured operator's rifle for the safety of the team and bystanders. Compl. ¶25-30; Herrera Dec. ¶8. He has attended SWAT school and today trains monthly to maximize his safety in the field, team members' safety, and any bystanders' safety. Compl. ¶¶29-31; Herrera Dec. ¶9.

Detailed below, firearms and magazine bans in Illinois, Cook County, and the City of Chicago unconstitutionally dictate where and how Dr. Herrera may exercise his fundamental right to self-defense, as though it is up to Defendants to decide "whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. Defendants do not tell Dr. Herrera he may speak freely by speaking only certain words or practice his religion by attending the Presbyterian Church but not the Catholic Church. Compare that to here, where local laws prohibit Dr. Herrera from even *keeping* the most common semiautomatic rifle in the country today, the AR-15, inside his home. Compl. ¶¶24, 32; Herrera Dec. ¶¶6-7, 11. The State tells Dr. Herrera that, if he wishes to keep the semiautomatic rifles that he currently owns, he must register them by disclosing sensitive information to the Illinois State Police. Herrera Dec. ¶14; Compl. ¶103. Both state and local laws prohibit Dr. Herrera from *using* that most

common semiautomatic rifle for lawful purposes including self-defense. Compl. ¶¶24, 32-35, 37-38; Herrera Dec. ¶¶6-7, 11-13. And while—at least as of today—local law permits Dr. Herrera to keep a common handgun inside his home, a Glock 45, both state and local laws prohibit Dr. Herrera from keeping, using, or replacing the standard magazine for that handgun. Compl. ¶¶20-22, 101, 114; Herrera Dec. ¶¶5. As a result, he keeps his Glock 45 inoperable. Herrera Dec. ¶5; Compl. ¶¶20, 22 ("Because of the ban on the 17-round standard magazine for the Glock 45, Dr. Herrera keeps his Glock 45 inoperable in his home."). He cannot use his Glock 45 handgun for self-defense, whether inside or outside the home. *Id.*

These laws affect Dr. Herrera's life in myriad ways. He owns AR-15 rifles, for example, but he cannot keep them in his Chicago home. Herrera Dec. ¶6. He must store it more than an hour away. Compl. ¶24; Herrera Dec. ¶7. On top of that, state and local laws ban him from purchasing new equipment to maintain or improve or use his AR-15 rifles, including standard magazines that wear over time. Compl. ¶101; Herrera Dec. ¶¶5-6. State and local law thus ban Dr. Herrera from using an AR-15 for self-defense in his home. Herrera Dec. ¶¶5-7, 11 Outside his home, Dr. Herrera cannot take part in the SWAT team's monthly training drills with his AR-15—shooting drills that he would otherwise participate in to ensure he remains able to quickly disable and secure any injured operator's or perpetrator's firearm. Compl. ¶99; Herrera Dec. ¶¶7-10, 12. Participating in training with his AR-15 would entail driving hours to retrieve his AR-15 from beyond county lines for training and then return it after training. Compl. ¶¶24, 32-35; Herrera Dec. ¶¶7, 12. Dr. Herrera, unsurprisingly, does not have hours to retrieve and return his AR-15 given his medical and teaching obligations. State and local laws make it a practical impossibility to participate in that training. Compl. ¶¶32-35; Herrera Dec. ¶¶6-7, 12. Those laws also impede Dr. Herrera's ability to use his firearms for other lawful purposes, such as hunting and sport shooting. Herrera Dec. ¶13; Compl. ¶¶37-38, 100.

## I. Illinois enacts an outright ban on selling, purchasing, possessing, and carrying common rifles and standard magazines.

On January 10, 2023, Governor Pritzker signed into law the "Protect Illinois Communities Act." *See* Ill. Pub. Act 102-1116, §1 (H.B. 5471). The Act largely took effect on January 10, 2023. *Id.* §99. According to the Governor, the Act "immediately bans the sale and distribution of assault weapons" and "high-capacity magazines." Compl. ¶54. The Governor promised that the Illinois State Police will immediately enforce the Act. Compl. ¶¶53-55.

The Act creates two new sections to the Illinois Compiled Statutes: 720 Ill. Comp. Stat. Ann. 5/24-1.9 (the rifle ban) and 720 Ill. Comp. Stat. Ann. 5/24-1.10 (the magazine ban). H.B. 5471, §25. It also amends section 24-1 of the Criminal Code of 2012. *Id.* The Act makes it a crime to "knowingly … [c]arr[y] or possess[] any assault weapon," 720 Ill. Comp. Stat. Ann. 5/24-1(a)(15), or "knowingly … purchases any assault weapon … in violation of Section 24-1.9," *id.* §24-1(a)(16).

There is no pre-existing category of "assault weapons." The Act defines "assault weapon" to include, *inter alia*, "[a] semiautomatic rifle that has the capacity to accept a detachable magazine … if the firearm has … a pistol grip." 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(1)(A)(i). The Act expressly names "[a]ll AR types, including" the "AR-15." *Id.* §24-1.9(a)(1)(J)(ii)(II). Section 24-1.9 then declares that selling, purchasing, possessing, or using so-called "assault weapons" is unlawful. *Id.* §24-1.9(b) (prohibiting selling or purchasing), (c) (prohibiting possessing); *see also* 720 Ill. Comp. Stat. Ann. 5/24-1(a)(15) (criminalizing knowingly carrying or possessing). In short, possessing a semiautomatic rifle such as the AR-15 is now a criminal offense, and purchasing one is now a felony in Illinois. *See* 720 Ill. Comp. Stat. Ann. 5/24-1(b).

Section 24-1.9 contains a grandfather provision requiring registration. It applies only to those who possessed an "assault weapon" before January 10, 2023, or "inherited" one from someone who did. *Id.* §24-1.9(d). To be eligible, the grandfather provision requires the detailed registration of such

6

firearms with the Illinois State Police, including "the make, model, caliber, and serial number of the … assault weapon." *Id.*

Section 24-1.9 will soon stop even those grandfathered from freely possessing America's most common rifle or using it for self-defense. In fewer than 90 days, those grandfathered may possess the banned arms in only specified places and circumstances. A person may *possess* the rifles only on his own "private property"; on "private property that is not open to the public with the express permission of the person who owns or immediately controls such property;" on "the premises of a licensed firearms dealer or gunsmith for the purpose of lawful repair;" "while engaged in the legal use of the assault weapon … at a properly licensed firing range or sport shooting competition venue;" or "while traveling to or from these locations, provided that the assault weapon … is unloaded and the assault weapon … is enclosed in a case … or other container." *Id.* Other than the reference to shooting ranges, the Act does not indicate that those grandfathered may *use*—that is, "bear"—these common rifles for self-defense purposes, even on their own property.

Separately, the Act bans standard magazines. The Act prohibits "'[l]arge capacity ammunition feeding device[s],'" defined as magazines of "more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns." 720 Ill. Comp. Stat. Ann. 5/24-1.10(a)(1); *see id.* §24-1.10(b) (banning purchase), (c) (banning possession). As defined, that bans standard magazines for the AR-15 and the Glock 45—both owned by Dr. Herrera and millions of other Americans. Compl. ¶¶68-87; Herrera Dec. ¶¶5-6.

The magazine ban contains a similar grandfathering provision—but only for those magazines lawfully possessed *before* the Act's effective date. 720 Ill. Comp. Stat. Ann. 5/24-1.10(d). That means someone like Dr. Herrera could not purchase new magazines to replace old ones, subject to wear-and-tear, for his standard firearms after the Act's effective date. Herrera Dec. ¶¶5-6; 720 Ill. Comp. Stat. Ann. 5/24-1.10(g). The grandfathering provision also limits the places and circumstances where a

7

person may possess any grandfathered magazines and does not indicate that they may be used for self-defense. *Id.* §24-1.10(d)(1)-(5).

## II. Cook County and the City of Chicago ban outright selling, purchasing, possessing, and carrying common rifles and standard magazines.

Cook County similarly bans both rifles and magazines, without any applicable grandfathering provisions. Cook Co. Code of Ord. §54-212(a) ("unlawful…to…acquire, carry or possess"), (b) (unlawful if "possessed, carried, sold, or transferred"), (c) (prior owners must "remove the assault weapon or large capacity magazine from" the County, or "render it permanently inoperable," or "surrender" them "to the Sheriff"); §54-214(a) (penalties including imprisonment). The County ordinance defines "assault weapon" to include all "AR-15" rifles and similar rifles. *Id.* §54-211(1), (7)(A)(iii). It defines "*[l]arge-capacity magazine*" as those exceeding "more than ten rounds." *Id.* §54-211.

The City likewise contains an outright ban on semiautomatic rifles and magazines. The Municipal Code of Chicago defines an "assault weapon" to mean "[a] semiautomatic rifle that has the ability to accept a detachable magazine and has … a handgun grip," and expressly includes the "AR-15" rifle and rifles like it. Chi. Mun. Code §8-20-010; *see id.* §8-20-075(a) (unlawful "to import, sell, manufacture, transfer, or possess"), (d) (declaring such weapons "contraband" that "shall be seized by and forfeited to the city"); §8-20-300(a) (penalties including incarceration). The Code states that the "superintendent has the authority to seize any … assault weapon … carried or possessed in violation of this chapter" and that such "items are declared contraband" that "shall be destroyed at the direction of the superintendent." *Id.* §8-20-250.

The Code also bans so-called "high capacity magazines." *See id.* §8-20-085(a) (unlawful to "carry, possess, sell, offer or display for sale, or otherwise transfer"), (b) (large-capacity magazines "contraband and shall be forfeited to the city"); §8-20-300 (penalties including imprisonment). The Code defines "high capacity magazines" as those with "an overall capacity of more than 15 rounds of ammunition." *Id.* §8-20-010.

* * *

Together, these bans infringe Dr. Herrera's fundamental right to defend himself. The County and City bans prohibit Dr. Herrera from keeping his AR-15 in his home for self-defense. That infringes his right in the home, but also out of the home—because of travel times, Dr. Herrera cannot attend regular SWAT team training with his AR-15. Compl. ¶99; Herrera Dec. ¶¶7, 12. That compounds the infringement of his right of self-defense. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use."). As for the handgun he lawfully owns and could keep in his home for self-defense, the County and City also prohibit Dr. Herrera from keeping the standard magazine for that handgun, which exceeds 15 rounds. Compl. ¶98 ("The County and City ordinances mean that Dr. Herrera cannot keep his Glock 45 operable at home for self-defense, because the Glock 45 comes standard with 17-round magazines."); Herrera Dec. ¶5. Finally, the bans prohibit Dr. Herrera from acquiring semiautomatic rifles and standard magazines, which but for the bans Dr. Herrera would purchase. Compl. ¶¶101-02; Herrera Dec. ¶6. Accordingly, all bans directly infringe Dr. Herrera's right to self-defense, including where it is "most acute" in "the home." *Heller*, 554 U.S. at 628.

## ARGUMENT

This Court should grant Dr. Herrera's emergency motion for a temporary restraining order and preliminary injunction. For a temporary restraining order and a preliminary injunction,[1] Dr. Herrera must show (1) that he has "some likelihood of success on the merits" and (2) that he has "no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied." *Ezell*, 651 F.3d at 694. "If the moving party meets these threshold requirements, the district court weighs

---

[1] "The standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 & n.5 (N.D. Ill. 2019).

the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.* Here, binding precedent establishes Dr. Herrera's likelihood of success on the merits of his claims that the state and local laws at issue are unconstitutional. The ongoing deprivation of his constitutional self-defense right is irreparable harm. No countervailing factors outweigh that ongoing harm, and the public interest favors a stay.

## I.  Dr. Herrera is likely to succeed on the merits.

### A. *Bruen* abrogates pre-*Bruen* decisions and requires Defendants to prove that analogous laws existed at the Founding.

*Bruen*'s governing framework is simple. The Government must justify regulations of firearms "'in common use'" as consistent with historical regulations. *See Bruen*, 142 S. Ct. at 2134-26. The government "may not simply posit that the regulation promotes an important interest." *Id.* at 2126. "Only if a firearm regulation is consistent with this Nation's historical tradition [of firearms regulation] may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.*; *see also id.* at 2135. The government cannot make that showing when it bans arms commonly kept by law-abiding citizens for lawful purposes. *See Heller*, 554 U.S. at 625, 629; *Bruen*, 142 S. Ct. at 2128, 2156. Such laws violate "the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2126.

That test from *Bruen* abrogates pre-*Bruen* Seventh Circuit precedent. *See Villasenor v. Indus. Wire & Cable, Inc.*, 929 F. Supp. 310, 313 (N.D. Ill. 1996) (Courts "are bound by Seventh Circuit precedent unless and until a subsequent decision by … the Supreme Court undermines its holding."). Before *Bruen*, the Seventh Circuit and other courts "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." *Bruen*, 142 S. Ct. at 2125. *Bruen* categorically rejects that two-step framework including, expressly, Seventh Circuit cases employing it. *See id.* at 2125-27 & n.4 (citing *Kanter v. Barr*, 919 F.3d 437, 442 (7th Cir. 2019), *abrogated*

10

*by Bruen*, 142 S. Ct. 2111)); *see also, e.g.*, *White v. Illinois State Police*, 15 F.4th 801, 805, 811-12 (7th Cir. 2021) (collecting Seventh Circuit decisions that applied "intermediate scrutiny"); *Hatfield v. Barr*, 925 F.3d 950, 953 (7th Cir. 2019); *Kanter*, 919 F.3d at 442; *Horsley v. Trame*, 808 F.3d 1126, 1131 (7th Cir. 2015); *United States v. Skoien*, 614 F.3d 638, 640-42 (7th Cir. 2010). Courts in the Seventh Circuit may no longer "apply[] means-end scrutiny in the Second Amendment context." *Bruen*, 142 S. Ct. at 2127. "Instead, the government must *affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* (emphasis added).

