**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ROBERT C. BEVIS, and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation, | ) ) ) ) ) | Case No. 22-cv-04775 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CITY OF NAPERVILLE, ILLINOIS, and JASON ARRES, Chief of Police of Naperville, Illinois; | ) ) ) ) | |
| Defendants. | ) ) | |

## MOTION FOR INJUNCTION PENDING APPEAL

Plaintiffs submit the following Motion for Injunction Pending Appeal.

### I.      Procedural Background

Plaintiffs filed motions for preliminary injunction with respect to the City of Naperville Ordinance on November 18, 2022 [Doc. 10] and with respect to the State of Illinois Statute on January 24, 2023 [Doc. 50 (hereinafter, "Mot.")]. The Court denied Plaintiffs' motions for preliminary injunction in an order dated February 17, 2023 [Doc. 63 (hereinafter, the "Order")]. On February 21, 2023, Plaintiffs appealed the Order to the United States Court of Appeals for the Seventh Circuit [Doc. 64]. *See* 28 U.S.C. § 1292(a)(1) (order denying request for preliminary injunction appealable).

### II.      Standard of Review

Fed.R.App.P. 8(a)(1)(C) states that a party must move first in the district court for an injunction pending appeal. Fed.R.Civ.P. 62(d) provides that a district court may grant an

1

injunction while an interlocutory appeal is pending. In evaluating a motion for entry of an injunction pending appeal, the court must consider: (1) whether the movants have made a strong showing that they are likely to prevail on the merits of their appeal; (2) whether the movants will be irreparably injured if the injunction is not granted; (3) whether granting the injunction will substantially harm the opposing parties; and (4) where the public interest lies. *Denver Bible Church v. Becerra*, 2021 WL 1220758, at *1 (D. Colo. 2021). Thus, the standard for an injunction pending appeal is similar to the standard for a preliminary injunction. In a constitutional case like this one, "the [preliminary injunction] analysis begins and ends with the likelihood of success on the merits of [that] claim." *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017) (internal quotation omitted). *See also Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (same). Accordingly, Sections III to X will focus on that issue. Section XI will focus on the remaining three prongs.

### III.    Justice Thomas: Laws Like the Illinois Statute and the City's Ordinance are Clearly Unconstitutional

This is not a close case. Justice Thomas, the author of *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), has provided a roadmap to the resolution of this case in his dissent from denial of certiorari in *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting). Justice Thomas examined an arms ban that was for practical purposes identical to the Illinois' statute.[1] He noted that under *Heller*, only those "weapons typically possessed by law-abiding citizens for lawful purposes" are excluded from Second Amendment protection. *Id*. Millions of Americans own AR-style semiautomatic rifles for lawful purposes, including self-defense and target shooting. *Id*. "**Under our precedents, that is**

---

[1] His analysis applies equally to the City's absolute ban on commercial sales. Like the Court in its Order (18 n. 8), Plaintiffs will treat the two laws the same in this brief.

all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Id*. (emphasis added). Thus, this case turns on *Heller's* simple rule to which Justice Thomas alluded. Is the firearm hardware commonly owned by law-abiding citizens for lawful purposes? "**If the answer[ is] 'yes,' the test is over**." *Duncan v. Becerra ("Duncan III")*, 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019)[2].  In this case, the answer is "yes." The test is, therefore, over. The challenged laws are unconstitutional. It is just that simple.

## IV.    "The Relative Dangerousness of a Weapon is Irrelevant"

In *Heller* the Supreme Court held that the Nation's **historical tradition** of firearms regulation supports banning weapons that are both "dangerous and unusual." *Heller*, 554 U.S. at 627 (emphasis added). Here, apparently relying on this passage from *Heller*, the Court held that "[b]ecause assault weapons are particularly dangerous weapons and high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with **history and tradition**." Order 30 (emphasis added). With all due respect, the Court has misinterpreted *Heller* in two respects. Importantly, "[the *Heller* test] is a conjunctive test: A weapon may not be banned unless it is **both** dangerous **and** unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J. concurring) (emphasis in the original). An arm that is commonly possessed by law-abiding citizens for lawful purposes is, by definition, not unusual. Thus, such an arm cannot be both dangerous and unusual and therefore it cannot be subjected to a categorical ban. *Heller*, 554 U.S. at 629. It follows, that "the relative dangerousness of a

---

[2] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 213 L. Ed. 2d 1109, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022), *and rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).

weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418.

