# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CUTBERTO VIRAMONTES, an individual and resident of Cook County, Illinois, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THE COUNTY OF COOK, a body politic and corporate, *et al.*, <br><br> Defendants. | No. 1:21-cv-04595 <br><br> Honorable Rebecca R. Pallmeyer <br><br> Honorable Susan E. Cox |

**CITY OF HIGHLAND PARK'S MOTION TO**
**REASSIGN RELATED CASE PURSUANT TO LOCAL RULE 40.4**

The City of Highland Park, Illinois ("Highland Park") respectfully moves to reassign a related case to this Court's docket pursuant to Local Rule 40.4. The related case, captioned *Goldman v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill.) (the "Highland Park action"), is pending in the Northern District of Illinois before Judge Harry D. Leinenweber.

The plaintiffs in the Highland Park action oppose the Motion. The defendants in this action, *Viramontes v. County of Cook*, No. 21-cv-04595 (N.D. Ill.), consent to this Motion and are in favor of reassignment. The plaintiffs in this action take no position on the Motion.

Highland Park respectfully requests that this Court exercise its discretion and grant this Motion for the reasons set forth in the accompanying memorandum of law and supporting exhibits.[1]

Dated: December 23, 2022                    Respectfully submitted,

                                            */s/ David H. Hoffman*
                                            David H. Hoffman (No. 6229441)

---

[1] Undersigned counsel will serve copies of this motion and the accompanying memorandum of law and supporting exhibits on counsel for the plaintiffs in the Highland Park action on the day this motion is filed.

Neil H. Conrad (No. 6321947)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
david.hoffman@sidley.com
nconrad@sidley.com

*Attorneys for Non-Party Movant City of Highland Park, Illinois*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CUTBERTO VIRAMONTES, an individual and resident of Cook County, Illinois, *et al.*, | No. 1:21-cv-04595 |
| Plaintiffs, | Honorable Rebecca R. Pallmeyer |
| v. | Honorable Susan E. Cox |
| THE COUNTY OF COOK, a body politic and corporate, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF THE CITY OF HIGHLAND PARK'S**
**MOTION TO REASSIGN RELATED CASE PURSUANT TO LOCAL RULE 40.4**

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

BACKGROUND ................................................................................................................1

ARGUMENT .....................................................................................................................3

      I.      The Cook County And Highland Park Cases Are Related. ....................................4

      II.     Reassignment Would Promote The Efficient Use Of Judicial Resources. ..............6

CONCLUSION.................................................................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*21 srl v. Enable Holdings, Inc.*, 2009 WL 4884177 (N.D. Ill. Dec. 9, 2009)............................8, 9

*Blair v. Equifax Check Servs., Inc.*,
181 F.3d 832 (7th Cir. 1999) ............................................................................7

*BP Corp. N.A. Inc. v. N. Tr. Invs., N.A.*,
2009 WL 1684531 (N.D. Ill. June 15, 2009)......................................................6

*Ewing v. Carrier*,
35 F.4th 592 (7th Cir. 2022) ..........................................................................4, 7

*Freeman v. Bogusiewicz*,
2004 WL 1879045 (N.D. Ill. Aug. 11, 2004) .....................................................9

*Friedman v. City of Highland Park*,
68 F. Supp. 3d 895 (N.D. Ill. 2014) ...................................................................2

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) .............................................................................2

*Gautreaux v. Chi. Hous. Auth.*,
2013 WL 5567771 (N.D. Ill. Oct. 9, 2013)........................................................8

*Glob. Pat. Holdings, LLC v. Green Bay Packers, LLC*,
2008 WL 1848142 (N.D. Ill. Apr. 23, 2008) ..................................................4, 9

*Helferich Pat. Licensing, L.L.C. v. N.Y. Times Co.*,
2012 WL 1368193 (N.D. Ill. April 19, 2012) .................................................8, 9

*Murry v. Am. Mortg. Banc, Inc.*,
2004 WL 407010 (N.D. Ill. March 1, 2004) .......................................................6

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022)....................................................................................1, 7

*Sha-Poppin Gourmet Popcorn, LLC v. JP Morgan Chase Bank, N.A.*,
2020 WL 8367421 (N.D. Ill. Sept. 4, 2020) ...................................................5, 7

*Stingley v. Laci Transp., Inc.*,
2020 WL 12182491 (N.D. Ill. Dec. 1, 2020)......................................................6

*United States v. Bullock*,
2022 WL 16649175 (S.D. Miss. Oct. 27, 2022) .................................................7

*Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC,*
2019 WL 2515984 (N.D. Ill. June 18, 2019) ...........................................................4

*Velocity Pat. LLC v. Mercedes-Benz USA, LLC,*
2014 WL 1661849 (N.D. Ill. Apr. 24, 2014) ...........................................................9

*Wilson v. Cook County,*
937 F.3d 1028 (7th Cir. 2019) .........................................................................2, 5

**Statutes**

Cook County, Ill. Code §§ 54-211, 54-212 ................................................................1, 5

Highland Park, Ill. Code §§ 136.001-006 ..................................................................2, 5

**Other Authorities**

Local Rule 40.4 ................................................................................................4, 5, 8

## INTRODUCTION

The City of Highland Park, Illinois ("Highland Park") moves under Local Rule 40.4 to reassign a related case to this Court's docket. The related case, captioned *Goldman v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill.) (the "Highland Park action"), is pending in the Northern District of Illinois before Judge Harry D. Leinenweber.

The Highland Park action and this action are both constitutional challenges to ordinances that prohibit assault weapons and large-capacity magazines. As the Seventh Circuit recognized in 2019, the challenged ordinances are materially identical. Both actions involve the same essential question of law: whether, in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), governments may lawfully ban assault weapons. Likewise, both actions raise many common questions of fact, including about how dangerous they are, how broadly Americans lawfully own and use them, and which historical weapons regulations are relevant.

All required conditions for reassignment in Local Rule 40.4 are satisfied. Given the identical ordinances and overlapping nature of the legal and factual issues, Highland Park respectfully requests that this Court exercise its discretion to grant the motion. Reassignment would promote the efficient use of judicial resources and minimize the risk of inconsistent rulings or judgments in the two cases. In accordance with Local Rule 40.4(c), a copy of the *Highland Park* complaint is attached as Exhibit A.

## BACKGROUND

Over a decade ago, Cook County and Highland Park enacted assault weapons and large-capacity magazine bans. The Cook County Board of Commissioners enacted a ban on assault weapons and large-capacity magazines in November 2006. *See* Cook County, Ill. Code §§ 54-

211, 54-212. In June 2013, Highland Park enacted a materially identical ordinance prohibiting assault weapons and large-capacity magazines. *See* Highland Park, Ill. Code § 136.005.

Highland Park modeled its ordinance after Cook County's and, as a result, the two ordinances are nearly identical. *See* Ex. B, Rotering Decl. in *Friedman v. City of Highland Park*, No. 1:13-cv-09073 (N.D. Ill.), Dkt. 45-1, at ¶ 6 (explaining that Highland Park "modeled its Ordinance after Cook County's assault weapon ban"); *Friedman v. City of Highland Park*, 68 F. Supp. 3d 895, 898 n.1 (N.D. Ill. 2014) ("The Ordinance is nearly identical to a ban in neighboring Cook County … ."), *aff'd* 784 F.3d 406 (7th Cir. 2015). As the Seventh Circuit has recognized, the "Highland Park Ordinance defines 'assault weapon' and 'large-capacity magazine' in virtually identical terms as the [Cook] County Ordinance does and proscribes the same conduct: it penalizes those who 'manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess' any assault weapon or large-capacity magazine." *Wilson v. Cook County*, 937 F.3d 1028, 1030 (7th Cir. 2019) (quoting Highland Park, Ill. Code § 136.005).

Both ordinances were challenged as unconstitutional under the Second Amendment in earlier litigations, and both ordinances were upheld by this Court and the Seventh Circuit. *Id.* (upholding Cook County's ban); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) (upholding Highland Park's ban). Now, the constitutionality of the Cook County and Highland Park ordinances are being re-litigated in new lawsuits.

The action pending before this Court, *Viramontes v. Cook County*, No. 1:21-cv-04595 (N.D. Ill.) (the "Cook County action"), was filed on August 27, 2021. In that action, two organizations, the Second Amendment Foundation and the Firearms Policy Coalition, and three individual plaintiffs (the "Cook County Plaintiffs") allege that Cook County's assault weapons

2

ban is unconstitutional.[1] Although that case was filed in the summer of 2021, the schedule for

that case was substantially revised after *Bruen*. Under the current schedule, expert discovery

closed on November 28, 2022, and dispositive motions are due by January 19, 2023. (Dkt. 46 in

Case No. 1:21-cv-04595.)

On September 7, 2022, the National Association for Gun Rights ("NAGR") and

individual plaintiff Susan Goldman (the "Highland Park Plaintiffs") sued Highland Park in

*Goldman v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill.). The Highland Park action is

currently pending before Judge Leinenweber. It challenges the constitutionality of Highland

Park's assault weapons and large-capacity magazine ban. Plaintiffs in the Highland Park action

filed a preliminary injunction motion in October 2022. Judge Leinenweber issued a briefing

schedule on the motion, providing that Highland Park's response is due on January 10, 2023, and

briefing will be completed on March 2, 2023. (Dkt. 22 in Case No. 1:22-cv-04774.) Additionally,

on November 17, 2022, Highland Park filed a partial motion to dismiss Plaintiff NAGR for lack

of standing and a partial Answer as to Plaintiff Susan Goldman. (Dkts. 26, 29 in Case No. 1:22-

cv-04774.) Plaintiff NAGR's response to the motion to dismiss is due December 28, 2022, and

Highland Park's reply is due January 13, 2023. (Dkt. 31 in Case No. 1:22-cv-04774.)

Highland Park now seeks to reassign the Highland Park action to this Court. The

Highland Park Plaintiffs oppose the motion. Cook County is in favor of reassignment. The Cook

County Plaintiffs take no position on the motion.

## ARGUMENT

Local Rule 40.4 allows for the reassignment of related cases. This rule "promotes

efficient use of judicial resources by minimizing duplication of effort on cases that have a great

---

[1] This action is brought against several defendants which are referred to collectively as "Cook County."

deal in common." *Glob. Pat. Holdings, LLC v. Green Bay Packers, LLC*, 2008 WL 1848142, at *2 (N.D. Ill. Apr. 23, 2008). It also supports the judiciary's interest "in avoiding messy, duplicative litigation" and multiple appeals involving the same issues. *Ewing v. Carrier*, 35 F.4th 592, 594 (7th Cir. 2022).