Most relevant here, *Bruen* abrogates pre-*Bruen* decisions upholding semiautomatic-rifle bans, which employed the sort of constitutional analysis that *Bruen* rejects. *See Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015); *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019). Before *Bruen*, the *Friedman* panel "adopted a new test," *see Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari), by asking whether banned rifles have "'some reasonable relationship to the preservation or efficiency of a well regulated militia, and whether law-abiding citizens retain adequate means of self-defense.'" *Friedman*, 784 F.3d at 410. *Friedman* expressly rejected the historical test that *Bruen* now mandates, *compare id.* at 408-09 (rejecting argument "that there is no 'historical tradition' of banning possession of semi-automatic guns and large-capacity magazines" and rejecting reliance "on how common a weapon is at the time of litigation"), *with Bruen*, 142 S. Ct. at 2135, 2143 (explaining that the question is whether weapons are "in common use *today*" and restricting the analysis to whether the regulation "is consistent with this Nation's historical tradition of firearm regulation" (emphasis added)). *Friedman*'s "reasonable relationship" test was the "freestanding interest-balancing approach" that both *Heller* and *Bruen* forbid. *See Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari) (cleaned up); *Bruen*, 142 S. Ct. at 2176. *Wilson* likewise upheld Cook County's ban based on the government's "'substantial' interests," 937 F.3d at

1036—again the sort of interest-balancing that *Heller* and *Bruen* forbid. *Bruen* confirms that these decisions "flout[ed]" Supreme Court precedent. *See Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari).

After *Bruen*, a panel of the Seventh Circuit has acknowledged that "the question is *only* whether the restriction is consistent with 'the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *United States v. Gonzalez*, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (emphasis added). The district courts have acknowledged the same. *See, e.g.*, *United States v. Seiwert*, 2022 WL 4534605, at *1-2 (N.D. Ill. Sept. 28, 2022) (explaining that the Supreme Court "rejected" the Seventh Circuit's approach). Applying *Bruen*'s framework, and not those abrogated decisions, the question here is whether Defendants can satisfy their burden to "affirmatively prove that [their] firearms regulation[s] [are] part of the historical tradition" of regulations. *Bruen*, 142 S. Ct. at 2134; *see Villasenor*, 929 F. Supp. at 313. They cannot.

**B.    The outright bans on the sale, purchase, possession, and self-defense use of semiautomatic rifles as common as the AR-15 violate Dr. Herrera's rights under the Second and Fourteenth Amendments.**

Dr. Herrera challenges outright bans on the sale, purchase, possession, and self-defense use of semiautomatic rifles such as the AR-15 by state, county, and city law. The State ban immediately prohibits the sale and purchase of semiautomatic rifles including the AR-15. *See* 720 ILCS 5/24-1(a)(15)-(16); *id.* §24-1.9(a). Cook County declares that it is unlawful for Dr. Herrera "acquire, carry or possess" his AR-15 in his home. Cook Co. Code of Ord. §54-212(a). And Chicago likewise bans Dr. Herrera from keeping his AR-15 in his home. *See* Chi. Mun. Code §8-20-075(a). These bans are facially unconstitutional because they prohibit the purchase and possession of arms in common use by law-abiding citizens. They are also unconstitutional applied to Dr. Herrera: because of the bans, he cannot keep his own AR-15 in his own home, even though he would prefer it for self-defense, nor can he train with that firearm in furtherance of his safety in the field as a SWAT medic. *Cf. Ezell*, 651 F.3d at

704 ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use."); Herrera Dec. ¶¶6-12. Nor can he purchase an AR-15 or AR-15 components, which he would otherwise do but for the bans. Herrera Dec. ¶6; Compl. ¶102. Defendants should be enjoined from enforcing their unconstitutional bans.

Dr. Herrera is likely to succeed on the merits of his claims because Defendants cannot meet their burden. Just as Defendants cannot contest that Dr. Herrera—a "law-abiding, adult citizen[]—[is] part of 'the people' whom the Second Amendment protects," Defendants cannot contest that the plain text of the Second Amendment protects his right to armed self-defense inside and outside his home. *Bruen*, 142 S. Ct. at 2134-35; *id.* at 2134 (The Second Amendment protects "the individual right to possess … weapons in case of confrontation.'" (quoting *Heller*, 554 U.S. at 592)). That right presumptively "'extends … to *all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding,'" *id.* at 2132 (emphasis added) (quoting *Heller*, 554 U.S. at 582), including "rifle[s] of *all* descriptions," *Andrews v. State*, 50 Tenn. 165, 179 (1871). And the right to keep and bear arms "protect[s] those closely related acts necessary to their exercise," *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring), including the ability to *purchase* and ultimately *use* "modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2129-30, 2132. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to *acquire* arms." (emphasis added) (quoting *Ezell*, 651 F.3d at 704)); *Andrews*, 50 Tenn. at 178 ("[T]he right of keeping arms … necessarily involves the right to *purchase* and *use* them in such a way as is usual." (emphases added)).[2]

---

[2] Courts in this district have already held that the Second Amendment protects a right to acquire and purchase covered arms. *See Illinois Ass'n of Firearms Retailers (IAFR) v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) (holding that an outright ban on sale and purchase violates the Second Amendment); *Kole v. Vill. of Norridge*, 2017 WL 5128989, at *9 (N.D. Ill. Nov. 6, 2017) ("[T]he Second Amendment right to keep and bear arms for self-defense necessarily includes the right to

Defendants therefore must "affirmatively prove" that their laws—changing the terms by which Dr. Herrera can exercise his presumptively protected conduct by completely banning Dr. Herrera's possession or self-defense use of an AR-15 inside his home—are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126-27; *see also IAFR*, 961 F. Supp. 2d at 934 (quoting *Ezell*, 651 F.3d at 702-03) (describing government's burden "to 'establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment'"). But here, Defendants cannot satisfy their burden to show either (1) that their bans concern weapons not in common use[3] or—another way at getting at that question—(2) that their bans are consistent with this Nation's historical tradition of firearm regulation. Accordingly, each of the challenged provisions are unconstitutional.

### 1. Semiautomatic rifles are in common use for lawful purposes.

Defendants cannot plausibly argue that the banned weapons, semiautomatic rifles as ubiquitous as the AR-15, are not "weapons 'in common use' today for" lawful purposes. *Bruen*, 142 S. Ct. at 2134; *see also Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (rejecting "equating 'unusual' with 'in common use at the time of the Second Amendment's enactment'"). For this inquiry, "*all that is needed* for citizens to have a right under the Second Amendment to keep" semiautomatic rifles is that the "overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including

---

acquire a firearm, and … this right is implicated by local laws directly or functionally banning firearm sales" and purchase.).

[3] *Bruen* makes clear that "'[g]overnment[s] bear[] the burden of proving the constitutionality of [their] actions,'" 142 S. Ct. at 2130, and even pre-*Bruen* courts recognized that they have the burden to show that the regulated arms are uncommon, *see, e.g., Ezell*, 651 F.3d at 702-03; *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015) (holding that the State bears the burden to show that the "'bearable arms'" are "unusual" to rebut the "presumption in favor of Second Amendment protection (citing *Ezell*, 651 F.3d at 702-03)); *Kolbe v. Hogan*, 813 F.3d 160, 176 (4th Cir. 2016), *on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017) (same (citing *Ezell*, 651 F.3d at 702-03)); *O'Neill v. Neronha*, 594 F. Supp. 3d 463, 470-74 (D.R.I. 2022) (collecting cases and imposing burden on government defendants).

self-defense and target shooting." *See Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari) (emphasis added).[4] Defendants cannot satisfy their burden to prove that semiautomatic rifles such as the AR-15 are within the historical tradition of restricting "'dangerous *and* unusual'" arms. *See Heller*, 554 U.S. at 627 (emphasis added); *Bruen*, 142 S. Ct. at 2143.

    ***Common use.*** Semiautomatic rifles are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.[5] Defendants cannot liken an AR-15 to "short-barreled shotguns" or other arms "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. In *Staples v. United States*, the Supreme Court expressly distinguished semiautomatic rifles such as the AR-15 from uncommon arms like "machineguns, sawed-off shotguns, and artillery pieces." 511 U.S. 600, 603, 611-12 (1994); *accord Heller*, 670 F.3d 1261 ("semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use'"). As *Staples* confirmed, "semi-automatic rifles [including] … the AR-15 [are] in common use by law-abiding citizens and ha[ve] traditionally been lawful to possess." *Heller*, 670 F.3d at 1288 (Kavanaugh, J., dissenting).

---

    [4] It is legally irrelevant whether the arms at issue are often *used* in self-defense encounters or are *effective* when so used. *See McDonald*, 561 U.S. at 767-68 (explaining that what matters is whether the people commonly "prefer[]" a weapon and "consider[]" it to be worthy of ownership for a lawful purpose (cleaned up)); *accord id.* at 890 n.33 (Stevens, J., dissenting) ("The Court struck down the District of Columbia's handgun ban not because of the *utility* of handguns for lawful self-defense, but rather because of their *popularity* for that purpose."); *Kolbe*, 813 F.3d at 174 (explaining that "Second Amendment rights do not depend on how often the semi-automatic rifles or regulated magazines are actually used to repel an intruder" or "whether the magazines are often actually employed in self-defense incidents"); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014) (explaining that "the standard is whether the prohibited [arms] are 'typically *possessed* by law-abiding citizens for lawful purposes,' not whether they are often *used* for self-defense" (quoting *Heller*, 554 U.S. at 625)), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).

    [5] Semiautomatic rifles like the AR-15 are not a machine guns. "A semi-automatic gun 'fires only one shot with each pull of the trigger' and 'requires no manual manipulation by the operator to place another round in the chamber after each round is fired.'" *Heller*, 670 F.3d at 1285 (Kavanaugh, J., dissenting) (*quoting Staples v. United States*, 511 U.S. 600, 602 n.1 (1994)). "That is in contrast to an automatic gun—also known as a machine gun—which 'fires repeatedly with a single pull of the trigger.'" *Id.*

With good reason. "Even accepting the most conservative estimates," so-called "assault weapons … are 'in common use' as the term was used in *Heller*" because "Americans own *millions* of the firearms that the challenged legislation prohibits." *Cuomo*, 804 F.3d at 255-56 (emphasis added); *compare Caetano*, 577 U.S. at 420 (Alito, J., concurring) (explaining that stun guns are in common use for lawful purposes notwithstanding that they are "less popular than handguns" because "'approximately 200,000 civilians owned stun guns' as of 2009"). As then-Judge Kavanaugh explained, "about 40 percent of rifles sold in 2010 were semi-automatic," *Heller*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and "the AR-15 semiautomatic rifle … has become '[t]he most popular rifle in American history.'" *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey (ANJRPC II)*, 974 F.3d 237, 256 (3d Cir. 2020) (Matey, J., dissenting), *cert. granted, judgment vac'd sub nom.* 142 S. Ct. 2894 (2022) (quoting David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859-60 (2015)). Courts have consistently found that semiautomatic rifles such as the AR-15 are commonly owned. *See, e.g.*, *Kolbe*, 813 F.3d at 174 (collecting cases and stating that "it is beyond dispute" "that law-abiding citizens commonly possess semi-automatic rifles such as the AR-15").

The most recent data confirms what courts have consistently concluded. A recent report of the Congressional Research Service identified that "from 1990 through 2020, nearly 24.5 million AR- and AK-type rifles were introduced into the U.S. civilian gun stock," and "2.8 million AR-or AK-type rifles" "were introduced into the U.S. civilian gun stock" in 2020 alone.[6] Another report states that "30.2% of gun owners—about 24.6 million individuals—have owned an AR-15 or similarly styled rifle

---

[6] *See* Congressional Research Service, House-Reported Assault Weapons Ban of 2022 (H.R. 1808), at 2 (July 21, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12174. Public documents like CRS reports are subject to judicial notice. *See, e.g.*, *Kareem v. Haspel*, 986 F.3d 859, 867 n.7 (D.C. Cir. 2021); *Mobility Workx, LLC v. United Pats., LLC*, 15 F.4th 1146, 1151 & n.1 (Fed. Cir. 2021); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 207-08 (1st Cir. 2016).

(up to 44 million such rifles in total)."[7] As the ATF acknowledges, "the AR-15-type rifle" is "one of the most popular firearms in the United States," including "for civilian use." 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022).[8] Indeed, semiautomatic rifles such as the AR-15 are more common than Ford F-150 trucks, "the most commonly sold vehicle in the United States." *Kolbe*, 813 F.3d at 174. "Twice as many [semiautomatic] rifles were sold" in 2018 as the "909,330 Ford F-150s" that were sold that year. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (2021), *vac'd and rem.*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). "[E]very time one passes a new Ford pickup truck, it is a reminder that two new modern rifles have been purchased. That is a lot of modern rifles owned by Americans." *Id.*

These commonly owned rifles, moreover, are commonly owned for lawful purposes. *See Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari); *Friedman*, 784 F.3d at 416 & n.3 (Manion, J., dissenting) (explaining that "a statistically significant amount of gun owners … use semiautomatic weapons and high-capacity magazines for lawful purposes"); *Heller*, 670 F.3d at 1287-88 (Kavanaugh, J., dissenting) ("Semi-automatic rifles are commonly used for self-defense in the home, hunting, target shooting and competitions."). In 2018, whereas "only 5% of traditional rifles were bought for personal protection," about "34% of buyers purchased" a semiautomatic rifle "for personal protection, while 36% purchased for target practice or informal shooting, and 29% purchased for hunting." *Bonta*, 542 F. Supp. 3d at 1022 (noting more than 18 million people participated nationally in target and sport shooting with modern rifles). So the "overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting." *See*

---

[7] William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown McDonough School of Business Research Paper No. 4109494, at 2, 20 (May 18, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

[8] "The contents of the Federal Register shall be judicially noticed." 44 U.S.C. §1507; *see also Denius*, 330 F.3d at 926-27 (explaining that a "court is required to take judicial notice of information contained in agency regulations").

*Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari). And "that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Id.*

    ***Dangerousness***. Defendants cannot carry their burden by arguing about the dangerousness of semiautomatic rifles in the hands of some. The test is *conjunctive*: Defendants may restrict arms that are both unusual *and* dangerous. *See Caetano*, 577 U.S. at 412; *see also id.* at 417 (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual."). Because these semiautomatic rifles are *not* unusual, the Court need not "consider the … conclusion that they are also 'dangerous.'" *Id.* at 417 (Alito, J., concurring). The Court can instead conclude that "broadly prohibitory laws restricting … possession even in the home … are categorically unconstitutional." *Ezell*, 651 F.3d at 703.

    In any event, Defendants cannot establish dangerousness as would be required for their firearms bans.[9] Even if the "relative dangerousness of a weapon were relevant"—it is not, *see Caetano*, 577 U.S. at 418 (Alito, J., concurring)—"semi-automatic handguns are more dangerous as a class than semi-automatic rifles because handguns can be concealed." *Heller*, 670 F.3d at 1286 (Kavanaugh, J., dissenting). Semiautomatic handguns "are the overwhelmingly favorite weapon of armed criminals." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). Federal government statistics show that between 2015 and 2019, about 1,600 people were killed in the United States with a rifle of any kind, as compared to about 33,000 with handguns.[10] Handguns "account for 71 percent to 83 percent of the firearms used in murders and 84 percent to 90 percent of the firearms used in other violent crimes." *Cuomo*, 804 F.3d at 255-56. Yet they remain protected as the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. It necessarily follows that semiautomatic rifles, which are statistically less "dangerous," qualify

---

    [9] "Dangerous" cannot mean merely objects "designed and constructed to produce death or great bodily harm and for the purpose of bodily assault or defense." *See Caetano*, 577 U.S. at  417-18 (Alito, J., concurring). Otherwise, "virtually every covered arm would qualify as dangerous." *Id.* at 418.

    [10] FBI, "2019 Crime in the United States: Murder Victims by Weapon, 2015-2019," https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls.

too. *Heller*, 670 F.3d at 1286 (Kavanaugh, J., dissenting). "Put simply, it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles." *Id.* at 1286-87.

> ### 2. There is no other historical tradition in this Nation that would justify broadly prohibiting the purchase or possession of commonly owned rifles.

Each of the challenged laws ban conduct that the Constitution "presumptively protects." *Bruen*, 142 S. Ct. at 2126. First, the State now bans semiautomatic rifles as common as the AR-15. *See* 720 Ill. Comp. Stat. Ann. 5/24-1(a)(15)-(16); *id.* §24-1.9. And while there is a narrow grandfathering provision, it does not contemplate the self-defense use of the common weapons, *supra*. Nor would it do Dr. Herrera any good. The County and City laws impose outright bans on possessing his AR-15 in his home. *See* Cook Co. Code of Ord. §§54-211, 54-212, 54-214; Chi. Mun. Code §§8-20-010, 8-20-075, 8-20-250, 8-20-300.

Defendants bear a heavy burden to justify those bans. They must "demonstrate a tradition of *broadly* prohibiting the" purchase and possession of "commonly used firearms for self-defense" by identifying analogous prohibitions that existed "when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137-38 (emphasis added).

No such historical traditions existed. *Bruen* already decided that, as a general rule, there was no historical tradition of outright bans on arms in common use—and that was *outside* the home. 142 S. Ct. at 2147, 2156. Indeed, long guns were historically treated *more* favorably than handguns. *See id.* at 2144 (noting that one restriction of pistols "did not prohibit planters from carrying long guns for self-defense—including the popular musket and carbine"); *id.* at 2154 (noting that two jurisdictions "prohibited the carry of pistols in towns, cities, and villages, but seemingly permitted the carry of rifles and other long guns *everywhere*" and that another "prohibited public carry of pistols *everywhere*, but allowed the carry of 'shot-guns or rifles' for certain purposes"). It necessarily follows that there is no historical tradition of broadly prohibiting their use *inside* the home for self-defense and other lawful purposes.

*See Heller*, 554 U.S. at 624-25, 627 (concluding that there was no tradition of completely banning arms in common use and explaining that in "'in the colonial and revolutionary war era, small-arms weapons used by militiamen and weapons used in defense of person and home were one and the same" (alteration adopted)).

Semiautomatic rifles are no exception to the historical tradition of protecting possession of long guns. There is no "evidence that prohibitions on either semiautomatic rifles or large-capacity magazines are longstanding." *See Heller*, 670 F.3d at 1260 (Kavanaugh, J., dissenting). Detailed above, semiautomatic rifles such as the AR-15 "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612; *Heller*, 670 F.3d at 1288 (Kavanaugh, J., dissenting) (explaining that "most of the country does not" ban semiautomatic rifles even today). Historically, the earliest examples that courts have found come from the last century: two bans passed in 1927 and 1932. *See id.* at 1260 n.*. But those twentieth century bans are not indicative of acceptable restrictions at the time of the founding. *See Bruen*, 142 S. Ct. at 2237-38, 2153-54.

Nor is there a longstanding tradition of banning the purchase of "'popular and common arms,'" *see IAFR*, 961 F. Supp. at 937, as the State now seeks to do for Dr. Herrera and everyone else. On the contrary, there appears to be an *opposite* tradition, spanning before, during, and after the Revolution. *See Kole*, 2017 WL 5128989, at *10. A Virginia statute enacted in 1676-77 declared that "all persons have hereby liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." 2 William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia* 403 (1823). In response to King George III imposing a firearms embargo, persons were recommended "'to provide themselves immediately, with at least twelve and a half rounds of powder, with a proportionate quantity of bullets.'" *See* David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 Harv. L. Rev. F. 230, 234 (2014). One early commentator suggested that no law forbade "'the veriest pauper'" from raising "'a sum sufficient for the purchase of … his Gun.'" *Heller*, 554 U.S.

at 583 n.7. The Militia Act 1792 declared that all "able-bodied white male citizen[s]" above "the age of eighteen years and under the age of forty-five years … shall … provide himself with a good musket or firelock" and adequate ammunition.[11] *See* Militia Act, 1 Stat. 271, §1 (May 8, 1792). And later courts acknowledged that the right to keep arms "necessarily involves the right to *purchase* and use them in such a way as is usual, or to keep them for the ordinary purposes to which they are adapted." *See Andrews*, 50 Tenn. at 178. In short, "[o]ur citizens have *always* been free to make, vend, and export arms." Letter from Thomas Jefferson to George Hammond (May 15, 1793), *in* 6 *The Writings of Thomas Jefferson* 252-53 (P. Ford, ed. 1895) (emphasis added).

To summarize, there "is no meaningful or persuasive constitutional distinction between semi-automatic handguns"—unquestionably protected by the Second Amendment as the Supreme Court has held and held again—"and semi-automatic rifles." *Heller*, 670 F.3d at 1269 (Kavanaugh, J., dissenting); *see also id.* at 1286. "Semi-automatic rifles, like semi-automatic handguns, have not traditionally been banned and are in common use today by law-abiding citizens for self-defense in the home, hunting, and other lawful purposes." *Id.* at 1269. It follows that semiautomatic rifles are protected by the Second Amendment. *Id.* at 1286-87. So, Dr. Herrera is likely to succeed on the merits of his claim.

---

[11] States likewise mandated that able-bodied men acquire arms suitable for militia service, implying no tradition of prohibiting the sale or purchase of arms. For example, one statute declared that an able-bodied man "shall constantly keep himself furnished and provided with the arms and equipments required by the laws of the United States" and "made the duty of parents and guardians to furnish minors, enrolled in the militia, while under their care respectively, with the arms and equipments required." *See Com. v. Annis*, 9 Mass. 31, 32 (1812). Accordingly, the existence of statutes requiring ordinary civilians to acquire arms at their own expense implies that there was no general prohibition of the sale, purchase, or acquisition of arms at the Founding.

**C. The outright bans on the sale, purchase, and possession of standard magazines, including the standard magazine for the firearm Dr. Herrera keeps in his home, violate Dr. Herrera's rights under the Second and Fourteenth Amendments.**

Also unconstitutional are the outright bans on the sale, purchase, and possession of so-called "large-capacity magazines" that are standard for some of the most commonly owned rifles and handguns, including AR-15 rifles and Glock 45 handguns. The State, County, and City all ban the acquisition or self-defense use of rifle and handgun magazines with capacities of greater than 10 and 15 rounds, respectively. *See* 720 Ill. Comp. Stat. Ann. 5/24-1.10; Cook Co. Code of Ord. §§54-211, 212, 214; Chi. Mun. Code §§8-20-010, 8-20-085, 8-20-300.

Each of these bans are facially unconstitutional and unconstitutional as applied to Dr. Herrera. They categorically prohibit, on their face, the purchase and possession of commonly owned arms protected by the Second Amendment. They are particularly egregious as applied to Dr. Herrera. As a result of Defendants' bans, Dr. Herrera cannot keep his standard-issue 17-round Glock 45 magazine in his home for self-defense, where the right is "most acute," *Heller*, 554 U.S. at 628. *See* Herrera Dec. ¶5; Compl. ¶98. Including because of its standard magazine, he cannot keep his AR-15 in his home for self-defense or train with it. ¶¶6-7, 11-12. And he cannot purchase new magazines, which he would do but for the bans. Herrera Dec. ¶¶5-6; Compl. ¶101.

Dr. Herrera is likely to succeed on the merits of his claims. Magazines—like all components of arms necessary for their functionality—are inherent in the meaning of "Arms." *See Luis*, 578 U.S. at 26 (Thomas, J., concurring) (explaining that the Second Amendment protects "closely related acts necessary" to exercise the right to keep and bear arms, including implicit rights related to ammunition). Because magazines are "modern instruments that facilitate armed self-defense," *Bruen*, 142 S. Ct. at 2135, the text of the Second Amendment covers them. "Magazines enjoy Second Amendment protection for a simple reason: Without a magazine, many weapons would be useless, including 'quintessential' self-defense weapons like the handgun." *Duncan (I) v. Becerra*, 970 F.3d 1133, 1146 (9th Cir.

2020);[12] *accord Heller*, 554 U.S. at 630 (invalidating regulation that "ma[de] it impossible for citizens to use" firearms "for the core lawful purpose of self defense"); *Fyock*, 779 F.3d at 998 (concluding that, if a firearm is "commonly possessed by law-abiding citizens for lawful purposes, … there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable."); *Kolbe*, 813 F.3d at 174 (similar based on "strong historical support"). "Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of New Jersey Rifle & Pistol Ass'n, Inc. (ANJRPC I) v. Att'y Gen.*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated in part by Bruen*, 142 S. Ct. 2111 (2022). "Put simply, a regulation cannot permissibly ban a protected firearm's components critical to its operation." *Duncan I*, 970 F.3d at 1146.

Accordingly, the Second Amendment "presumptively protects" acquiring and possessing rifle and handgun magazines. *Bruen*, 142 S. Ct. at 2129-30, 2132; *see also, e.g.*, *Teixeira*, 873 F.3d at 677. Defendants therefore "must demonstrate that the[ir] regulation[s are] consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Defendants cannot show that there is "a tradition of broadly prohibiting the" acquisition and possession of magazines or ammunition. *Id.* at 2138.

### 1. The banned magazines are in common use for lawful purposes.

"[M]agazines holding more than ten rounds are indeed in 'common use.'" *Heller*, 670 F.3d at 1261. "Millions of Americans across the country own" large-capacity magazines and "nearly half of all magazines in the United States today hold more than ten rounds of ammunition." *Duncan I*, 970

---

[12] This decision was vacated by the *en banc* court, but then the Supreme Court vacated the *en banc* decision. *See Duncan (II) v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated* 142 S. Ct. 2895 (2022).

F.3d at 1142.[13] There are "nearly 115 million … in circulation in America today" for lawful purposes, *id.* at 1149 n.8, and they "are a standard component on many of the nation's most popular firearms, such as the Glock pistol, which comes with a magazine that holds 15 to 17 rounds," *Duncan II,* 19 F.4th at 1155 (Bumatay, J., dissenting); *accord Kolbe*, 813 F.3d at 174 (collecting cases). Those common magazines include the 17-round magazines that are standard for Herrera's Glock 45 handgun. And "all that is needed for citizens to have a right" to possess magazines is that the "overwhelming majority of citizens who own and use" them "do so for lawful purposes, including self-defense and target shooting." *Friedman*, 577 U.S. at 1039 (Thomas, J., dissenting from denial of certiorari). So the magazines that Defendants ban are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

### 2. There is no other historical tradition that would justify broadly prohibiting the purchase or possession of commonly owned rifle and handgun magazines.

Each of the challenged laws ban conduct that the Constitution "presumptively protects." *Bruen*, 142 S. Ct. at 2129-30, 2132. First, because of the bans, Dr. Herrera cannot purchase new magazines that come standard issue for both his rifle and his handgun. Second, Dr. Herrera cannot possess the magazines he owns for his rifle and his handgun in his home, where his right to self-defense is "most acute." *Heller*, 554 U.S. at 628. For two reasons, Defendants cannot "affirmatively prove" that there is "a tradition of broadly prohibiting the" acquisition and possession of magazines. *Bruen*, 142 S. Ct. at 2126-27, 2138.

---

[13] In *Duncan II*, the en banc court acknowledged that "'[m]ost pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds.'" 19 F.4th at 1097. It also considered "that approximately half of all privately owned magazines in the United States have a capacity greater than ten rounds." *Id.*; *accord id.* at 1155 (Bumatay, J., dissenting). Dr. Herrera's rifle and handgun magazines exceed the capacity allowed by all the regulations at issue here. Herrera Dec. ¶¶5-6.