In summary, under *Heller*, the nation's history of firearms regulation supports a law banning a "dangerous and unusual" weapon. Conversely, nothing in *Heller* suggests that the nation's history of firearms regulation supports a law banning a weapon commonly used for lawful purposes because it is "particularly dangerous." This Court did not recognize this critical distinction in its Order, and it erred when it upheld the challenged laws merely because the banned arms are in its view particularly dangerous.

This Court cited *Heller's* reliance on a passage from 4 William Blackstone, *Commentaries on the Laws of England* as authority for upholding the arms ban. Order 18. This Court misapprehended *Heller* in this regard. That Blackstone passage states: "The offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." *Id.*, at 148-49. But even though *Heller* cited this passage, it used the conjunctive (and not the disjunctive) when it described the type of arms that may be banned. And as Justice Alito noted, its use of the conjunctive is important. *Bruen* goes even further and explicitly links the "dangerous and unusual" test with the "common use" test:

> [In *Heller*], we found it 'fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' 'that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.' *Id.*, at 627, 128 S.Ct. 2783 (first **citing 4 W. Blackstone**, Commentaries on the Laws of England 148–149 (1769).

*Id.*, 142 S. Ct. at 2128 (emphasis added).

In a second passage, the Court repeated this theme:

> At most, respondents can show that colonial legislatures sometimes prohibited the carrying of 'dangerous **and** unusual weapons' – a fact we already acknowledged in *Heller*. … Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the

4

time,' as opposed to those that 'are highly unusual in society at large.' … Whatever the likelihood that handguns were considered 'dangerous **and** unusual' during the colonial period, they are indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.' … **Thus, even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.**

*Id*., 142 S. Ct. at 2143 (emphasis added).

This passage from *Bruen* cannot be reconciled with this Court's Order. In *Bruen*, the Court held that even if founding era laws prohibited arms because they were considered dangerous and unusual, those laws "provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id*.

**V.      The Court Failed to Distinguish Between "Ban" and "Regulation"**

The Court held that because, in its view, the banned weapons are particularly dangerous, "their **regulation** accords with history and tradition." Order 30 (emphasis added). The word "regulation" is misplaced. This is a ban, not a regulation, and *Heller* distinguishes between laws that ban arms and laws that regulate arms. The flaw in the Court's historical analysis is that it has failed to distinguish between the two types of laws. *Heller* held that "dangerous and unusual" arms may be banned. *Id*., 554 U.S. at 627. Conversely, arms typically possessed by law-abiding citizens may not be banned. *Id*., 554 U.S. at 628. In the same passage, the Court held that various regulations – short of bans – such as prohibitions on concealed carry, possession of firearms by felons, possession of firearms in sensitive places, and conditions on the commercial sales of weapons, are legitimate. *Id*., 554 U.S. at 627-28. The reason for this dichotomy is that nothing in the Nation's history and tradition of firearm laws, "remotely burden[s] the right of self-defense as much as an absolute ban." *Id*., 554 U.S. at 632. Whereas

5

regulations that do not burden the right anywhere near as much as a ban may be "fairly supported by [] historical tradition." *Id*., 554 U.S. at 628.

## VI.     This Court's Means-End Scrutiny was Not Proper

This Court properly recognized that *Bruen* rejected means-end scrutiny as a mode of analysis in the context of the Second Amendment. Order 13. The Supreme Court also warned courts to be careful not to allow means-end analysis to impact their analysis in other, less obvious ways.  In particular, *Bruen* stated that "courts may [not] engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id*., 142 S. Ct. at 2133 n. 7. Unfortunately, the Court erred when it did just that. Pages 26 to 30 of the Order recite the Court's public safety concerns implicated by the semi-automatic rifles and magazines banned by the challenged laws. The Court followed that discussion by stating that Naperville and Illinois addressed these public safety concerns with their laws, and for that reason the laws are constitutional. Order 30. But it is this sort of means-end scrutiny that may not be used to justify a firearms regulation. "To justify its regulation, the government **may not simply posit that the regulation promotes an important interest**. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added). The Court may not identify an important governmental interest (such as public safety) and uphold the challenged laws on the ground that the means the State and the City chose further that governmental end. But that is what the Court did.