To warrant reassignment under Rule 40.4, first, the cases must be related. "Two or more civil cases may be related if … (1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; [or] (3) the cases grow out of the same transaction or occurrence." L.R. 40.4(a). Second, the moving party must show that "(1) both cases are pending in this Court; (2) the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in a single proceeding." L.R. 40.4(b).

The decision to reassign cases is within the sound discretion of the Court. *See Urb. 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 2019 WL 2515984, at *3 (N.D. Ill. June 18, 2019). If a court grants the motion for reassignment, then the higher-numbered case is transferred to the court's docket of the lower-numbered case.

## I.     The Cook County And Highland Park Cases Are Related.

The Cook County and Highland Park cases clearly "involve some of the same issues of fact or law." L.R. 40.4(a). Because the two cases involve materially identical ordinances, the two cases raise the same core legal issue—whether a local ban on the possession of assault weapons are constitutional after *Bruen*. The two cases will also involve many overlapping issues of fact.

Both ordinances define the prohibited weapons in "virtually identical" ways and ban the "same conduct." *Wilson*, 937 F.3d at 1030; *compare* Cook County, Ill. Code § 54-212, *with*

Highland Park, Ill. Code § 136.005. And the legal challenges brought by the plaintiffs in the two cases are very similar, resulting in the same dispositive issues of law and fact. Plaintiffs in both cases allege that assault weapons are commonly possessed and that the Second Amendment protects their fundamental right to keep and bear such weapons. *Compare* Ex. A at ¶¶ 29–30, *with* Ex. C, Cook County Compl. at ¶¶ 1, 4. Plaintiffs in both cases bring just one count, alleging that the challenged restrictions violate the Second Amendment as incorporated through the Fourteenth Amendment. *Compare* Ex. A at ¶¶ 30, 35, *with* Ex. C at ¶ 69. And Plaintiffs in both actions seek the same injunctive relief and monetary damages under 42 U.S.C. § 1983. *Compare* Ex. A at ¶¶ 36–40, *with* Ex. C at ¶ 71. In fact, the core issues are so similar that the Cook County Plaintiffs explicitly seek to overrule the Seventh Circuit decisions upholding both the Cook County Ordinance *and* the Highland Park Ordinance. *See* Ex. C at ¶ 5.

To be sure, the cases are not identical in every respect. While both ordinances prohibit assault weapons and large-capacity magazines, the Cook County action challenges only the assault weapons ban portion of the Cook County Ordinance. The Highland Park action, by contrast, challenges both the assault weapons ban and large-capacity magazine ban. But Local Rule "40.4(a)(2) does not demand a complete identity of legal and factual issues; rather, the cases must 'involve *some of* the same issues of fact or law.'" *Sha-Poppin Gourmet Popcorn, LLC v. JP Morgan Chase Bank, N.A.*, 2020 WL 8367421, at *2 (N.D. Ill. Sept. 4, 2020) (emphasis in original) (quoting L.R. 40.4(a)(2)). And here, the key dispositive legal issue in both cases is whether assault weapons bans are constitutional, which will require the court in both cases to determine how *Bruen* applies to this type of gun regulation. Thus, the cases are clearly related. *See, e.g.*, *Murry v. Am. Mortg. Banc, Inc.*, 2004 WL 407010, at *2 (N.D. Ill. March 1, 2004) (explaining that perfect symmetry is not required for a finding of relatedness; cases were

related because they required "a determination of the legality of the same defendants' actions

under the same statutes and regulations").

## II.    Reassignment Would Promote The Efficient Use Of Judicial Resources.

All four conditions in Local Rule 40.4(b) are satisfied here.

First, both cases are currently pending in this District.

Second, assigning both cases to this Court's docket will save the judiciary substantial

time and resources. As described above, both actions challenge virtually identical ordinances and

concern the same key constitutional issue. In addition, after discussions between Highland Park

and Cook County, it is apparent that the brief and accompanying expert reports that Highland

Park is scheduled to file on January 10, 2023 in response to the Highland Park Plaintiffs'

preliminary injunction motion will heavily overlap with the brief and accompanying expert

reports that Cook County is scheduled to file on January 19, 2023 in support of its summary

judgment motion.[2] Both briefs will make similar arguments about the applicability of the Second

Amendment and *Bruen* to these essentially identical ordinances. And indeed, some of the experts

presented by Cook County and Highland Park will be the same. Thus, a single judge can most

efficiently adjudicate both actions. *See, e.g.*, *Stingley v. Laci Transp., Inc.*, 2020 WL 12182491,

at *3 (N.D. Ill. Dec. 1, 2020) (reassigning a related case where "several [] issues" had not yet

been resolved, "meaning both that already-expended judicial time will not be wasted and that

only one judge will have to resolve those complex and consequential issues"); *BP Corp. N.A.

Inc. v. N. Tr. Invs., N.A.*, 2009 WL 1684531, at *2–3 (N.D. Ill. June 15, 2009) (reassigning case

where the two actions interpreted the same provisions of law, applied the same case law, and

---

[2] Highland Park has filed an agreed motion requesting that the briefing schedule in its case be adjusted by nine days, so that both its brief and Cook County's brief are due on January 19, 2023. *See* Dkt. 34.

necessitated the same experts); *cf. Sha-Poppin Gourmet Popcorn*, 2020 WL 8367421, at *3 ("The Seventh Circuit has been critical of district courts for failing to reassign cases presenting overlapping issues … .") (citing *Smith v. Check-N-Go of Illinois, Inc.*, 200 F.3d 511, 513 n.* [sic] (7th Cir. 1999)); *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 839 (7th Cir. 1999) ("By far the best means of avoiding wasteful overlap when related suits are pending in the same court is to consolidate all before a single judge.").

The potential efficiency gains of reassignment are especially significant here because *Bruen* instructs courts to engage in a comprehensive historical analysis to determine whether restrictions on firearms protected by the Second Amendment are "consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. Such an analysis "can be difficult; it sometimes requires resolving threshold questions, [] making nuanced judgments about which evidence to consult and how to interpret it," and performing a detailed review of many different historical and empirical sources. *Id.* (citation omitted); *see also United States v. Bullock*, 2022 WL 16649175, at *1, *3 (S.D. Miss. Oct. 27, 2022) (noting that "courts have realized, after *Bruen*, [that] adjudicating the issue[s] presents certain difficulties" and considering whether to appoint a historian as a court-appointed expert).

Given the complexity of the analysis, it would waste judicial resources for two courts to conduct the same historical and empirical inquiry into assault weapons restrictions, including the assessment of reports from some of the very same experts. *Cf. Ewing*, 35 F.4th at 594. Indeed, without reassignment, resolving Plaintiffs' claims requires two different judges "to tread much, if not all, of the same ground." *See Sha-Poppin Gourmet Popcorn*, 2020 WL 8367421, at *3. And the substantial overlap in these two actions means that, absent reassignment, there is a serious risk of inconsistent rulings and piecemeal appeals on a novel issue. *See, e.g.*, *Helferich Pat.*

*Licensing, L.L.C. v. N.Y. Times Co.*, 2012 WL 1368193, at *3 (N.D. Ill. April 19, 2012) ("[R]eassigning the cases to the same judge would avoid potentially inconsistent or conflicting rulings with regard to the common claims arising in each case."). For all of these reasons, there are substantial time and resource efficiencies to reassignment.

Third, reassignment will not substantially delay proceedings in this case. While the Cook County action was filed about a year before the Highland Park action, the cases are now proceeding on similar timeframes given this Court's adjustment to the Cook County case schedule in light of *Bruen*. (*See* Dkt. 46 in Case No. 1:21-cv-04595.) Accordingly, reassignment will not significantly delay proceedings in the Cook County action. Neither case has had any dispositive rulings, and the parties will both be filing substantive briefs in mid-January on the same substantive issues with very similar expert reports involving some of the same experts. *See, e.g.*, *Gautreaux v. Chi. Hous. Auth.*, 2013 WL 5567771, at *4 (N.D. Ill. Oct. 9, 2013) (finding reassignment appropriate when neither case had addressed the primary legal issue raised). Despite the difference in procedural postures, Defendants in both cases will be presenting substantive argument on the core constitutional issues at the same time, and there is no reason to believe that reassignment would cause any delay, much less "substantial" delay. *See, e.g.*, *21 srl v. Enable Holdings, Inc.*, 2009 WL 4884177, at *3 (N.D. Ill. Dec. 9, 2009) (noting that one case was "more advanced" than the other but holding that any resulting delay associated with getting the cases on the same timeline would not be "substantial"); *accord* L.R. 40.4(b)(3) (the focus is whether reassignment would cause "the proceedings in the earlier case" to be delayed "substantially").

Finally, the actions are susceptible of disposition in a single proceeding. As described above, the actions involve overlapping Second Amendment issues. *See Glob. Pat. Holdings*,

2008 WL 1848142, at *4 (granting motion for reassignment where "both actions involve *prima facie* fundamentally similar claims and defenses that will likely be amenable to dispositive treatment in unified proceedings"); *Freeman v. Bogusiewicz*, 2004 WL 1879045, at *2 (N.D. Ill. Aug. 11, 2004) (reassignment appropriate where "[t]he facts and issues in both cases are similar in nature and can be handled more efficiently in one proceeding"). And reassignment to a single judge who can oversee both actions reduces the risk of inconsistent rulings and piecemeal appeals that exists if the cases are proceeding on different timelines in front of different judges. *See, e.g.*, *Helferich Pat. Licensing*, 2012 WL 1368193, at *3 ("reassigning the cases to the same judge would avoid potentially inconsistent or conflicting rulings with regard to the common claims arising in each case"); *21 srl*, 2009 WL 4884177, at *2 (explaining that "reassignment would save judicial time and effort by avoiding potentially inconsistent rulings" and noting that the Seventh Circuit has criticized district courts for allowing "multiple cases involving similar legal issues to proceed along different tracks before different judges, resulting in numerous and disparate decisions, as well as multiple appeals" (citation and internal quotation marks omitted)).[3]

In sum, the criteria set forth in Local Rule 40.4(a) and (b) are satisfied here, and the Highland Park action should be reassigned to this Court.

---

[3] While the cases are amenable to a single disposition, reassignment does not require the Court to resolve both cases at the same time. *See, e.g.*, *Helferich Pat. Licensing*, 2012 WL 1368193, at *3 ("Reassignment does not require that the two cases be bound together, proceeding in unison for all purposes. In fact, reassignment does not even require the [c]ases to be disposed of at the same time; they merely need to be *susceptible* to disposition at the same time.") (emphasis in original); *Velocity Pat. LLC v. Mercedes-Benz USA, LLC*, 2014 WL 1661849, at *2 (N.D. Ill. Apr. 24, 2014) ("This is not to say that the cases will be disposed of at the same time, but only that they are *susceptible*.") (emphasis in original).