**First**, so-called large-capacity magazines existed before the Founding and the Fourteenth Amendment, as Judge Bumatay catalogued:

- The first known firearm capable of firing more than ten rounds without reloading was a 16-shooter invented in 1580.
- The earliest record of a repeating firearm in America noted that it fired more than ten rounds.
- At the Founding, the state-of-the-art firearm was the Girandoni air rifle with a 22-shot magazine capacity.
- In 1777, Joseph Belton demonstrated a 16-shot repeating rifle before the Continental Congress.
- By the 1830s, 'Pepperbox' pistols had been introduced to the American public and became commercially successful. Depending on the model, the Pepperbox could fire 5, 6, 12, 18, or 24 rounds without reloading.
- It took several years for Samuel Colt's revolvers (also invented in the 1830s) to surpass the Pepperbox pistol in the marketplace.
- From the 1830s to the 1850s, several more rifles were invented with large ammunition capacities, ranging from 12- to 38-shot magazines.
- By 1855, Daniel Wesson (of Smith and Wesson fame) and Oliver Winchester collaborated to introduce the lever action rifle, which contained a 30-round magazine that could be emptied in less than one minute. A later iteration of this rifle, the 16-round Henry lever action rifle, became commercially successful, selling about 14,000 from 1860 to 1866.
- By 1866, the first Winchester rifle, the Model 1866, could hold 17 rounds in the magazine and one in the chamber, all of which could be fired in nine seconds. All told, Winchester made over 170,000 copies … from 1866 to 1898.
- A few years later, Winchester produced the M1873, capable of holding 10 to 11 rounds, of which over 720,000 copies were made from 1873 to 1919.

*Duncan II*, 19 F.4th at 1154-55 (Bumatay, J., dissenting). "From this history, the clear picture emerges that firearms with large-capacity capabilities were widely possessed by law-abiding citizens by the time of the Second Amendment's incorporation." *Id.* at 1155; *see also* Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, *supra*, at 851 ("In terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified.").

**Second**, despite the early existence of large-capacity magazines, magazine regulations are relatively recent phenomena. Even before *Bruen*, the Courts of Appeals recognized that magazine bans are not longstanding and lack historical pedigree. *See, e.g.*, *Heller*, 670 F.3d at 1260 ("We are not aware

of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity."); *ANJRPC I*, 910 F.3d at 116-17 ("[T]here is no longstanding history of LCM regulation."); *id.* at 117 n.18 ("LCMs were not regulated until the 1920s, but most of those laws were invalidated by the 1970s."). At the founding, "no laws restricted ammunition capacity despite multi-shot firearms having been in existence for some 200 years." *Duncan I*, 970 F.3d at 1150. The "earliest analogues only show up in the early twentieth century." *Duncan II*, 19 F.4th at 1156-57 (Bumatay, J., dissenting). The magazines banned here are *detachable* ones and yet "[t]he oldest statute limiting the permissible size of a detachable firearm magazine" was introduced in 1990 by New Jersey. *See Duncan*, 366 F. Supp. at 1149. Even if the analogy is broadened to capacity generally, "laws restricting ammunition capacity emerged in 1927 and all but one [were later] repealed." *Duncan I*, 970 F.3d at 1150-51. None of the regulations from the first half of the 20th century limited that capacity to 10 rounds. *Duncan*, 366 F. Supp. at 1152-53 ("No regulation on 'firing-capacity' set a limit as low as California's 10-round limit."). And such "short lived" and "passing regulatory efforts" cannot demonstrate "an enduring American tradition of state regulation."[14] *Bruen*, 142 S. Ct. at 2155; *id.* at 2153-54 (rejecting government's appeal to regulations from "the late-19th century" because "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence").

In short, Defendants cannot "affirmatively prove" that their bans are "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. The magazine bans are "therefore unconstitutional." *Id.* at 2138.

---

[14] "Ironically, the closest Founding-era analogues to ammunition regulations appear to be laws requiring that citizens arm themselves with particular arms and a specific *minimum* amount of ammunition." *Duncan II*, 19 F.4th at 1159 (Bumatay, J., dissenting) (emphasis added) (citing 1784 Mass. Acts 142; 1786 N.Y. Laws 228; 1785 Va. Statutes at Large 12 (12 Hening c. 1); 1 Stat. 271; Herbert L. Osgood, *The American Colonies in the Seventeenth Century* 499-500 (1904)).

### D. Illinois's mandatory-registration provision violates Dr. Herrera's Second and Fourteenth Amendment rights.

Dr. Herrera is also likely to succeed on the merits of his claim that Illinois's mandatory-registration provision is ahistorical and unconstitutional. Herrera Dec. ¶14; Compl. ¶¶46, 103, 127-35. Dr. Herrera proposes to possess his current AR-15 rifle, but he cannot do so unless there is an injunction of the County and City bans. Even if enjoined, he still faces another hurdle. To continue possessing his lawfully owned AR-15 rifle, he must register with the Illinois State Police by revealing the rifle's "make, model, caliber, and serial number." *See* 720 Ill. Comp. Stat. Ann. 5/24-1.9(d). Because this regulation burdens the right to keep arms, Illinois must "justify" its registration requirement by establishing that it is longstanding. *Bruen*, 142 S. Ct. at 2129-30. But the "fundamental problem with [the] gun registration law is that registration of lawfully possessed guns is not 'longstanding.'"[15] *Heller*, 670 F.3d at 1291 (Kavanaugh, J., dissenting). "Because the vast majority of states have not traditionally required and even now do not require registration of lawfully possessed guns, [Illinois]'s registration law … does not satisfy the history- and tradition-based test." *Id.* at 1293 (Kavanaugh, J., dissenting). The registration requirement is "therefore unconstitutional." *Bruen*, 142 S. Ct. at 2128; *cf. Thomas v. Collins*, 323 U.S. 516, 540 (1945) ("[A] requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment."). It is ahistorical, *id.*, and, in other countries, has been the first step on the way to confiscation of such weapons. *See* Smilde, *Citizen Security Reform, part 5: Gun Control*, Venezuelan Politics and Human Rights (Aug. 5, 2013) (describing Venezuela's gun registration law

---

[15] The majority of the D.C. Circuit in *Heller* acknowledged that registration requirements for *long guns* are not longstanding, but then went on to apply intermediate scrutiny, which *Bruen* now foreclose. *Heller*, 670 F.3d at 1255-56 ("The requirements that are not longstanding, which include … *all* the requirements as applied to long guns."). Illinois acknowledges that the AR-15 is a long gun, *see, e.g.*, 720 Ill. Comp. Stat. Ann. 5/24-1.10(a), so the regulation as applied to the AR-15 and Dr. Herrera is not longstanding.

in advance of private gun confiscation), *available at* venezuelablog.org/citizen-security-reform-part-5-gun-control; *see also* Kopel, *In the Wake of a Gun Ban, Venezuela Sees Rising Homicide Rate*, The Hill (Apr. 19, 2018), *available at* thehill.com/opinion/campaign/383968-in-the-wake-of-a-gun-ban-venezuela-sees-rising-homicide-rate.

## II.     The balance of the equities and the public interest favor an injunction.

Dr. Herrera is suffering irreparable harm for which there is no adequate remedy at law and therefore seeks relief by February 27, 2023, when he will next attend SWAT team training, or earlier. *See* Herrera Dec. ¶15. Dr. Herrera seeks a temporary restraining order, but if the preliminary injunction can be decided within that time, then he would forgo the request for a temporary restraining order.

The harm to Dr. Herrera is irreparable. *See* Compl. ¶¶97-104. The "loss of constitutional freedom, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)); *see also, e.g.*, *Ezell*, 651 F.3d at 698. Irreparable harm is thus presumed for constitutional violations including those perpetuated here. *See Ezell*, 651 F.3d at 699-700 (citing 11A Charles Alan Wright et al., Federal Practice & Procedure §2948.1 (2d ed. 1995)); *see also Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014) ("'[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury."). "Infringements of [the Second Amendment] cannot be compensated by damages." *Ezell*, 651 F.3d at 699.[16] No amount of money damages can compensate Dr. Herrera for the lost training opportunities, to the detriment of his safety, or the other unconstitutional compromises that state and local law require of him for self-defense inside and outside his home. *See*

---

[16] The Seventh Circuit analogized infringements of Second Amendment rights with infringements of First Amendment rights for purposes of irreparable harm and other preliminary-injunction factors. *See Ezell*, 651 F.3d at 699. As *Bruen* reaffirmed, the right to keep and bear arms "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156.

Herrera Dec. ¶¶5-14 The "ban[s] w[ere] unconstitutional when enacted and violate[] [Dr. Herrera's] Second Amendment rights every day [the bans] remain[] on the books." *Id.* at 698. That "kind of constitutional harm" is irreparable. *See id.* at 698-99.

In light of that irreparable harm, the balance of harms favors Dr. Herrera. *See Ezell*, 14 F.3d at 314. That balance of "harm to the parties and considering the public interest 'largely overlap' when a Plaintiff sues a government entity to enjoin enforcement of a statute." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd*, 593 F.3d 660 (7th Cir. 2010). Applied here, "there can be no irreparable harm to a [government]"—nor is it in the public interest—when the government "is prevented from enforcing an unconstitutional statute." *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). Although "the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in" doing so through unconstitutional means. *Ripley*, 616 F. Supp. 2d at 908; *accord Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (explaining that governments "cannot suffer harm from an injunction that merely ends an unlawful practice"). On the other side, Dr. Herrera is suffering and will continue to suffer irreparable harm "every day" the bans remain "on the books." *Ezell*, 651 F.3d at 698-99. In short, "the balance of harms … favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012); *see also Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest."); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("'It is always in the public interest to prevent the violation of a party's constitutional rights.'"). Because Dr. Herrera is suffering and will continue to suffer irreparable harm and it is in the public interest to stop the violation of his rights, this Court should enjoin each of the challenged regulations.

# CONCLUSION

For the foregoing reasons, this Court should grant Dr. Herrera's motion for a temporary restraining order and preliminary injunction.

Dated: January 27, 2023

Gene P. Hamilton*
Reed D. Rubinstein*
Michael Ding (IL ARDC 6312671)
AMERICA FIRST LEGAL FOUNDATION
300 Independence Avenue SE
Washington, DC 20003
Tel: (202) 964-3721
gene.hamilton@aflegal.org
reed.rubinstein@aflegal.org
michael.ding@aflegal.org

*Pro hac vice applications forthcoming*

Respectfully submitted,

 /s/ Taylor A.R. Meehan
Thomas R. McCarthy*
Jeffrey M. Harris*
Taylor A.R. Meehan (IL ARDC 6313481)
C'Zar D. Bernstein*
Matthew R. Pociask*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
jeff@consovoymccarthy.com
taylor@consovoymccarthy.com
czar@consovoymccarthy.com
matt@consovoymccarthy.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I filed this motion with the Court via ECF. Because Defendants have not yet entered an appearance, I will attempt to serve the foregoing by process server on Monday, January 30, 2023, or earlier, unless Defendants' counsel agree to service by email. I have also notified counsel who have represented Defendants in other cases in this district of the filing of the underlying complaint and the motion for temporary restraining order and preliminary injunction. I will email a copy of such motion, this memorandum of law, and all attachments to Defendants' counsel in related cases.

Dated: January 27, 2023                                  */s/ Taylor A.R. Meehan*
                                                          Taylor A.R. Meehan

                                                          *Counsel for Plaintiff*

**Exhibit D**

**EXHIBIT 1**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JAVIER HERRERA, | |
| *Plaintiff,* | |
| v. | Case No. 1:23-cv-00532 |
| KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police, COOK COUNTY, a body politic and corporate, TONI PRECKWINKLE, in her official capacity County Board of Commissioners President, KIMBERLY M. FOXX, in her official capacity as Cook County State's Attorney, THOMAS J. DART, in his official capacity as Sheriff of Cook County, CITY OF CHICAGO, a body politic and corporate, DAVID O'NEAL BROWN, in his official capacity as Superintendent of Police for the Chicago Police Department, | Hon. Mary M. Rowland |
| *Defendants.* | |

## DECLARATION OF JAVIER HERRERA

I, Javier Herrera, declare as follows:

1.      I am over the age of 18, of sound mind, and otherwise competent to sign this declaration.

2.      I am a United States citizen born and raised in the Chicago area. I currently live within Chicago's city limits. I am an emergency medicine doctor at a Chicago area public hospital. I teach tactical medicine at a public university, which entails providing emergency medical care during high-risk law enforcement operations.

3.      I am a law-abiding gun owner with a valid firearm owner's identification card and concealed-carry license.

4.      I own and use firearms and magazines for various purposes—including self-defense, training for work, hunting, and sport shooting.

5.      I own a Glock 45, a common handgun that comes standard with a 17-round magazine. State and local law preclude me from purchasing, keeping, or using that standard magazine. Because of that, I cannot use my Glock 45 with standard components in my home. Based on my experience, using Glock handguns with non-standard magazines causes them to malfunction. But for state and local bans, I would purchase, keep, and use the standard 17-round magazine for my Glock 45 to make it function as designed, including for self-defense in my home. In my experience, not being able to use the standard magazine has various disadvantages, including for self-defense, such as the potential to impede the firearm's safety, reliability, and warranty.

6.      I also own two AR-15 rifles, common semiautomatic rifles that come standard with a 30-round magazine. State and local law preclude me from keeping that rifle and its standard magazine in my home or using it for self-defense. State and local law also preclude me from purchasing components to replace, improve, or modify my AR-15, preclude me from purchasing standard magazines for that rifle, and preclude me from purchasing a new rifle. But for state and local bans, I would purchase new components, standard magazines, and a new rifle. Before Illinois passed its statewide rifle ban, I had planned to purchase other AR components, magazines, and another AR-15 rifle this year to accommodate my multiple uses for that style of firearm.