The arms banned by the challenged laws are typically possessed by law abiding-citizens for lawful purposes. The whole point of *Heller* is that a categorical ban of such commonly

6

possessed arms is not supported by the Nation's historical tradition of firearms regulation. As in *Heller*, none of the historical regulations identified by the Court "remotely burden[s] the right of self-defense as much as an absolute ban on" commonly possessed arms in the challenged laws. *See Heller*, 554 U.S. at 632. This is *Heller's* simple rule. This Court's means-end analysis cannot be reconciled with that rule.

## VII.    The City's Central Premise is False

### A.    *Heller* Rejected the City's Central Premise

The Central Premise of the City's argument is that when it decided *Heller*, the Supreme Court surely never intended to extend Second Amendment protection to a category of firearms that can be used in mass shootings. The City's Central Premise rests on a fundamental misunderstanding of *Heller* and is therefore false. This is easily demonstrated.

On April 16, 2007, Seung Hui Cho committed a mass shooting at Virginia Tech University.[3] At the time, Cho's crime was the worst mass shooting in American history. *Id*. Cho fired 174 rounds, killed thirty-two people, and wounded many others.[4] Aside from the first two murders, Cho was able to do all of this in only a few minutes. *Id*. Cho did not use an "assault rifle" to commit his crimes.[5] He used two semiautomatic handguns. *Id*.

*Helle*r was argued less than one year later on March 18, 2008,[6] and D.C. made sure the Court was aware that the worst mass shooting in U.S. history up until then had recently been committed with handguns like those banned by its ordinance. It wrote in its brief: "In the recent Virginia Tech shooting, a single student with two **handguns** discharged over 170 rounds in

---

[3] Ben Williamson, *The Gunslinger to the Ivory Tower Came: Should Universities Have A Duty to Prevent Rampage Killings?,* 60 Fla. L. Rev. 895, 895–96 (2008).
[4] Grant Arnold, *Arming the Good Guys: School Zones and the Second Amendment*, 2015 B.Y.U. Educ. & L.J. 481, 500–01 (2015).
[5] Craig R. Whitney, *A Liberal's Case for the Second Amendment, 31 T.M. Cooley L. Rev. 15, 19 (2014).*
[6] *Id*., 554 U.S. at 570.

nine minutes, killing 32 people and wounding 25 more." Brief of Petitioners, *D.C. v. Heller*, 2008 WL 102223, 53 (emphasis added). Thus, when it decided *Heller*, the Supreme Court was keenly aware that semiautomatic handguns could be used in mass shootings. Nevertheless, it struck D.C.'s ban as unconstitutional. In doing so, the Court wrote:

> **We are aware of the problem of handgun violence** in this country, and **we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution**. The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, [] But the enshrinement of constitutional rights necessarily **takes certain policy choices off the table. These include the absolute prohibition of handguns** held and used for self-defense in the home.

*Heller*, 554 U.S. at 636 (emphasis added).

Only months after the Virginia Tech shooting, the Supreme Court held that the very weapons used by the shooter were protected by the Second Amendment. It follows that the City's Central Premise is false. The fact that a weapon can be used in a mass shooting does not disqualify it from Second Amendment protection. Otherwise, *Heller* would have come out the other way.

The case for upholding Second Amendment rights is even more compelling here than in *Heller*. In *Heller*, the Court held that the rights of the millions of Americans who possess handguns will not be taken away even though handguns are used by thousands of criminals to kill over ten thousand people every year.[7] In contrast, as horrific as mass shootings are, they actually account for only a tiny fraction of homicides. Mot. 17-18. The banned arms are owned by millions. Mot. 13-20. The rights of those millions cannot be taken away because a few maniacs use semi-automatic rifles to kill tens of people each year in mass shootings.

Then-Judge Kavanaugh expressed the matter this way in his dissent in *Heller II*:

---

[7] U.S. Dept. of Just., *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019, Crime in the United States*, 2019, FBI, available at https://bit.ly/31WmQ1V (last visited Feb. 12, 2023).