**<u>CONCLUSION</u>**

For these reasons, this Court should find that the Highland Park and Cook County actions are related and reassign the Highland Park action to this Court's docket.

Dated: December 23, 2022

Respectfully submitted,

*/s/ David H. Hoffman*
David H. Hoffman (No. 6229441)
Neil H. Conrad (No. 6321947)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
david.hoffman@sidley.com
nconrad@sidley.com

*Attorneys for Non-Party Movant City of Highland Park, Illinois*

10

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CUTBERTO VIRAMONTES, an individual and resident of Cook County, Illinois, *et al.*, | No. 1:21-cv-04595 |
| Plaintiffs, | |
| v. | Honorable Rebecca R. Pallmeyer |
| THE COUNTY OF COOK, a body politic and corporate, *et al.*, | Honorable Susan E. Cox |
| Defendants. | |

## INDEX OF EXHIBITS IN SUPPORT OF THE CITY OF HIGHLAND PARK'S MOTION TO REASSIGN RELATED CASE PURSUANT TO LOCAL RULE 40.4

| Exhibit | Description |
|---|---|
| A | Complaint, *Goldman v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill. Sept. 7, 2022) (Dkt. 1) |
| B | Declaration of Nancy Rotering, *Friedman v. City of Highland Park*, No. 1:13-cv-09073 (N.D. Ill. June 30, 2014) (Dkt. 45-1) |
| C | Complaint, *Viramontes v. County of Cook*, No. 1:21-cv-04595 (N.D. Ill. Aug. 27, 2021) (Dkt. 1) |

# Exhibit A

**Complaint, *Goldman v. City of Highland Park*, No. 1:22-cv-04774**
**(N.D. Ill. Sept. 7, 2022) (Dkt. 1)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, and<br>SUSAN KAREN GOLDMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF HIGHLAND PARK, ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiffs submit the following Complaint against Defendant City of Highland Park,

Illinois (the "City").

## I.  PARTIES

1.      Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit membership and

donor-supported organization qualified as tax-exempt under 26 U.S.C. § 501(c)(4).  NAGR

seeks to defend the right of all law-abiding individuals to keep and bear arms.  NAGR has

members who reside within the City.  NAGR represents the interests of its members who reside

in the City.  Specifically, NAGR represents the interests of those who are affected by the City's

prohibition of commonly used firearms and magazines.  In addition to their standing as citizens

and taxpayers, those members' interests include their wish to exercise their constitutionally

protected right to keep and bear arms without being subjected to criminal prosecution and to

continue to lawfully possess and/or transfer property that they lawfully obtained.  But for the

City's unlawful prohibition of commonly used arms and their reasonable fear of prosecution for

violating these prohibitions, NAGR members would seek to acquire, keep, possess and/or

1

transfer lawful arms for self-defense and other lawful purposes. For purposes of this Complaint, the term "Plaintiffs" is meant to include NAGR in its capacity as a representative of its members.

2.    Plaintiff Susan Goldman is a resident of the City and a law-abiding citizen of the United States. She currently owns certain semi-automatic firearms that are putatively made illegal by the Code (defined below), and magazines capable of holding more than 10 rounds of ammunition. She has possessed this property lawfully for years but stores it outside of the city limits. She seeks to continue possessing her lawfully owned property, acquire additional arms putatively made illegal by the Code, and lawfully transfer property to others within the city limits. But for the City's restrictions on commonly used arms, and her reasonable fear of criminal prosecution for violating these restrictions, she would continue to possess her lawfully owned arms, acquire additional arms, and/or transfer them to others. She is especially aggrieved by the fact that the City's prohibitions require her to store her arms outside the city limits, which requirement renders the arms useless for the defense of her home.

3.    Defendant City of Highland Park, Illinois is a city with an address of 1707 St. Johns Avenue, Highland Park, Illinois 60035.

4.    Defendant is or will enforce the unconstitutional provisions of the Code against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

### III. JURISDICTION AND VENUE

5.    The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to

redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

6.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

7.      Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.  GENERAL ALLEGATIONS

8.      The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed."  U.S. CONST. Amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008) ("*Heller*"); *McDonald v. City of Chicago*, 561 U.S. 742 (2010) ("*McDonald*"); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 2022 WL 2251305 (U.S. June 23, 2022) ("*Bruen*").

9.      The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment.  *McDonald, supra*.

10.     This action challenges the constitutionality of certain provisions of the Highland Park City Code of 1968 (the "Code").  A copy of the relevant portion of the Code is attached hereto as Exhibit A.

11.     Section 136.001of the Code defines the term "assault weapon."  Section 136.005 of the Code states in relevant part:

> No person shall manufacture, sell, offer, or display for sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity Magazine . . .

3

12.     The term "assault weapon" as used in the Code is not a technical term used in the firearms industry or community for firearms commonly available to civilians.  Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes.  Plaintiffs refuse to adopt the City's politically charged rhetoric in this Complaint.  Therefore, for purposes of this Complaint, the term "Banned Firearm" shall have the same meaning as the term "assault weapon" in Section 136.001of the Code.

13.     Plaintiffs and/or their members currently own and possess Banned Firearms.  Plaintiffs and/or their members desire to continue to possess the Banned Firearms within the city limits of the City, and they wish to acquire more Banned Firearms, transfer their currently owned Banned Firearms to other persons in the City and bequeath their Banned Firearms to their devisees.  All of these constitutionally protected activities are made illegal by the Code.

14.     The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes.  *Heller*, *supra*, at 627.

15.     There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles such as those banned by the Code.  The Supreme Court has held as much.  In *Staples v. United States*, 511 U.S. 600 (1994), the Court noted that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions. " *Id*., 511 U.S. 611-12 (identifying the AR-15 – the archetypal "assault weapon" – as a traditionally lawful firearm).  The vast majority of States do not ban they type of semiautomatic rifles deemed "assault weapons" in the Code.

4

16.     Millions of law-abiding citizens choose to possess firearms such as the Banned

Firearms. *Duncan v. Becerra ("Duncan IV)"*, 970 F.3d 1133, 1147 (9th Cir. 2020) [1]

("Commonality is determined largely by statistics."); *Ass 'n of N.J Rifle & Pistol Clubs, Inc. v.*

*Atty. Gen*. *N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned

because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass*

*'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative

estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common

use' as that term was used in *Heller*."); *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1261 (D.C.

Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in

'common use.' "). This is demonstrated by the AR-15 and other modem semiautomatic rifles,

which epitomize the firearms that the City bans.

17.     The AR-15, as just one example among many of a Banned Firearm, is America's "most

popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in

recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson,

*Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J.

1285, 1296 (2009). Already in early 2013, sources estimated that there were five million AR-

15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar.

9, 2013), https://bit.ly/3whtDTj (last visited August 25, 2022); *see also Duncan v. Becerra*

*("Duncan III")*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019). [2]

---

[1] , *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

[2] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and on *reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

18.     Millions of law-abiding citizens own and use for lawful purposes semi-automatic firearms such as the Banned Firearms currently possessed by Plaintiffs.  The Code's prohibition on the possession, sale, or other transfer of the Banned Firearms possessed by Plaintiffs and/or their members violates the Second Amendment.

19.     Section 136.001 of the Code defines the term "large-capacity magazine" to mean any firearm magazine capable of holding more than ten rounds of ammunition.

20.     The Code again uses politically charged rhetoric to describe the arms it bans.  The Code's characterization of these magazines as "large capacity" is a misnomer.  Magazines capable of holding more than 10 rounds are standard capacity magazines.  Plaintiffs refuse to adopt the City's politically charged rhetoric in this Complaint.  Therefore, for purposes of this Complaint, the term "Banned Magazine" shall have the same meaning as the term "large-capacity magazine" in section Section 136.001 of the Code.

21.     Section 136.005 of the Code states in relevant part:

        No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any Assault Weapon or Large Capacity Magazine . . .

22.     Magazines are indisputably "arms" protected by the Second Amendment, as the right to keep and bear arms necessarily includes the right to keep and bear components such as ammunition and magazines that are necessary for the firearm to operate. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing seventeenth century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition"); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless").

6

23.     The magazines the City has banned unquestionably satisfy the "common use" test.

*Duncan III,*, 366 F. Supp. 3d at 1143-45; *Duncan IV*, 970 F.3d at 1146-47.

24.     In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated by Bruen*, *supra*, Judge

Traxler (whose dissenting opinion almost certainly accurately states the law post *Bruen*) stated:

> The record also shows unequivocally that magazines with a capacity of greater
> than 10 rounds are commonly kept by American citizens, as there are more than
> 75 million such magazines owned by them in the United States.  These magazines
> are so common that they are standard on many firearms: On a nationwide basis
> most pistols are manufactured with magazines holding ten to 17 rounds.  Even
> more than 20 years ago, fully 18 percent of all firearms owned by civilians were
> equipped with magazines holding more than ten rounds."

*Id*., 849 F.3d at 154, Traxler, J. dissenting (internal citations and quotation marks omitted).

25.     Magazines capable of holding more than 10 rounds of ammunition are commonly

owned by millions and millions of Americans for all manner of lawful purposes, including self-

defense, sporting, and hunting. They come standard with many of the most popular handguns

and long guns on the market, and Americans own roughly 115 million of them, *Duncan IV*, 970

F.3d at 1142, accounting for "approximately half of all privately owned magazines in the

United States," *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021), *cert. granted, judgment

vacated*, 142 S. Ct. 2895 (2022).  Indeed, the most popular handgun in America, the Glock 17

pistol, comes standard with a 17-round magazine. *See Duncan III*, 366 F.Supp.3d at 1145.

26.     There can be no serious dispute that magazines capable of holding more than 10 rounds

are bearable arms that satisfy the common use test and thus are presumptively protected by the

Second Amendment.  Law-abiding citizens own over 100 million magazines such as the

Banned Magazines.  The Code's prohibition on the possession, sale, or other transfer of the

Banned Magazines owned by Plaintiffs and/or their members violates the Second Amendment.

27.     The Second Amendment's plain text covers the Banned Firearms and the Banned Magazines.  It therefore falls to the Defendant to justify its regulation as consistent with historical tradition rooted in the Founding. This it cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms, such as the Banned Firearms and the Banned Magazines.