7.      I must keep my AR-15 rifles, components, and standard magazines at a location north of Cook County. In regular Chicago traffic, it would take me more than one hour to drive from my home to that location to retrieve my AR-15 and more than one hour to drive back to my home.

8.      In 2018, I was recruited to serve as a medic on a Chicagoland SWAT team. The team helps with high-risk search and arrest warrants, where weapons are known or suspected to be at the location, hostage situations, and active shooter situations. I am the medic, there to provide medical care to the operators on my team, any injured perpetrators, or injured bystanders. I am ordinarily stationed inside the SWAT team's command vehicle until called upon to render aid; medics are sometimes called upon to render aid in the so-called "hot zone" during these missions. Operators on my

2

team carry AR-15 rifles when we are deployed for missions. For my safety and everyone else's safety, it is important to me to cross-train to ensure that I am confident and proficient with the AR-15 rifle that the operators on my team carry. For example, that cross-training ensures that I could immediately secure, unload, and make safe an operator's AR-15 if an operator were to be injured. It ensures that an operator could quickly hand me their AR-15 if they needed to use a breaching tool or other specialized weapon, which has happened on past missions. If I didn't have the confidence or proficiency to safely and securely handle the AR-15, these tasks would fall to another operator, reducing the number of available operators in a high-risk, high-stress, fast-paced environment. Cross-training to maintain my proficiency with an AR-15 ensures that, whatever might happen on these high-risk missions, I am not a liability to my team. This training is essential to my safety and to building trust with my teammates.

9.      In 2021, I attended SWAT school so that I could be more familiar with SWAT team fundamentals and learn the team's tactical maneuvers, both for my safety when we are deployed and the safety of the operators on my team and others whom I'm there to help. SWAT school entails shooting drills. I participated in those shooting drills—again to familiarize myself with my fellow team members' tactical maneuvers in the field and to maintain my firearm proficiency and familiarity. A weapon was not provided to me for those shooting drills; I used my own AR-15 and my own Glock 45 as a sidearm.

10.     I participate in monthly training as part of the SWAT team. Two or three days every month, we train at locations south of my Chicago home. Monthly training includes shooting drills. Similar to SWAT school, I have participated in those shooting drills in the past with my own AR-15. It is important to me to participate in those shooting drills to familiarize myself with the team's operations on missions and to maintain the confidence and proficiency to safely and securely handle the AR-15 for my safety, my team's safety, and bystander's safety during missions.

11.     Because I cannot keep my AR-15 rifles at my home, I cannot use it for self-defense in my home. I would keep an AR-15 in my home for self-defense to defend against a violent intruder at my home. In my experience, an AR-15 is easier to safely and accurately use under stress as compared

3

to a handgun. Unlike a handgun, an AR-15 allows me to place my non-firing hand farther toward the rifle's muzzle. Also unlike a handgun, an AR-15 has a stock that allows me to stabilize the rifle against my body. These features give me more control over the rifle, reducing the risk of injury to myself or a bystander in a high-stress situation. I know first-hand the stress of an active shooter situation. During my residency, I was at the hospital and rendered aid after a shooter killed the attending physician on duty and two others.

12. Because I cannot keep my AR-15 rifles at my home, it is also a practical impossibility for me to participate in my SWAT team's monthly shooting drills with my AR-15—drills I would otherwise participate in to maintain proficiency and confidence when handing that rifle. To attend training with my AR-15, it would require more than four hours of driving to and from locations to retrieve and return my AR-15, and then return home. It would take me more than an hour to drive to retrieve my weapon from its secure location outside of Cook County. From that location, it would then take me well over an hour and sometimes more than two hours to drive to the training locations. After training, it would take me well over an hour and sometimes two hours to return my AR-15 to the location outside of Cook County. It would then take me another hour or more to return to my home in Chicago. Because of the demands of my job as an emergency medicine doctor and my teaching commitments, I do not have hours to spend driving to retrieve and return my AR-15. As a result, I have been unable to participate in shooting drills with my AR-15 with the SWAT team. But for the ban prohibiting me from keeping my AR-15 in my home, I would be able to participate in shooting drills with my AR-15 with the SWAT team. My participation in those shooting drills is important for my own safety on missions and the safety of others.

13. I also use my AR-15 rifles for recreational purposes, including hunting and sport shooting. I visit indoor and outdoor ranges for target shooting. I use my AR-15 rifles to hunt small game in Indiana. But state and local laws burden my ability to enjoy these pursuits, including because I must keep my AR-15 rifles far from home.

14. For me to continue possessing my AR-15 rifles—albeit not in my home due to Cook County and City of Chicago ordinances—I understand I must register with the Illinois State Police.

4

These registration requirements are intrusive, and I do not wish to register the make, model, caliber, and serial number of my rifles, as the registration requirement demands, including because I fear that information could be later used to confiscate my rifle if the State, County, or City were to enact further legislation to confiscate firearms. I also fear that registration leaves me vulnerable to information breaches, where third parties could get access to my information.

15.     I will attend the SWAT team's next scheduled training on February 27, 2023.

16.     Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 27, 2023.

_____
Javier Herrera

Exhibit E

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CUTBERTO VIRAMONTES, an individual and resident of Cook County, Illinois, *et al.*, | No. 1:21-cv-04595 |
| Plaintiffs, | |
| v. | Honorable Rebecca R. Pallmeyer |
| THE COUNTY OF COOK, a body politic and corporate, *et al.*, | Honorable Susan E. Cox |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF THE CITY OF HIGHLAND PARK'S**
**MOTION TO REASSIGN RELATED CASE PURSUANT TO LOCAL RULE 40.4**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................1

ARGUMENT .........................................................................................................................3

    I.      The Cook County And Highland Park Cases Are Related. ....................................4

    II.     Reassignment Would Promote The Efficient Use Of Judicial Resources. .............6

CONCLUSION....................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*21 srl v. Enable Holdings, Inc.*, 2009 WL 4884177 (N.D. Ill. Dec. 9, 2009).............................8, 9

*Blair v. Equifax Check Servs., Inc.*,
   181 F.3d 832 (7th Cir. 1999) ...................................................................................7

*BP Corp. N.A. Inc. v. N. Tr. Invs., N.A.*,
   2009 WL 1684531 (N.D. Ill. June 15, 2009) ..........................................................6

*Ewing v. Carrier*,
   35 F.4th 592 (7th Cir. 2022) ................................................................................4, 7

*Freeman v. Bogusiewicz*,
   2004 WL 1879045 (N.D. Ill. Aug. 11, 2004) ..........................................................9

*Friedman v. City of Highland Park*,
   68 F. Supp. 3d 895 (N.D. Ill. 2014) ........................................................................2

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ..................................................................................2

*Gautreaux v. Chi. Hous. Auth.*,
   2013 WL 5567771 (N.D. Ill. Oct. 9, 2013)..............................................................8

*Glob. Pat. Holdings, LLC v. Green Bay Packers, LLC*,
   2008 WL 1848142 (N.D. Ill. Apr. 23, 2008) .......................................................4, 9

*Helferich Pat. Licensing, L.L.C. v. N.Y. Times Co.*,
   2012 WL 1368193 (N.D. Ill. April 19, 2012) ......................................................8, 9

*Murry v. Am. Mortg. Banc, Inc.*,
   2004 WL 407010 (N.D. Ill. March 1, 2004) ...........................................................6

*N.Y. State Rife & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022).........................................................................................1, 7

*Sha-Poppin Gourmet Popcorn, LLC v. JP Morgan Chase Bank, N.A.*,
   2020 WL 8367421 (N.D. Ill. Sept. 4, 2020) .......................................................5, 7

*Stingley v. Laci Transp., Inc.*,
   2020 WL 12182491 (N.D. Ill. Dec. 1, 2020).........................................................6

*United States v. Bullock*,
   2022 WL 16649175 (S.D. Miss. Oct. 27, 2022) .....................................................7

*Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*,
    2019 WL 2515984 (N.D. Ill. June 18, 2019) ...........................................................................4

*Velocity Pat. LLC v. Mercedes-Benz USA, LLC*,
    2014 WL 1661849 (N.D. Ill. Apr. 24, 2014) ...........................................................................9

*Wilson v. Cook County*,
    937 F.3d 1028 (7th Cir. 2019) .............................................................................................2, 5

**Statutes**

Cook County, Ill. Code §§ 54-211, 54-212 ..................................................................................1, 5

Highland Park, Ill. Code §§ 136.001-006 .....................................................................................2, 5

**Other Authorities**

Local Rule 40.4 ........................................................................................................................4, 5, 8

## **INTRODUCTION**

The City of Highland Park, Illinois ("Highland Park") moves under Local Rule 40.4 to reassign a related case to this Court's docket. The related case, captioned *Goldman v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill.) (the "Highland Park action"), is pending in the Northern District of Illinois before Judge Harry D. Leinenweber.

The Highland Park action and this action are both constitutional challenges to ordinances that prohibit assault weapons and large-capacity magazines. As the Seventh Circuit recognized in 2019, the challenged ordinances are materially identical. Both actions involve the same essential question of law: whether, in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), governments may lawfully ban assault weapons. Likewise, both actions raise many common questions of fact, including about how dangerous they are, how broadly Americans lawfully own and use them, and which historical weapons regulations are relevant.

All required conditions for reassignment in Local Rule 40.4 are satisfied. Given the identical ordinances and overlapping nature of the legal and factual issues, Highland Park respectfully requests that this Court exercise its discretion to grant the motion. Reassignment would promote the efficient use of judicial resources and minimize the risk of inconsistent rulings or judgments in the two cases. In accordance with Local Rule 40.4(c), a copy of the *Highland Park* complaint is attached as Exhibit A.

## **BACKGROUND**

Over a decade ago, Cook County and Highland Park enacted assault weapons and large-capacity magazine bans. The Cook County Board of Commissioners enacted a ban on assault weapons and large-capacity magazines in November 2006. *See* Cook County, Ill. Code §§ 54-

1

211, 54-212. In June 2013, Highland Park enacted a materially identical ordinance prohibiting assault weapons and large-capacity magazines. *See* Highland Park, Ill. Code § 136.005.

Highland Park modeled its ordinance after Cook County's and, as a result, the two ordinances are nearly identical. *See* Ex. B, Rotering Decl. in *Friedman v. City of Highland Park*, No. 1:13-cv-09073 (N.D. Ill.), Dkt. 45-1, at ¶ 6 (explaining that Highland Park "modeled its Ordinance after Cook County's assault weapon ban"); *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 898 n.1 (N.D. Ill. 2014) ("The Ordinance is nearly identical to a ban in neighboring Cook County … ."), *aff'd* 784 F.3d 406 (7th Cir. 2015). As the Seventh Circuit has recognized, the "Highland Park Ordinance defines 'assault weapon' and 'large-capacity magazine' in virtually identical terms as the [Cook] County Ordinance does and proscribes the same conduct: it penalizes those who 'manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess' any assault weapon or large-capacity magazine." *Wilson v. Cook County*, 937 F.3d 1028, 1030 (7th Cir. 2019) (quoting Highland Park, Ill. Code § 136.005).

Both ordinances were challenged as unconstitutional under the Second Amendment in earlier litigations, and both ordinances were upheld by this Court and the Seventh Circuit. *Id.* (upholding Cook County's ban); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) (upholding Highland Park's ban). Now, the constitutionality of the Cook County and Highland Park ordinances are being re-litigated in new lawsuits.

The action pending before this Court, *Viramontes v. Cook County*, No. 1:21-cv-04595 (N.D. Ill.) (the "Cook County action"), was filed on August 27, 2021. In that action, two organizations, the Second Amendment Foundation and the Firearms Policy Coalition, and three individual plaintiffs (the "Cook County Plaintiffs") allege that Cook County's assault weapons

ban is unconstitutional.[1] Although that case was filed in the summer of 2021, the schedule for

that case was substantially revised after *Bruen*. Under the current schedule, expert discovery

closed on November 28, 2022, and dispositive motions are due by January 19, 2023. (Dkt. 46 in

Case No. 1:21-cv-04595.)

On September 7, 2022, the National Association for Gun Rights ("NAGR") and

individual plaintiff Susan Goldman (the "Highland Park Plaintiffs") sued Highland Park in

*Goldman v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill.). The Highland Park action is

currently pending before Judge Leinenweber. It challenges the constitutionality of Highland

Park's assault weapons and large-capacity magazine ban. Plaintiffs in the Highland Park action

filed a preliminary injunction motion in October 2022. Judge Leinenweber issued a briefing

schedule on the motion, providing that Highland Park's response is due on January 10, 2023, and

briefing will be completed on March 2, 2023. (Dkt. 22 in Case No. 1:22-cv-04774.) Additionally,

on November 17, 2022, Highland Park filed a partial motion to dismiss Plaintiff NAGR for lack

of standing and a partial Answer as to Plaintiff Susan Goldman. (Dkts. 26, 29 in Case No. 1:22-

cv-04774.) Plaintiff NAGR's response to the motion to dismiss is due December 28, 2022, and

Highland Park's reply is due January 13, 2023. (Dkt. 31 in Case No. 1:22-cv-04774.)

Highland Park now seeks to reassign the Highland Park action to this Court. The

Highland Park Plaintiffs oppose the motion. Cook County is in favor of reassignment. The Cook

County Plaintiffs take no position on the motion.

## ARGUMENT

Local Rule 40.4 allows for the reassignment of related cases. This rule "promotes

efficient use of judicial resources by minimizing duplication of effort on cases that have a great

---

[1] This action is brought against several defendants which are referred to collectively as "Cook County."

deal in common." *Glob. Pat. Holdings, LLC v. Green Bay Packers, LLC*, 2008 WL 1848142, at *2 (N.D. Ill. Apr. 23, 2008). It also supports the judiciary's interest "in avoiding messy, duplicative litigation" and multiple appeals involving the same issues. *Ewing v. Carrier*, 35 F.4th 592, 594 (7th Cir. 2022).