[C]onsidering just the public safety rationale invoked by D.C., **semi-automatic handguns are more dangerous as a class** than semi-automatic rifles . . . [H]andguns 'are the overwhelmingly favorite weapon of armed criminals.'… So it would seem a bit backwards – at least from a public safety perspective – to interpret the Second Amendment to protect semi-automatic handguns but not semi-automatic rifles. … [Heller erects a] serious hurdle … in the way of D.C.'s attempt to ban semi-automatic rifles. Put simply, **it would strain logic and common sense to conclude that the Second Amendment protects semi-automatic handguns but does not protect semi-automatic rifles**.

*Heller v. D.C.*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)

(emphasis added).[8]

In *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), the Seventh Circuit reached a similar conclusion. The Court reviewed the evidence Illinois submitted in support of its view that its firearm regulation would reduce gun violence. The Court ruled the evidence was not relevant to its resolution of the case because:

> … **the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts.** 554 U.S. at 636, 128 S.Ct. 2783. If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois.

*Id.*, 702 F.3d at 939 (emphasis added).

Identical logic applies in this case. "If the mere possibility that [banning certain semi-automatic weapons would decrease the harm of mass shootings] sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois." *Id*.

## VIII.  The *Heller/Bruen* Historical Analysis

### A.  The Founding Era is the Relevant Time Frame

---

[8] Plaintiffs shall refer to Judge Kavanaugh's dissent in this case as "*Heller II*." Even though Judge Kavanaugh was in dissent, after *Bruen* his analysis almost certainly accurately reflects the law. Indeed, in *Bruen,* the Court cited Judge Kavanaugh's dissent with approval multiple times. *See, id.*, 142 S. Ct. at 2129, n.5, 2134, 2137,

This is a simple case that may be resolved under the "hardware test." But even if one engages in a detailed historical review, the result does not change. The challenged laws are unconstitutional. The first issue in a historical inquiry is to identify the relevant time period. In *Bruen*, the Court noted that "not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have **when the people adopted them**.'" *Id.*, 142 S.Ct at 2136, *citing Heller*, 554 U.S. at 634- 35 (emphasis in the original). The Second Amendment was adopted in 1791. The Court cautioned against "giving postenactment history more weight than it can rightly bear." *Id.*, 142 S.Ct. at 2136. And "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S.Ct. at 2137 (citation omitted). In examining the relevant history that was offered in *Bruen*, the Court noted that "[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Bruen*, 142 S.Ct at 2137 (citing *Heller*, 554 U.S. at 614). The Court need not resolve the issue of whether 1791 or 1868[9] is the proper timeframe, because, as in *Bruen*, "the lack of support for [the City's] law in either period makes it unnecessary to choose between them." *Id.*, 142 S.Ct at 2163 (Barrett, J., concurring)

### B.     The Court Should Not Focus on the 20th Century

---

[9] *Bruen* noted an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope ..." *Id.*, 142 S.Ct. at 2138. At the same time, however, the Court noted that it had "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*, 142 S.Ct. at 2137 (citations omitted). The founding era is key. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (2022), available at [bit.ly/3Xwtgze](bit.ly/3Xwtgze) (last visited Feb. 16, 2023). This is evident for at least two reasons. First, in *McDonald*, the Court held that the Second Amendment bears the same meaning as applied against the federal government as it does against the states. *Id.*, 561 U.S. at 765. Second, the Supreme Court has always treated the time of the ratification of the Bill of Rights as the key historical period for understanding the scope of those rights – regardless of whether the Court was applying the Amendments against the federal government or against the states. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

The thrust of the City's argument appears to be that even if there is no founding era precedent analogous to its ban, it may instead point to 20th century precedent because the arms it bans are the product of advances in weapons technology that have created new social problems. This is not proper. In *Bruen*, the Court stated: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154, n. 28. The Supreme Court ignored 20th century precedent in *Bruen*. The Court should do the same in this case.

The City's argument is also inconsistent with *Heller*. The modern handguns at issue in *Heller* were the product of exactly the same sort of technological innovation cited by the City. Those handguns produced the same societal problems. Nevertheless, the Supreme Court held that D.C.'s ban was an extreme historical outlier, *Heller*, 554 U.S. at 629, and held the ban was unconstitutional. The flaw in the City's argument is that it believes that merely identifying advances in firearm technology satisfies its burden. But *Bruen* flatly states it does not: "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*., 142 S.Ct. at 2132, *quoting Heller*, 554 U.S. at 582.