28.     In the post-*Bruen* decision of *Rocky Mountain Gun Owners v. The Town of Superior*, Case No. 22-cv-1685 (July 22, 2022), the court entered an order in which it restrained enforcement of certain provisions of a Town of Superior, Colorado ordinance that banned semiautomatic weapons and magazine with a capacity greater than ten rounds.  The court held there was a strong likelihood that the plaintiffs in that case would prevail on the merits of their constitutional challenge to the ordinance provisions.  The restrained ordinance is substantially identical to the ordinance provisions challenged in this action.

29.     There is an actual and present controversy between the parties.  The Code infringes on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of arms that are commonly possessed by millions of Americans for lawful purposes.  Defendant denies these contentions.  Plaintiffs desire a judicial declaration that the Code sections identified above, facially and/or as applied to them, violate their constitutional rights.  Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights.  This is true even if certain provisions of the Code provide affirmative defenses to criminal prosecution.  The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

8

30.     Plaintiffs are or will be injured by Defendant's enforcement of the Code sections identified above insofar as those provisions violate Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, transfer and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  If not enjoined by this Court, Defendant will enforce the Code in derogation of Plaintiffs' constitutional rights.  Plaintiffs have no plain, speedy, and adequate remedy at law.  Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity due to Defendant's present or contemplated enforcement of these provisions.

## V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

31.     Paragraphs 1-30 are realleged and incorporated by reference.

32.     The Code bans firearms and firearm magazines that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.  The Code, therefore, generally prohibits residents of the City including Plaintiffs, from acquiring, keeping, possessing, and/or transferring arms protected by the Second Amendment.  There are significant penalties for violations of the Code.

33.     These restrictions infringe on the right of the people of the City, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to the states and its political subdivisions by the Fourteenth Amendment.

34.     The Code's prohibitions extend into Plaintiffs' homes, where Second Amendment protections are at their zenith.

9

35.     Defendant cannot satisfy its burden of justifying these restrictions on the Second

Amendment right of the People, including Plaintiffs, to bear, acquire, keep, possess, transfer,

and use arms that are in common use by law-abiding adults throughout the United States for the

core right of self-defense in the home and other lawful purposes.

## VI.  PRAYER FOR RELIEF

Plaintiffs pray that the Court:

36.     Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Code sections

identified herein are unconstitutional on their face or as applied to the extent their prohibitions

apply to law-abiding adults seeking to acquire, use, transfer, or possess arms that are in

common use by the American public for lawful purposes;

37.     Enter preliminary and permanent injunctive relief enjoining Defendant and its officers,

agents, and employees from enforcing the unconstitutional Code sections identified above;

38.     Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees,

costs, and expenses under 42 U.S.C. § 1988, or any other applicable law;

39.     Award actual compensatory and/or nominal damages; and

40.     Grant any such other and further relief as the Court may deem proper.

Respectfully submitted this __ day of September 2022.

*/s/ Jason R. Craddock*

_____

Jason R. Craddock
Attorney at Law
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(773) 777-4440
cradlaw1970@gmail.com or craddocklaw@icloud.com

10

Barry K. Arrington*
Arrington Law Firm
3801 East Florida Avenue, Suite 830
Denver, Colorado 80210
(303) 205-7870
barry@arringtonpc.com
*Admission Pro Hoc Vice Pending*

*Attorneys for Plaintiffs*

# CITY OF HIGHLAND PARK

## ORDINANCE NO. ____

### AN ORDINANCE AMENDING CHAPTER 134 OF
### "THE HIGHLAND PARK CODE OF 1968," AS AMENDED,
### REGARDING ASSAULT WEAPONS

**WHEREAS,** Chapter 134 of "The Highland Park Code of 1968," as amended (*"City Code"*), regulates the manufacture, sale, and possession of firearms in the City; and

**WHEREAS**, the Constitution of the United States of America and the Constitution of the State of Illinois afford certain protections related to the ownership of firearms; and

**WHEREAS**, in *District of Columbia v. Heller*, the United States Supreme Court recognized that the Constitutional protections related to firearm ownership is not unlimited, and can be subject to certain types of governmental regulations; and

**WHEREAS**, in its *Heller* decision, the United States Supreme Court specifically acknowledged that the protections afforded by the Second Amendment to the Constitution of the United States does not extend to all types of firearms; and

**WHEREAS**, many courts throughout the nation have upheld local regulations restricting or prohibiting the ownership or possession of assault weapons, including, without limitation, the State of Illinois Appellate Court, the United States District Court for the District of Columbia, and the Court of Appeals for the State of California; and

**WHEREAS**, recent incidents in Aurora, Colorado; Newtown, Connecticut; Tucson, Arizona; and Santa Monica, California demonstrate that gun violence is not limited to urban settings, but is also, tragically, a reality in many suburban and small town locations as well; and

**WHEREAS**, the City Council has determined that assault weapons are not traditionally used for self-defense in the City of Highland Park, and that such weapons pose an undue threat to public safety to residents, property owners, and visitors within the City of Highland Park; and

**WHEREAS,** the City has previously encouraged the Governor and the Illinois General Assembly to enact statewide legislation banning the sale and possession of assault weapons; and

**WHEREAS,** to date, the State has failed to enact a statewide ban on the sale or possession of assault weapons; and

**WHEREAS,** on May 31, 2013, the Illinois General Assembly approved House Bill 183, as amended, which Bill contains a provision that would preempt the home rule authority of the City to regulate the possession or ownership of assault weapons, unless the City adopts such a regulation not later than 10 days after House Bill 183 becomes law; and

**WHEREAS,** pursuant to the home rule powers of the City, and in order to protect both the home rule authority of the City and the public safety and welfare, the City Council desires to amend Chapter 134 of the City Code to prohibit the manufacture, sale, ownership, acquisition, or possession of assault weapons within the City; and

**WHEREAS**, the City Council has determined that it will serve and be in the best interest of the City and its residents to amend the City Code pursuant to this Ordinance;

**NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF HIGHLAND PARK, LAKE COUNTY, STATE OF ILLINOIS,** as follows:

**SECTION ONE:** **RECITALS.** The foregoing recitals are incorporated into, and made a part of, this Ordinance as the findings of the City Council.

**SECTION TWO:** **FIREARMS CONTROL.** Chapter 134, entitled "Handgun Control," of Title XIII, entitled "Misdemeanors," of the City Code is hereby re-titled "Firearms Control".

**SECTION THREE: ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES.** Chapter 134, entitled "Firearms Control," of Title XIII, entitled "Misdemeanors," of the City Code is hereby amended to add a new Section 134.010, which Section 134.010 hereafter reads as follows:

"Sec. 134.010  Assault Weapons and Large Capacity Magazines.

(A)     Whenever the following words and phrases are used, they shall, for purposes of this Section 134.010, have the meanings ascribed to them in this Section 134.010(A), except when the context otherwise indicates.

(1)     "Assault Weapon" means

(a)     A semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise and one or more of the following:

(i)     Only a pistol grip without a stock attached;

(ii)     Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii)     A folding, telescoping or thumbhole stock;

(iv)     A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or

(v)        A muzzle brake or muzzle compensator;

(b)        A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of ammunition;

(c)        A semiautomatic pistol that has the capacity to accept a detachable magazine and has one or more of the following:

(i)        Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(ii)        A folding, telescoping or thumbhole stock;

(iii)        A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

(iv)        A muzzle brake or muzzle compensator; or

(v)        The capacity to accept a detachable magazine at some location outside of the pistol grip;

(d)        A semiautomatic shotgun that has one or more of the following:

(i)        Only a pistol grip without a stock attached;

(ii)        Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(iii)        A folding, telescoping or thumbhole stock;

(iv)        A fixed magazine capacity in excess of five rounds; or

(v)        An ability to accept a detachable magazine;

(e)        Any shotgun with a revolving cylinder;

3

(f)     Conversion kit, part or combination of parts, from which an assault weapon can be assembled if those parts are in the possession or under the control of the same person;

(g)     Shall include, but not be limited to, the assault weapons models identified as follows:

(i)     The following rifles or copies or duplicates thereof:

(A)     AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR;

(B)     AR-10;

(C)     AR-15, Bushmaster XM15, Armalite M15, or Olympic Arms PCR;

(D)     AR70;

(E)     Calico Liberty;

(F)     Dragunov SVD Sniper Rifle or Dragunov SVU;

(G)     Fabrique National FN/FAL, FN/LAR, or FNC;

(H)     Hi-Point Carbine;

(I)     HK-91, HK-93, HK-94, or HK-PSG-1;

(J)     Kel-Tec Sub Rifle;

(K)     Saiga;

(L)     SAR-8, SAR-4800;

(M)     SKS with detachable magazine;

(N)     SLG 95;

(O)     SLR 95 or 96;

(P)     Steyr AUG;

(Q)     Sturm, Ruger Mini-14;

4

        (R)  Tavor;

        (S)  Thompson 1927, Thompson M1, or Thompson 1927 Commando; or

        (T)  Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz).

      (ii)  The following pistols or copies or duplicates thereof:

        (A)  Calico M-110;

        (B)  MAC-10, MAC-11, or MPA3;

        (C)  Olympic Arms OA;

        (D)  TEC-9, TEC-DC9, TEC-22 Scorpion, or AB-10; or

        (E)  Uzi.

      (iii)  The following shotguns or copies or duplicates thereof:

        (A)  Armscor 30 BG;

        (B)  SPAS 12 or LAW 12;

        (C)  Striker 12; or

        (D)  Streetsweeper.

  "Assault weapon" does not include any firearm that has been made permanently inoperable, or satisfies the definition of "antique firearm," stated in Section 134.001 of this Chapter, or weapons designed for Olympic target shooting events.

  (2)  "Detachable Magazine" means any ammunition feeding device, the function of which is to deliver one or more ammunition cartridges into the firing chamber, which can be removed from the firearm without the use of any tool, including a bullet or ammunition cartridge.

  (3)  "Large Capacity Magazine" means any ammunition feeding device with the capacity to accept more than ten rounds, but shall not be construed to include the following:

    (a)  A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds.

(b)    A 22 caliber tube ammunition feeding device.

(c)    A tubular magazine that is contained in a lever-action firearm.

(4)    "Muzzle Brake" means a device attached to the muzzle of a weapon that utilizes escaping gas to reduce recoil.

(5)    "Muzzle Compensator" means a device attached to the muzzle of a weapon that utilizes escaping gas to control muzzle movement.