To warrant reassignment under Rule 40.4, first, the cases must be related. "Two or more civil cases may be related if … (1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; [or] (3) the cases grow out of the same transaction or occurrence." L.R. 40.4(a). Second, the moving party must show that "(1) both cases are pending in this Court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in a single proceeding." L.R. 40.4(b).

The decision to reassign cases is within the sound discretion of the Court. *See Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 2019 WL 2515984, at *3 (N.D. Ill. June 18, 2019). If a court grants the motion for reassignment, then the higher-numbered case is transferred to the court's docket of the lower-numbered case.

## I. The Cook County And Highland Park Cases Are Related.

The Cook County and Highland Park cases clearly "involve some of the same issues of fact or law." L.R. 40.4(a). Because the two cases involve materially identical ordinances, the two cases raise the same core legal issue—whether a local ban on the possession of assault weapons are constitutional after *Bruen*. The two cases will also involve many overlapping issues of fact.

Both ordinances define the prohibited weapons in "virtually identical" ways and ban the "same conduct." *Wilson*, 937 F.3d at 1030; *compare* Cook County, Ill. Code § 54-212, *with*

Highland Park, Ill. Code § 136.005. And the legal challenges brought by the plaintiffs in the two cases are very similar, resulting in the same dispositive issues of law and fact. Plaintiffs in both cases allege that assault weapons are commonly possessed and that the Second Amendment protects their fundamental right to keep and bear such weapons. *Compare* Ex. A at ¶¶ 29–30, *with* Ex. C, Cook County Compl. at ¶¶ 1, 4. Plaintiffs in both cases bring just one count, alleging that the challenged restrictions violate the Second Amendment as incorporated through the Fourteenth Amendment. *Compare* Ex. A at ¶¶ 30, 35, *with* Ex. C at ¶ 69. And Plaintiffs in both actions seek the same injunctive relief and monetary damages under 42 U.S.C. § 1983. *Compare* Ex. A at ¶¶ 36–40, *with* Ex. C at ¶ 71. In fact, the core issues are so similar that the Cook County Plaintiffs explicitly seek to overrule the Seventh Circuit decisions upholding both the Cook County Ordinance *and* the Highland Park Ordinance. *See* Ex. C at ¶ 5.

To be sure, the cases are not identical in every respect. While both ordinances prohibit assault weapons and large-capacity magazines, the Cook County action challenges only the assault weapons ban portion of the Cook County Ordinance. The Highland Park action, by contrast, challenges both the assault weapons ban and large-capacity magazine ban. But Local Rule "40.4(a)(2) does not demand a complete identity of legal and factual issues; rather, the cases must 'involve *some of* the same issues of fact or law.'" *Sha-Poppin Gourmet Popcorn, LLC v. JP Morgan Chase Bank, N.A.*, 2020 WL 8367421, at *2 (N.D. Ill. Sept. 4, 2020) (emphasis in original) (quoting L.R. 40.4(a)(2)). And here, the key dispositive legal issue in both cases is whether assault weapons bans are constitutional, which will require the court in both cases to determine how *Bruen* applies to this type of gun regulation. Thus, the cases are clearly related. *See, e.g.*, *Murry v. Am. Mortg. Banc, Inc.*, 2004 WL 407010, at *2 (N.D. Ill. March 1, 2004) (explaining that perfect symmetry is not required for a finding of relatedness; cases were

related because they required "a determination of the legality of the same defendants' actions under the same statutes and regulations").

## II.    Reassignment Would Promote The Efficient Use Of Judicial Resources.

All four conditions in Local Rule 40.4(b) are satisfied here.

First, both cases are currently pending in this District.

Second, assigning both cases to this Court's docket will save the judiciary substantial time and resources. As described above, both actions challenge virtually identical ordinances and concern the same key constitutional issue. In addition, after discussions between Highland Park and Cook County, it is apparent that the brief and accompanying expert reports that Highland Park is scheduled to file on January 10, 2023 in response to the Highland Park Plaintiffs' preliminary injunction motion will heavily overlap with the brief and accompanying expert reports that Cook County is scheduled to file on January 19, 2023 in support of its summary judgment motion.[2] Both briefs will make similar arguments about the applicability of the Second Amendment and *Bruen* to these essentially identical ordinances. And indeed, some of the experts presented by Cook County and Highland Park will be the same. Thus, a single judge can most efficiently adjudicate both actions. *See, e.g.*, *Stingley v. Laci Transp., Inc.*, 2020 WL 12182491, at *3 (N.D. Ill. Dec. 1, 2020) (reassigning a related case where "several [] issues" had not yet been resolved, "meaning both that already-expended judicial time will not be wasted and that only one judge will have to resolve those complex and consequential issues"); *BP Corp. N.A. Inc. v. N. Tr. Invs., N.A.*, 2009 WL 1684531, at *2–3 (N.D. Ill. June 15, 2009) (reassigning case where the two actions interpreted the same provisions of law, applied the same case law, and

---

[2] Highland Park has filed an agreed motion requesting that the briefing schedule in its case be adjusted by nine days, so that both its brief and Cook County's brief are due on January 19, 2023. *See* Dkt. 34.

6

necessitated the same experts); *cf. Sha-Poppin Gourmet Popcorn*, 2020 WL 8367421, at *3 ("The Seventh Circuit has been critical of district courts for failing to reassign cases presenting overlapping issues … .") (citing *Smith v. Check-N-Go of Illinois, Inc.*, 200 F.3d 511, 513 n.* [sic] (7th Cir. 1999)); *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 839 (7th Cir. 1999) ("By far the best means of avoiding wasteful overlap when related suits are pending in the same court is to consolidate all before a single judge.").

The potential efficiency gains of reassignment are especially significant here because *Bruen* instructs courts to engage in a comprehensive historical analysis to determine whether restrictions on firearms protected by the Second Amendment are "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. Such an analysis "can be difficult; it sometimes requires resolving threshold questions, [] making nuanced judgments about which evidence to consult and how to interpret it," and performing a detailed review of many different historical and empirical sources. *Id.* (citation omitted); *see also United States v. Bullock*, 2022 WL 16649175, at *1, *3 (S.D. Miss. Oct. 27, 2022) (noting that "courts have realized, after *Bruen*, [that] adjudicating the issue[s] presents certain difficulties" and considering whether to appoint a historian as a court-appointed expert).

Given the complexity of the analysis, it would waste judicial resources for two courts to conduct the same historical and empirical inquiry into assault weapons restrictions, including the assessment of reports from some of the very same experts. *Cf. Ewing*, 35 F.4th at 594. Indeed, without reassignment, resolving Plaintiffs' claims requires two different judges "to tread much, if not all, of the same ground." *See Sha-Poppin Gourmet Popcorn*, 2020 WL 8367421, at *3. And the substantial overlap in these two actions means that, absent reassignment, there is a serious risk of inconsistent rulings and piecemeal appeals on a novel issue. *See, e.g.*, *Helferich Pat.*

7

*Licensing, L.L.C. v. N.Y. Times Co.*, 2012 WL 1368193, at *3 (N.D. Ill. April 19, 2012) ("[R]eassigning the cases to the same judge would avoid potentially inconsistent or conflicting rulings with regard to the common claims arising in each case."). For all of these reasons, there are substantial time and resource efficiencies to reassignment.

Third, reassignment will not substantially delay proceedings in this case. While the Cook County action was filed about a year before the Highland Park action, the cases are now proceeding on similar timeframes given this Court's adjustment to the Cook County case schedule in light of *Bruen*. (*See* Dkt. 46 in Case No. 1:21-cv-04595.) Accordingly, reassignment will not significantly delay proceedings in the Cook County action. Neither case has had any dispositive rulings, and the parties will both be filing substantive briefs in mid-January on the same substantive issues with very similar expert reports involving some of the same experts. *See, e.g.*, *Gautreaux v. Chi. Hous. Auth.*, 2013 WL 5567771, at *4 (N.D. Ill. Oct. 9, 2013) (finding reassignment appropriate when neither case had addressed the primary legal issue raised). Despite the difference in procedural postures, Defendants in both cases will be presenting substantive argument on the core constitutional issues at the same time, and there is no reason to believe that reassignment would cause any delay, much less "substantial" delay. *See, e.g.*, *21 srl v. Enable Holdings, Inc.*, 2009 WL 4884177, at *3 (N.D. Ill. Dec. 9, 2009) (noting that one case was "more advanced" than the other but holding that any resulting delay associated with getting the cases on the same timeline would not be "substantial"); *accord* L.R. 40.4(b)(3) (the focus is whether reassignment would cause "the proceedings in the earlier case" to be delayed "substantially").

Finally, the actions are susceptible of disposition in a single proceeding. As described above, the actions involve overlapping Second Amendment issues. *See Glob. Pat. Holdings*,

2008 WL 1848142, at *4 (granting motion for reassignment where "both actions involve *prima facie* fundamentally similar claims and defenses that will likely be amenable to dispositive treatment in unified proceedings"); *Freeman v. Bogusiewicz*, 2004 WL 1879045, at *2 (N.D. Ill. Aug. 11, 2004) (reassignment appropriate where "[t]he facts and issues in both cases are similar in nature and can be handled more efficiently in one proceeding"). And reassignment to a single judge who can oversee both actions reduces the risk of inconsistent rulings and piecemeal appeals that exists if the cases are proceeding on different timelines in front of different judges. *See, e.g.*, *Helferich Pat. Licensing*, 2012 WL 1368193, at *3 ("reassigning the cases to the same judge would avoid potentially inconsistent or conflicting rulings with regard to the common claims arising in each case"); *21 srl*, 2009 WL 4884177, at *2 (explaining that "reassignment would save judicial time and effort by avoiding potentially inconsistent rulings" and noting that the Seventh Circuit has criticized district courts for allowing "multiple cases involving similar legal issues to proceed along different tracks before different judges, resulting in numerous and disparate decisions, as well as multiple appeals" (citation and internal quotation marks omitted)).[3]

In sum, the criteria set forth in Local Rule 40.4(a) and (b) are satisfied here, and the Highland Park action should be reassigned to this Court.

---

[3] While the cases are amenable to a single disposition, reassignment does not require the Court to resolve both cases at the same time. *See, e.g.*, *Helferich Pat. Licensing*, 2012 WL 1368193, at *3 ("Reassignment does not require that the two cases be bound together, proceeding in unison for all purposes. In fact, reassignment does not even require the [c]ases to be disposed of at the same time; they merely need to be *susceptible* to disposition at the same time.") (emphasis in original); *Velocity Pat. LLC v. Mercedes-Benz USA, LLC*, 2014 WL 1661849, at *2 (N.D. Ill. Apr. 24, 2014) ("This is not to say that the cases will be disposed of at the same time, but only that they are *susceptible*.") (emphasis in original).

## **CONCLUSION**

For these reasons, this Court should find that the Highland Park and Cook County actions are related and reassign the Highland Park action to this Court's docket.

Dated: December 23, 2022

Respectfully submitted,

*/s/ David H. Hoffman*
David H. Hoffman (No. 6229441)
Neil H. Conrad (No. 6321947)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
david.hoffman@sidley.com
nconrad@sidley.com

*Attorneys for Non-Party Movant City of Highland Park, Illinois*

Exhibit F

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CUTBERTO VIRAMONTES, an individual and resident of Cook County, Illinois, *et al.*, | No. 1:21-cv-04595 |
| Plaintiffs, | Honorable Rebecca R. Pallmeyer |
| v. | Honorable Susan E. Cox |
| THE COUNTY OF COOK, a body politic and corporate, *et al.*, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF THE CITY OF NAPERVILLE'S MOTION TO REASSIGN RELATED CASE PURSUANT TO LOCAL RULE 40.4

**TABLE OF CONTENTS**

Page

INTRODUCTION.................................................................................................. 1

BACKGROUND................................................................................................... 2

ARGUMENT ........................................................................................................ 4

    I.      The Cook County And Naperville Cases Are Related.......................................... 5

    II.     Both the Cook County and Naperville Cases Are Pending in This Court ............ 7

    III.    Reassignment Would Promote The Efficient Use Of Judicial Resources.............. 7

           A.    Both Actions Challenge Similar Ordinances Under the Second Amendment........................................................................................ 7

           B.    A Similar Motion to Reassign is Already Pending in This Court............. 9

           C.    Motions To Amend Complaints to Challenge the State Assault Weapons Ban Are Currently Pending. .................................................. 10

    IV.    Reassignment Will Not Substantially Delay Proceedings in This Case.............. 11

    V.     Both cases are susceptible of disposition in a single proceeding........................ 12

CONCLUSION..................................................................................................... 13

160140393.3
160187302.1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*21 srl v. Enable Holdings, Inc.*,
  2009 WL 4884177 (N.D. Ill. Dec. 9, 2009) ...............................................................11, 12

*Bevis v. City of Naperville*,
  No. 1:22-cv-04775 (N.D. Ill.) ....................................................................................1, 3

*Blair v. Equifax Check Servs., Inc.*,
  181 F.3d 832 (7th Cir. 1999) .......................................................................................... 8

*BP Corp. N.A. Inc. v. N. Tr. Invs., N.A.*,
  2009 WL 1684531 (N.D. Ill. June 15, 2009) ................................................................. 8

*Ewing v. Carrier*,
  35 F.4th 592 (7th Cir. 2022) .......................................................................................4, 9

*Freeman v. Bogusiewicz*,
  2004 WL 1879045 (N.D. Ill. Aug. 11, 2004) .............................................................. 12

*Friedman v. City of Highland Park*,
  68 F. Supp. 3d 895 (N.D. Ill. 2014), *aff'd* 784 F.3d 406 (7th Cir. 2015) ...................... 2