In summary, the issue before the Court is whether historical precedent from the founding era (not from the 20th century) evinces a comparable tradition of regulation with the purpose of controlling the societal problem identified by the City. *Id*. 142 S. Ct. at 2131-32 (internal citations and quotation marks omitted). Like D.C., the City cannot point to a single

founding-era law (far less a national tradition) that prohibited mere possession of an entire class of commonly held firearms. As Judge Kavanagh stated in *Heller II* with respect to D.C.'s ban of semi-automatic rifles, the historical facts are substantially the same as in *Heller* and therefore the result should be the same as well. *Id.*, 670 F.3d at 1287.

### C. The City's Burden is to Identify "an Enduring American Tradition," Not a Handful of Isolated Examples and Outliers

Even if the City were able to identify a handful of isolated examples and outliers, that would not carry its burden. "[T]he burden falls on [the City] to show that [its regulation] is consistent with this **Nation's historical tradition** of firearm regulation." *Bruen*, 142 S. Ct. at 2135 (emphasis added). The issue is whether a widespread and enduring tradition of regulation existed, and a few isolated regulations do not establish such a tradition. The "bare existence" of "localized restrictions" is insufficient to counter an "American tradition." *Id.*, 142 S. Ct. at 2154. A handful of examples is insufficient to show a tradition. *Id.*, 142 S. Ct. at 2142 (three regulations insufficient to show a tradition). Isolated examples do not "demonstrate a broad tradition of [the] States." *Id.*, 142 S. Ct. at 2156.

### D. The City's Focus on Mass Shootings Does Not Distinguish This Case from *Heller*

"In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. In *Heller*, D.C.'s flat ban on the possession of handguns was a regulation the Founders themselves could have adopted to confront the societal problem D.C. identified, i.e.

12

handgun violence in urban areas. *Bruen*, 142 S. Ct. at 2131. And since none of the founding era regulations identified by D.C. was analogous to its ban, the ban was unconstitutional.

The City has identified a subset of firearms violence, i.e., mass shootings, as the societal problem it seeks to address with its arms ban. But the City's focus on mass shootings does not distinguish this case from *Heller*, because, once again, D.C. could have made an identical argument in *Heller*. In fact, D.C. **did** make an identical argument in *Heller*. D.C. included a section in its brief in which it described the "harms posed by handguns" it was seeking to address. Brief of Petitioners, *D.C. v. Heller*, 49-55. One of the harms was the use of semi-automatic handguns in mass shootings. *Id.*, at 53 (citing the Virginia Tech shooting as an example). Thus, D.C. specifically identified mass shootings as one of the social problems it was seeking to address. But the mass shooting problem D.C. identified did not change the result in *Heller*. The Court held, even in the face of this issue, that D.C. was required to demonstrate a historical tradition comparable to its firearms ban. There is no such tradition and the law was declared unconstitutional.

In this case, the City seems to believe that if it is able to identify an unprecedented societal concern (i.e., mass shootings), it need not identify a founding era analogue that is "relevantly similar" to the challenged laws. This is not true. Under *Bruen*, a court must determine whether the laws impose a comparable burden as that imposed by a historical analogue from the founding era. *Id.*, 142 S. Ct. at 2132–33. The Court did note that when a regulation implicates unprecedented societal concerns or dramatic technological changes, the search for historical analogies may be more "nuanced." *Id*. But it never suggested that in those cases, the search for founding era analogues may be abandoned altogether. Even in these cases, the government is required to identify a relevantly similar tradition justifying its regulation.

13

*Heller* distinguishes between categorical bans and other types of regulations. The former is simple; the latter may be more nuanced. As discussed above, this case is straightforward and simple. It is not in the "nuanced" category. But even if that were not the case, the City would still be required to show founding era regulations that are "relevantly similar" to its absolute ban. It has not.