(B)    No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine. This Section 134.010(B) shall not apply to:

(1)    The sale or transfer to, or possession by any officer, agent, or employee of the City or any other municipality or state or of the United States, members of the armed forces of the United States, or the organized militia of this or any other state; or peace officers, to the extent that any such person named in this Section 134.010(B)(1) is otherwise authorized to acquire or possess an assault weapon and/or large capacity magazine and does so while acting within the scope of his or her duties; or

(2)    Transportation of assault weapons or large capacity magazine if such weapons are broken down and in a nonfunctioning state and are not immediately accessible to any person.

(C)    Any assault weapon or large capacity magazine possessed, sold or transferred in violation of Section 134.010(B) of this Chapter is hereby declared to be contraband and shall be seized and destroyed of in accordance with the provisions of Section 134.010(E) of this Chapter.

(D)    Any person who, prior to the effective date of this Section 134.010, was legally in possession of an assault weapon or large capacity magazine prohibited by this Section 134.010 shall have 90 days from the effective date of this Section 134.010 to do any of the following without being subject to prosecution hereunder:

(1)    To remove the assault weapon or large capacity magazine from within the limits of the City;

(2)    To modify the assault weapon or large capacity magazine either to render it permanently inoperable or to permanently make it a device no longer defined as an assault weapon or large capacity magazine; or

(3)    To surrender the assault weapon or large capacity magazine to the Chief of Police or his or her designee for disposal as provided in Section 134.010(E) of this Chapter.

(E)     The Chief of Police shall cause to be destroyed each assault weapon or large capacity magazine surrendered or confiscated pursuant to this Section 134.010; provided, however, that no firearm or large capacity magazine shall be destroyed until such time as the Chief of Police determines that the firearm or large capacity magazine is not needed as evidence in any matter.  The Chief of Police shall cause to be kept a record of the date and method of destruction of each Firearm or Large Capacity Magazine destroyed pursuant to this Chapter.

(F)     The violation of any provision of this Section 134.010 is a misdemeanor, punishable by not more than six months imprisonment or a fine of not less than $500 and not more than $1000, or both."

**SECTION FOUR:**  **PUBLICATION.**  The City Clerk shall be, and is hereby, directed to publish this Ordinance in pamphlet form pursuant to the Statutes of the State of Illinois.

**SECTION FIVE:**  **EFFECTIVE DATE.**  This Ordinance shall be in full force and effect from and after its passage, approval, and publication in the manner provided by law.

AYES:

NAYS:

ABSENT:

PASSED:

APPROVED:

PUBLISHED IN PAMPHLET FORM:

ORDINANCE NO.

_____
Nancy R. Rotering, Mayor

ATTEST:

_____
Ghida S. Neukirch, City Clerk

#23629981_v4

7

# Exhibit B

**Declaration of Nancy Rotering,**
***Friedman v. City of Highland Park***, No. 1:13-cv-09073 (N.D. Ill. June 30, 2014) (Dkt. 45-1)

## DECLARATION OF NANCY ROTERING

I, Nancy Rotering, under penalty of perjury as set forth in 28 U.S.C. § 1746 declare as follows:

1. I serve as the Mayor of the City of Highland Park, Illinois ("*City*"). I have served the City as Mayor since May 2011. Prior to being elected as Mayor, I served as a member of the City Council from May 2009 until May 2011.

2. I have personal knowledge of the matters set forth in this Affidavit and can testify competently to such matters.

3. I was born in the City of Cincinnati, Ohio in 1961 and have lived in Highland Park for all but 18-years of my life.

4. As the legislative body for the City, the City Council is responsible for making policy and enacting laws that protect and preserve the public health, safety, and welfare of City residents, businesses, and visitors. Specifically, the City Council has the duty to prevent, to the greatest extent practicable, the commission of violent crimes within the City.

5. On June 24, 2013, the City Council adopted City Ordinance No. 68-13, prohibiting the manufacture, sale and possession of assault weapons and large capacity magazines within the City ("*Ordinance*"). A true and correct copy of the Ordinance, which bears my signature, is attached to this Affidavit as Exhibit A.

6. The City modeled its Ordinance after Cook County's assault weapon ban; with only minor non-substantive exceptions, the City's Ordinance is identical to the County's.

7.     The City deliberately chose Cook County's ordinance as a model because it has recently survived equal protection and vagueness challenges before the Illinois Supreme Court.

8.     As set forth in the Ordinance, the City Council believes that assault weapons pose an undue threat to public safety for the residents, property owners and visitors to the City.

9.     The City Council also expressed its concern that the recent mass shooting tragedies in Aurora, Colorado, Newtown, Connecticut, Tucson, Arizona and Santa Monica, California, could occur in Highland Park, unless proper public safety measures are taken. As Mayor, and as a mother of four, I am particularly concerned about preventing a school shooting similar to the massacre at Sandy Hook Elementary School in Newtown. That is what was on my mind throughout our consideration of the Ordinance: how unlikely an assault weapon massacre was in Newtown and how similar our communities are. I could not shake the thought that we could just as easily be those panicked and grief-stricken parents. In a similar vein, I wrote a letter to the Mayor of Aurora, Colorado, in the wake of their gun-related tragedy, empathizing with the agony his community was experiencing. Lastly, the tragedy that occurred when Laurie Dann attempted to ignite an incendiary device at one of our Highland Park elementary schools, then went on a shooting rampage at another school in nearby Winnetka was also on my mind. My concern for how vulnerable our schools and schoolchildren are played into our need to pass the Ordinance.

2

10.     The City Council believes that the City is not immune to gun violence, particularly gun violence involving assault weapons, and that the weapons pose a dangerous threat in the City and other suburban areas.

Nancy Rotering
Mayor
City of Highland Park

#27507543_v1

3

ORDINANCE NO. 68-13

AN ORDINANCE AMENDING CHAPTER 134 OF "THE HIGHLAND PARK
CODE OF 1968," AS AMENDED, REGARDING ASSAULT WEAPONS

WHEREAS, Chapter 134 of "The Highland Park Code of 1968," as amended (*"City Code"*), regulates the manufacture, sale, and possession of firearms in the City; and

WHEREAS, the Constitution of the United States of America and the Constitution of the State of Illinois afford certain protections related to the ownership of firearms; and

WHEREAS, in *District of Columbia v. Heller*, the United States Supreme Court recognized that the Constitutional protections related to firearm ownership is not unlimited, and can be subject to certain types of governmental regulations; and

WHEREAS, in its *Heller* decision, the United States Supreme Court specifically acknowledged that the protections afforded by the Second Amendment to the Constitution of the United States does not extend to all types of firearms; and

WHEREAS, many courts throughout the nation have upheld local regulations restricting or prohibiting the ownership or possession of assault weapons, including, without limitation, the State of Illinois Appellate Court, the United States District Court for the District of Columbia, and the Court of Appeals for the State of California; and

WHEREAS, recent incidents in Aurora, Colorado; Newtown, Connecticut; Tucson, Arizona; and Santa Monica, California demonstrate that gun violence is not limited to urban settings, but is also, tragically, a reality in many suburban and small town locations as well; and

WHEREAS, the City Council has determined that assault weapons are not traditionally used for self-defense in the City of Highland Park, and that such weapons pose an undue threat to public safety to residents, property owners, and visitors within the City of Highland Park; and

WHEREAS, the City has previously encouraged the Governor and the Illinois General Assembly to enact statewide legislation banning the sale and possession of assault weapons; and

WHEREAS, to date, the State has failed to enact a statewide ban on the sale or possession of assault weapons; and

WHEREAS, on May 31, 2013, the Illinois General Assembly approved House Bill 183, as amended, which Bill contains a provision that would preempt the home rule authority of the City to regulate the possession or ownership of assault weapons, unless the City adopts such a regulation not later than 10 days after House Bill 183 becomes law; and

WHEREAS, pursuant to the home rule powers of the City, and in order to protect both the home rule authority of the City and the public safety and welfare, the City Council desires to amend Chapter 134 of the City Code to prohibit the manufacture, sale, ownership, acquisition, or possession of assault weapons within the City; and

WHEREAS, the City Council has determined that it will serve and be in the best interest of the City and its residents to amend the City Code pursuant to this Ordinance;

NOW, THEREFORE, BE IT ORDAINED BY THE CITY COUNCIL OF HIGHLAND PARK, LAKE COUNTY, STATE OF ILLINOIS, as follows:

SECTION ONE:    RECITALS. The foregoing recitals are incorporated into, and made a part of, this Ordinance as the findings of the City Council.

SECTION TWO:    FIREARMS CONTROL. Chapter 134, entitled "Handgun Control," of Title XIII, entitled "Misdemeanors," of the City Code is hereby re-titled "Firearms Control".

Exhibit 1

**SECTION THREE: ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES.** Chapter 134, entitled "Firearms Control," of Title XIII, entitled "Misdemeanors," of the City Code is hereby amended to add a new Section 134.010, which Section 134.010 hereafter reads as follows:

"Sec. 134.010 Assault Weapons and Large Capacity Magazines.

    (A)    Whenever the following words and phrases are used, they shall, for purposes of this Section 134.010, have the meanings ascribed to them in this Section 134.010(A), except when the context otherwise indicates.

        (1)    "Assault Weapon" means

            (a)    A semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise and one or more of the following:

                (i)    Only a pistol grip without a stock attached;

                (ii)    Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

                (iii)    A folding, telescoping or thumbhole stock;

                (iv)    A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or

                (v)    A muzzle brake or muzzle compensator;

            (b)    A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of ammunition;

            (c)    A semiautomatic pistol that has the capacity to accept a detachable magazine and has one or more of the following:

                (i)    Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

                (ii)    A folding, telescoping or thumbhole stock;

                (iii)    A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

                (iv)    A muzzle brake or muzzle compensator; or

                (v)    The capacity to accept a detachable magazine at some location outside of the pistol grip;

            (d)    A semiautomatic shotgun that has one or more of the following:

                (i)    Only a pistol grip without a stock attached;

                (ii)    Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

                (iii)    A folding, telescoping or thumbhole stock;

2

        (iv)     A fixed magazine capacity in excess of five rounds; or

        (v)     An ability to accept a detachable magazine;

    (e)     Any shotgun with a revolving cylinder;

    (f)     Conversion kit, part or combination of parts, from which an assault weapon can be assembled if those parts are in the possession or under the control of the same person;

    (g)     Shall include, but not be limited to, the assault weapons models identified as follows:

        (i)     The following rifles or copies or duplicates thereof:

           (A)    AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR;

           (B)    AR-10;

           (C)    AR-15, Bushmaster XM15, Armalite M15, or Olympic Arms PCR;

           (D)    AR70;

           (E)    Calico Liberty;

           (F)    Dragunov SVD Sniper Rifle or Dragunov SVU;

           (G)    Fabrique National FN/FAL, FN/LAR, or FNC;

           (H)    Hi-Point Carbine;

           (I)    HK-91, HK-93, HK-94, or HK-PSG-1;

           (J)    Kel-Tec Sub Rifle;

           (K)    Saiga;

           (L)    SAR-8, SAR-4800;

           (M)    SKS with detachable magazine;

           (N)    SLG 95;

           (O)    SLR 95 or 96;

           (P)    Steyr AUG;

           (Q)    Sturm, Ruger Mini-14;

           (R)    Tavor;

           (S)    Thompson 1927, Thompson M1, or Thompson 1927 Commando; or

           (T)    Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz).