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) .......................................................................................... 2

*Gautreaux v. Chi. Hous. Auth.*,
  2013 WL 5567771 (N.D. Ill. Oct. 9, 2013) ................................................................ 11

*Glob. Pat. Holdings, LLC v. Green Bay Packers, LLC*,
  2008 WL 1848142 (N.D. Ill. Apr. 23, 2008) .............................................................4, 12

*Goldman v. City of Highland Park*,
  No. 1:22-cv-04774 (N.D. Ill.) ....................................................................................1, 3

*Helferich Pat. Licensing, L.L.C. v. N.Y. Times Co.*,
  2012 WL 1368193 (N.D. Ill. April 19, 2012) .............................................................9, 12

*Murry v. Am. Mortg. Banc, Inc.*,
  2004 WL 407010 (N.D. Ill. March 1, 2004) ................................................................. 6

*New York State Rifle & Pistol Association v. Bruen*,
  142 S. Ct. 2111 (2022) .............................................................................................1, 2, 8

ii

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Sha-Poppin Gourmet Popcorn, LLC v. JP Morgan Chase Bank, N.A.*,
    2020 WL 8367421 (N.D. Ill. Sept. 4, 2020) ...................................................6, 8, 9

*Smith v. Check-N-Go of Illinois, Inc.*,
    200 F.3d 511 (7th Cir. 1999) ........................................................................ 8

*Stingley v. Laci Transp., Inc.*,
    2020 WL 12182491 (N.D. Ill. Dec. 1, 2020) ...................................................... 7

*United States v. Bullock*,
    2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).................................................... 8

*Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4*, LLC,
    2019 WL 2515984 (N.D. Ill. June 18, 2019) ...................................................... 5

*Velocity Pat. LLC v. Mercedes-Benz USA, LLC*,
    2014 WL 1661849 (N.D. Ill. Apr. 24, 2014) ..................................................... 12

*Viramontes v. Cook County*,
    No. 1:21-cv-04595 (N.D. Ill.)......................................................................... 2

*Wilson v. Cook County*,
    937 F.3d 1028 (7th Cir. 2019) ....................................................................... 2

**STATUTES**

42 U.S.C. § 1983 .......................................................................................... 6

Cook County, Ill. Code § 54-211.................................................................2, 5

Cook County, Ill. Code § 54-212.................................................................2, 5

Naperville Ordinance No. 22-099..................................................................2, 5

**RULES**

L. R. 40.4 ..................................................................................................1, 4

L.R. 40.4(a)...............................................................................................5, 13

L.R. 40.4(a)(2) ............................................................................................ 6

L.R. 40.4(b)...............................................................................................5, 13

L.R. 40.4(b)(1) ............................................................................................ 7

iii

Case 1:21-cv-04755 Document 63-5 Filed 01/13/23 Page 34 of 24 PageID #: 16087

## <u>TABLE OF AUTHORITIES (continued)</u>

**Page(s)**

L.R. 40.4(b)(2) ................................................................................................................ 7

L.R. 40.4(b)(3) .............................................................................................................. 11

L.R. 40.4(b)(4) .............................................................................................................. 12

L. R. 40.4(c) ................................................................................................................... 2

160140393.3
160187302.1

# INTRODUCTION

The City of Naperville, Illinois ("Naperville") moves under Local Rule 40.4 to reassign a related case to this Court's docket. The related case, captioned *Bevis v. City of Naperville*, No. 1:22-cv-04775 (N.D. Ill.) (the "Naperville action"), is currently pending in the Northern District of Illinois before Judge Virginia K. Kendall.

The City of Highland Park has filed a similar motion before this court in the case *Goldman v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill.) (the "Highland Park action"), in which it is the Defendant. The Highland Park ordinance, Cook County ordinance, and Naperville ordinance all involve constitutional challenges to ordinances that regulate assault weapons. All actions involve the same essential question of law: whether, in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), legislatures may lawfully prohibit assault weapons. Likewise, all actions raise many common questions of fact, including about how dangerous assault weapons are, how broadly Americans lawfully own and use them, and which historical weapons regulations are relevantly similar to them. Highland Park and Naperville's motions to reassign their actions to this court are all the more appropriate in light of the motions made by Plaintiffs in each case to add nearly identical constitutional challenges to the recently enacted Illinois State Law, HB 5471, against local officials charged with enforcing this law.

In the Naperville case and the Highland Park case, Plaintiffs have filed identical motions for leave to amend their complaints to add a constitutional challenge to the State of Illinois' Assault Weapons Ban adopted by the State of Illinois on January 1, 2023. Defendants intend to oppose those motions on various grounds. Consolidating these cases will also serve judicial economy and administration by allowing a single judge to decide these identical issues.

160140393.3
160187302.1

All required conditions for reassignment in Local Rule 40.4 are satisfied. Given the materially similar ordinances and overlapping nature of the legal and factual issues, Naperville respectfully requests that this Court exercise its discretion to grant the motion. Reassignment would promote the efficient use of judicial resources and minimize the risk of inconsistent rulings or judgments in the three cases. In accordance with Local Rule 40.4(c), a copy of the *Naperville* complaint is attached as Exhibit A.

## BACKGROUND

In 2006, Cook County enacted an assault weapons and large-capacity magazine ban. *See* Cook County, Ill. Code §§ 54-211, 54-212. In 2013, neighboring city Highland Park enacted a substantially similar ordinance banning assault weapons and large capacity magazines. *See Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 898 n.1 (N.D. Ill. 2014), *aff'd* 784 F.3d 406 (7th Cir. 2015) ("The Ordinance is nearly identical to a ban in neighboring Cook County . . . .").[2] In 2022, the City of Naperville enacted a materially similar but more limited ordinance prohibiting the commercial sale of assault weapons. *See* Naperville Ordinance No. 22-099 (2022).

The action pending before this Court, *Viramontes v. Cook County*, No. 1:21-cv-04595 (N.D. Ill.) (the "Cook County action"), was filed on August 27, 2021. In that action, two organizations, the Second Amendment Foundation and the Firearms Policy Coalition, and three individual plaintiffs (the "Cook County Plaintiffs") allege that Cook County's assault weapons ban is unconstitutional. Although that case was filed in the summer of 2021, the schedule for that case was substantially revised after the Supreme Court decided *Bruen*. Under the current

---

[2] Because the Cook County and Highland Park ordinances are substantially similar, both ordinances were challenged on the same ground under the Second Amendment. Both ordinances were upheld by this Court and the Seventh Circuit. *Wilson v. Cook County*, 937 F.3d 1028, 1030 (7th Cir. 2019) (upholding Cook County's ban); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) (upholding Highland Park's ban).

schedule, expert discovery closed on November 28, 2022, and dispositive motions are due by February 2, 2023 (Dkt. 63 in Case No. 1:21-cv-04595).

On September 7, 2022, in light of *Bruen*, simultaneous lawsuits were filed challenging Highland Park's ordinance banning assault weapons and Naperville's ordinance banning the commercial sale of assault weapons. *Goldman v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill. Sept. 7, 2022); *Bevis v. City of Naperville*, No. 1:22-cv-04775 (N.D. Ill. Sept. 7, 2022).

In the Naperville case, currently pending before Judge Kendall, the National Association for Gun Rights ("NAGR") and individual plaintiff Robert Bevis (the "Naperville Plaintiffs") challenged the constitutionality of Naperville's currently stayed ordinance prohibiting the sale of assault weapons. The Naperville Plaintiffs filed a temporary restraining order and preliminary injunction motion on November 18, 2022 (Dkt. 10 in Case No. 1:22-cv-04775). Judge Kendall issued a briefing schedule on the motion, providing that Naperville's response was due on November 21, 2022 (Dkt. 11 in Case No. 1:22-cv-04775). After a hearing held on November 21, 2022, Judge Kendall requested supplemental briefing on two questions, essentially asking both parties to brief whether the ordinance was constitutional under the *Bruen* test (Dkt. 15 in Case No. 1:22-cv-04775). Briefing on these questions was completed on December 23, 2022, and the court has not issued an opinion (Dkt. 35 in Case No. 1:22-cv-04775). Additionally, on November 28, 2022, Naperville filed a partial motion to dismiss Plaintiff NAGR for lack of standing and a partial Answer as to Plaintiff Robert Bevis (Dkts. 19, 20 in Case No. 1:22-cv-04775). Plaintiff NAGR's response to the motion to dismiss was due January 18, 2023, and Naperville's reply is due January 25, 2023 (Dkt. 39 in Case No. 1:22-cv-04775).

In the Highland Park case, currently pending before Judge Harry Leinenweber, the plaintiffs challenged Highland Park's ordinance banning the possession and sale of assault

weapons in light of *Bruen*. Judge Leinenweber issued a briefing schedule on the pending preliminary injunction, providing that Highland Park's response is due on January 19, 2023, plaintiffs' reply is due on February 20, 2023, and Highland Park's reply is due on March 13, 2023. (Dkt. 36 in Case No. 1:22-cv-04774). On December 30, 2022, Highland Park filed a notice before this Court seeking to reassign the case to this Court's docket, noting the substantial overlaps between the two cases. (Dkt. 39 in Case No. 1:22-cv-04774).

On January 1, 2023, the Illinois General Assembly passed a bill banning the possession and sale of assault weapons statewide ("HB 5471"). In light of the new state law, Judge Kendall asked both parties in the Naperville action to submit a joint status report by January 19, 2023, regarding HB 5471 and how it affects the case (Dkt. 40 in Case No. 1:22-cv-04775).

On January 17, 2023, both the Naperville and the Highland Park Plaintiffs filed motions to amend and supplement their complaints (Dkt. 41 in Case No. 1:22-cv-04775; Dkt. 42 in Case No. 1:22-cv-04774). Plaintiffs in both cases seek to challenge HB 5471 and to add additional defendants charged with enforcing it. The Naperville Plaintiffs' motion to amend their complaint was noticed to be heard on January 23, 2023 (Dkt. 42 in Case No. 1:22-cv-04775).

Like Highland Park, Naperville now seeks to reassign the Naperville action to this Court's docket.

<u>**ARGUMENT**</u>

Local Rule 40.4 allows reassignment of related cases where doing so "promotes efficient use of judicial resources by minimizing duplication of effort on cases that have a great deal in common." *Glob. Pat. Holdings, LLC v. Green Bay Packers, LLC*, 2008 WL 1848142, at *2 (N.D. Ill. Apr. 23, 2008). It also supports the judiciary's interest "in avoiding messy, duplicative litigation" and multiple appeals involving the same issues. *Ewing v. Carrier*, 35 F.4th 592, 594 (7th Cir. 2022).

To warrant reassignment under Rule 40.4, first, the cases must be related. "Two or more civil cases may be related if . . . (1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; [or] (3) the cases grow out of the same transaction or occurrence." L.R. 40.4(a). Second, the moving party must show that "(1) both cases are pending in this Court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in a single proceeding." L.R. 40.4(b).

The decision to reassign cases is within the sound discretion of the Court. *See Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4*, LLC, 2019 WL 2515984, at *3 (N.D. Ill. June 18, 2019). If a court grants the motion for reassignment, then the higher-numbered case is transferred to the court's docket of the lower-numbered case.

## I.     The Cook County, Highland Park and Naperville Cases Are Related.

The Cook County, Highland Park and Naperville cases clearly "involve some of the same issues of fact or law." L.R. 40.4(a). Because the three cases involve ordinances regulating the same activity, they raise the same core legal issue—whether a local ban on the sale of assault weapons is constitutional after *Bruen*. The three cases will also involve many overlapping issues of fact.

All three ordinances define the prohibited weapons in substantially similar ways and ban similar conduct. For example, all three Ordinances define assault weapons in substantively similar ways with identical language throughout, and all ordinances include a similar list of banned assault weapon models. *Compare* Naperville Ordinance No. 22-099, *with* Cook County Ill. Code §§ 54-211. The ordinances also ban the sale of assault weapons and provide similar exceptions, and

each ordinance provides a penalty for any violation. *Compare* Naperville No. 22-099, *with* Cook County Ill. Code §§ 54-212.

The legal challenges brought by the plaintiffs in these cases are also materially similar, resulting in the same dispositive issues of law and fact. Plaintiffs in all cases allege that assault weapons are commonly possessed and that the Second Amendment protects their fundamental right to keep and bear such weapons. *Compare* Ex. A at ¶¶ 14–15, *with* Ex. B Cook County Compl. at ¶¶ 1, 4. Plaintiffs in both cases bring just one count, alleging that the challenged restrictions violate the Second Amendment as incorporated through the Fourteenth Amendment. *Compare* Ex. A at ¶ 28, *with* Ex. B at ¶¶ 48, 69. And Plaintiffs in both actions seek the same injunctive relief and monetary damages under 42 U.S.C. § 1983. *Compare* Ex. A at ¶ 35, *with* Ex. B at ¶ 71.

To be sure, the cases are not identical in every respect. While all three ordinances prohibit the sale of assault weapons, the Cook County and Highland Park actions challenge the ban on the possession of assault weapons. The Naperville action, by contrast, involves a challenge to Naperville's prohibition of the commercial sale of assault weapons. Local Rule "40.4(a)(2), however, does not demand a complete identity of legal and factual issues; rather, the cases must 'involve *some of* the same issues of fact or law.'" *Sha-Poppin Gourmet Popcorn, LLC v. JP Morgan Chase Bank, N.A.*, 2020 WL 8367421, at *2 (N.D. Ill. Sept. 4, 2020) (emphasis in original) (quoting L.R. 40.4(a)(2)). And here, the key dispositive legal issue in each case is whether assault weapons bans are constitutional, which will require the court to determine how *Bruen* applies to these gun regulations. Thus, the cases are clearly related. *See, e.g.*, *Murry v. Am. Mortg. Banc, Inc.*, 2004 WL 407010, at *2 (N.D. Ill. March 1, 2004) (explaining that perfect symmetry is not required for a finding of relatedness; cases were related because they

6

required "a determination of the legality of the same defendants' actions under the same statutes and regulations").