## IX.   The City Cannot Identify a Historical Tradition of Absolute Bans of Commonly Held Arms

The City has not identified anything in the historical record that suggests that *Heller's* conclusion – i.e., that bans on commonly possessed arms are not supported by the historical record – should be reconsidered. As then-Judge Kavanaugh stated in *Heller II*, semi-automatic rifles "have not traditionally been banned and are in common use today, and are thus protected under *Heller*." *Heller II*, 670 F.3d at 1287; see also *Bonta*, 542 F. Supp. 3d at 1024 ("a ban on modern rifles has no historical pedigree.").[10]

In its Order, the Court relied upon regulations on Bowie Knives and blunt weapons in its historical analysis. Order 20-23. But none of the laws cited by the Court supports the categorical bans at issue in this case. At best, the Court has established a founding era tradition of prohibiting concealed carry and imposing other regulations short of a ban. Again, *Heller* distinguishes between categorical bans and lesser regulations. *Heller* stated that a categorical ban may be imposed only on dangerous and unusual weapons, and conversely, weapons in common use may not be banned. If founding era laws prohibiting concealed carry and other lesser regulations supported a categorical ban, *Heller* would have come out differently, because *Heller* itself noted the existence of such laws. *Id*., 570 U.S. at 626.

---

[10] *Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021), vacated and remanded on other grounds, 2022 WL 3095986 (9th Cir. 2022). Plaintiffs will refer to this opinion as "*Bonta*."

None of the laws cited by the Court imposed a categorical ban on any weapon. After an exhaustive review of all nineteenth-century state and territorial statutes, Law professor David Kopel, whose work was cited favorably in *Bruen,* concluded: "As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words 'bowie knife' or variant. … At the end of the 19th century, **no state prohibited possession of Bowie knives.**" David Kopel, *Bowie Knife Statutes 1837-1899*, available at bit.ly/3RNRpQD (last visited Feb. 10, 2023) (emphasis added). Kopel concluded that the history of Bowie knife law is no stronger in creating historical precedents for banning common firearms or magazines than that which was examined in *Heller* and *Bruen*. *Id.*

The laws banning trap guns cited by the Court also did not ban any class of arms. Rather, they regulated the manner of using them.[11] That is, they banned setting loaded, unattended guns to prevent unintended discharges. Since these laws were regulations of use and not categorical bans, they offer no support for the laws challenged here.

The Court cited several 20th century laws in its analysis. This was error. In *Bruen*, the Court stated: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154, n. 28.

**X.      Typical Possession, Not Actual Use, is the Test**

By posing and then using cherry-picked data to answer its own question of whether "assault weapons" are frequently used in self-defense, the City has simply attempted to reframe this case into a policy question: does the average citizen really need a semi-automatic rifle? But

---

[11] To this day Illinois' statute bans spring guns as an unlawful **use** of weapons. *See* 720 Ill. Comp. Stat. 5/24-1(a)(5).

the premise of the question was already rejected by *Heller*, which held that it is the choices of the American People – and not their governments – which settle that question.

## XI. The Other Temporary Injunction Factors Are Met

### A. The Factors Are Met on the Basis of the Constitutional Violation

In *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113 (7th Cir. 2017), the Seventh Circuit held that in a constitutional case like this one, "the analysis begins and ends with the likelihood of success on the merits of [that] claim." *Id.*, 858 F.3d at 1116 (internal quotation omitted). *See also Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (same).

But even if one were to examine the other three factors, the result is the same. In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), the Seventh Circuit held that irreparable harm is presumptively established when there is a probable violation of Second Amendment rights. This Court stated that no binding precedent establishes that a violation of any constitutional right is presumed to cause irreparable harm. This is not correct. Indeed, the very case cited by the Court, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), states just that: "The loss of First Amendment freedoms, for even minimal periods of time, **unquestionably** constitutes irreparable injury." (emphasis added). And after *Bruen*, Second Amendment rights are on par with First Amendment rights (*Id.*, 142 S. Ct. at 2156), so this rule should apply in this case as well.

As for the "balance of harm" and "public interest" prongs, injunctions protecting constitutional freedoms "are always in the public interest." *Am. C.L. Union of Illinois v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012). And if the moving party establishes a likelihood of success on the merits, the balance of harms favors granting preliminary injunctive relief. *Id.* In summary, the probable success on the merits prong is determinative. Plaintiffs have established

16

their constitutional rights are violated by the challenged law; therefore, they have necessarily established the irreparable harm, public interest, and balance of harms prongs.