3

  (ii)  The following pistols or copies or duplicates thereof:

    (A)  Calico M-110;

    (B)  MAC-10, MAC-11, or MPA3;

    (C)  Olympic Arms OA;

    (D)  TEC-9, TEC-DC9, TEC-22 Scorpion, or AB-10; or

    (E)  Uzi.

  (iii)  The following shotguns or copies or duplicates thereof:

    (A)  Armscor 30 BG;

    (B)  SPAS 12 or LAW 12;

    (C)  Striker 12; or

    (D)  Streetsweeper.

"Assault weapon" does not include any firearm that has been made permanently inoperable, or satisfies the definition of "antique firearm," stated in Section 134.001 of this Chapter, or weapons designed for Olympic target shooting events.

  (2)  "Detachable Magazine" means any ammunition feeding device, the function of which is to deliver one or more ammunition cartridges into the firing chamber, which can be removed from the firearm without the use of any tool, including a bullet or ammunition cartridge.

  (3)  "Large Capacity Magazine" means any ammunition feeding device with the capacity to accept more than ten rounds, but shall not be construed to include the following:

    (a)  A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds.

    (b)  A 22 caliber tube ammunition feeding device.

    (c)  A tubular magazine that is contained in a lever-action firearm.

  (4)  "Muzzle Brake" means a device attached to the muzzle of a weapon that utilizes escaping gas to reduce recoil.

  (5)  "Muzzle Compensator" means a device attached to the muzzle of a weapon that utilizes escaping gas to control muzzle movement.

  (B)  No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine. This Section 134.010(B) shall not apply to:

  (1)  The sale or transfer to, or possession by any officer, agent, or employee of the City or any other municipality or state or of the United States, members of the armed forces of the United States, or the organized militia of this or any other state; or peace officers, to the extent that any such person named in this Section 134.010(B)(1) is otherwise authorized to acquire or possess an assault weapon and/or large capacity magazine and does so while acting within the scope of his or her duties; or

4

(2)     Transportation of assault weapons or large capacity magazine if such weapons are broken down and in a nonfunctioning state and are not immediately accessible to any person.

(C)     Any assault weapon or large capacity magazine possessed, sold or transferred in violation of Section 134.010(B) of this Chapter is hereby declared to be contraband and shall be seized and destroyed of in accordance with the provisions of Section 134.010(E) of this Chapter.

(D)     Any person who, prior to the effective date of this Section 134.010, was legally in possession of an assault weapon or large capacity magazine prohibited by this Section 134.010 shall have 90 days from the effective date of this Section 134.010 to do any of the following without being subject to prosecution hereunder:

(1)     To remove the assault weapon or large capacity magazine from within the limits of the City;

(2)     To modify the assault weapon or large capacity magazine either to render it permanently inoperable or to permanently make it a device no longer defined as an assault weapon or large capacity magazine; or

(3)     To surrender the assault weapon or large capacity magazine to the Chief of Police or his or her designee for disposal as provided in Section 134.010(E) of this Chapter.

(E)     The Chief of Police shall cause to be destroyed each assault weapon or large capacity magazine surrendered or confiscated pursuant to this Section 134.010; provided, however, that no firearm or large capacity magazine shall be destroyed until such time as the Chief of Police determines that the firearm or large capacity magazine is not needed as evidence in any matter. The Chief of Police shall cause to be kept a record of the date and method of destruction of each Firearm or Large Capacity Magazine destroyed pursuant to this Chapter.

(F)     The violation of any provision of this Section 134.010 is a misdemeanor, punishable by not more than six months imprisonment or a fine of not less than $500 and not more than $1000, or both."

**SECTION FOUR:  PUBLICATION.**  The City Clerk shall be, and is hereby, directed to publish this Ordinance in pamphlet form pursuant to the Statutes of the State of Illinois.

**SECTION FIVE:  EFFECTIVE DATE.**  This Ordinance shall be in full force and effect from and after its passage, approval, and publication in the manner provided by law.

AYES:            Mayor Rotering, Councilman Stone, Kaufman, Frank, Blumberg, Knobel

NAYS:            Councilman Naftzger

ABSENT:          None

PASSED:          June 24, 2013

APPROVED:        June 24, 2013

PUBLISHED IN PAMPHLET FORM: June 25, 2013

ORDINANCE NO.:  68-13

_Nancy R. Rotering, Mayor_

ATTEST:

_Glida S. Neukirch, City Clerk_

#23629981_v4

5

# Exhibit C

**Complaint, *Viramontes v. County of Cook*, No. 1:21-cv-04595**
**(N.D. Ill. Aug. 27, 2021) (Dkt. 1)**

# IN UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Cutberto Viramontes, an individual and resident of Cook County, Illinois; | : | |
| | : | No. |
| Rubi Joyal, an individual and resident of Cook County, Illinois; | : | |
| | : | |
| Christopher Khaya, an individual and resident of Cook County, Illinois; | : | |
| | : | |
| SECOND AMENDMENT FOUNDATION; *and* | : | |
| | : | |
| FIREARMS POLICY COALITION, INC., | : | |
| | : | |
| *Plaintiffs*, | : | **COMPLAINT** |
| | : | |
| v. | : | |
| | : | |
| THE COUNTY OF COOK, a body politic and corporate; | : | |
| | : | |
| TONI PRECKWINKLE, in her official capacity as County Board President and Chief Executive Officer of Cook County; | : | |
| | : | |
| KIMBERLY M. FOXX, in her official capacity as State's Attorney; *and* | : | |
| | : | |
| THOMAS DART, in his official capacity as Sheriff, | : | |
| | : | |
| *Defendants*. | : | |
| | : | |

Plaintiffs CUTBERTO VIRAMONTES, RUBI JOYAL, CHRISTOPHER KHAYA, SECOND AMENDMENT FOUNDATION ("SAF"), and FIREARMS POLICY COALITION, INC. ("FPC") (collectively, "Plaintiffs"), by and through counsel of record, bring this complaint against Defendants, the County of Cook, Illinois, and county officials responsible for enacting and

enforcing a county ordinance infringing the right of law-abiding citizens to keep and bear commonly possessed firearms for defense of self and family and for other lawful purposes, and allege as follows:

## **INTRODUCTION**

1. The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. Under this constitutional provision, citizens such as Plaintiffs Cutberto Viramontes, Rubi Joyal, and Christopher Khaya who are legally eligible to possess and acquire firearms, have a fundamental, constitutionally guaranteed right to keep common firearms for defense of self and family and for other lawful pursuits.

2. But Defendants have enacted and enforced a flat prohibition on the gift, transfer, acquisition, carry, or possession, of many common semiautomatic rifles—tendentiously labeled "assault weapons"—by ordinary citizens, making it criminal for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See* Code of Ordinances of Cook Cnty., Ill. §§ 54-212, 54-214(a) (Dec. 15, 2020), https://bit.ly/2Lcts75.

3. The County's very limited exemptions for certain persons from this broad criminal statute do not allow typical law-abiding citizens to keep and bear these common firearms. *See id.* § 54-212(a).

4. Defendants' enactment and enforcement of Cook County's prohibition on common semiautomatic rifles tendentiously and inaccurately labelled assault weapons denies individuals who reside in the County, including individual Plaintiffs and members of SAF and FPC, their fundamental, individual right to keep and bear common arms.

5. To be sure, Plaintiffs acknowledge that the result they seek is contrary to *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), and *Friedman v. City of Highland Park*, 784 F.3d

406 (7th Cir. 2015), but Plaintiffs submit those cases were wrongly decided. They therefore institute this litigation to vindicate their Second Amendment rights and seek to have *Wilson* and *Friedman* overruled.

## JURISDICTION & VENUE

6.    This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

7.    Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202 and 42 U.S.C. §§ 1983 and 1988.

8.    Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

9.    Plaintiff Cutberto Viramontes is a natural person, a resident of Cook County, Illinois, an adult over the age of 21, a citizen of the United States and the State of Illinois, and legally eligible under federal and state law to possess and acquire firearms. Plaintiff Cutberto Viramontes is a member of Plaintiffs SAF and FPC.

10.    Plaintiff Rubi Joyal is a natural person, a resident of Cook County, Illinois, an adult over the age of 21, a citizen of the United States and the State of Illinois, and legally eligible under federal and state law to possess and acquire firearms. Plaintiff Rubi Joyal is a member of Plaintiffs SAF and FPC.

11.    Plaintiff Christopher Khaya is a natural person, a resident of Cook County, Illinois, an adult over the age of 21, a citizen of the United States and the State of Illinois, and legally eligible under federal and state law to possess and acquire firearms. Plaintiff Christopher Khaya is a member of Plaintiffs SAF and FPC.

12.    Plaintiff Second Amendment Foundation ("SAF") is a 501(c)(3) nonprofit

educational foundation incorporated in 1974 under the laws of Washington with its principal place of business in Bellevue, Washington. SAF's mission is to preserve the individual constitutional right to keep and bear arms through public education, judicial, historical, and economic research, publishing, and legal-action programs focused on the civil right guaranteed by the Second Amendment to the United States Constitution. SAF has members nationwide, including in Cook County. SAF brings this action on behalf of its members, including Plaintiffs Cutberto Viramontes, Rubi Joyal, and Christopher Khaya, who seek to exercise their right to keep and bear common semiautomatic arms for lawful purposes in Cook County.

13.     Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a 501(c)(4) nonprofit organization incorporated under the laws of Delaware with a place of business in Sacramento, California. The purposes of FPC include defending and promoting the People's rights, especially, but not limited to, the fundamental, individual Second Amendment right to keep and bear arms, advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC brings this action on behalf of its members, including Plaintiffs Cutberto Viramontes, Rubi Joyal, and Christopher Khaya , who seek to exercise their right to keep and bear common semiautomatic arms for lawful purposes in Cook County.