## II. The Cook County, Highland Park and Naperville Cases Are All Pending in This Court.

In addition to the threshold question of relatedness, there are four conditions for reassignment. The first condition of reassignment is that "both cases are pending in this Court." L.R. 40.4(b)(1). Here, both the Cook County and Naperville cases are currently pending in the Northern District of Illinois, thereby satisfying the first condition. The Highland Park case, which is also subject to a motion for reassignment, is also pending in the Northern District of Illinois.

## III. Reassignment Would Promote the Efficient Use of Judicial Resources.

The second condition for reassignment is that "the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort." L.R. 40.4(b)(2).

Here, assigning both cases to this Court's docket will save the judiciary substantial time and resources for three reasons: (1) both actions challenge substantially similar ordinances under the Second Amendment; (2) a similar motion to reassign the Highland Park case is already pending in this Court; and (3) the plaintiffs in both the Highland Park and Naperville cases have filed a motion to amend their complaints, seeking to challenge HB 5471 on assault weapons.

### A. Both Actions Challenge Similar Ordinances Under the Second Amendment.

First, both actions challenge substantially similar ordinances and concern the same key constitutional issues. The brief and accompanying expert reports that Naperville filed on December 19, 2022 in response to the Naperville Plaintiffs' preliminary injunction motion will heavily overlap with the brief and accompanying expert reports that Cook County is scheduled to file on February 2, 2023 in support of its summary judgment motion. Both briefs will make

7

similar arguments about the applicability of the Second Amendment and *Bruen* to these substantially similar ordinances.

And indeed, some of the experts presented by Cook County and Naperville will be the same. Thus, a single judge can most efficiently adjudicate both actions. *See, e.g.*, *Stingley v. Laci Transp., Inc.*, 2020 WL 12182491, at *3 (N.D. Ill. Dec. 1, 2020) (reassigning a related case where "several [] issues" had not yet been resolved, "meaning both that already-expended judicial time will not be wasted and that only one judge will have to resolve those complex and consequential issues"); *BP Corp. N.A. Inc. v. N. Tr. Invs., N.A.*, 2009 WL 1684531, at *2–3 (N.D. Ill. June 15, 2009) (reassigning case where the two actions interpreted the same provisions of law, applied the same case law, and necessitated the same experts); *cf. Sha-Poppin Gourmet Popcorn*, 2020 WL 8367421, at *3 ("The Seventh Circuit has been critical of district courts for failing to reassign cases presenting overlapping issues . . . .") (citing *Smith v. Check-N-Go of Illinois, Inc.*, 200 F.3d 511, 513 n.* [sic] (7th Cir. 1999)); *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 839 (7th Cir. 1999) ("By far the best means of avoiding wasteful overlap when related suits are pending in the same court is to consolidate all before a single judge.").

The potential efficiency gains of reassignment are especially significant here because *Bruen* instructs courts to engage in a comprehensive historical analysis to determine whether restrictions on firearms protected by the Second Amendment are "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. Such an analysis "can be difficult; it sometimes requires resolving threshold questions, [] making nuanced judgments about which evidence to consult and how to interpret it," and performing a detailed review of many different historical and empirical sources. *Id.* (citation omitted); *see also United States v. Bullock*, 2022 WL 16649175, at *1, *3 (S.D. Miss. Oct. 27, 2022) (noting that "courts have

8

realized, after *Bruen*, [that] adjudicating the issue[s] presents certain difficulties" and considering whether to appoint a historian as a court-appointed expert).

Given the complexity of the analysis, it would waste judicial resources for two courts to conduct the same historical and empirical inquiry into assault weapons restrictions, including the assessment of reports from some of the very same experts. *Cf. Ewing*, 35 F.4th at 594. Indeed, without reassignment, resolving Plaintiffs' claims requires two different judges "to tread much, if not all, of the same ground." *See Sha-Poppin Gourmet Popcorn*, 2020 WL 8367421, at *3. And the substantial overlap in these two actions means that, absent reassignment, there is a serious risk of inconsistent rulings and piecemeal appeals on a novel issue. *See, e.g.*, *Helferich Pat. Licensing, L.L.C. v. N.Y. Times Co.*, 2012 WL 1368193, at *3 (N.D. Ill. April 19, 2012) ("[R]eassigning the cases to the same judge would avoid potentially inconsistent or conflicting rulings with regard to the common claims arising in each case.").

### B. A Similar Motion to Reassign Is Already Pending in this Court.

Second, in addition to this current Motion to Reassign, this Court is already considering a similar motion to reassign the Highland Park case. The Highland Park motion and Naperville's Motion to Reassign are substantially similar for the same reason—all three ordinances (Cook County, Highland Park, and Naperville) regulate assault weapons and the plaintiffs raise similar arguments and make similar Second Amendment allegations challenging each.

In Highland Park's motion to reassign to this Court's docket, it argues that its ordinance was modeled after Cook County's ordinance and that it contains similar language. Mem. in Support of Mot. to Reassign, Dkt. 39 in Case No. 1:22-cv-04774, at 2. It also argues that reassignment will save judicial resources because of the overlaps in evidence and constitutional inquiries. *Id.* at 6–9. Naperville is making similar arguments in this Motion to Reassign. *See supra*. Because this Court is already considering Highland Park's motion, reassigning the

Naperville case to this Court's docket will enable this Court to potentially adjudicate the

constitutionality of all three ordinances at the same time, thereby saving enormous judicial

resources. *See Blair*, 181 F.3d at 839 ("By far the best means of avoiding wasteful overlap when

related suits are pending in the same court is to consolidate all before a single judge.").

### C.    Motions to Amend Complaints to Challenge the State Assault Weapons Ban Are Currently Pending.

Third, in light of the statewide ban of assault weapons, HB 5471, the plaintiffs in both the

Highland Park and Naperville cases have filed a motion to amend and supplement their

complaints. In both cases, the plaintiffs seek to amend their complaints to challenge the

constitutionality of the statewide ban in addition to the Highland Park Ordinance and Naperville

Ordinance (Dkt. 41 in Case No. 1:22-cv-04775; Dkt. 42 in Case No. 1:22-cv-04774). In identical

terms, the Highland Park and Naperville plaintiffs argue that the state law is "unconstitutional for

the same reason the Ordinance is unconstitutional" and that although "Plaintiffs could file a

complaint in a separate action challenging the State Law, . . . [i]t would, however, promote a

complete adjudication of the dispute between the parties and serve the interests of judicial

economy and the economic and speedy disposition of the entire controversy, if Plaintiffs were to

supplements their existing complaint in this action." Mot. to Amend Compl., Dkt. 41 in Case No.

1:22-cv-04775 at 4; Dkt. 42 in Case No. 1:22-cv-04774 at 4. Moreover, both the Highland Park

and Naperville plaintiffs seek to add as defendants the police chiefs in their respective cities who

will enforce the statewide ban. *Id.*

As such, the motion to amend the complaint in the Highland Park case is virtually

identical to the motion to amend the complaint in the Naperville case. Because this Court is

already considering Highland Park's motion to reassign to this Court's docket, reassigning the

10

Naperville case will potentially allow this Court to adjudicate these identical motions at the same time, thereby saving judicial resources.

For all of these reasons, there are substantial time and resource efficiencies to reassignment.

## IV.    Reassignment Will Not Substantially Delay Proceedings in this Case.

The third condition for reassignment is that "the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially." L.R. 40.4(b)(3).

Here, reassignment will not substantially delay proceedings in this case. While the Cook County action was filed about two years before the Naperville action, the cases are now proceeding on similar timeframes given this Court's adjustment to the Cook County case schedule in light of *Bruen* (*See* Dkt. 46, 63 in Case No. 1:21-cv-04595). Accordingly, reassignment will not significantly delay proceedings in the Cook County action. Neither case has had any dispositive rulings, and Cook County will be filing a substantive brief in early February on the same substantive issues with very similar expert reports involving some of the same experts that Naperville briefed in response to Naperville Plaintiffs' preliminary injunction motion in December. *See, e.g.*, *Gautreaux v. Chi. Hous. Auth.*, 2013 WL 5567771, at *4 (N.D. Ill. Oct. 9, 2013) (finding reassignment appropriate when neither case had addressed the primary legal issue raised).

Despite the difference in procedural postures, Defendants in both cases will be presenting substantive argument on the core constitutional issues at the same time, and there is no reason to believe that reassignment would cause any delay, much less "substantial" delay. *See, e.g., 21 srl v. Enable Holdings, Inc.*, 2009 WL 4884177, at *3 (N.D. Ill. Dec. 9, 2009) (noting that one case was "more advanced" than the other but holding that any resulting delay associated with getting

11

the cases on the same timeline would not be "substantial"); *accord* L.R. 40.4(b)(3) (the focus is whether reassignment would cause "the proceedings in the earlier case" to be delayed "substantially").

## V.    Both Cases Are Susceptible of Disposition in a Single Proceeding.

The fourth condition for reassignment is that "the cases are susceptible of disposition in a single proceeding." L.R. 40.4(b)(4).

Here, this action and the Naperville action are susceptible of disposition in a single proceeding. As described above, the actions involve overlapping Second Amendment issues. *See Glob. Pat. Holdings*, 2008 WL 1848142, at *4 (granting motion for reassignment where "both actions involve prima facie fundamentally similar claims and defenses that will likely be amenable to dispositive treatment in unified proceedings"); *Freeman v. Bogusiewicz*, 2004 WL 1879045, at *2 (N.D. Ill. Aug. 11, 2004) (reassignment appropriate where "[t]he facts and issues in both cases are similar in nature and can be handled more efficiently in one proceeding"). And reassignment to a single judge who can oversee both actions reduces the risk of inconsistent rulings and piecemeal appeals that exists if the cases are proceeding on different timelines in front of different judges. *See, e.g.*, *Helferich Pat. Licensing*, 2012 WL 1368193, at *3 ("reassigning the cases to the same judge would avoid potentially inconsistent or conflicting rulings with regard to the common claims arising in each case"); *21 srl*, 2009 WL 4884177, at *2 (explaining that "reassignment would save judicial time and effort by avoiding potentially inconsistent rulings" and noting that the Seventh Circuit has criticized district courts for allowing "multiple cases involving similar legal issues to proceed along different tracks before different

12

judges, resulting in numerous and disparate decisions, as well as multiple appeals" (citation and internal quotation marks omitted)). [4]

In sum, the criteria set forth in Local Rules 40.4(a) and (b) are satisfied here, and the Naperville action should be reassigned to this Court.

## **CONCLUSION**

For these reasons, this Court should find that the Naperville and Cook County actions are related and reassign the Naperville action to this Court's docket.


Dated: January 19, 2023         Respectfully submitted,

        */s/ Christopher B. Wilson*
        Christopher B. Wilson (No. 06202139)
        Micaela M. Snashall (6339703)
        Gabriel Tong (6342969)
        PERKINS COIE LLP
        110 N. Wacker, Ste. 3400
        Chicago, IL 60606
        Telephone: (312) 324-8400
        Facsimile: (312) 324-9603
        CWilson@perkinscoie.com
        MSnashall@perkinscoie.com
        GTong@perkinscoie.com


        Douglas N. Letter (*pro hac vice forthcoming*)
        Shira Lauren Feldman (*pro hac vice*)
        BRADY
        840 First Street NE, Suite 400
        Washington, DC 20002
        Telephone: (202) 370-8100
        sfeldman@bradyunited.org

---

[4] While the cases are amenable to a single disposition, reassignment does not require the Court to resolve both cases at the same time. *See, e.g., Helferich Pat. Licensing*, 2012 WL 1368193, at *3 ("Reassignment does not require that the two cases be bound together, proceeding in unison for all purposes. In fact, reassignment does not even require the [c]ases to be disposed of at the same time; they merely need to be susceptible to disposition at the same time.") (emphasis in original); *Velocity Pat. LLC v. Mercedes-Benz USA, LLC*, 2014 WL 1661849, at *2 (N.D. Ill. Apr. 24, 2014) ("This is not to say that the cases will be disposed of at the same time, but only that they are susceptible.") (emphasis in original).

*Attorneys for Non-Party Movant City of Naperville, Illinois*

14

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CUTBERTO VIRAMONTES, an individual
and resident of Cook County, Illinois, *et al.*,

        Plaintiffs,

    v.

THE COUNTY OF COOK, a body politic and
corporate, *et al.*,

        Defendants.

No. 1:21-cv-04595

Honorable Rebecca R. Pallmeyer

Honorable Susan E. Cox

## INDEX OF EXHIBITS IN SUPPORT OF THE CITY OF NAPERVILLE'S MOTION TO REASSIGN RELATED CASE PURSUANT TO LOCAL RULE 40.4

| Exhibit | Description |
|---------|-------------|
| A | Complaint, *Bevis v. City of Naperville*, No. 1:22-cv-04775 (N.D. Ill. Sept. 7, 2022) (Dkt. 1) |
| B | Complaint, *Viramontes v. County of Cook*, No. 1:21-cv-04595 (N.D. Ill. Aug. 27, 2021) (Dkt. 1) |

160140393.3
160187302.1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that in accordance with Federal Rule of Civil Procedure 5 and Local Rule 5.5, the following document was served on January 19, 2023 through the district court's ECF system to all ECF filers, and by electronic mail to the following:

Jason Craddock
Attorney at Law
2021 Midwest Rd., Ste 200
Oak Brook, IL 60523
craddocklaw@icloud.com

Barry K. Arrington
Arrington Law Firm
3801 East Florida Avenue, Suite 830
Denver, Colorado 80210
barry@arringtonpc.com

*/s/ Christopher B. Wilson*
Christopher B. Wilson