**B.     The Factors Are Met Based on Law Weapons, Inc.'s Extreme Financial Duress**

Plaintiff Law Weapons, Inc. ("LWI") as well as its customers are being prohibited from exercising their Second Amendment rights, which means LWI will be forced out of business. Bevis Dec. ¶ 10. 85% of the firearms LWI sells are banned under the Naperville ordinance and state law. *Id.*, ¶ 12. Cash reserves have been depleted, and as a result, LWI has had to lay off employees and ask Bevis' family to work without pay. *Id.*, ¶ 13. Bevis has extended his personal credit, missed personal payments like home and car payments, maxed his credit limits, and taken out loans to pay the monthly bills. *Id.* LWI will not be able to abide by the terms of its 15-year commercial lease for the business real property, as well as the equipment leases and inventory, if these bans remain in effect any longer. *Id.* In short, Law Weapons, Inc. will be put out of business if these laws are enforced. *Id.*

As this Court held in *Dumanian v. Schwartz*, 2022 WL 2714994, at *14 (N.D. Ill. 2022), a plaintiff suffers irreparable harm if, in the absence of a preliminary injunction, it will go out of business. "A likelihood of lost business is a form of irreparable injury because it is difficult to 'pin[ ] down what business has been or will be lost.'" *Id.*, *quoting Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (*quoting Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632–33 (7th Cir. 2005)); *see In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) (harm to business that "cannot be reliably estimated" was irreparable); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[A] damages remedy may be inadequate if it comes 'too late to save plaintiff's business'" (*quoting Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984))).

The "balance of harms" and "public interest" prongs merge when the government is the defendant. *Eli Lilly & Co. v. Cochran*, 526 F. Supp. 3d 393, 409 (S.D. Ind. 2021), *citing Nken v. Holder*, 556 U.S. 418, 435 (2009). In addition to the reasons identified above, these interests favor granting relief, because the State is not harmed by an injunction in this Court, because the law is already subject to an injunction in another court, as this Court noted in its Order. Moreover, this is not a case where Plaintiffs have sought an injunction against a law of long standing. Neither of the challenged laws was effective until 2023. Therefore, an injunction would preserve the status quo. And a "preliminary injunction is often said to be designed to maintain the status quo pending completion of the litigation. *Praefke Auto Elec. & Battery Co. v. Tecumseh Prod. Co.*, 255 F.3d 460, 464 (7th Cir. 2001).

### C. The Injunction Pending Appeal Must Apply to More Than Just The Plaintiffs

As the challenge to both laws is a facial challenge, the injunction can cover parties beyond the litigants in this case. *Smith v. Executive Dir. of Indiana War Memorials*, 742 F. 3d 282, 290 ("Because Smith has a reasonable likelihood of showing that the policy is unconstitutional both as it was applied to him and as it applies to individuals and small groups generally, the preliminary injunction should prohibit its enforcement against any individual or small group").[12]

Accordingly, for this injunction pending appeal to truly avert irreparable harm and be effective, it must of necessity apply to all affected by the City ordinance and state law.

---

[12] While *Smith* is a First Amendment case, Second Amendment cases are treated the same as First Amendment cases for purposes of constitutional analysis. *Ezell v. City of Chicago*, 651 F. 3d 684, 697 (7th Cir. 2011) ("The loss of a First Amendment right is frequently presumed to cause irreparable harm based on 'the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'" (Citations omitted.) The Second Amendment protects similarly intangible and unquantifiable interests," *id*, at 699).

18

Specifically, the injunction must enjoin enforcement of both laws against purchasers of the banned firearms as well as those who sell them. Otherwise irreparable harm will still accrue to businesses such as Plaintiff Law Weapons, Inc. as they will still not be able to sell the banned firearms if those purchasing them are subject to enforcement of these laws against such purchases.

**X.      Conclusion**

For the foregoing reasons, Plaintiffs have met all of the Fed.R.Civ.P. 62(d) criteria for an injunction pending appeal and respectfully request the Court to enter such injunction forthwith.

*/s/ Jason R. Craddock*
Jason R. Craddock
Law Office of Jason R. Craddock
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(708) 964-4973
cradlaw1970@gmail.com or craddocklaw@icloud.com

*/s/ Barry K. Arrington*
Barry K. Arrington
Arrington Law Firm
4195 Wadsworth Boulevard
Wheat Ridge, Colorado 80033
Voice:  (303) 205-7870
Email: barry@arringtonpc.com
*Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2023, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via email counsel of record:

*/s/ Jason R. Craddock*