14.     Defendant the County of Cook is a county in the State of Illinois. It is "a body politic and corporate" that "may . . . be sued." 55 Ill. Comp. Stat. Ann. 5/5-1001. As a county with an elected chief executive officer, it is permitted, under Illinois law, to "(1) exercise any power and perform any function pertaining to its government and affairs, or (2) exercise those powers within traditional areas of county activity, except as limited by the Illinois Constitution or a proper limiting statute, notwithstanding effects on competition." 55 Ill. Comp. Stat. Ann. 5/2-5016; *see*

*also* Ill. Const. art. VII, § 6. The County has exercised that power to pass its unconstitutional ban on rifles mischaracterized as assault weapons.

15. Defendant Toni Preckwinkle is President of the Cook County Board of Commissioners and the chief executive officer of the County. *Office of the President*, Cook County Government, https://bit.ly/2X1nmJq (last visited Dec. 31, 2020). As such, she is empowered to approve or veto any ordinance passed by the Board, 55 Ill. Comp. Stat. Ann. 5/2-5010, and obliged to "see that all of the orders, resolutions and regulations of the board are faithfully executed," *id.* 5/2-5009(a). The President approved the County's unconstitutional ban on rifles mischaracterized as assault weapons. *See Cook County Board Bans Assault Weapons, Toughens Penalties*, Cook County Government (July 17, 2013), https://bit.ly/380I1Ut.

16. Defendant Kimberly M. Foxx is State's Attorney for Cook County, Illinois. In such capacity, Foxx enforces the County's ordinances, including its unconstitutional ban on rifles mischaracterized as assault weapons. *See* 55 Ill. Comp. Stat. Ann. 5/3-9005. Foxx's ongoing enforcement of the "assault weapons" ban against Cook County residents places Plaintiffs Cutberto Viramontes, Rubi Joyal, and Christopher Khaya under imminent threat of prosecution should they violate the ban, which leaves them unable to keep common firearms. All similarly situated members of SAF and FPC in Cook County face the same clear threat of enforcement.

17. Defendant Thomas Dart is the Sheriff of Cook County, Illinois. In such capacity, Dart enforces the County's ordinances, including its unconstitutional ban on rifles mischaracterized as assault weapons. *See* 55 Ill. Comp. Stat. Ann. 5/3-6019; Code of Ordinances of Cook Cnty., Ill. §§ 54-212(b)–(c), 54-213 (Dec. 15, 2020), https://bit.ly/2Lcts75. Dart's ongoing enforcement of the "assault weapons" ban against Cook County residents places Plaintiffs Cutberto Viramontes, Rubi Joyal, and Christopher Khaya under imminent threat of arrest and

suffering confiscation should they violate the ban, which leaves them unable to keep common firearms. All similarly situated members of SAF and FPC in Cook County face the same clear threat of enforcement.

## FACTUAL ALLEGATIONS

### I.     COOK COUNTY'S UNCONSTITUTIONAL ORDINANCE

18.     In November 2006, the Cook County Board of Commissioners enacted, and in July 2013 they revised, the Blair Holt Assault Weapons Ban ("the Ordinance").

19.     In current form, the Ordinance labels many firearms in common use "assault weapon[s]" and criminalizes any act to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire, carry or possess" such firearms in Cook County. Code of Ordinances of Cook Cnty., Ill. §§ 54-211, 54-212(a) (Dec. 15, 2020), https://bit.ly/2Lcts75.

20.     This criminal prohibition "appl[ies] to all persons in Cook County," excepting only an "officer, agent, or employee of Cook County or any other municipality or state or of the United States, members of the armed forces of the United States; or the organized militia of this or any other state; or peace officers to the extent that any such person named in this subsection is otherwise authorized . . . and does so while acting in the scope of his or her duties." *Id.* §§ 54-210, 54-212(a)(1).[1]

21.     Any ordinary person in Cook County who legally possessed a so-called "assault weapon" before enactment must, under the Ordinance, remove it from county limits, modify it to render it permanently inoperable, or surrender it to the Sheriff. *Id.* § 54-212(c).

22.     The Ordinance declares "assault weapon[s]" to be "contraband"; it requires the

---

[1] The ban does not apply either to "[t]ransportation of assault weapons . . . if such weapons are broken down and in a nonfunctioning state and are not immediately accessible to any person." *Id.* §§ 54-212(a)(2).

Sheriff to seize such firearms and, if he ascertains that they are not "needed as evidence in any matter," to destroy them. *Id.* §§ 54-212(b), 54-213.

23.    A first-time violation of the Ordinance is a crime punishable by a $10,000 fine and six months in prison. *Id.* § 54-214(a).

## II.    THE ORDINANCE BANS RIFLES IN COMMON USE

24.    The Ordinance bans as an "assault weapon" any semiautomatic rifle with a capacity to accept a magazine holding more than ten rounds of ammunition, if it has any of the following features:

(A) Only a pistol grip without a stock attached;
(B) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;
(C) A folding, telescoping or thumbhole stock;
(D) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or
(E) A muzzle brake or muzzle compensator.

*Id.* § 54-211, *Assault weapon* ¶ (1); *see also id.*, *Large-capacity magazine*.

25.    Further, the Ordinance bans any "[c]onversion kit, part or combination of parts, from which an assault weapon can be assembled if those parts are in the possession or under the control of the same person." *Id.* ¶ (6).

26.    Finally, the Ordinance lists these specific examples of banned "assault weapons models":

(A) The following rifles or copies or duplicates thereof:

(i)     AK, AKM, AKS, AK-47, AK-74, ARM, MAK90, Misr, NHM 90, NHM 91, SA 85, SA 93, VEPR, Rock River Arms LAR-47, Vector Arms AK-47, VEPR, WASR-10, WUM, MAADI, Norinco 56S, 56S2, 84S, and 86S;
(ii)    AR-10;
(iii)   AR-15, Bushmaster XM15, Bushmaster Carbon 15, Bushmaster ACR, Bushmaster MOE series, Armalite M15, Armalite M15-T and Olympic Arms PCR;
(iv)    AR70;
(v)     Calico Liberty;

(vi)  Dragunov SVD Sniper Rifle or Dragunov SVU;
(vii)  Fabrique National FN/FAL, FN/LAR, or FNC;
(viii)  Hi-Point Carbine;
(ix)  HK-91, HK-93, HK-94, HK-USC and HK-PSG-1;
(x)  Kel-Tec Sub Rifle, Kel-Tec Sub-2000, SU-16, and RFB;
(xi)  Saiga;
(xii)  SAR-8, SAR-4800;
(xiii)  KS with detachable magazine;
(xiv)  SLG 95;
(xv)  SLR 95 or 96;
(xvi)  Steyr AUG;
(xvii)  Sturm, Ruger Mini-14, and Sturm, Ruger & Co. SR556;
(xviii)  Tavor;
(xix)  All Thompson rifles, including Thompson 1927, Thompson M1, Thompson M1SB, Thompson T1100D, Thompson T150D, Thompson T1B, Thompson T1B100D, Thompson T1B50D, Thompson T1BSB, Thompson T1-C, Thompson T1D, Thompson T1SB, Thompson T5, Thompson T5100D, Thompson TM1, Thompson TM1C and Thompson 1927 Commando;
(xx)  Uzi, Galil and Uzi Sporter, Galil Sporter, or Galil Sniper Rifle (Galatz);
(xxi)  Barret REC7, Barrett M82A1, Barrett M107A1;
(xxii)  Colt Match Target Rifles;
(xxiii)  Double Star AR Rifles;
(xxiv)  DPMS Tactical Rifles;
(xxv)  Heckler & Koch MR556;
(xxvi)  Remington R-15 Rifles;
(xxvii)  Rock River Arms LAR-15;
(xxviii)  Sig Sauer SIG516 Rifles, SIG AMT, SIG PE 57, Sig Saucer SG 550, and Sig Saucer SG 551;
(xxix)  Smith & Wesson M&P15;
(xxx)  Stag Arms AR;
(xxxi)  Baretta CX4 Storm;
(xxxii)  CETME Sporter;
(xxxiii)  Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR 110C;
(xxxiv)  Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000;
(xxxv)  Feather Industries AT-9;
(xxxvi)  Galil Model AR and Model ARM;
(xxxvii)  Springfield Armory SAR-48;
(xxxviii)  Steyr AUG;
(xxxix)  UMAREX UZI Rifle;
(xl)  UZI Mini Carbine, UZI Model A Carbine, and UZI Model B Carbine;
(xli)  Valmet M62S. M71S, and M78;
(xlii)  Vector Arms UZI Type;
(xliii)  Weaver Arms Nighthawk; and
(xliv)  Wilkinson Arms Linda Carbine.

-8-

*Id.* ¶ (7).

27.     Semiautomatic rifles "traditionally have been widely accepted as lawful possessions," *see Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle), and they too are in common use presently, *see Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use' as the plaintiffs contend."). Indeed, counting just "modern sporting rifles" (a category that includes semiautomatic AR-style and AK-style rifles), the number in circulation today approaches (and may exceed) twenty million. Indeed, a recent survey of gun owners indicates that about 24.6 million Americans have owned an AR-15 or similar rifle. *See* William English, 2021 National Firearms Survey at 1, https://bit.ly/3rYa13k. According to industry sources, more than one out of every five firearms sold in certain recent years were semiautomatic modern sporting rifles.

28.     The banned semiautomatic rifles, like all other semiautomatic firearms, fire only one round for each pull of the trigger. They are not machine guns. *See Staples*, 511 U.S. at 602 n.1. What is more, the designation "assault weapons" is a complete misnomer, "developed by anti-gun publicists" in their crusade against lawful firearm ownership. *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

29.     Rifles built on an AR-style platform are a paradigmatic example of the type of arm Cook County bans. AR-15 rifles, for example, are among the most popular firearms in the nation, and they are owned by millions of Americans.

30.     Central among the common uses of rifles banned in Cook County is defense of self in the home. For example, most AR-style firearms are chambered for 5.56x45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and common cartridge that is particularly

well suited for home-defense purposes because it has sufficient stopping power in the event a home intruder is encountered but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. Although most pistol rounds have less muzzle velocity than a 5.56x45mm NATO round, they have greater mass, maintain velocity after passing through walls and other objects, and pose substantially greater risk to unintended targets in the home. An AR-15 rifle chambered for 5.56x45mm NATO ammunition is an optimal firearm to rely on in a self-defense encounter.

31.     Like the AR-15 generally, the specific features banned by the Ordinance aid home defense. Folding, telescoping, and thumbhole stocks[2] reduce length- or weight-based obstacles to maneuverability without sacrificing the stability and thus accuracy that stocks may provide. *See* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 398–99 (1994).

32.     Muzzle brakes or compensators, thumbhole stocks, and protruding grips for non-trigger hands all reduce the "kick" or recoil in discharging a rifle and thereby enhances accurate fire (in particular for individuals of smaller stature, including, of course, many women).

33.     Absent, folding, and telescoping stocks also increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces.

34.     Most common semiautomatic rifles, including those banned under the Ordinance, can accept a detachable magazine. Detachable magazines not only assist law-abiding shooters to

---

[2] A folding stock, of course, folds toward the rest of the firearm.  A telescoping stock allows the length of the stock to be shortened or lengthened, consistent with the length of a person's arms. A thumbhole stock is partially carved out, reducing its weight and allowing the stock-holding thumb greater control over the weapon.

reload their weapon in stressful defense circumstances, but in the case of some platforms, including the AR-15, they are required to safely and quickly remedy malfunctions.

35. Encounters with criminal intruders in the home are not uncommon. For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive gun uses in the United States have determined that there are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property. Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. of Crim. L. & Criminology 150, 164 (1995).

36. Other common, lawful uses of the banned rifles are hunting and sport. At least a third of all gun-owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense, for owning a modern sporting rifle.

37. Here again, the banned features of rifles mischaracterized as assault weapons serve lawful purposes. Folding and telescoping stocks, for example, allow for safe transportation, including in a hiking pack, an ATV, or a boat. These stocks, as well as thumbhole stocks, also ease carrying over long distances while hunting. Detachable magazines have the same benefits in hunting and sport-shooting as they do in home defense—improved reloading and remedying of malfunctions. Muzzle brakes or compensators, thumbhole stocks, and protruding grips for non-trigger hands open hunting and sport-shooting to those for whom recoil represents a high barrier to entry. Lastly, a "shroud attached to the barrel . . . allow[s] the bearer to hold the firearm with

the non-trigger hand without being burned," a safety-enhancing feature that the Ordinance admits even while banning it.  *Id.* § 54-211, *Assault weapon* ¶¶ (1), (3), (4).

38.    By contrast, one use that is not common for so-called "assault rifles" is crime. According to a widely cited 2004 study, these arms "are used in a small fraction of gun crimes." This has long been true. *See* Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (evidence indicates that "well under 1% [of crime guns] are 'assault rifles.' "). Indeed, according to FBI statistics in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.), and 397 with blunt objects. *See* Expanded Homicide Table 8, Crime in the United States (FBI 2019), https://bit.ly/3lHABwE.

39.    The Ordinance's ban on acquiring, purchasing, receiving, transporting, possessing, and lawfully using an "assault weapon" is, therefore, a ban on keeping and bearing semiautomatic rifles that are commonly and overwhelmingly possessed and used for lawful purposes, including self-defense in the home.

## III.    THE EFFECT ON PLAINTIFFS

40.    Plaintiff Cutberto Viramontes lives in Chicago in Cook County. Viramontes intends and desires to exercise his right to keep and bear a so-called assault weapon, particularly a Smith and Wesson M&P rifle, for lawful purposes, especially for self-defense. The Smith and Wesson M&P as an AR-15 style rifle that is explicitly identified as illegal in the Ordinance. Viramontes would acquire, purchase or receive, as well as transport, possess, and lawfully use this firearm, were it not for Defendants' enactment and enforcement of Cook County's outright ban on these common arms. But in light of Defendants' actions, including their threats of arrest, confiscation, prosecution, fine and imprisonment, Viramontes continues to refrain from acquiring, purchasing, receiving, transporting, possessing, or lawfully using an M&P AR -15 rifle or any

similar firearm, for self-defense and other lawful purposes.

41.    Plaintiff Rubi Joyal lives in Chicago in Cook County. Joyal intends and desires to exercise his right to keep and bear a so-called assault weapon, particularly a Smith and Wesson M&P, for lawful purposes, especially for self-defense. The Smith and Wesson M&P is an AR-15 style rifle that is explicitly identified as illegal in the Ordinance. Joyal would acquire, purchase or receive, as well as transport, possess, and lawfully use this firearm, were it not for Defendants' enactment and enforcement of Cook County's outright ban on these common arms. But in light of Defendants' actions, including their threats of arrest, confiscation, prosecution, fine and imprisonment, Joyal continues to refrain from acquiring, purchasing, receiving, transporting, possessing, or lawfully using an M&P AR-15 rifle or any similar firearm, for self-defense and other lawful purposes.

42.    Plaintiff Christopher Khaya lives in Chicago in Cook County. Khaya intends and desires to exercise his right to keep and bear a so-called assault weapon, particularly an IMI Galil rifle, for lawful purposes, especially for self-defense. The IMI Galil is an AR-15 styled semi-automatic rifle that is explicitly identified as illegal in the Ordinance. Khaya would acquire, purchase or receive, as well as transport, possess, and lawfully use this firearm, were it not for Defendants' enactment and enforcement of Cook County's outright ban on these common arms. But in light of Defendants' actions, including their threats of arrest, confiscation, prosecution, fine and imprisonment, Khaya continues to refrain from acquiring, purchasing, receiving, transporting, possessing, or lawfully using an IMI Galil rifle or any similar firearm, for self-defense and other lawful purposes.

43.    Members of Plaintiffs SAF and FPC intend and desire to acquire, purchase, receive, transport, possess, or lawfully use semiautomatic rifles banned by the challenged provisions, and

are subject to and adversely affected by the restrictions articulated in this complaint on "assault weapons."

44.    But for the enactment and enforcement of the Ordinance, these members would forthwith obtain and possess such rifles, but cannot do so because they are considered "assault weapons."

45.    But for Defendants' enactment and enforcement of an unconstitutional Ordinance, and Defendants' enforcement thereof, and the criminal penalties associated with violations of the Ordinance, members of Plaintiffs SAF or FPC, including Plaintiffs Cutberto Viramontes, Rubi Joyal, and Christopher Khaya would exercise their right to keep and bear the banned firearms for lawful purposes, including self-defense, without the fear or risk of arrest and prosecution for engaging in constitutionally protected, lawful conduct.

## IV.    DEFENDANTS' LAWS AND REGULATIONS VIOLATE THE SECOND AMENDMENT.

46.    The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

47.    The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

48.    The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J., concurring).

49.    "The very enumeration of the right [to keep and bear arms] takes out of the hands

of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008).

50.      "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634–35.

51.      At the same time, indeed for this reason, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582 (citations omitted).

52.      The rifles at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding people possess at home by the millions. And they are, moreover, exactly what they would bring to service in militia duty, should such be necessary. As the Southern District of California recently explained in finding California's "assault weapons" ban unconstitutional, "the AR-15 rifle is the perfect combination of home defense weapon and homeland defense equipment." *Miller v. Bonta*, 2021 WL 2284132 (S.D. Cal. June 4, 2021).

53.      In *Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

54.      This is "'a natural right which the people have reserved to themselves, confirmed by the Bill of Rights.'" *Id.* at 594 (quoting A Journal of the Times: Mar. 17, New York Journal, Supp. 1, Apr. 13, 1769).

55.      When seconds count, and the police are minutes or hours away, if they come at all—they certainly have no obligation to, *see, e.g.*, *Town of Castle Rock v. Gonzales*, 545 U.S. 748

(2005)—the People have a constitutional right to make use of common firearms for effective self-defense and not to be disarmed by the enactment and enforcement of the Ordinance.

56.     Further, the Second Amendment protects "arms . . . of the kind in common use . . . for lawful purposes like self-defense." *Heller*, 554 U.S. at 624 (quotation marks and citation omitted).

57.     Assuming ordinary citizens are not disqualified from exercising Second Amendment rights, the State must permit them to keep and bear common rifles for lawful purposes.

58.     The right to keep and bear common rifles guaranteed under the Bill of Rights cannot be subjected to laws and regulations that prohibit ordinary, law-abiding citizens from keeping and bearing common firearms—particularly when such schemes place these citizens under constant threat of criminal sanction for violating them.

59.     The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Id.* at 636.

60.     Yet, this is precisely how the Ordinance in Cook County operates, completely shutting out ordinary, law-abiding citizens from exercising their rights in the County.

## COUNT ONE

### 42 U.S.C. § 1983 Action for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the United States Constitution

61.     Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

62.     There is an actual and present controversy between the parties.

63.     The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of states their fundamental right to keep and bear arms, both in the home and in public.

64.     The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty, and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

65.     The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire, purchase, receive, transport, possess, and lawfully use common rifles for all lawful purposes, including self-defense.

66.     Under paragraphs 1 and 3 through 6 of the "Assault weapon" definition in section 54-211 of the Code of Ordinances of Cook County, Illinois, in combination with sections 54-210 and 54-212 through 54-214 of the same, the County bans rifles that are commonly used for lawful purposes, grounding this ban on features that do not make a firearm more powerful or dangerous. No adequate basis exists for such a ban.

67.     Also banned under sections 54-210 and 54-212 through 54-214 are semiautomatic rifles permitted under federal law but listed in paragraph 7 of the "Assault weapon" definition in section 54-211. No adequate basis exists to restrict such firearms, which fire only once per trigger pull, like all other semiautomatic firearms.

68.     42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

69.     Defendants, individually and collectively, and under color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the County of Cook, including Plaintiffs Cutberto Viramontes, Rubi Joyal, Christopher Khaya, and all similarly situated members of Plaintiffs SAF or FPC through enactment and enforcement of the Ordinance.

70.     For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

## PRAYER FOR RELIEF

71.    WHEREFORE, Plaintiffs respectfully pray for the following relief:

a.    A declaratory judgment that the Ordinance's ban on semiautomatic rifles and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs Cutberto Viramontes, Rubi Joyal, Christopher Khaya, and all similarly situated members of Plaintiffs SAF or FPC, from exercising their fundamental right to keep and bear arms, including by acquiring, purchasing, receiving, transporting, possessing, and lawfully using common semiautomatic rifles banned under the Ordinance for all lawful purposes including self-defense, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution;

b.    A preliminary and permanent injunction prohibiting each Defendant, and each Defendant's respective employees, officers, agents, representatives, all those acting in concert or participation with him or her, from enforcing the Ordinance's ban on semiautomatic rifles and all related regulations, policies, and/or customs designed to enforce or implement the same;

c.    An award of nominal damages against Defendant County of Cook;

d.    Attorney's fees, expert fees, and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and,

e.    Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Dated: August 27, 2021

Respectfully submitted,

/s/ Christian D. Ambler
    Christian D. Ambler – ARDC#6228749
STONE & JOHNSON, CHTD.
111 West Washington Street
Suite 1800
Chicago, Illinois 60602
(312) 332-5656
cambler@stonejohnsonlaw.com

David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com

       *Pro hac vice application
       forthcoming

     *Attorneys for Plaintiffs*